## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Andrew Lyles, #667516

       Plaintiff,

v.

Papendick et al

       Defendants,

Case No.: 2:19-cv-10673
District Judge: Laurie J. Michelson
Magistrate Judge: Kimberly Altman

| | |
|---|---|
| LAURENCE H. MARGOLIS P.C.<br>Ian Cross (P83367)<br>Attorney for Plaintiff<br>214 S. Main St., Suite 200<br>Ann Arbor, MI 48104<br>(734) 994-9590<br>ian@lawinannarbor.com | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A., LL.M. (P37603)<br>Devlin K. Scarber (P64532)<br>Attorneys for Sharon Oliver, M.D. and Keith Papendick, M.D.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>rchapman@chapmanlawgroup.com<br>dscarber@chapmanlawgroup.com |
| Michigan Dept. of Attorney General<br>Jennifer A. Foster (P75947)<br>Attorney for MDOC Defendants<br>P.O. Box 30217<br>Lansing, MI 48909<br>(517) 335-3055<br>fosterj15@michigan.gov | |

## DEFENDANTS SHARON OLIVER, M.D. AND KEITH PAPENDICK, M.D.'S MOTION FOR SUMMARY JUDGMENT

## PROOF OF SERVICE

NOW COME Defendants SHARON OLIVER, M.D., and KEITH PAPENDICK, M.D., ("Defendants"), by and through their attorneys, CHAPMAN LAW GROUP, and bring this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7.1, stating as follows:

1.      Plaintiff, Andrew Lyles, filed his Complaint in this matter on March 6, 2019 while incarcerated at Lakeland Correctional Facility (**ECF No. 1**). Plaintiff claims deliberate indifference to his serious medical needs under 42 U.S.C. § 1983. Specifically, Plaintiff alleges Defendants failed to diagnose or provide appropriate treatment for his ulcerative colitis.

2.      The medical records demonstrate that Defendants Sharon Oliver, M.D., and Keith Papendick, M.D., provided Plaintiff with appropriate medical treatment on each occasion of their involvement.

3.      Notwithstanding that Defendants provided appropriate medical treatment in all respects, the law holds that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir. 1976). An alleged "misdiagnosis of an ailment" does not constitute deliberate indifference. *Johnson v Karnes*, 398 F.3d 868, 875 (6th Cir. 2005). "[A] medical professional who assesses patient's condition and takes steps to provide

medical care, based upon the condition the professional has perceived, is not acting with indifference. Even if the professional's assessment is ultimately incorrect, the professional acted to provide medical care. *Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019).

4.      Defendants bring this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

5.      The undersigned counsel certifies that on November 11, 2021, counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; however, concurrence could not be obtained.

6.      For the reasons set forth in the Brief accompanying this Motion, there is no genuine issue of material fact remaining, and Defendants are entitled to summary judgment in their favor.

WHEREFORE, Defendants SHARON OLIVER, M.D., and KEITH PAPENDICK, M.D. respectfully request that this Honorable Court grant their Motion for Summary Judgment, dismiss all claims against them with prejudice, and provide any and all such other relief as the Court deems just and equitable.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated:  November 11, 2021      /s/Devlin Scarber
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Devlin K. Scarber (P64532)
Attorneys for Sharon Oliver, M.D. and
Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Andrew Lyles, #667516

      Plaintiff,

v.

Papendick et al

      Defendants,

Case No.: 2:19-cv-10673
District Judge: Laurie J. Michelson
Magistrate Judge: Kimberly Altman

---

LAURENCE H. MARGOLIS P.C.
Ian Cross (P83367)
Attorney for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
(734) 994-9590
ian@lawinannarbor.com

Michigan Dept. of Attorney General
Jennifer A. Foster (P75947)
Attorney for MDOC Defendants
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
fosterj15@michigan.gov

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Devlin K. Scarber (P64532)
Attorneys for Sharon Oliver, M.D.
and Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
dscarber@chapmanlawgroup.com

---

## BRIEF IN SUPPORT OF
## DEFENDANTS SHARON OLIVER, M.D. AND KEITH PAPENDICK,
## M.D.'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

**Page**

INDEX OF AUTHORITIES.......................................................................... iii

INDEX OF EXHIBITS ............................................................................... v

STATEMENT OF ISSUES PRESENTED................................................vi

CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT....... vii

STATEMENT OF MATERIAL FACTS ................................................1

LEGAL STANDARD...............................................................13

LEGAL ARGUMENT...............................................................14

A.  THERE IS NO GENUINE DISPUTE THAT THE DEFENDANTS' ACTIONS DID NOT CONSTITUTE DELIBERATE INDIFFERENCE………………….... 14

1. OBJECTIVE COMPONENT………………………………………………..17

2. SUBJECTIVE COMPONENT………………………………………….....19

RELIEF REQUESTED............................................................25

## INDEX OF AUTHORITIES

<u>CASES</u>

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970)............................................ vii, 13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)...................................... vii, 13

*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004)………………...15, 17

*Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019)….16, 24

*Cox v Kentucky Dept. of Transportation*, 53 F.3d 146 (6th Cir. 1995)....................14

*Dominguez v. Correctional Med. Servs.*, 555 F.3d 543 (6th Cir. 2009)…………..23

*Duchon v. Cajon Co., 791 F.2d 43 (6th Cir. 1986)*..................................................13

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................. vii, 14

*Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009)..........................................................14

*Ferrari v. Ford Motor Co.*,826 F.3d 885 (6th Cir. 2016)........................................14

*Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005)…………….19

*Gibson v. Matthews*, 926 F.2d 532 (6th Cir. 1991)…………………………..vii, 19

*Johnson v Karnes*, 398 F.3d 868, 875 (6th Cir. 2005) ……………………………20

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990)..................................14

*Minion v Lindsey*, 2021 U.S. Dist. LEXIS 60832, at *19-20 (WD Ky, Mar. 30, 2021)……………………………………………………………………………23

*Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001)……..…………………17

*Pearce v. Faurecia Exhaust Systems, Inc.*, 529 Fed. Appx. 454 (6th Cir. 2013).....14

*Rhinehart v. Scutt*, 2018 U.S. App. LEXIS 17749; 2018 FED App. 0127P (6th Cir. 2018)……………………………………………………………………..…23,24

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................................................13

*Street v. JC Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ..................................14

*Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976)............................................ 16, 20

*Williams v. Mehra*, 186 F.3rd 685 (6th Cir. 1999) ............................................... viii

*Wilson v. Seiter*, 501 U.S. 294 (1991) ..........................................................vii, viii

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ...........................................................20

**S**TATUTES

42 U.S.C. § 1983 ............................................................................. vii, 1, 23

**F**EDERAL **R**ULES OF **C**IVIL **P**ROCEDURE

Fed. R. Civ. P. 56 ............................................................................. vii, 13

## <u>INDEX OF EXHIBITS</u>

**EXHIBIT A**        Relevant Portions of Plaintiff's MDOC Medical Records

**EXHIBIT B**        Deposition of Sharon Oliver, M.D.

**EXHIBIT C**        Deposition of Keith Papendick, M.D.

**EXHIBIT D**        Affidavit of Randall R. Stoltz, M.D., C.C.H.P. (Correctional Medicine)

**EXHIBIT E**        Relevant Portions of Plaintiff's McLaren Medical Records

**EXHIBIT F**        Plaintiff's Response to Defs. Request for Admission 5/31/21

**EXHIBIT G**        Affidavit of Michael Duffy, M.D., F.A.C.G.

**EXHIBIT H**        *Minion v Lindsey*, 2021 U.S. Dist. LEXIS 60832, at *19-20 (WD Ky, Mar. 30, 2021)

## <u>STATEMENT OF ISSUES PRESENTED</u>

WHETHER THE COURT SHOULD GRANT
SUMMARY JUDGMENT TO SHARON OLIVER,
M.D., AND KEITH PAPENDICK, M.D., WHERE
THERE IS NO GENUINE ISSUE OF MATERIAL FACT
REGARDING PLAINTIFF'S CLAIMS AGAINST
THEM.

Defendants Answer:                          YES.
Plaintiff Answers:                           NO.

## <u>CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u>

Under Fed. R. Civ. P. 56, summary judgment is proper if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment is appropriate if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In a 42 U.S.C. § 1983 case, in order to find any defendant liable, liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th. Cir. 1991).

A claim made by an inmate or detainee that his constitutional right to medical treatment was violated is analyzed under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). To state a 42 U.S.C. § 1983 claim for a violation of a prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle*, 429 U.S. 97. To succeed on a claim of deliberate indifference, Plaintiff must satisfy two elements, an objective one and a subjective one. He must show he had a serious medical need, and he must show that defendant, being aware of that need, acted with deliberate indifference to

it. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991); *Williams v. Mehra*, 186 F.3rd 685,

691 (6th Cir. 1999).

# I. <u>STATEMENT OF MATERIAL FACTS</u>

### A.   <u>Procedural Facts</u>

Plaintiff, Andrew Lyles, filed his Complaint in this matter on March 6, 2019 while incarcerated at Lakeland Correctional Facility (**ECF No. 1**). Plaintiff claims deliberate indifference to his serious medical needs under 42 U.S.C. § 1983. Specifically, Plaintiff alleges Defendants failed to diagnose or provide appropriate treatment for his ulcerative colitis.

On July 18, 2019, this Court entered an order dismissing Corizon Medical Services from this case, holding: "Lyles fails to allege that [Corizon] actively engaged in unconstitutional behavior. Instead, he asserts conclusory allegations that they had policies or customs that caused him serious harm and pain." "Lyles fails to plead any specific facts suggesting that the execution of a policy created by Defendant Washington or Corizon caused the alleged Eighth Amendment violations, and they will be dismissed from this action." (**ECF No. 6, PageID.47**). Therefore, <u>there are no *Monell* claims against Corizon and no viable claim that there was some</u> <u>sort of unconstitutional policy of Corizon that motivated Drs. Papendick or Oliver</u> <u>to not approve a colonoscopy, including for any alleged cost-saving reasons.</u>

### B.   <u>Substantive Facts</u>

Plaintiff presented to health care on November 7, 2016 complaining of lower abdominal pain ongoing for the past three (3) weeks with occasional blood in stool

(**Ex A**, MDOC records, 658). Plaintiff had not submitted any prior kites on this issue. He was assessed by Nurse Carla Gross for these complaints. Nurse Gross notified Corizon's Joshua Buskirk, P.A., of Plaintiff's complaints. The plan was for Plaintiff to obtain three (3) fecal occult blood tests (FOBTs) and notify health care if there is an increase in pain or bleeding (***Id.*** at 660).

On November 10, 2016, Plaintiff was seen by Dr. Sharon Oliver, M.D., for his gastrointestinal complaints. His FOBT tests were positive, and Plaintiff presented with abdominal pain, bloating, and distension. Plaintiff stated that he has been having pain for the past three (3) weeks with occasional bright red blood in stool. Plaintiff's abdominal pain at this visit was "not as bad as it previously was but was still present." His FOBT was negative on November 7, 2016, and positive on November 8, 2016 and November 9, 2016.  He denied any other complaints at this appointment. His weight was noted as 194.6 (2.6 lbs. higher than November 7th). Dr. Oliver ordered an x-ray of the abdomen and labs. The plan was to evaluate the x-ray and labs, and then consider a gastrointestinal (GI) consult depending on the results. Plaintiff was told to kite if problems occurred. (***Id.*** at 663-665). Dr. Oliver testified that ***she relied upon her training and experience*** in treating Mr. Lyles (**Ex B**, 41).

Later this same day, Nurse Melynda Ruether, R.N., called Plaintiff to answer his medical questions. Plaintiff stated he did not have any pain today until after he

started eating. This had been waxing and waning for three (3) weeks. He denied having a bowel movement or bleeding at this time. (*Id.* at 669).

The x-ray performed on November 10, 2016 revealed Plaintiff was constipated (*Id.* at 668).

On November 17, 2016, Plaintiff presented to Dr. Oliver for a follow up examination. Plaintiff complained of continued lower left quadrant (LLQ) pain and had small hard stools with blood in toilet. He denied any other complaints at this time. Dr. Oliver examined his rectum ("looking for anything that could contribute to the diagnosis of pain and bleeding.") (**Ex B**, Oliver dep, 18-19). Dr. Oliver scheduled Plaintiff for an anoscopy. (**Ex A,** at 675-676). An anoscopy is an onsite procedure where she inserts a tube in the rectum checking for masses or ulcers in the lower part of the colon. (**Ex B**, 20). The plan was to consider a 407 request[1] if the anoscopy was negative. Plaintiff agreed to the plan and would kite if problems occurred. Dr. Oliver administered Protonix for his complaints. (**Ex A**, 676). Protonix is a medication that "helps to submit or place the acids into the digestive system to help with digestion." (**Ex B**, Oliver dep, 21).

On November 22, 2016, Dr. Oliver performed an anoscopy on Plaintiff and was assisted by Nurse Gross. This procedure revealed the peri-rectal area was normal to inspection and palpation (**Ex A**, 682-683). On November 22, 2016, Dr.

---

[1] "A 407 is a consult request."  (**Ex C**, Dr. Papendick, 11).

3

Oliver submitted a 407 request to see if a colonoscopy was appropriate. (*Id.* at 678-679).

On November 23, 2016, Dr. Papendick, (who works in the utilization management for Corizon and reviews 407 requests) deferred the request on the basis that the bleeding was most likely caused by the constipation, which is a common cause of rectal bleeding and abdominal pain. Dr. Papendick recommended clearing the constipation. Specifically, Dr. Papendick's ATP stated:

> ATP: Medical necessity not demonstrated at this time. Clear constipation. Consider utilizing Senna 8.6 mg up to 2 tabs bid, scheduled not PRN, and re-evaluate at the time that Abdominal films demonstrate resolution of constipation. (*Id.* at 679).

Dr. Papendick testified regarding his role in this matter, stating: "Utilization management is the department that reviews requests for off-site visits and looks at, in *our medical judgment*, looks at whether they are best for the patient." (**Ex C**, Papendick dep, 9). In Dr. Papendick's medical judgment, constipation was a primary concern and likely cause of the Plaintiff's symptoms:

<div style="margin-left: 2em;">

                              27
24   Q.   So why did you issue this ATP instead of approving this
25         request for a colonoscopy?
                              28
1    A.   First of all, if he's constipated, you can't do an
2          adequate colonoscopy in a constipated individual.  You
3          have to clear the constipation and prove it's been
4          cleared.
5                Second, in the prison population, constipation
6          is a horrible problem and, unfortunately, that is more
7          common than any of the other reasons for bright red

</div>

8        bleeding in the population. (**Ex C**, 27-21).

On December 1, 2016, Dr. Oliver saw Plaintiff for a follow-up visit. Plaintiff stated that he was having bowel movements only three (3) times a week at this time, when previously he would have bowel movements 3-5 times a day. This is consistent with Dr. Papendick's alternative treatment plan to clear constipation. The plan was to start Plaintiff on Milk of Magnesium (MOM) and Senna to relieve constipation and re-evaluate abdominal x-ray for obstruction. Plaintiff was to kite if problems worsened. (**Ex A**, 689-691)

On December 8, 2016, an abdominal x-ray was performed on Plaintiff, which revealed a normal abdomen, but did not specifically indicate that the constipation had been cleared (***Id.*** at 694).

On December 12, 2016, Plaintiff sent a kite requesting an eye exam for his continued headaches. He did not make any complaints of abdominal pain (***Id.*** at 696).

On December 22, 2016, Dr. Oliver submitted a follow-up 407 request for GI consult (***Id.*** at 702-703), based only upon the December 8th x-ray. On December 23, 2016, Dr. Papendick again deferred this request. His ATP was as follows:

> ATP: Medical necessity not demonstrated at this time. Treat constipation with scheduled senna 8.6 2 tabs bid, prove clearance with abd. film and re-evaluate. (***Id.*** at 703).

5

Dr. Papendick testified that he reviewed the December 22nd request, and determined, in his medical judgment, that the phrase "visceral outlines appeared to be unremarkable" means that "they can see the bowel." (**Ex C**, Papendick dep, 35).

```
                          35
25  Q.  What does it mean that the gaseous pattern appeared normal
                          36
 1      throughout?
 2  A.  That he had the correct amount of gas in his colon.
 3  Q.  What's the clinical significance of that?
 4  A.  Well, you can have the correct amount of gaseous patterns
 5      appearing normal throughout with constipation. There's
 6      nothing in this that says constipation is cleared. (Ex C, 36)
```

On January 6, 2017, Dr. Oliver submitted a third request for a GI Consult (colonoscopy), in which she explained the abdomen x-ray results in a clearer manner regarding the patient's constipation and changed the order of the lab results to emphasize the labs (**Ex A,** at 709; **Ex C**, Oliver dep, 34-35).

On January 6, 2017, when Dr. Papendick reviewed the request along with the lab work, Dr. Papendick was concerned that, in his medical judgment, the patient's lab work and symptoms were inconsistent and continued to demonstrate constipation or other causes for the patient's symptoms. (See **Ex C**, Papendick, 30, "the lab data does not support [it]"):

```
                          32
24  Q.  So when you received this request, did you doubt that Mr.
25      Lyles actually had bright red blood in his stool?
                          33
 1  A.  I don't know that I doubted it. I noted that his
 2      hemoglobin was 15.4, which is rather normal for a male,
```

3      and somebody who had been bleeding significantly would not

4      have a hemoglobin of 15.4.  (**Ex C**, 32-33).

Therefore, he issued an alternative treatment plan (ATP) for the request, stating: "Medical necessity not demonstrated at this time. When symptoms demonstrate medical necessity, resubmit." (***Id.*** at 710).  Dr. Papendick discussed his medical decision analysis, further testifying:

            54

5  Q.  So why wasn't your ATP, in January, colonoscopy?

6  A.  Because <u>I didn't have the information that I needed to</u>

7     <u>prove that the colonoscopy, that the colonoscopy could be</u>

8     <u>done without a problem from the constipation.</u> (**Ex C**, 54)

\* \* \*

            64

17  <u>Were you utilizing your medical judgment when</u>

18     <u>you were responding to the 407 requests concerning Andrew</u>

19     <u>Lyles?</u>

20  **A.  Absolutely**.

21  Q.  <u>And was it your medical judgment, regarding your</u>

22     <u>understanding of his particular conditions, that served as</u>

23     <u>a basis for your determinations and decisions</u>?

24  **A.  Yes**.

25  Q.  Now, when receiving a 407 request regarding an undiagnosed

            65

1     GI bleed in the stool, what are the differentials that you

2     are considering?

3  A.  You have to consider infection, such as C. difficile --

4     that's capital C period d-i-f-f-i-c-i-l-e -- constipation,

5     hemorrhoids, inflammatory bowel disease, irritable bowel

6     disease, and colon cancer, or polyps that could be

7     pre-colon cancer.

8  Q.  Now, <u>do these conditions that you describe have common</u>

9     <u>symptoms, such as abdominal pain, change in bowel habits,</u>

10     <u>bright red blood in the stool and diarrhea?</u>

11  <u>A.  Yeah.</u>

12  Q.  And you talked about, in your experience, many inmates

7

13    suffering from constipation in the prison.
14         Why?  Why is that?
15  A.  Well, they have a low fiber diet.  I will tell you when I
16       was working at Duane Waters, we had patients who had said
17       they didn't want to drink water because they thought we
18       had poisoned it.  They don't have full access to movement,
19       to get out and have exercise that would help them with the
20       constipation.
21  Q.  Do the inmates also complain of diarrhea and bloody stool
22       with positive FOB tests and that's often caused by
23       constipation?
24  A.  Yes.  It's called post-obstructive constipation or --
25       excuse me -- post-obstructive diarrhea, where the

                          66

1     constipation is obstructing the bowel, the bowel contents
2       from coming down to the colon and, thus, the body
3       liquifies the stool above the constipation, it goes around
4       the constipation, and they actually get leaking a lot from
5       that.
6  Q.  What is -- it's a term -- what is loose stool overflow?
7  A.  That's what I was just describing.
8  Q.  Okay.  Is that what you were describing?
9  A.  Post-obstructive diarrhea.
10  Q.  Have you experienced, in your position with Corizon and
11       working in this capacity with inmates or reviewing
12       requests concerning inmates, that relieving constipation
13       will very often relieve an inmate's symptoms?
14  **A.  Absolutely**.  (**Ex C**, 64-66)
* * *

                          67

7  Q.  Was his hemoglobin and iron levels normal?
8  A.  Yes.
9  Q.  Does that play a role -- and I think you were discussing
10       that with Mr. Cross -- in your decision?
11  A.  Yes.  Yes, it does.
12  Q.  And why is that important for you?
13  A.  **Because significant, significant bleeding in the bowel, or**
14       **anywhere, would cause anemia.  And in this case there**
15       **wasn't anemia, so he hadn't lost a great deal of blood, if**
16       **he had lost any.**  Like I said, they could've

                          8

17        misinterpreted what the red was. (**Ex C**, 67)

Correctional medicine expert, Dr. Randall Stoltz, M.D., has reviewed medical

records of Mr. Lyles, and affirms:

> Dr. Papendick's decision to ATP the initial 407 colonoscopy requests
> was proper based on the facts and Mr. Lyles' presenting symptoms,
> testing, and lab work at that time. The initial X-rays showed
> constipation. Thus, it was reasonable to clear this first to see if this
> corrected the condition. Also, the lab work showed a normal blood
> count, which continued to be consistent with the effects of constipation
> as opposed to more serious conditions and suggested that a colonoscopy
> was not medically necessary on January 6, 2017.  With a normal blood
> count, and later with improvements in Mr. Lyles' bowel movements
> and medication treatments given, it a reasonable to believe that Mr.
> Lyles' symptoms and the causes of his symptoms were consistent with
> other medical conditions which did not require a colonoscopy at that
> point. (**Ex D**, Stolz Affidavit, ⁋9)

After January 6, 2017, Dr. Oliver continued to treat Plaintiff and any

continuing symptoms. On January 11, 2017, Dr. Oliver "instructed inmate to return

FOBT cards as completed (to check for any continued bleeding). She increased his

Protonix and added TUMS for further pain control. Will check for chronic

pancreatitis and inflammation. Will continue to follow up with inmate in CCC as

needed. He agreed to these plans and will kite if problems occur."  See (**Ex A**, 720-

722). Between January 11, 2017 and March 2017, Mr. Lyles demonstrated that his

symptoms had improved.  (**Ex B**, Oliver, 49). **On January 19, 2017, January 21,**

**2017, and January 23, 2017, Plaintiff's FOBT was negative, indicating that**

**there was <u>no bleeding</u>** (*Id.* at. 726). **Also, on both February 16, 2017 and**

February 17, 2017 his FOBT's were negative, **again indicating that there was no bleeding** (*Id.* at 728).

Dr. Papendick testified that clearing the constipation and treating the patient with antibiotics ("which would go along with the C-difficile differential diagnosis") led to improvement. (**Ex C**, 42, 68). "The patients get better, which did happen in this case." (*Id*. at 42).

On March 10, 2017, Dr. Oliver saw Plaintiff to follow-up on his condition. He gave the following history: **"the bleeding resolved after drinking lots of water but resumed last month. He denies any further abdominal pain. He voiced no other complaints at his appointment." "We reviewed past labs and x-rays that were in normal ranges."** (*Id.* at 733). Given this updated history, Dr. Oliver suspected hemorrhoids. Dr. Oliver's documented plan was: "Internal rectal bleed-fair. Suspect internal hemorrhoids. Renewed Tums. Will continue to follow in CCC as needed. Plaintiff agreed to this plan and will kite if problems occur." (*Id.* at 733).

Dr. Oliver therefore did not resubmit a 407 request until April 12, 2017, when Mr. Lyles began decompensating again. (**Ex B**, 49). Dr. Oliver documented on the April 12th 407 request that Plaintiff's latest episode began on March 30, 2017, and that on April 1, 2017, Plaintiff returned three (3) positive FOBT cards. (*Id.* at 754-755). Dr. Oliver requested a colonoscopy to "rule out diverticular disease of the colon and diagnose source of recurrent lower GI bleed." (*Id.*)  On April 13, 2021,

within one (1) day after being notified that Mr. Lyles' symptoms had returned and he was decompensating, Dr. Papendick approved this request. (*Id.* at 755).

Mr. Lyle's colonoscopy appointment was set for June 21, 2017. The earliest appointment was scheduled by the MDOC's secretary at the prison (**Ex B**, Oliver dep, 52). Scheduling is based upon the prison's protocols and based upon the outside medical facilities and providers that are utilized by the MDOC. Dr. Oliver has no control over that process and no influence over how quickly an appointment gets scheduled (**Ex B**, 51-52). It is quite common for an appointment of that nature to take approximately two (2) months. (**Ex B**, 52).

Beginning on April 26, 2017, Plaintiff presented with other medical concerns, including sores and ulcers in his mouth, which Dr. Oliver treated with medications and antibiotics, and an HIV test. Dr. Oliver also changed his diet to a soft diet. (See **Ex A**, MDOC records, 764-765,767,776-777). During that time period, Plaintiff also complained of having boils and itching on his leg and was believed to have an infection or MRSA (*Id.* at 781-782).

On June 7, 2017, Dr. Oliver saw Plaintiff for his dermatologic and mouth sore issues, and also noted that he would soon be undergoing the colonoscopy on June 21, 2017, as scheduled. (*Id.* at 822-823)

On June 21, 2017, Plaintiff underwent the colonoscopy at McLaren Hospital. The biopsy report showed ulcerative colitis. (**Ex E**, McLaren records, 712, 713, 720,

11

721). For this condition, Dr. Oliver was required to put in a request for non-formulary medication of Mesalamine 400 mg (a nonsteroidal anti-inflammatory drug used to treat ulcerative colitis) which she got approved by the MDOC's ACMO, Dr. Coleman (MDOC records, at 848). Dr. Oliver obtained a 3-month prescription for Mr. Lyles. (*Id.* at 851).

On August 2, 2017, following continued complaints of abdominal pain, PA Buskirk of Corizon ordered Mr. Lyles' medication (Cipro, Flagyl, and Prednisone) and stat lab draws. PA Buskirk instructed Mr. Lyles to start a liquid diet and to contact healthcare if symptoms worsened. (*Id.* at 868-871). The same day, Mr. Lyles' symptoms did not improve, so an order for IV fluids was entered (*Id.* at 873-875). On August 2, 2017, in the evening, Mr. Lyles' condition worsened, and PA Buskirk referred him to the emergency room. While hospitalized, Mr. Lyles was treated for ulcerative colitis. On August 17, 2017, Mr. Lyles was released from the hospital to the prison infirmary, Duane Waters Hospital (DWH). Mr. Lyles was released from DWH back to his facility on September 26, 2017. Mr. Lyles was approved for his Inflectra IV injection to occur every two (2) months by Corizon Utilization Management (*Id.* at 1203-1204).

Plaintiff admits that that his claims are limited to the care provided between October 2016 and August 2017. (**Ex F**, Plt Resp to RFA, 5/31/21). As demonstrated by the above facts, the only period in which Defendants are alleged to have failed to

diagnose Plaintiff for ulcerative colitis is from November 7, 2016 through April 12, 2017 (a 5-month period).  For three (3) of those months (mid-January 2017 to early April 2017), Plaintiff improved with the care that Defendants provided.

## II. <u>LEGAL STANDARD</u>

Under Fed. R. Civ. P. 56, summary judgment is proper if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment is appropriate if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986). However, a party opposing a motion for summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id*. (quotations and citation omitted). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

13

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.. .." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). Conclusory statements without demonstrated evidentiary support will not defeat a motion for summary judgment. *Ferrari v. Ford Motor Co.*, 826 F.3d 885,897-898 (6th Cir. 2016) (quoting *Pearce v. Faurecia Exhaust Systems, Inc.*, 529 Fed. Appx. 454,458 (6th Cir. 2013). Moreover, a plaintiff cannot simply "replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). As the Sixth Circuit stated, a party responding to a summary judgment motion must "put up" supporting evidence or "shut up" regarding his claim. *Street v. JC Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989); *Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995).

### III. <u>LEGAL ARGUMENT</u>

**A.    There Is No Genuine Dispute That The Defendants' Actions Did Not Constitute Deliberate Indifference.**

The U.S. Supreme Court holds that deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" and therefore violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104

14

(1976). However, an action under the Eighth Amendment does not transform medical malpractice claims into constitutional violations "merely because the victim is a prisoner." *Id*. at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id*. To prevail on a claim of deliberate indifference, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennen*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 895 (6th Cir. 2004). To satisfy the objective component, an inmate's "sufficiently serious" medical need must be a condition "diagnosed by a physician as mandating treatment," or "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 897 (6th Cir. 2004). To satisfy the subjective component, a plaintiff must prove that the Defendants "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

A healthcare professional exercising medical judgment to determine what treatment is needed for a patient is not unconstitutional or illegal. A deliberate indifference claim is a more "stringent standard" than a traditional medical malpractice claim and the "misdiagnosis of an ailment" is insufficient to establish deliberate indifference. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir. 1976). The law holds that, so long as a Defendant provided medical treatment, "albeit carelessly or inefficaciously to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs." *Comstock, supra*. The reasoning for the "subjectively perceived" standard and requirement is:

> *Why is it necessary that a medical professional subjectively perceive facts from which to infer a substantial risk of harm, and then also draw that inference*? Because a medical professional who assesses patient's condition and takes steps to provide medical care, based upon the condition the professional has perceived, is not acting with indifference. Even if the professional's assessment is ultimately incorrect, the professional acted to provide medical care.

*Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019) (emphasis added).

1. **Objective Component**

Here, Defendants do not dispute that Mr. Lyles was ultimately diagnosed with ulcerative colitis. However, that diagnosis was not made until several months after Defendants started treating him. Therefore, prior to that time, it was not known and still remains unconfirmed that Plaintiff had ulcerative colitis, as his conditions were consistent with other less serious conditions, including constipation and hemorrhoids, and his condition did appear to improve with treatment that was provided. (**Ex B**, 49; **Ex C**, 42,68).

Moreover, for all relevant time frames, to the extent that Plaintiff contends that he had a serious medical need requiring treatment and that the treatment he received was inadequate and/or delayed, he must demonstrate resulting harm. *Blackmore v. Kalamazoo Cty.*, 390 F.3d at 898, citing *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001). An untreated ulcerative colitis does not worsen the condition.

> 2   Q.   What are the risks of leaving ulcerative colitis
> 3         untreated?
> * * *
> 6   A.   It does not cause any more -- any worsening of the
> 7         condition.  (**Ex C**, Papendick, 57).

See also Dr. Oliver's deposition, wherein she testified that no treatment would have prevented his disease or decompensation:

> 50
> 13   Q.   To your knowledge, is ulcerative colitis a

17

14      preventative disease?
**15    A.  No.**
16    Q.   Even if you had provided him with the appropriate
17          treatments for ulcerative colitis, could he have
18          still decompensated after that?
**19    A.   Yes.** (**Ex B**, 50).

Also, correctional medicine expert, Dr. Stoltz, affirms and will testify that

Plaintiff suffered no resulting harm from the alleged delay of treatment:

> The length of time until final diagnosis was reasonable in light of Mr. Lyles' symptoms and had no meaningful degree of influence on the outcome in this case. Ulcerative colitis is not a preventable or curable condition, other than removing one's entire colon.
>
>     \*   \*   \*
>
> Based upon the medical records and Mr. Lyles' presenting symptoms, I do not agree that an earlier diagnosis of ulcerative colitis should have been made. I do not believe that Mr. Lyles suffered any damages as a result of the care, treatment, and decision-making provided by Dr. Oliver or Dr. Papendick.  (**Ex D**, Stoltz Affidavit, ¶8, ¶13).

Additionally, expert gastroenterologist Dr. Michael Duffy, M.D., has affirmed

and will testify that the actions or alleged inactions of Dr. Oliver and Dr. Papendick

did not cause harm or worsen Plaintiff's condition:

> 10.    I do not agree with the argument that an earlier diagnosis should have been made. More likely than not, and within a reasonable degree of medical certainty, any earlier diagnosis and treatment in 2017 would not have prevented Mr. Lyles' ultimate need for surgery…
>
> 11.    Any alleged delay in diagnosis and treatment did not increase Mr. Lyles' risk for colon cancer. Ulcerative colitis is a chronic condition of unknown cause characterized by periods of remission and exacerbation. There is no known means to prevent the onset of this disease.

12.     Mr. Lyles did not suffer any medical damages from any alleged actions or inactions by Dr. Papendick or Dr. Oliver. (**Ex G**, Dr. Duffy Affidavit, ¶¶10, 11, 12).

Therefore, since Plaintiff cannot show, and the medical evidence does not suggest, that (1) he required treatment for ulcerative colitis prior to his ultimate diagnosis in June 2017, and (2) the allegedly delayed diagnosis or inadequate treatment caused him harm, Plaintiff's deliberate indifference claim fails as to establish the objective component.

## 2.  <u>Subjective Component</u>

The Court must analyze the subjective component of a deliberate-indifference claim "for each [Defendant] individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005); *see Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). Because Dr. Oliver assessed Plaintiff and implemented a reasonable treatment plan on each occasion of her involvement and exercised her medical judgment, Plaintiff cannot demonstrate the subjective component of his deliberate indifference claim against her. Similarly, because Dr. Papendick suggested a reasonable treatment plan on each occasion of his involvement and his decisions involved exercising his medical judgment, Plaintiff cannot demonstrate the subjective component of his deliberate indifference claim against him.

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a

deliberate indifference claim. *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). Courts typically do not intervene in questions of medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d 857 at n.5. Nor does an alleged "**misdiagnosis** of an ailment" constitute deliberate indifference. *Johnson v Karnes*, 398 F.3d 868, 875 (6th Cir. 2005).

Plaintiff cannot show that Dr. Oliver or Dr. Papendick "subjectively perceived" (and consciously disregarded) facts from which to infer substantial risk" to Plaintiff, particularly where they attempted to treat, and did treat, his conditions.

As the above "Statement of Facts" section demonstrates (**pgs. 1-12 above**), the Defendants provided an abundance of medical treatment to Plaintiff over the course of November 2017 through August 2017. Such treatment included numerous physical examinations, rectal examinations, multiple x-rays, an anoscopy procedure, numerous fecal occult blood tests, tests to determine whether Plaintiff had HIV;, providing numerous medications (Protonix, Senna, Tums, Tylenol, Triamcinolone Acetonide for mouth sores, Viscous lidocaine and Peridex, also for mouth sores, Bactrim for leg sores), and routine wound care and dressing changes, placing him on a soft diet,  routine follow-up visits to monitor the progression of his symptoms;

and generating differential diagnoses, including constipation, internal hemorrhoids and diverticulosis.  They ordered the colonoscopy after conservative management.

Plaintiff's symptoms actually improved for a period of time with the recommended treatment that was provided.  Between January 11, 2017 and March 2017, Mr. Lyles demonstrated that his symptoms had improved.  (**Ex B**, Oliver, 49). **On January 19, 2017, January 21, 2017, and January 23, 2017, Plaintiff's FOBT was negative, indicating that there was <u>no bleeding</u>** (**Exhibit A,** at 726). **Also, on both February 16, 2017 and February 17, 2017 his FOBT's were negative, again indicating that there was <u>no bleeding</u>** (*Id.* at 728).  Dr. Papendick testified that clearing the constipation and treating the patient with antibiotics ("which would go along with a C-difficile differential diagnosis") led to improvement. (**Ex C**, 42, 68). "The patients get better, which did happen in this case." (*Id*. at 42). On March 10, 2017, Dr. Oliver saw Plaintiff to follow-up on his condition. He gave the following history: "**the bleeding resolved after drinking lots of water, but resumed last month.  He denies any further abdominal pain.  He voiced no other complaints at his appointment."  "We reviewed past labs and x-rays that were in normal ranges."** (*Id.* at 733).

Not only did Dr. Oliver and Dr. Papendick testify that they were using their medical judgment in treating Plaintiff (**Ex B**, Oliver dep, 41; **Ex C**, Papendick dep,

10, 19, 42, 50, 64), but Plaintiff has acknowledged that they both were exercising

medical judgment.  At depositions, Plaintiff asked [BY MR. CROSS]:

> 18
> 18  Q.   So why **wouldn't you defer to the medical judgment of**
> 19       **Dr. Oliver** regarding whether a patient needs a given
> 20       off-site procedure?
> 21  A.   I've already explained that, that sometimes those
> 22       procedures that are requested are not the best for the
> 23       patient.
> *  *  *
> 19
> 5   Q.   So **why would you second guess her medical judgment?**
> 6   A.   I'm not second guessing; I'm making a medical judgment as
> 7        a utilization manager. (**Ex C**, Papendick, 18-19)

See also correctional medical expert Dr. Stoltz and gastroenterology expert

Dr. Duffy, who both affirm and will testify that the decisions involved in Mr. Lyle's

care involved the exercise of medical judgment:

> 14.     I conclude with a reasonable degree of medical certainty that the
> care provided by Dr. Oliver was proper and showed no omission or
> delay based on the documentation in the medical records. The
> assessment, diagnoses, and treatment of Mr. Lyles' complaints and
> symptoms involved the exercise of medical judgment by Dr. Oliver.
>
> 15.     In addition, Dr. Papendick used his medical judgment to decide
> at what point a colonoscopy was indicated and the records reveal a
> reasonable conservative medical management approach was done prior
> to the 407 approval. (**Ex D**, Dr. Stoltz' Affidavit, ¶¶13-14).
>
> *  *  *
> 6.      The assessment, diagnoses, and treatment of Mr. Lyles'
> complaints and symptoms involved the exercise of medical judgment
> by the defendants, Dr. Papendick and Dr. Oliver.  In my opinion, based
> upon the facts and evidence surrounding Mr. Lyles' medical course, Dr.
> Papendick and Dr. Oliver both exercised proper medical judgment at

all times during their involvement in Mr. Lyles' care. (**Ex G**, Dr. Duffy Affidavit, ¶6).

Both Dr. Oliver's and Dr. Papendick's respective medical judgment was reasonable and appropriate in light of the extensive medical records, their testimony, Plaintiff's questions, and according to retained experts Dr. Stoltz and Dr. Duffy. (**Exhibits D and G**). Accordingly, "this is not a case involving cursory treatment amounting to no treatment at all." *Rhinehart v. Scutt* at *32, citing and distinguishing *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 550-551 (6th Cir. 2009).

Disagreements between doctors, even two (2) prison doctors, regarding the appropriate course of treatment for a patient is not deliberate indifference:

> Even a difference of opinion between doctors does not rise to the level of a constitutional violation. *Lane v. Wexford Health Sources (Contreator)*, 510 F. App'x 385, 388 (6th Cir. 2013) (per curiam) (holding that **disagreements between two prison doctors do not show deliberate indifference but "suggest, at most, a difference in medical opinion, which is not actionable under § 1983");** *Chapman v. Parke*, 946 F.2d 894 (6th Cir. 1991) (**"[A] difference of opinion [between prisoner [\*20] and doctors or among the medical staff] regarding treatment or . . . need for surgery is insufficient to state a claim under the Eighth Amendment."**); *Haynes v. Ivens*, No. 08-CV-13091-DT, 2010 WL 420030, at *8 (E.D. Mich. Jan. 27, 2010) ("Plaintiff has done nothing more than allege a reasonable difference of medical opinion between two doctors, upon which his claim cannot proceed."). Consequently, the Court finds that Defendants have shown that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.

*Minion v Lindsey*, 2021 U.S. Dist. LEXIS 60832, at *19-20 (WD Ky, Mar. 30, 2021) (**Ex H**).

The fact that Plaintiff's symptoms were consistent with other conditions and did improve for a period of time with the recommended treatment, demonstrates that the medical judgments were reasonable and that the provided treatments appeared to be appropriate at various periods of time.

Importantly, Plaintiff Lyles has not alleged a medical malpractice claim, but only a deliberate indifference claim. As *Westlake* holds, state medical malpractice tort claims cannot be constitutionalized into *alleged* federal deliberate indifference claims wherein the court is being called upon to "second guess <u>medical judgments.</u>" *Westlake, supra,* at 860. Defendants Dr. Oliver and Dr. Papendick's actions were correct in all respects. But even if they somehow made a mistake, the law is clear that "<u>a medical professional who assesses patient's condition and takes steps to provide medical care, based upon the condition the professional has perceived, is not acting with indifference. Even if the professional's assessment is ultimately incorrect, the professional acted to provide medical care</u>." *Blaine, supra*, at 526. "A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful." *Rhinehart, supra*, at 738.

Additionally, given the fact that Plaintiff's *Monell* claim is dismissed and there is no viable claim of an unconstitutional policy (including costs-saving arguments) motivating either Dr. Papendick or Dr. Oliver to deny a colonoscopy

or to not treat Plaintiff's ulcerative colitis(**ECF No. 6, PageID.47**), there is no basis for any such argument or themes in this case. Moreover, any such argument is belied by the fact that Plaintiff was provided numerous treatments for his conditions, including the colonoscopy and extensive treatment for his ulcerative colitis.

Therefore, the law is well-settled that there is no genuine issue of material fact in this case that Defendants' actions in treating Plaintiff did not amount to deliberate indifference.

## IV. <u>RELIEF REQUESTED</u>

WHEREFORE, Defendants SHARON OLIVER, M.D., and KEITH PAPENDICK, M.D. respectfully request that this Honorable Court grant their Motion for Summary Judgment, dismiss all claims against them with prejudice, and provide any and all such other relief as the Court deems just and equitable.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated:  November 11, 2021  /s/Devlin Scarber
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Devlin K. Scarber (P64532)
Attorneys for Sharon Oliver, M.D. and
Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com

25

## <u>LOCAL RULE CERTIFICATION</u>

I, DEVLIN K. SCARBER, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3)

/s/Devlin K. Scarber
Devlin K. Scarber (P64532)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com

## <u>PROOF OF SERVICE</u>

I hereby certify that on November 11, 2021, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved non participants.

/s/Devlin K. Scarber
Devlin K. Scarber (P64532)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com