## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

ANDREW LYLES,

     Plaintiff,

v.

KEITH PAPENDICK, *et al*.,

     Defendants.

CASE NO. 2:19-cv-10673

HON.: Laurie J. Michelson
MAG.: Kimberly Altman

---

Laurence H. Margolis (P69635)
Ian T. Cross (P83367)
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI  48104
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

Ronald W. Chapman Sr., (P37603)
Delvin Scarber (P64532)
*Chapman Law Group*
Attorneys for Defendants Keith Papendick,
M.D. and Sharon Oliver, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: rchapman@chapmanlawgroup.com
Email: dscarber@chapmanlawgroup.com

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

i

## TABLE OF CONTENTS

| SECTION | PAGE |
| NO. | |
|---|---|
| Table of Contents…………………………………...………… | ii. |
| Index of Exhibits …………………………………………… | iii. |
| Statement of Issues Presented……...……………………….… | iv. |
| Controlling or Most Appropriate Authorities………….………..... | v. |

### Argument

| | |
|---|---|
| I) Statement of Material Facts…….…………………….….... | 1 |
| II) Plaintiff can satisfy the objective prong of the deliberate-indifference inquiry under either the *Blackmore* 'obviousness' standard or the *Napier* 'verifying-medical-evidence' standard…..…... | 16 |
| III) There is sufficient evidence for a jury to find that each Defendant was aware of, and disregarded, a substantial risk of serious harm……………………………….………………….. | 19 |
| IV) Conclusion…………………………………………… | 25 |

# INDEX OF EXHIBITS

**Exhibit A**: Selected Medical Records for Plaintiff Andrew Lyles

**Exhibit B:** Declaration of Dr. Myung "Scott" Choi, M.D.

**Exhibit C**: Deposition of Defendant Dr. Keith Papendick, M.D., 08-23-21

**Exhibit D**: Deposition of Defendant Dr. Sharon Oliver, M.D., 07-12-21

**Exhibit E**: Deposition of Plaintiff Andrew Lyles, 05-14-21

**Exhibit F:** Deposition of Dr. Keith Papendick in *Wright v. Corizon Health, Inc.*, 06-25-18

**Exhibit G:** Deposition of Dr. Keith Papendick in *Spiller v. Stieve*, 03-27-19

**Exhibit H:** Deposition of Dr. Keith Papendick in *Lashuay v. DeLine*, 11-19-18

**Exhibit I:** Dr. Keith Papendick Job Performance Evaluations

**Exhibit J:** Referral Request for Transportation, 02-27-18

**Exhibit K:** Selected Email Correspondence of Dr. Keith Papendick

**Exhibit L:** Written Discovery Responses of Defendant Dr. Keith Papendick

**Exhibit M:**  InterQual Criteria for Acute Lower GI Bleed (adult, 2016)

**Exhibit N:** InterQual Criteria for Positive FOBT Test (adult, 2016)

**Exhibit O:** UpToDate Flowchart for Evaluation of Hematochezia

**Exhibit P:** First 407 Request, 11-22-16

**Exhibit Q:** Second 407 Request, 12-22-16

**Exhibit R:** Third 407 Request, 01-06-17

**Exhibit S:** Fourth 407 Request, 04-12-17

<u>STATEMENT OF ISSUES PRESENTED</u>

1. Can Plaintiff demonstrate that he had an 'objectively serious medical need' under either the *Blackmore* 'obviousness' standard or the *Napier* 'verifying-medical-evidence' standard?

Plaintiff Answers: **YES**

Defendant Answers: **NO**


2. Is there sufficient evidence for a jury to find that Defendant Papendick was aware of, and disregarded, a substantial risk of serious harm when he denied Dr. Oliver's requests to send Plaintiff to a specialist in November 2016, December 2016, and January 2017?

Plaintiff Answers: **YES**

Defendant Answers: **NO**


3. Is there sufficient evidence for a jury to find that Defendant Oliver was aware of, and disregarded, a substantial risk of serious harm in February and March of 2017, when she knew that Plaintiff had abdominal pain, weight loss, and blood coming out of his anus for several months, but took no further action to determine the cause of the bleeding, and prescribed only TUMS?

Plaintiff Answers: **YES**

Defendant Answers: **NO**

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

1. *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004)

2. *Johnson v. Karnes*, 398 F.3d 868 (6th Cir. 2005)

3. *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001)

## I. Statement of Material Facts

Plaintiff Andrew Lyles suffers from ulcerative colitis. Because he is incarcerated, Mr. Lyles must rely on physicians provided by the healthcare contractor for the Michigan Department of Corrections ("MDOC") for his medical needs. At all times relevant to this case, the MDOC healthcare contractor was Corizon Health, Inc., and Mr. Lyles' primary-care physician was Dr. Sharon Oliver.

Mr. Lyles first began defecating blood in October of 2016. (**Ex. A**, Medical Records, pg. 52). On November 7, 2016, Mr. Lyles passed a large amount of bright red blood, and reported abdominal pain and rectal bleeding to nursing staff at the Saginaw Correctional Facility. (**Ex. A**, 52). To verify his self-reported rectal bleeding, nursing staff provided Mr. Lyles with a set of Fecal Occult Blood Test (FOBT) cards. An FOBT card is a method for testing for the presence of blood in stool. The patient swabs a stool sample onto the card, and a healthcare worker places a liquid reagent on the stool sample. If the stool sample contains blood, the reagent turns blue. (**Ex. B**, Declaration of Dr. Scott Choi, M.D. ¶ 13). Mr. Lyles' stool samples from November 8th and 9th of 2016 tested positive. (**Ex. A**, 49).

The blood that Mr. Lyles was passing in October and November of 2016 was liquid and bright red. Blood in stool is not always bright red; "typically when it's a stomach bleed, it's black." (**Ex. C,** Papendick Dep., 22). Black, tarry stools can

1

occur due to bleeding in the upper GI tract, or even because a patient has eaten red meat. (**Ex. C**, 22-23; **Ex. D**, Oliver Dep., 16). But as both Defendants agree, bright red blood in a patient's stool typically indicates bleeding somewhere in the lower gastrointestinal tract. (**Ex. C**, 23; **Ex. D**, 43-44).

Bright red blood passing out of the anus can occur due to a source of bleeding close to the anus, such as an anal fissure, genital warts, or hemorrhoids. (**Ex. C**, 23-24). Hemorrhoids or anal fissure, in turn, can be caused by constipation. (**Ex. B**, ¶ 23). So on November 17, 2016, Dr. Oliver digitally examined Mr. Lyles' anus and rectum to check for these potential causes of bleeding. (**Ex. A**, 47; **Ex. D**, 18-19; **Ex. E,** Lyles Dep., 32). Dr. Oliver did not find any potential sources of bleeding via her November 17th digital rectal examination. (**Ex. A**, 47; **Ex. D**, 19). Dr. Oliver then scheduled Mr. Lyles for another visit on November 22, so she could perform an anoscopy. (**Ex. A**, 48).

An anoscopy is a procedure in which a scope is inserted into the anus to visualize the rectum. (**Ex. D**, 20). The anoscopy revealed a normal rectum, allowing Dr. Oliver to rule out a rectal source of the bleeding. (**Ex. D**, 35-36). At this point, Dr. Oliver knew that blood was probably entering Mr. Lyles' gastrointestinal tract somewhere farther up in his large intestine (colon). (**Ex. D**, 16-17, 23). Colonic bleeding can indicate a number of serious pathologies,

2

including Crohns' disease, ulcerative colitis, or even colon cancer. (**Ex. C**, 21, 25-26; **Ex. D**, 30). The way to determine the cause of Mr. Lyles' colonic bleeding was to perform a colonoscopy. (**Ex. B**, ¶ 31; **Ex. C**, 26; **Ex. D**, 23, 47). Dr. Oliver believed that it was important to perform a colonoscopy on Mr. Lyles in late 2016, "[s]o that we would know exactly what we were trying to treat." (**Ex. D**, 37).

Although Dr. Oliver was the only physician who worked at the Saginaw Correctional Facility, (**Ex. D**, 9-10), she did not have the authority to order a colonoscopy. Dr. Oliver was required to seek pre-approval from Corizon's Utilization Management Department prior to referring a patient for any specialty care. (**Ex. D**, 23). Final decisions as to whether to approve specialist referrals were made by Dr. Keith Papendick, the Utilization Management Medical Director for Michigan prisons. (**Ex. D,** 38).

Dr. Papendick is a former family-medicine practitioner who is not board-certified in gastroenterology or in any other specialty. (**Ex. F**, Papendick Dep. in *Wright v. Corizon Health*, pg. 0022). Dr. Papendick does not treat patients, (**Ex. G**, Papendick Dep. in *Spiller v. Stieve*, pg. 35), has never spoken with Mr. Lyles, (**Ex. E**, 42), and to Dr. Oliver's knowledge, has never been to the Saginaw Correctional Facility. (**Ex. D**, 25). In addition to never seeing Mr. Lyles, Dr. Papendick did not

3

have access to any information about what treatment was best for Mr. Lyles that was unavailable to Dr. Oliver. (**Ex. C**, 18-19).

Dr. Papendick's primary job duty was to review requests for specialty-care referrals. He reviewed approximately 100 such referral requests per day. (**Ex. G**, 14-15). His options for responding to a request were "approve, ATP, and NMI, which is Need More Information." (**Ex. H**, Papendick Dep. in *Lashuay v. DeLine*, pg. 27). "ATP" stands for, "alternative treatment plan, that's what we call deferred." (**Ex. F**, pg. 26). Dr. Papendick creates these "Alternative Treatment Plans" himself, and they mostly consist of "a list of blurbs that I have developed over the years where I could just copy and paste." (**Ex. H**, pg. 28).

At his deposition in this case, Dr. Papendick was adamant that no portion of his annual performance evaluation is based on the percentage of referral requests that he "ATP's":

> 4 Q.  Do you receive performance evaluations in your job, sir?
> **5 A.  Yes, on how long it takes me to do a procedure -- or do an**
> **6       approval.**
> 7 Q.   Is a portion of your annual performance eval based on the
> 8        percentage of requests that you ATP?
> **9 A.   Absolutely not.**
> 10 Q.   It is not?
> **11 A.   It is not.**

(**Ex. C**, pg. 38).

4

However, Dr. Papendick's performance review clearly indicates that the percentage of requests that he "ATP'd" accounted for 25% of his overall score. (**Ex. I**, Papendick Performance Evaluation, pg. 009). Dr. Papendick also testified that the reason that primary-care providers need authorization from Utilization Management for *off*-site procedures, but not for *on*-site procedures, is the need for transportation for an off-site procedure:

> 1 Q.   Why do providers need approval from utilization management
> 2     for off-site procedures but not for on-site procedures?
> **3 A.   Because they have to have trans -- one major issue is they**
> **4     have to have transportation and they have to have approval**
> **5     for an off-site visit for transportation.**

(**Ex. C**, 17).

However, in 2018, when a provider submitted a request to Utilization Management to authorize transportation of Mr. Lyles to an MDOC-operated health center for twice-monthly Remicade infusions, Dr. Papendick explained that Utilization-Management's approval was not needed for transportation.[1] (**Ex. J**). And Mr. Lyles' medical records demonstrate that approval from Corizon's Utilization Management Department <u>*was required*</u> for consults with a specialist via telemedicine, which do not involve transporting the inmate to a location outside of the prison. (**Ex. A**, 1-5). The salient difference between services that required pre-approval from Corizon's Utilization Management Department, and those that did not, does not appear to be

---

1  "ACMO" stands for Assistant Chief Medical Officer, an MDOC employee.

5

*where* the service takes place, but rather *whether the service will be performed by an outside contractor*, (**Ex. D**, 23), who will consequently send Corizon a bill. (**Ex. C**, 11; **Ex. K**, Papendick Emails, pg. 6-9).

Dr. Papendick's employer provides him with access to two subscription medical reference databases to help him determine when specialty care referrals are appropriate: UpToDate (**Ex. H**, pg. 17), and InterQual. (**Ex. G**, pg. 33). Dr. Papendick claims that he did not consult these materials when deciding whether to approve Dr. Oliver's referral requests for Mr. Lyles. (**Ex. L**, Papendick Discovery Responses, RTPs 4, 9, 10, 11, 12). He also claims that he did not communicate with Dr. Oliver or anyone else at the Saginaw Correctional Facility about Mr. Lyles, other than via the ATPs he placed in Mr. Lyle's prison health record. (**Ex. L**, RTPs 5, 6). It is doubtful that Dr. Papendick actually remembers what materials he consulted when he denied these requests almost four years ago: he reviews approximately one hundred such requests per day, he has testified on multiple occasions that he does not typically remember anything about individual referral requests. (**Ex. G**, pg. 14-15; **Ex. H**, pg. 33). If Dr. Papendick did consult UpToDate or InterQual when evaluating the referral requests for Mr. Lyles, he would have seen that both resources recommend colonoscopy for an individual with Mr. Lyles'

6

symptoms. (**Ex. M**, InterQual Criteria for Acute Lower GI Bleed; **Ex. N**, InterQual Criteria for positive FOBT; **Ex. O**, UpToDate Hematochezia Flowchart).

On November 22, 2016, Dr. Oliver submitted a request to the Utilization Management Department to refer Mr. Lyles for a colonoscopy. (**Ex. P**, First 407 Request). She did so because his anoscopy was apparently normal, and she needed a colonoscopy to determine the cause of his pain and bleeding. (**Ex. D**, 23, 47). Dr. Papendick ATP'd this request. He wrote, in part, "ATP: medical necessity not demonstrated at this time." (**Ex. P**). Instead of a colonoscopy, Dr. Papendick instructed Dr. Oliver to administer a laxative to Mr. Lyles twice daily and then to take an X-ray of Mr. Lyles' abdomen to prove that no constipated stool was present. (**Ex. P**; **Ex. D**, 24-25).

Dr. Oliver did as instructed. From December 1st to December 15th of 2016, Mr. Lyles was administered a laxative. (**Ex. A**, 45). An x-ray was taken of his abdomen, and it showed that any constipation was cleared. (**Ex. D**, 27). In mid-December, Mr. Lyles was given a second set of FOBT cards to verify his claims that he continued to have bloody bowel movements. These cards were returned on December 20, 2016, and all three cards tested positive. (**Ex. A**, 44).

Dr. Oliver saw Mr. Lyles again on December 22, 2016. By this time, his constipation had resolved, in fact, he had diarrhea and was losing weight. (**Ex. A**,

7

43; **Ex. D**, 29). He continued to have abdominal pain and pass blood, and his recent weight loss indicated to Dr. Oliver "that his symptoms were worsening." (**Ex. D**, 28-29). So Dr. Oliver submitted another referral request for a gastroenterology consult. She did so, "[b]ecause I followed the recommendations of the alternative treatment plan, and the patient continued to have symptoms, so I was still looking for the cause of his symptoms." (**Ex. D**, 30).

Dr. Oliver and Dr. Papendick knew that Mr. Lyles' symptoms could indicate a variety of potentially serious pathologies, such as diverticulosis, polyps, colitis, Crohn's disease, ulcerative colitis, or even colorectal cancer. (**Ex. C**, 21, 25-26; **Ex. D**, 30). Defendants also knew that his symptoms were not caused by several common, relatively-benign pathologies, such as an anal fissure, hemorrhoids, or constipation, because, 1) Mr. Lyles had worsening symptoms but was no longer constipated, and 2) the anoscopy exam had ruled out anal tears and hemorrhoids. (**Ex. D**, 30-32, 35-36).  When constipation causes a patient to pass blood from their anus, it does so *via* the creation of bleeding hemorrhoids or an anal fissure, as the patient strains excessively while defecating. (**Ex. B**, ¶ 23). Constipation does not normally cause bleeding farther 'upstream' in the colon. (**Ex. B**, ¶ 24).

But despite his knowledge that Mr. Lyles had been in pain and passing blood since mid-October, his knowledge that Mr. Lyles' symptoms could indicate a

8

variety of serious medical conditions, and his knowledge that a colonoscopy was necessary to determine the cause of Mr. Lyles' symptoms, Dr. Papendick again overruled Dr. Oliver. On December 23rd, 2016, he issued an ATP that was identical to the ATP he had issued a month before, in response to Dr. Oliver's first request. (**Ex. Q**, Second 407 Request; **Ex. D**, 31-32).

Having no other recourse, on January 6, 2017, Dr. Oliver resubmitted the request for the third time. (**Ex. R**, Third 407 Request; **Ex. D**, 33). In the third request, Dr. Oliver explained: "**[o]n 12/20/16 he returned 3 FOBT positive cards, after clearing constipation.**" (**Ex. R**) (emphasis added). She reiterated that Mr. Lyles had no hemorrhoids, fissures, or condylomata, and that his rectal walls appeared normal. (**Ex. R**). Dr. Oliver further explained that Mr. Lyles was now defecating six to seven times per day, with bright-red blood in each bowel movement, and that he had lost seven pounds since the 1st of December. (**Ex. R**). Yet for the third time, Dr. Papendick did not approve the referral request. His 'Alternative Treatment Plan' was: "ATP: Medical necessity not demonstrated at this time. When symptoms demonstrate medical necessity, resubmit." (**Ex. R**).

According to Dr. Papendick, "medical necessity" is a guiding principle in his decisionmaking. (**Ex. H**, pg. 67-68). A specialty service is "medically necessary," by Dr. Papendick's definition of the term, if failure to immediately perform the

9

service presents a "risk to life or limb, or deficit in ADLs, activities of daily living." (**Ex. H**, pg. 58; **Ex. F**, pg. 0014; **Ex. K**, pp. 2-5). According to Dr. Papendick, a procedure that is necessary to prevent a risk of permanent disability that would limit the patient's future ability to earn a living would "probably not" be medically necessary. (**Ex. H**, pg. 58).

By January of 2017, Dr. Papendick knew that Mr. Lyles was not constipated. (**Ex. R**). He knew that Mr. Lyles did not have a rectal fissure or bleeding hemorrhoids. (**Ex. P**; **Ex. Q**; **Ex. R**). He knew that Mr. Lyles had been in pain and bleeding in his lower gastrointestinal tract for approximately three months, that lower GI bleeding can indicate a variety of serious medical conditions, (**Ex. C**, 21, 43-44), and that once authorized, a referral to a specialist would likely take more than a month to schedule within the prison healthcare system. (**Ex. C**, 43; **Ex. D**, 52). Yet Dr. Papendick chose to wait until Mr. Lyles' symptoms "demonstrate medical necessity," i.e., become either life-threatening, or so severe that Mr. Lyles could not complete daily activities, before authorizing a referral. (**Ex. K**, pg. 2-5).

Dr. Oliver saw Mr. Lyles again on January 11, 2017, two days after the third 'Alternative Treatment Plan' was issued by Dr. Papendick. Dr. Oliver reported that Mr. Lyles' "[o]verall appearance is chronically-ill appearing," (**Ex. A**, 41) which she explained means "[t]hat he was starting to look ill." (**Ex. D**, 44). She also noted

10

that he had lost a significant amount of weight, (**Ex. D**, 44), that he continued to have left-upper-quadrant pain and bloody bowel movements, and that "the pain is worsening despite taking Protonix." (**Ex. A**, 40). Mr. Lyles testified that during this visit, Dr. Oliver told him the following:

> I saw Dr. Oliver after the third consultation that she put in for me to get a colonoscopy got denied. I saw Dr. Oliver and she basically told me that she didn't know what else to do, that they not approving it, they don't really listen to her when she puts in these consultations, and the only thing she could think for me to do is to drink -- she told me to drink tons of water. She told me to drink tons of water for the next few days. "I'm going to call you back over here and I'm going to draw your labs, and hopefully the water that you intake will make the labs come up abnormal, and if you show up anemic enough, I can try to use that to send you out."

(**Ex. E**, Lyles Dep. pg. 75).

So Mr. Lyles drank a large volume of water, (**Ex. E**, 75), and Dr. Oliver ordered a blood draw for labs. (**Ex. A**, 39). But Dr. Oliver did not submit another referral request in January. Dr. Oliver next saw Mr. Lyles on March 10, 2017. She noted that he continued to report bright red blood in his bowel movements, his recent FOBT cards were positive, and he now had a palpable mass in his abdomen. (**Ex. A**, 37-38). The reason Dr. Oliver palpated Mr. Lyles' abdomen during her exams was to check for tumors. (**Ex. D**, 19). The mass that Dr. Oliver detected in March 2017 was new: when she performed a similar examination in November 2016, Mr. Lyles did not have a palpable mass. (**Ex. D**, 19; **Ex. A**, 47). Dr. Oliver

11

also knew that it was important to determine the *cause* of Mr. Lyles' rectal bleeding as early as 2016. (**Ex. D**, 46). She believed that "when we merely suppress or hammer our symptoms with quick fixes without investigating the cause of the symptoms, we're playing with fire. We're ignoring what's brewing within us." (**Ex. D**, 46). But Dr. Oliver made no referrals, conducted no additional investigation, and prescribed no treatment for Mr. Lyles' ongoing rectal bleeding at the March 10th appointment, other than TUMS. (**Ex. A**, 36-38).

Between mid-December of 2016 and early April of 2017, the only medications Dr. Oliver prescribed to Mr. Lyles were Protonix and TUMS. (**Ex. A**, 37, 41-42, 45). Protonix is a proton-pump-inhibitor. (**Ex. C**, 24; **Ex. D**, 21). Proton pump inhibitors inhibit the production of stomach acid. (**Ex. C**, 8). Both defendants knew that in the human gastrointestinal tract, the acid is located in the stomach, not in the large intestine. (**Ex. C**, 7; **Ex. D**, 21). So a proton pump inhibitor would "probably not" do anything to treat bleeding in the large intestine. (**Ex. C**, 25). Dr. Oliver specifically noted in all of her referral requests that Protonix was not effective for treating Mr. Lyles' symptoms. (**Ex. D**, 22-23, 36, 43-44).

The other medication Dr. Oliver prescribed in this time period, TUMS, is a mild antacid. (**Ex. B**, ¶ 18). Like Protonix, TUMS reduces the acidity of the

12

stomach. (**Ex. B**, ¶ 18). TUMS is not an effective treatment for lower GI bleeding, (**Ex. B**, ¶¶ 19, 20), and did not relieve the symptoms of Mr. Lyles' ulcerative colitis. (**Ex. E**, 35, 85).

On April 12, 2017, after Mr. Lyles had been defecating blood for approximately five months, Dr. Oliver submitted a fourth referral request for a colonoscopy. (**Ex. S**, Fourth 407 Request). This time, Dr. Papendick relented, and the request was approved. (**Ex. S**). But Mr. Lyles did not undergo a colonoscopy in April of 2017. It was not until May 9, just under four weeks after the approval was issued, that an MDOC medical scheduler managed to schedule an appointment for the procedure. (**Ex. A**, 33). And the appointment she scheduled was more than six weeks after that, on June 21, 2017. (**Ex. A**, 33). When Defendants were waiting for Mr. Lyles' symptoms to become more severe before approving/resubmitting the referral request, they were aware that additional lengthy delays between approval of a request and performance of the service were common within the MDOC healthcare system. (**Ex. C**, 43; **Ex. D**, 52).

In the seventy-day period between April 12th, the date the fourth referral request was submitted, and June 21st, the date of the colonoscopy was performed, Mr. Lyles' health continued to deteriorate. His ulcerative colitis, initially relatively mild, became severe. (**Ex. B**, ¶ 36). He developed extra-intestinal manifestations of

13

ulcerative colitis, including a skin lesion called pyoderma gangrenosum which caused external ulcers to develop on his shoulder, thigh and calf, and aphthous ulcers in his mouth and throat causing dysphasia and odynophasia. (**Ex. A**, 28-31, 34; **Ex. B**, ¶ 36). Per Mr. Lyles, the skin lesions "start like a little pimple and opens up. Just look like a hole . . ." (**Ex. E**, 29). Over one hundred ulcers developed in his mouth and throat, and nursing staff needed to numb his throat with triamcinolone acetonide and lidocaine in order to allow him to eat. (**Ex. E**, 77; **Ex. A**, 25-27, 34-35).  Mr. Lyles needed to defecate at least thirty times a day, (**Ex. E**, 29), and he continued losing weight, even though by April he had already lost approximately twenty pounds. (**Ex. E**, 76). In total, Mr. Lyles lost over a third of his body weight, dropping from approximately 196 lbs before his symptoms began to 124 lbs by the end of September of 2017. (**Ex. E**, 87).[2]

On June 21, 2017, Dr. Radoslav Coleski performed a colonoscopy on Mr. Lyles at McLaren Hospital in Lansing. Dr. Coleski took biopsies of the colon and ordered a test of a stool sample for C. Difficile infection.[3] (**Ex. A**, 20-24). On the

---

2  Mr. Lyles is 6'4". (**Ex. A**, 50).

3  Mr. Lyles was negative for C. Difficile. (**Ex. A**, 24). Although Dr. Papendick suggested C. Difficile infection as a possible cause of Mr. Lyles' symptoms, Dr. Papendick never ordered a test of Mr. Lyles' stool for C. Difficile and never recommended antibiotics. (**Ex. C**, 65, 68; **Ex. P**; **Ex. Q**; **Ex. R**; **Ex. S**). Mr. Lyles did not 'improve' (ECF 66, PageID.459) in February and March of 2017 due to antibiotics: he did not receive any antibiotics until May 18, 2017, when Bactrim was prescribed for his pyoderma gangrenosum abscesses. (**Ex. A**, 31-

basis of the colonoscopy and biopsies, Mr. Lyles was diagnosed with ulcerative colitis. He began treatment with oral balsalazide on July 11, 2017. (**Ex. A**, 19).

While oral balsalazide is often used successfully to treat mild ulcerative colitis, by July of 2017, Mr. Lyles' ulcerative colitis had progressed to a moderate-to-severe state and therefore required more aggressive treatment. (**Ex. B**, ¶ 38). Two weeks after starting treatment with balsalazide, Mr. Lyles was still having bloody diarrhea, suffering from aphthous ulcers, and losing weight. (**Ex. A**, 14-18). By August 2nd, Mr. Lyles was too weak to walk. (**Ex. A**, 11-13). He was going to the bathroom every five to ten minutes, passing only a yellow liquid. (**Ex. A**, 13). A healthcare worker at the prison, P.A. Bushkirk, ordered him transported to the ER. (**Ex. A**, 10).

Mr. Lyles remained hospitalized in various facilities for nearly two months, from August 2nd, 2017 to September 26th, 2017. (**Ex. E**, 77-79). He received aggressive treatment during these hospitalizations: Mr. Lyles began taking Prednisone, a steroid, and IV infusions of Remicade (infliximab), to induce remission of his disease. (**Ex. A**, 7). Once remission was achieved, an attempt was made to wean Mr. Lyles off of Prednisone, but it was not successful. (**Ex. B**, ¶ 44). As a result, Mr. Lyles became corticosteroid-dependent for several years. (**Ex. B**, ¶

---

32). Pyoderma gangrenosum is non-bacterial, and is caused by uncontrolled ulcerative colitis. (**Ex. B**, ¶ 36).

15

44). Mr. Lyles was in extreme pain for much of his seven-week hospitalization, requiring morphine and MS Contin for pain control as he continued to rapidly lose weight. (**Ex. A**, 9). Mr. Lyles' weight dropped to 134 lbs by September 6, 2017, (**Ex. A**, 6), and 124 lbs by September 26. (**Ex. E**, 87). When Mr. Lyles was stabilized and returned to the Saginaw Correctional Facility in late September, Dr. Oliver told him that he was lucky to still have a colon, and lucky to be alive. (**Ex. E**, 79).

## Legal Argument

### II. Plaintiff can satisfy the objective prong of the deliberate-indifference inquiry under either the *Blackmore* 'obviousness' standard, or the *Napier* 'verifying-medical-evidence' standard.

Defendants claim that Mr. Lyles' ulcerative colitis did not constitute an objectively serious medical need. Citing the discussion of *Napier v. Madison Cnty,* 238 F.3d 739 (6th Cir. 2001) in *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004), they argue that to establish the objective component in cases involving a delay in providing treatment, Lyles "must demonstrate resulting harm." Then, they claim that no harm results from failing to treat ulcerative colitis. (ECF No. 66, PageID.466).

First, *Blackmore* clearly stands for the opposite proposition:

we hold today that where a plaintiff's claims arise from an injury or illness "so obvious that even a layperson would easily recognize the necessity for a

16

doctor's attention," *Gaudreault*, 923 F.3d at 208, **the plaintiff <u>need not</u> present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated.** Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.

*Blackmore*, 390 F.3d 890, 899-900 (6th Cir. 2004) (emphasis added).

Dr. Oliver admits that Mr. Lyles actually experienced a need for medical treatment for ulcerative colitis in late 2016. (**Ex. D**, 37, 46, 53). While *Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001) held that "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay," *Id.* at 742, *Blackmore* subsequently limited *Napier*'s holding "to those claims involving minor maladies or non-obvious complaints." *Blackmore*, 390 F.3d at 898. This is because delaying treatment of a prisoner's medical condition, when the need for treatment is obvious, exposes the prisoner to unnecessary risks: "the test for deliberate indifference is whether there exists a '***substantial risk*** of serious harm,' *Farmer*, 511 U.S. at 837, (emphasis added), and does not require actual harm to be suffered." *Blackmore* at 899.

In light of *Blackmore*, a plaintiff can satisfy the objective component in a delay-of-treatment case in one of two ways. The plaintiff can either show that he had symptoms that would demonstrate an obvious need for medical attention, such

17

as abdominal pain and vomiting, *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021), or he can place medical evidence in the record, such as an affidavit from an expert, demonstrating that he suffered some detrimental effect from the delay in treatment. *Johnson v. Karnes*, 398 F.3d 868, 874-75 (6th Cir. 2005).

Mr. Lyles' condition satisfies the objective component under either method. First, his symptoms evidenced an obvious need for medical treatment. Dr. Oliver admitted that in January of 2017, Mr. Lyles was visibly "chronically ill appearing." (**Ex. D**, 44). Mr. Lyles testified, "I was in excruciating pain and defecating blood." (**Ex. E**, 35). In *Blackmore*, similar testimony of severe abdominal pain and vomiting, which is "a clear manifestation of internal physical disorder," was sufficient to establish the objective component under the obviousness standard. *See Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021) (citing and explaining *Blackmore*).

Mr. Lyles has also placed medical evidence in the record of the detrimental effect of the delay in treatment. His retained expert, board-certified gastroenterologist Dr. Scott Choi, M.D., will testify that "when ulcerative colitis goes untreated, the disease progresses in severity," (**Ex. B**, ¶ 34), and that the delay in treating Mr. Lyles' ulcerative colitis caused various detrimental effects, including pyoderma gangrenosum, severe weight loss, and long-term steroid

18

dependency. (**Ex. B**, ¶¶ 36, 39, 45). If Mr. Lyles' need for treatment were not obvious, this would be sufficient to satisfy the *Napier* test for summary judgment purposes. *Johnson v. Karnes*, 398 F.3d 868, 874-75 (6th Cir. 2005). Even Dr. Oliver admits that it is important to provide treatment for ulcerative colitis, and that a purpose of providing treatment is to attempt to prevent the progression of the disease. (**Ex. D**, 53-54).

### III. There is sufficient evidence for a jury to find that each defendant was aware of, and disregarded, a substantial risk of serious harm.

The subjective component of the deliberate-indifference test is satisfied when a defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Since most defendants "do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence . . . a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009).

19

Importantly, the relevant subjective-component inquiry is whether a defendant **knew of and disregarded a substantial risk of serious harm**, not whether the defendant exercised "medical judgment," or provided *some* treatment rather than no treatment for the prisoner's ailment. *See Lemarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). As explained in *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001):

> Although defendants strenuously argue that "if medical treatment is given it is not a courts [sic] job to second guess the treatment given," Appellant's Reply Br. at 1, the issue is not whether McCrary provided some medical attention to Montgomery, but rather whether McCrary's conduct evinced deliberate indifference to Montgomery's serious medical needs. Defendants' position is, apparently, that if a prison doctor offers some treatment, no matter how insignificant, he cannot be found deliberately indifferent. This is not the law: as the Supreme Court noted in *Estelle*, 429 U.S. at 104-05 & n.10, a prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment.

> *Comstock*,  273 F.3d at 707 n.5 (6th Cir. 2001).

When viewing the evidence in the light most favorable to Mr. Lyles and drawing all reasonable inferences in his favor, a jury could conclude that Dr. Papendick knew of and disregarded a substantial risk of serious harm on November 23, 2016, December 23, 2016, and January 9, 2017, when he repeatedly

prevented Mr. Lyles' treating physician from referring Mr. Lyles to a specialist to determine the cause of his rectal bleeding. (**Ex. D**, 47).[4]

Dr. Papendick knew that bright red blood passing from a patient's anus indicates bleeding in the lower GI tract. (**Ex. C**, 23). He knew that relatively benign causes of the bleeding, such as hemorrhoids, constipation, or a tear in the lower rectum, had already been ruled out by Dr. Oliver. (**Ex. R**). He knew that bleeding farther up the in colon can indicate a variety of serious medical conditions that require prompt diagnosis and treatment. (**Ex. C**, 21, 25-26). Dr. Papendick did not need to have actual knowledge that Mr. Lyles' bleeding was caused by ulcerative colitis: awareness of a ***substantial risk*** to the prisoner is enough. *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009); *See also, Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001) (noting that "a prison official may not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.")

---

4 Where a decision to deny the care recommended by the patient's treating physician is made by "non-treating, non-examining supervisors," such persons cannot escape liability by claiming that their decision to deny care represents a mere, "difference of opinion regarding medical treatment." *Sildack v. Corizon Health, Inc.*, 2014 U.S. Dist. LEXIS 121801 at *18-*19 (E.D. Mich. 2014); *See also, Strayhorn v. Caruso*, 2015 U.S. Dist. LEXIS 114980 at *30-*31 (E.D. Mich. 2015).

Yet, Dr. Papendick chose not to authorize a referral on these occasions. A jury could infer that he did so because his job was to minimize the utilization of outside medical services to the greatest extent possible, (**Ex. C**, 29-30; **Ex. K**, 6-9), and his performance was measured, in part, on the basis of the percentage of specialist referrals that he could "contain[]." (**Ex. C**, 30; **Ex. I**, pg. 009). A jury could thus find that Dr. Papendick was "aware of [Plaintiff's] obvious and serious need for medical treatment and delay[ed] medical treatment of that condition for non-medical reasons," which satisfies the subjective component. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). A factfinder may also infer that Dr. Papendick acted with deliberate indifference from the fact "that he repeatedly acted in a certain manner. In such cases, the repeated acts, viewed singly and in isolation, would appear to be mere negligence; however, viewed together and as a pattern, the acts show deliberate indifference." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (emphasis added).

Dr. Oliver exhibited deliberate indifference later, between mid-January and early April of 2017, when she stopped trying to determine the cause of Mr. Lyles' lower GI bleeding. Dr. Oliver initially attempted to diagnose and treat Plaintiff's condition. (**Ex. D**, 46-47). But after her third referral request was denied by Dr. Papendick, Dr. Oliver gave up. Until April, she took no further action to try to

22

determine the cause of Mr. Lyles' symptoms and prescribed no further treatment, other than TUMS. (**Ex. E**, 85-87).

Dr. Oliver cites *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976), and *Youngberg v. Romeo*, 457 U.S. 307 (1982),  to argue that because she provided "some medical attention" and exercised "medical judgment," her conduct is beyond Eighth-Amendment scrutiny. (ECF No. 66, PageID.468-69). These cases are inapposite. *Youngberg* does not concern the Eighth-Amendment deliberate-indifference standard at all, but rather a substantive Due Process right possessed by mentally-retarded, civilly-committed persons to "minimally adequate habilitation," meaning a program of "training and development of needed skills." *Youngberg*, 457 U.S. at 316-17.

*Westlake* was decided in 1976, before the Supreme Court developed the modern framework for analyzing Eighth Amendment claims in *Estelle v. Gamble,* 429 U.S. 97 (1976),  *Wilson v. Seiter*, 501 U.S. 294 (1991), and *Farmer v. Brennan*, 511 U.S. 825 (1994). Sixth Circuit cases published after *Farmer* have explicitly rejected the argument that a prison doctor is not deliberately-indifferent so long as "medical judgment" is exercised, or some treatment is provided. *See, e.g., Comstock v. McCrary*, 273 F.3d 693, 707 n.5 (2001); *Quigley v. Tuong Vinh Thai,*

23

707 F.3d 675, 682-83 (6th Cir. 2013); *Lemarbe v. Wisneski,* 266 F.3d 429, 439 (6th Cir. 2001); *Richmond v. Huq,* 885 F.3d 928, 940 (6th Cir. 2018).

But even assuming the analytical approach to deliberate-indifference claims suggested by *Westlake* were still appropriate, *Westlake* would not support Dr. Oliver's position. At issue in *Westlake* was a nine-day period from November 17, 1973 to November 25, 1973, in which Edward Westlake suffered abdominal pain and vomited blood due to an ulcer in his upper GI tract. *Westlake,* 537 F.2d at 859. "When this was brought to the attention of his jailers, the only relief provided was a mild antacid." *Id*. The district court dismissed the complaint on the basis that the plaintiff had failed to allege a "tangible residual injury," *Id.* at 859, but the Sixth Circuit reversed. The panel held that, "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering," and noted, "[a]ppellant has alleged that he was forced to endure a period of intense discomfort" for which he could recover. *Westlake,* 537 F.2d at 860-61.

Defendants cite *Westlake* only for the dicta contained in footnote 5, which reads, in full:

> We distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. *See Fitzke v. Shappell, supra* at 1076 n.4. *See also Jones v. Lockhart, supra* at 1194; *Corby v. Conboy, supra* at 254. Where a

24

prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law. *See e.g.*, *Pinon v. Wisconsin*, 368 F.Supp. 608 (E.D. Wis. 1973). But *c.f. Fitzke v. Shappell*, *supra* at 1076-77 n.7. Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all. *See Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970).

Since the district court was reversed, *Westlake* implies that the treatment Mr. Westlake received from November 17, 1973 to November 25, 1973, for his symptoms of abdominal pain and vomiting blood, was "so woefully inadequate as to amount to no treatment at all." The treatment provided to Mr. Westlake in this nine-day period, "a mild antacid," is <u>precisely the same treatment provided to Mr. Lyles</u> from the beginning of February through early April of 2017. (**Ex. E**, 35, 85-87; **Ex. A**, 36-38). Prescribing a mild antacid was even more inappropriate for Mr. Lyles' lower GI bleeding than for Mr. Westlake's upper GI bleeding, because antacids have no effect the lower GI tract. (**Ex. B**, ¶¶ 18-20; **Ex. C**, 25). And Dr. Oliver knew that TUMS did nothing for Mr. Lyles' lower GI symptoms. (**Ex. D**, 16-17, 21-23, 36, 43-44).

## Conclusion

For all the foregoing reasons, Defendants' Motion should be denied.

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff

25