**Keith Papendick, M.D.**
**08/23/2021**

 1                  IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4   ANDREW LYLES,

 5   #667516,                  Case No. 2:19-cv-10673

 6         Plaintiff,          District Judge:  Laurie J. Michelson

 7   vs.                       Magistrate Judge:  Patricia T. Morris

 8   PAPENDICK et al,

 9         Defendant.

10   _____/

11

12           VIRTUAL ZOOM DEPOSITION OF KEITH PAPENDICK, M.D.

13   taken remotely via Hanson Renaissance Court Reporters & Video,

14   commencing on Monday, August 23, 2021, at 11:02 a.m.

15

16   APPEARANCES:

17   For the Plaintiff:       MR. IAN T. CROSS (P69635)
                              Margolis & Cross
18                            214 S. Main Street
                              Suite 200
19                            Ann Arbor, Michigan 48104
                              (734) 994-9590
20                            ian@lawinannarbor.com

21   For Defendants
     Oliver and Papendick:    MR. DEVLIN KYLE SCARBER (P64532)
22                            Chapman Law Group
                              1441 W. Long Lake Road
23                            Suite 310
                              Troy, Michigan 48098
24                            (248) 644-6326
                              dscarber@chapmanlawgroup.com

25



Keith Papendick, M.D.
08/23/2021

Pages 2..5

**Page 2**

```
1  APPEARANCES (Continued):
2  For MDOC Defendants:    MS. JENNIFER A. FOSTER (P75947)
                           Michigan Department of Attorney General
3                          PO Box 30217
                           Lansing, Michigan 48909
4                          (517) 335-3055
                           fosterj15@michigan.gov
5
6  REPORTED BY:            Ms. Diane Murray, CSR-4019, RPR
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                    TABLE OF CONTENTS
2  EXAMINATIONS                                      PAGE
3    Examination by Mr. Cross                           4
     Examination by Mr. Scarber                        64
4    Re-Examination by Mr. Cross                       69
5
6
7
8                       EXHIBITS
9                  (Attached hereto.)
10  EXHIBIT            DESCRIPTION              PAGE
11  Number 1    Procedure Consent                14
    Number 2    January Consultation             20
12  Number 3    November Consultation            26
    Number 4    December Consultation            33
13  Number 5    Curriculum vitae                 38
    Number 6    Interrogatories and Requests for 49
14              Production
    Number 7    Pope Opinion and Order           59
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

1    Monday, August 23, 2021 - 11:02 a.m.
2    COURT REPORTER: We're now on the record. I am
3  not in the same location as the witness and this
4  deposition is being conducted remotely.
5    Hearing that there are no objections to
6  administering the oath remotely, I will now swear in the
7  witness.
8    KEITH PAPENDICK, M.D.,
9    having been called and duly sworn:
10    EXAMINATION
11  BY MR. CROSS:
12  Q. Morning, Dr. Papendick. Nice to see you again. My name's
13    Ian Cross. I represent the Plaintiff, Andrew Lyles.
14    Something I want to go over first, because we
15    had some trouble with it last time, when I ask you a
16    question, I need you to answer the question that I asked
17    you and not another question.
18    Do you understand what that means?
19  **A. Yes.**
20  Q. What does it mean?
21  **A. That means that I answer the question you have and not try**
22    **to get any more information in.**
23  Q. Okay. Did you review any documents in preparation for
24    today's deposition?
25  **A. Just the medical record.**

**Page 5**

1  Q. What medical records did you review?
2  **A. I believe they were supplied by you and the 407's that I**
3    **had done.**
4  Q. So you reviewed your 407's and you reviewed some medical
5    records?
6  **A. 407 is a medical record.**
7  Q. Did you review a transcript of a deposition?
8  **A. No.**
9  Q. Okay. Did you review any UpToDate literature?
10  **A. No.**
11  Q. All right. Are you a medical doctor?
12  **A. I am.**
13  Q. Did you have to complete some education or training to
14    become a medical doctor?
15  **A. I did.**
16  Q. What education or training did you complete?
17  **A. I have my medical doctor's degree from Wayne State**
18    **University, School of Medicine, in Detroit.**
19  Q. Were you taught about the human digestive system in
20    medical school?
21  **A. Of course.**
22  Q. Can you please identify each of the components of the
23    human gastrointestinal tract, starting with the mouth and
24    ending with the anus, and for each component give us a
25    brief description of the function it performs?

Page 6

1     MR. SCARBER: Just going to object to form --
2  Dr. Papendick -- and the foundation -- Dr. Papendick isn't
3  your expert witness here. I mean if you've got a question
4  you want to ask him specific about Mr. Lyles and his
5  decisionmaking with respect to that, that's fine, but my
6  objection is to form and foundation, and you also asked
7  about four questions in one question.
8     So I'm not going to stop your question but
9  that's my objection. You might have to break it down.
10 BY MR. CROSS:
11 Q. You may answer.
12     MR. SCARBER: If you understand his question, go
13 ahead.
14 A. Well, it's an extensive question. You have the lips, the
15 teeth, the mouth, which is, will break the food into
16 smaller pieces, mixing it with amylase. You have the oral
17 pharynx where the food goes into the esophagus. You have
18 the esophagus, which functions to move the food from the
19 oral pharynx into the stomach. You have the stomach,
20 which digests the food, it's highly acid, and it's not
21 total digestion but it's the breakdown of the
22 macromolecules into smaller sections. The duodenum, which
23 is the first part of the small intestine after the
24 stomach, and in the duodenum, you mix with the pancreatic
25 juices, which include amylase, lipase and protease, which

Page 7

1  breaks down starch, lipase, fat and protein into its basic
2  molecules of the food which are then absorbed through the
3  small intestine. At the point of the small intestine
4  going into the large intestine is the ileocecal valve and,
5  after it goes through there, the function is predominantly
6  to absorb water. So when the contents of the bowel go
7  into the large intestine, it's all liquid and when it
8  comes out, of course, it's not supposed to be liquid.
9  Q. Okay. You mentioned that the process of digestion
10 involves acid; correct?
11 A. Correct.
12 Q. Where in the digestive tract is the acid located?
13 A. In the stomach.
14 Q. Is there acid in the large intestine?
15 A. Typically it's right at neutral.
16 Q. Okay. What is a proton pump inhibitor?
17     MR. SCARBER: Let me just place an objection to
18 foundation as well. Some of these questions are fairly
19 general and can be different with respect to different
20 patients, but go ahead. Next question.
21     THE WITNESS: I didn't hear him.
22     MR. SCARBER: Okay.
23 BY MR. CROSS:
24 Q. Did you hear my question?
25 A. No.

Page 8

1  Q. Okay. What is a proton pump inhibitor?
2  A. It is a medication and chemical that stops the stomach
3    from making acid.
4  Q. Okay.
5  A. Well, it decreases the stomach from making acid.
6  Q. What do you do for a living?
7  A. I'm a physician.
8  Q. By whom are you employed?
9  A. Quality Corrections -- Quality Corrections Care of
10    Michigan, P.C.
11 Q. What is your job title?
12 A. Utilization management medical director.
13 Q. How long have you been a utilization management medical
14    director?
15 A. Since 2014.
16 Q. What did you do before you were a utilization management
17    medical director?
18 A. I was a hospitalist at Duane Waters Health Center in
19    Jackson.
20 Q. What is Duane Waters Health Center?
21 A. It is the prison's -- it used to be a hospital. It's now
22    just a health center.
23 Q. What is utilization management?
24     COURT REPORTER: You're echoing really bad, Ian.
25     MR. CROSS: I don't know what to do about that.

Page 9

1     COURT REPORTER: We can keep trying and see how
2  it goes, I guess.
3  BY MR. CROSS:
4  Q. What is utilization --
5  A. Utilization management is --
6     MR. SCARBER: You want him to answer?
7     MR. CROSS: If he heard the question.
8     MR. SCARBER: You were just talking over each
9  other. I apologize, but there is a slight, a slight
10 delay. He's gonna answer your question about what
11 utilization management is. Go ahead.
12 A. Utilization management is the department that reviews
13    requests for off-site visits and looks at, in our medical
14    judgment, looks at whether they are best for the patient.
15 BY MR. CROSS:
16 Q. What is the purpose of utilization management?
17     COURT REPORTER: Excuse me. There's delays and
18 echos.
19     (At 11:15 to 11:23 a.m., recess taken to
20     troubleshoot Zoom connection.)
21     (At 11:23 a.m., record repeated by reporter as
22     follows: "Q. What is the purpose of
23     utilization management?")
24 A. I answered that question.
25 BY MR. CROSS:



Page 10

1  Q.  Well, then we didn't hear it.
2  A.  Oh, great.  Utilization management is the department that
3      looks at the requests to make certain that the patient is
4      getting the best care.
5  Q.  So the purpose of utilization management is for the
6      benefit of the patient?
7  A.  Absolutely.
8  Q.  And how does it benefit the patient, to review requests
9      for off-site services?
10 A.  Because sometimes off-site services are not, in medical
11     judgment, the best thing for the patient and, thus, we
12     tell them that.
13 Q.  So do you have any information to judge the propriety of
14     an off-site service that the doctor on site doesn't have?
15 A.  No.  Just purely medical judgment.
16 Q.  Are you board certified in any specialty?
17 A.  Not any longer.
18 Q.  Were you previously board certified in any specialty?
19 A.  Yes, I was.
20 Q.  What was that specialty?
21 A.  Family practice.
22 Q.  What is the difference between family practice and
23     internal medicine?
24 A.  Family practice takes care of pediatric patients and
25     sometimes OB as well as internal medicine.

Page 11

1  Q.  And what does internal medicine do?
2  A.  They look at the medical care of the patient without doing
3      pediatrics or OB.
4  Q.  Okay.  What are your job duties as a utilization
5      management medical director?
6  A.  Review 407's.
7  Q.  What's a 407?
8  A.  407 is a document that is called a 407 because that's what
9      it was when it was on paper at the Michigan Department of
10     Corrections, and so they continued to use the
11     nomenclature.  It's a consult request.
12 Q.  Can you describe the process of how the request gets to
13     you?
14 A.  The request is placed in the computer, it then goes to my
15     nurse who puts it into CARES, and I review the case from
16     there.
17 Q.  So what's CARES?
18 A.  CARES is a program developed by Corizon Health for the
19     utilization management to look at reviews and/or those
20     reviews to be sent to billing so that the bill can be
21     paid.
22 Q.  Does utilization management have anything at all to do
23     with cost control?
24 A.  No.
25 Q.  When you received the 407 request in CARES, do any

Page 12

1      documents come along with that 407 request, such as
2      medical records?
3  A.  A 407 is to be all-inclusive of everything I need but, on
4      occasion, I have asked for more records.
5  Q.  Okay.  This CARES process, was it in place in 2016?
6  A.  It was coming into -- it came into fruition in 2016.
7  Q.  Do you know when, in 2016, it came into fruition?
8  A.  No.
9  Q.  So in, for example, November of 2016, you don't know if
10     you would have been using CARES or not?
11 A.  Absolutely not certain.
12 Q.  Okay.  And you testified that all of the information you
13     need to make a decision must be contained in the request;
14     correct?
15 A.  The providers are told that all of the information is to
16     be in the 407.
17 Q.  Is there a section in the 407 called Failed Outpatient
18     Therapies?
19 A.  I don't believe so.  I don't know.
20 Q.  So Failed Outpatient Therapies are not listed in the 407?
21         MR. SCARBER:  Just going to place an objection.
22     If you have a form that you want to refer to him or put
23     up, so you can show him the 407 in which you're talking
24     about, I think that would be better.
25 BY MR. CROSS:

Page 13

1  Q.  Go ahead.
2  A.  I don't look at the 407.
3  Q.  You don't?
4  A.  No.  The 407's are put into CARES.
5  Q.  So what do you look at if not the 407?
6  A.  The CARES entry.
7  Q.  Okay.  Why do doctors at the prisons need to get your
8      approval for certain procedures?
9  A.  They need to get my approval because I have had some
10     training that allows me to look at what's best for the
11     patient and not necessarily what they want.
12 Q.  What was that training?
13 A.  I have twenty-five years of medical practice in managed
14     care and then what I received when I first came on the job
15     in '14.
16 Q.  What's managed care?
17 A.  Essentially utilization management in the insurance
18     company.
19 Q.  And why would an insurance company want to do utilization
20     management?
21 A.  To make sure the patient is getting the best care.
22 Q.  So this is really a quality control mechanism is what
23     you're telling me?
24 A.  You can, you can call it that.  We're not part of the
25     Quality Control Department.



Page 14

1 Q. All right. I'm going to attempt to show you --
2 A. You're going to attempt to what?
3 Q. -- show you a document.
4 Can you see that?
5 A. I see "Ian Cross has started screen sharing" in a big,
6 black screen.
7 Q. Oh, that's unfortunate.
8 A. Now I can see it.
9 Q. Okay. Is this something that you reviewed to prepare for
10 today's deposition?
11 A. I don't believe so.
12 Q. Okay.
13 MR. SCARBER: Could you identify what it is,
14 Ian, for the record, so we'll know in case something
15 happens?
16 MR. CROSS: This is a page -- we'll call this
17 Exhibit 1. It is a page from the Plaintiff's hard file
18 medical records.
19 MR. SCARBER: And what date and all that kind of
20 stuff is what I'm --
21 MR. CROSS: The date is 11-22-2016, 2:04 p.m.
22 (Deposition Exhibit Number 1 will be marked upon
23 receipt.)
24 BY MR. CROSS:
25 Q. So do you see where it says provider?

Page 15

1 A. Yes.
2 Q. Do you know who that person is?
3 A. Yes.
4 Q. Who is she?
5 A. She's a physician that works in a couple other places.
6 Q. Does she work in prisons?
7 A. Well, of course.
8 Q. Okay. And her name is Sharon Oliver?
9 A. Correct.
10 Q. Okay. Did Dr. Oliver need to send you a request before
11 she could perform -- well, strike that.
12 This is a Procedure Consent Form --
13 A. Correct.
14 Q. -- for an anoscopy; correct?
15 A. Correct.
16 Q. What is an anoscopy?
17 A. That's where you look inside the anus.
18 Q. Did Dr. Oliver need to send you a request form before she
19 could perform an anoscopy on this patient?
20 A. No.
21 Q. Why not?
22 A. Because it's an on-site procedure and not an off-site
23 procedure.
24 Q. I want to direct your attention to the second sentence of
25 the paragraph there. Could you read that for the record?

Page 16

1 A. "The specific risks of bleeding, death, failure rate,
2 infection, possible continued pain, possible conversion to
3 open surgery, possible loss of function, repeat procedure
4 were discussed in detail."
5 Q. So those risks, those are real risks; right?
6 A. Absolutely.
7 Q. Those risks can actually happen when you undergo an
8 anoscopy; correct?
9 A. Yeah.
10 Q. How can an anoscopy result in death?
11 A. If the rupture of a -- any procedure has a three percent
12 chance of risk, a risk of death, number one.
13 Q. So --
14 A. Number two, you can have death from an anoscopy if you
15 cause infection or bleeding. There is no open procedure
16 for anoscopy.
17 Q. So if an anoscopy is so dangerous, why is Dr. Oliver
18 authorized to do it without your approval?
19 MR. SCARBER: Just going to place an objection.
20 It's outside the -- it mischaracterizes the witness'
21 testimony. Go ahead.
22 A. If the provider is able to or, and, and knows how to do an
23 anoscopy, there's no reason why they shouldn't be doing
24 them on site.
25 BY MR. CROSS:

Page 17

1 Q. Why do providers need approval from utilization management
2 for off-site procedures but not for on-site procedures?
3 A. Because they have to have trans -- one major issue is they
4 have to have transportation and they have to have approval
5 for an off-site visit for transportation.
6 Q. But didn't you say that utilization management was about
7 making sure the patient gets the best care?
8 A. Certainly.
9 Q. So why wouldn't you want to make sure the patient gets the
10 best care with respect to on-site procedures?
11 A. Who, who is to say they aren't?
12 Q. Let me understand this. When the doctor wants to send the
13 patient off site for a service, you review that request to
14 make sure that the risks of the proposed service do not
15 outweigh the benefits to the patient; correct?
16 A. It may -- repeat that question again, please.
17 MR. CROSS: Can you read the question back,
18 ma'am?
19 (At 11:37 a.m., record repeated by reporter as
20 follows: "Q. Let me understand this. When the
21 doctor wants to send the patient off site for a
22 service, you review that request to make sure
23 that the risks of the proposed service do not
24 outweigh the benefits to the patient; correct?")
25 A. I review it to see that it's the best medicine for the



**Page 18**

1 patient. In my medical judgment, I have to be able to
2 say, yes, that is what should be done next.
3 BY MR. CROSS:
4 Q. And why would it not be important for you to do that when
5 a dangerous on-site procedure is being performed?
6 A. **An anoscope is a rather benign procedure that is performed**
7 **by lots of physicians.**
8 Q. How about a colonoscopy? Is a colonoscopy a rather benign
9 procedure that is performed by lots of physicians?
10 A. **No.**
11 Q. So a colonoscopy is more dangerous than an anoscopy?
12 A. **Yes.**
13 Q. Would you agree that in terms of knowing the patient, a
14 doctor who lays their hands on the patient probably knows
15 more about the patient than anybody that hasn't touched
16 the patient?
17 A. **Probably. Yes.**
18 Q. So why wouldn't you defer to the medical judgment of
19 Dr. Oliver regarding whether a patient needs a given
20 off-site procedure?
21 A. **I've already explained that, that sometimes those**
22 **procedures that are requested are not the best for the**
23 **patient.**
24 Q. Do you have some information about what's best for the
25 patient that Dr. Oliver doesn't have?

**Page 19**

1 MR. SCARBER: Just going to place an objection.
2 That's been asked and answered.
3 A. **No.**
4 BY MR. CROSS:
5 Q. So why would you second guess her medical judgment?
6 A. **I'm not second guessing; I'm making a medical judgment as**
7 **a utilization manager.**
8 Q. What is an ATP?
9 A. **Alternative treatment plan. It's an abbreviation.**
10 Q. Do you sometimes create ATP's rather than approving an
11 on-site physician's request for an off-site service?
12 A. **Yes.**
13 Q. How often do you do that?
14 A. **How often?**
15 Q. Yes.
16 A. **It's right around ten percent of the time.**
17 Q. Ten percent of the time.
18 And how many of these requests do you review a
19 day again?
20 A. **Probably that depends on the day, that depends on the**
21 **week, it depends on how many people are off on PTO. I**
22 **mean I really can't tell you that number.**
23 Q. Well, is it more than ten?
24 A. **Yes.**
25 Q. Is it more than fifty?

**Page 20**

1 A. **I'm sure there are days that it is.**
2 (Deposition Exhibit Number 2 will be marked upon
3 receipt.)
4 BY MR. CROSS:
5 Q. All right. I'm going to show you another document. We'll
6 call this Exhibit 2.
7 Do you recognize this document?
8 A. **It's a 407.**
9 Q. Is this a document you reviewed to prepare for today's
10 deposition?
11 A. **Yes.**
12 Q. Okay. I want to direct your attention to the sentence
13 starting on line three of the Signs & Symptoms paragraph.
14 MR. SCARBER: Hey, Ian, I don't want to
15 interrupt you, but you've got to identify the, you know,
16 exhibit, like the date. There's a couple of -- there's a
17 bunch of 407's in this case. So --
18 MR. CROSS: So --
19 MR. SCARBER: -- you can just say this is dated
20 whatever and that's fine. At least I'll know.
21 MR. CROSS: Request dated January 6th, 2017; is
22 that fair?
23 BY MR. CROSS:
24 Q. I want to direct your attention to the second sentence on
25 line three of the Signs & Symptoms paragraph.

**Page 21**

1 Could you read that for us?
2 A. **"He was found to have FOBT positive on 11-8, 11-9, 11-17,**
3 **11-18, 11-22. He complained of epigastric pain."**
4 Q. Okay. What is FOBT? What does that mean?
5 A. **That means that they found occult blood in his stool.**
6 **Occult, o-c-c-u-l-t.**
7 Q. Why is that something you would test for?
8 A. **To evaluate whether the patient has blood in his stool.**
9 Q. Why would a doctor need to know if there's blood in a
10 patient's stool?
11 A. **We test them yearly for FOBT's for blood in the stool as**
12 **colorectal cancer screening.**
13 Q. So you're saying that the reason you would test for blood
14 in a patient's stool is to screen for colorectal cancer?
15 A. **Not the only reason.**
16 Q. What other reasons might you test for blood in a patient's
17 stool?
18 A. **If a patient complains of blood in the stool; if the**
19 **patient has anemia.**
20 Q. I'm sorry. Go ahead.
21 A. **If the patient has anemia.**
22 Q. You would agree that blood in a patient's stool could
23 indicate that the patient has colorectal cancer?
24 A. **It could. It could also --**
25 MR. SCARBER: Finish your answer.



Keith Papendick, M.D.
08/23/2021
Pages 22..25

Page 22

1  A.  It could also indicate that the patient has eaten meat or
2     beets, or somebody read the FOBT test wrong.
3  BY MR. CROSS:
4  Q.  All right.  I want to direct your attention to the last
5     paragraph in the Signs & Symptoms -- or the last sentence
6     in the Signs & Symptoms paragraph.  I'm sorry.
7            Could you read that for the record?
8  A.  "Now with increasing numbers of stools, six to seven times
9     a day with BRB, and he has a seven-pounds weight loss
10     since December of '16."
11  Q.  What's BRB?
12  A.  Bright red blood.
13  Q.  Isn't blood always bright red?
14  A.  No.
15  Q.  When is blood in the stool not bright red?
16  A.  Typically when it's a stomach bleed, it's black.
17  Q.  What is melena?
18  A.  Black stools.
19  Q.  What does that indicate about the source of the bleeding?
20  A.  Did this case have melena?
21  Q.  Can you just answer my question?
22  A.  Yeah.
23            MR. SCARBER:  Object to relevance, but go ahead.
24  A.  Black stools typically or -- no -- may indicate that the
25     patient has bleeding in his stomach, it may indicate that

Page 23

1     he's used Pepto Bismol, and it may even be indicated, may
2     be found in patients who eat red meat.
3  BY MR. CROSS:
4  Q.  And what does bright red blood in the stool indicate?
5  A.  Bleeding further down the stool, down the colon.
6  Q.  Okay.  What are some -- do you see where it says Failed
7     Outpatient Therapies here on the form?
8  A.  I do.
9  Q.  Do you know what that means?
10  A.  It means that the provider believes that these are Failed
11     Outpatient Therapies.
12  Q.  What's a Failed Outpatient Therapy?
13  A.  A therapy that has not worked the way the provider thinks
14     it should have.
15  Q.  Why is it important for the provider to put Failed
16     Outpatient Therapies on the 407?
17  A.  So that I don't look for those therapies -- or look for
18     those problems.
19  Q.  Okay.  So can you read the first line of the Failed
20     Outpatient Therapies, for the record?
21  A.  "Anoscopy:  Perirectal area normal to inspection and
22     palpation."
23  Q.  And the second sentence?
24  A.  "No hemorrhoids, fissures or condylomata."
25  Q.  What's a hemorrhoid?

Page 24

1  A.  It's essentially a varicose vein in the anus.
2  Q.  Why would it be important to check for hemorrhoids in this
3     patient?
4  A.  Because bright red bleeding may be coming from his
5     hemorrhoids.
6  Q.  What's a fissure?
7  A.  A fissure is essentially a tear in the anus.
8  Q.  And why would you check for fissures in this patient?
9  A.  Bright red bleeding.
10  Q.  What is that last word in that sentence?
11  A.  Condyloma?
12  Q.  Yeah.  What is that?
13  A.  Human papillomavirus warts.
14  Q.  And why would we check for human papillomavirus warts in
15     this patient?
16  A.  Well, typically they're external, they don't bleed very
17     much, and they're just part of a complete exam.
18  Q.  Do you see, below that paragraph, where it says
19     "Protonix"?
20  A.  Yes.
21  Q.  What's Protonix?
22  A.  It's a PPI, what you asked about earlier.
23  Q.  Yes.  PPI is a proton pump inhibitor?
24  A.  Correct.
25  Q.  And the proton pump inhibitor I believe you testified

Page 25

1     would reduce the level of acid in the patient's stomach?
2  A.  Correct.
3  Q.  So why would you prescribe Protonix for this patient?
4  A.  I didn't.
5  Q.  Do you believe it's an appropriate drug to treat this
6     patient's symptoms?
7  A.  If the patient was having epigastric tenderness, yes, and
8     you'll see that he does.
9  Q.  Would Protonix do anything for this patient's bright red
10     blood in his stool?
11  A.  Probably not.
12  Q.  Okay.  What are some possible causes of bright red blood
13     in the stool?
14            MR. SCARBER:  Asked and answered I believe maybe
15     twice, but go ahead.
16  A.  Bright red blood in the stool, it would be a fissure, it
17     would be hemorrhoids, it could be constipation, it could
18     be a polyp.  It actually has been found that there are
19     some people that have bright red blood in their stool from
20     a gastric ulcer, ulcerative colitis, Crohn's disease, and
21     that would be the top diagnoses.
22  Q.  How about bowel perforation?
23  A.  Typically bowel perforation does not cause bright red
24     bleeding in the stool; it causes internal bleeding.
25  Q.  How about cancer?



Keith Papendick, M.D.
08/23/2021

Pages 26..29

1 A. Well, that would be polyps, but yes.
2 Q. Are you able to determine, from the information contained
3    in this 407 request, the source of the patient's rectal
4    bleeding?
5 A. No.
6 Q. What information would you need to be able to determine
7    the source of the bleeding?
8 A. Find out if the patient is constipated, then clear the
9    constipation, then do a, probably do a colonoscopy.
10 Q. So a colonoscopy would be necessary to determine why this
11   patient has been passing blood in his stool?
12 A. Not necessarily. You can pass blood and have a normal
13   colonoscopy.
14       (Deposition Exhibit Number 3 will be marked upon
15       receipt.)
16 BY MR. CROSS:
17 Q. All right. I'm going to direct your attention to another
18   document. We'll call this Exhibit 3.
19       Do you recognize this document, sir?
20 A. 11-22-16. It's a 407.
21 Q. Is this a document you reviewed to prepare for today's
22   deposition?
23       MR. SCARBER: I'm going to place another
24   objection. If you can identify what the exhibits are when
25   you refer to them, that would be helpful.

1 A. I would have to see the bottom of this to find out if I
2    reviewed this or not.
3 BY MR. CROSS:
4 Q. (Indicating.)
5 A. Yes, I did.
6 Q. And this is a Michigan Department of Corrections
7    Consultation Request Form submitted 11-22-2016.
8        So in the comments right below the name of this
9    individual, Kaelynn Pfeil, could you read that, for the
10   record?
11 A. "Request colonoscopy to evaluate rectal bleeding."
12 Q. And the reviewer comments down here, would you read that?
13 A. "ATP: Medical necessity not demonstrated at this time.
14   Clear constipation, consider utilizing Senna 8.6
15   milligrams up to 2 tabs twice a day scheduled not PRN, and
16   reevaluate at the time that the abdominal films
17   demonstrate resolution of constipation."
18 Q. What does that mean?
19 A. That means clear his constipation and prove that it's
20   cleared.
21 Q. And then do what?
22 A. Then you can reevaluate the patient. I can then look at
23   whether a colonoscopy is warranted.
24 Q. So why did you issue this ATP instead of approving this
25   request for a colonoscopy?

1 A. First of all, if he's constipated, you can't do an
2    adequate colonoscopy in a constipated individual. You
3    have to clear the constipation and prove it's been
4    cleared.
5        Second, in the prison population, constipation
6    is a horrible problem and, unfortunately, that is more
7    common than any of the other reasons for bright red
8    bleeding in the population.
9 Q. All right. So I want to go back to this Exhibit 2, the
10   January '17 request.
11       And what does it say in the Lab & X-ray Data,
12   starting on the third line?
13 A. "X-ray abdominal: Multi-view abdomen revealed the
14   visceral outlines to be unremarkable. The gaseous pattern
15   appeared to be normal. No evidence of calculi could be
16   seen in the region of the kidneys, ureters or urinary
17   bladder. No constipation was seen."
18 Q. And what's the date on that?
19 A. 12-8.
20 Q. 12-8-16?
21 A. Correct.
22 Q. So Exhibit 3, which we just looked at, this November 16
23   request, it looks like they did what you told them to do;
24   they cleared the constipation and proved clearance with an
25   X-ray; correct?

1 A. I would have to see the X-ray.
2 Q. So this Lab & X-ray Data here where it says "no
3    constipation was seen", that's not sufficient?
4 A. No. It's not sufficient. I would see the X-ray report.
5 Q. Do the requests you review typically come with an X-ray
6    report?
7 A. Sometimes; most of the times, I have to ask for it.
8 Q. Did you ask for the X-ray report on this occasion?
9 A. I assume so, but --
10 Q. I'm sorry. I didn't hear that.
11 A. I said I assume so, but I don't -- I can't recall. My
12   medical judgment would say get the X-ray.
13 Q. What are your options in responding to a 407 request?
14 A. Approve, defer, or ask for more information.
15 Q. Did you approve, defer, or ask for more information for
16   this request?
17 A. I don't know. I would have to see the bottom.
18 Q. (Indicating.)
19 A. I ATP'd it.
20 Q. Why didn't you ask for more information?
21 A. I may have had the X-ray.
22 Q. Can you read your ATP, for the record?
23 A. "Medical necessity not demonstrated at this time. When
24   symptoms demonstrate medical necessity, resubmit."
25 Q. What's medical necessity?



Page 30

1  A.  Do we need an off-site that can't be contained -- excuse
2      me -- do we need an off-site visit that can't be done on
3      site.
4  Q.  Can a colonoscopy be done on site?
5  A.  No, but further workup can be.
6  Q.  So what further workup did you order in this ATP?
7  A.  I had already ordered it to clear the constipation and
8      prove that it was cleared.
9  Q.  And why doesn't this Lab & X-ray Data indicate that they
10     have done that?
11 A.  Well, the lab information says he's not anemic, which is
12     unusual in somebody who, quote, has blood in every stool.
13     The abdominal film I would've had to see.  So either I
14     didn't see it or the lab data does not support or
15     something else.
16 Q.  But you're not able to determine -- strike that.
17         When would symptoms demonstrate medical
18     necessity?
19 A.  If he continued to have problems.
20 Q.  Do you know how long this patient had been having bright
21     red blood in his stool at this point?
22 A.  Yeah, since November, he had bright red blood as a
23     subjective observation.
24 Q.  What do you mean by that?
25 A.  I mean that he told them that he's been having bowel

Page 31

1      movements with bright red blood since November.  He --
2  Q.  Is there any reason not to believe him?
3         MR. SCARBER:  You know, I think the doctor is
4      trying to finish a couple of the answers and I think
5      because of the delay, you think he's finished; is that
6      true?
7         THE WITNESS:  That's true.
8         MR. SCARBER:  It's not your fault, Ian; it's
9      just the way that this is happening.  Go ahead.  Finish
10     your answer.
11 A.  I can't remember what I was going to say.
12         MR. SCARBER:  Court Reporter, Madam Court
13     Reporter, can you repeat back the answer -- the last
14     question and answer?
15         (At 12:02 p.m., record repeated by reporter as
16     follows:  "Q.  What do you mean by that?
17     A.  I mean that he told them that he's been
18     having bowel movements with bright red blood
19     since November.  He --")
20 A.  So that does not mean that he has had bright red blood, it
21     means that he thinks he has had bright red blood, and the
22     lab tests certainly don't lean towards that, with a normal
23     hemoglobin.
24 BY MR. CROSS:
25 Q.  Can you read the first sentence on the second line of the

Page 32

1      Signs & Symptoms on this request?
2  A.  The one that begins with "he was found"?
3  Q.  Yes.
4  A.  "He was found to have FOBT positive on 11-8, 11-9, 11-17,
5      11-18 and 11-22.
6  Q.  Are those subjective reports?
7  A.  Yes, they are.
8  Q.  Why are they subjective?
9  A.  Well, they're subjective from a physician's standpoint.
10 Q.  How about, "On 12-20-16 he returned three FOBT positive
11     cards, after clearing constipation"?
12 A.  Yeah.
13 Q.  Is that subjective?
14 A.  Okay.  FOB can be positive for several reasons.  One is
15     blood; two is anything he ate that had blood in it; three
16     is anything that causes his stool to be black; or a
17     misread of the FOBT cards.  The FOBT cards are read by
18     nursing staff, typically.  I don't know if these were read
19     by a physician or not.
20 Q.  So we have I think here eight FOBT positive cards in the
21     Signs & Symptoms and you're assuming that all of them were
22     misread?
23 A.  No.  I didn't say misread.
24 Q.  So when you received this request, did you doubt that Mr.
25     Lyles actually had bright red blood in his stool?

Page 33

1  A.  I don't know that I doubted it.  I noted that his
2      hemoglobin was 15.4, which is rather normal for a male,
3      and somebody who had been bleeding significantly would not
4      have a hemoglobin of 15.4.
5  Q.  So why would we even test with these FOBT cards?
6         Why don't we just do hemoglobin tests to
7      determine if people are bleeding rectally?
8  A.  Doing a hemoglobin test will not tell you that a patient
9      is bleeding rectally.  There are more anemias than anemias
10     caused by rectal bleeding.
11 Q.  But any anemia caused by rectal bleeding would result in a
12     low hemoglobin level?
13 A.  That's what anemia is.
14         (Deposition Exhibit Number 4 will be marked upon
15     receipt.)
16 BY MR. CROSS:
17 Q.  All right.  We'll call this Exhibit 4.  I'm going to show
18     you another document.  It is a request dated 12-22-2016.
19         Is this something you reviewed to prepare for
20     today's deposition?
21 A.  You have to drop down a little bit.
22 Q.  (Indicating.)
23 A.  Yes.
24 Q.  How did you respond to this request?
25 A.  ATP'd it.



**Keith Papendick, M.D.**
08/23/2021
**Pages 34..37**

Page 34

1  Q.  What was your --
2  A.  I beg your pardon?
3  Q.  What was your ATP?
4  A.  "Medical necessity not demonstrated at this time.  Treat
5       constipation with scheduled Senna and prove clearance with
6       abdominal films and reevaluation" -- excuse me -- "and
7       reevaluate."
8  Q.  Is that any different than your November 2016 ATP?
9  A.  I don't know.  I'd have to see it.
10 Q.  All right.  Let's go to Exhibit 3.
11 A.  It is different.
12 Q.  How is it different?
13 A.  I asked for abdominal films, demonstrate resolution of
14      constipation in the November 22 note.
15 Q.  And then in the December 22, did you request that they
16      prove clearance with abdominal film?
17 A.  No.  That was already requested in the previous ATP.
18 Q.  I guess what I'm getting at is did you request the same
19      thing again?
20 A.  I did not request abdominal film for resolution of the
21      constipation on the second one; I did request abdominal
22      film for resolution of the constipation on the first one.
23 Q.  All right.  Can you read -- we're looking at the
24      12-22-2016 ATP?
25 A.  Yes.

Page 35

1  Q.  Can you read the ATP, second sentence?
2  A.  I already did.  "Medical necessity not demonstrated at
3       this time.  Treat constipation with scheduled Senna 8.6
4       milligrams" -- excuse me -- "8.6, 2 tabs, BID, prove
5       clearance with abdominal film" -- oh, I guess I did --
6       "and reevaluate."
7  Q.  Isn't "prove clearance with abdominal film and reevaluate"
8       the same thing you requested a month before?
9  A.  Yeah, but it was in different wording.  I'm sorry.
10 Q.  So why did you give them the same ATP that they had just
11      done?
12 A.  Because it still says constipation.
13 Q.  Can you read the second sentence of the last Lab & X-Ray
14      Data on, this is the December '16 ATP?
15 A.  Sure.  Wait a minute.  That's December 22nd.
16 Q.  We have a November, we have a December, and we have a
17      January, so right now we're on the December.
18 A.  It says, "Multi-view abdomen revealed the visceral
19      outlines to be unremarkable.  The gaseous pattern appeared
20      normal.  No evidence of calculi could be seen in the
21      region of the kidneys, ureters or urinary bladder."
22 Q.  So what does it mean that the visceral outlines appeared
23      to be unremarkable?
24 A.  That they can see the bowel.
25 Q.  What does it mean that the gaseous pattern appeared normal

Page 36

1       throughout?
2  A.  That he had the correct amount of gas in his colon.
3  Q.  What's the clinical significance of that?
4  A.  Well, you can have the correct amount of gaseous patterns
5       appearing normal throughout with constipation.  There's
6       nothing in this that says constipation is cleared.
7  Q.  All right.  So if we go to the January '17 response, that
8       does say constipation was cleared; correct?
9  A.  It depends on who read it.
10 Q.  What'd you say?
11 A.  I said it depends on who read the X-ray.
12 Q.  Well, what they reported to you in the request form was
13      that there was no constipation; right?
14 A.  And we have a radiologist, at that time in 2016, that was
15      reading no constipation with constipation.  Right.
16 Q.  All right.  I want to direct your attention to the top of
17      this form.
18      Do you see where it says, "Third-Party insurance
19      (VA, Workmen's Comp, Federal, Interstate Compact)?
20 A.  Yes.
21 Q.  Do you know what Interstate Compact means?
22 A.  No.  It's an insurance company.
23 Q.  It's an insurance company?
24 A.  Wait.  Third-party insurance means, "Are there any?"  You
25      see the colon at the end of the line and it says "MDOC".

Page 37

1  Q.  Okay.  And VA, Workmen's Comp, Federal, Interstate
2       Compact, those are potential insurance companies?
3  A.  As far as I know.  That's how I read it.
4  Q.  That's how you read it?
5  A.  Yes.  And there is no "etc." insurance company.  It's a
6       list of insurance companies, and the one he's covered by
7       is MDOC.
8  Q.  Why is it important to list the insurance company that
9       he's covered by on the 407?
10 A.  I don't know.
11 Q.  You have no idea at all?
12 A.  No.  I have no idea at all.
13 Q.  Do you have any idea what --
14 A.  It makes no -- it makes no --
15 Q.  Go ahead.
16 A.  It makes no difference to me.
17 Q.  Do you have any idea what the passthrough list is?
18 A.  Yes.
19 Q.  What's the passthrough list?
20 A.  It's a list of procedures that can be approved without my
21      seeing them.
22 Q.  Do you contribute to determining what procedures are on
23      the passthrough list?
24 A.  I'm part of the department, and the department makes those
25      decisions.



Page 38

1 Q.  Are procedures paid for, by workmen's comp, on the
2      passthrough list?
3 A.  I have no idea. I have no idea who pays for any of it.
4 Q.  Do you receive performance evaluations in your job, sir?
5 A.  Yes, on how long it takes me to do a procedure -- or do an
6      approval.
7 Q.  Is a portion of your annual performance eval based on the
8      percentage of requests that you ATP?
9 A.  Absolutely not.
10 Q.  It is not?
11 A.  It is not.
12        (Deposition Exhibit Number 5 will be marked upon
13        receipt.)
14 BY MR. CROSS:
15 Q.  All right. I'm going to direct your attention to another
16      document. We'll call this Exhibit 5.
17        Do you recognize this document?
18 A.  Yes. It is a, it is a curriculum vitae, my experience,
19      and what's going on, what's happening with the patient.
20 Q.  I'm sorry. What was that?
21 A.  It's my experience and what my job is.
22 Q.  Okay. So see this Key Accomplishments section right here?
23        Can you read your first Key Accomplishment, for
24      the record?
25 A.  "Worked with providers one-on-one and increased approval

Page 39

1      rate for outpatient consult requests to ninety percent
2      consistently."
3 Q.  What does that mean?
4 A.  That means that I approved ninety percent of what comes
5      across my desk.
6 Q.  Well, how did you work with providers one-on-one to
7      increase their approval rate?
8 A.  If they're putting in for things that don't, that aren't
9      necessary or aren't going to increase the medical care of
10      the patient, then I call them and tell them.
11 Q.  So the providers of the prisoners should not be requesting
12      things that are not medically necessary?
13 A.  Correct.
14 Q.  So do you believe that this request, Exhibit 1, for a
15      colonoscopy for Mr. Lyles was inappropriate?
16 A.  Can you go back to that, please, so I can see it?
17 Q.  (Indicating.)
18 A.  That is not for a colonoscopy; that is a request for a GI
19      consult. We don't need a GI consult to do a colonoscopy.
20 Q.  How about this one? Is this a request for a colonoscopy?
21 A.  I can't see.
22 Q.  (Indicating.)
23 A.  Yes, it is.
24 Q.  The November 2016 request?
25 A.  Yes, it is.

Page 40

1 Q.  And do you believe that was inappropriate?
2        MR. SCARBER:  Just going to place an objection.
3      Mischaracterizes his testimony. All he said was he didn't
4      believe it was medically necessary at the time. Go ahead.
5 A.  At the time, the constipation was the issue because more
6      of our patients have constipation than have problems
7      necessitating a colonoscopy. So we go about finding the
8      easiest and most obvious problem first and get that out of
9      the way of our diagnostic workup.
10 BY MR. CROSS:
11 Q.  So after you had gotten that out of the way, for example,
12      the next month, you also deferred, correct, again?
13        MR. SCARBER:  Going to place an objection.
14      Outside the -- misquoting the doctor's testimony, or
15      misrepresenting, but go ahead.
16 A.  Yes. I deferred it again because it wasn't completed the
17      first time.
18 BY MR. CROSS:
19 Q.  And then in January '17, you deferred it again; correct?
20        MR. SCARBER:  Asked and answered.
21 A.  Yes, I did.
22 BY MR. CROSS:
23 Q.  How is Dr. Oliver supposed to know when the symptoms
24      demonstrate medical necessity?
25 A.  She is a physician.

Page 41

1 Q.  Well, in her medical judgment, she believed Mr. Lyles
2      should have an off-site visit; correct?
3        MR. SCARBER:  Just going to place an objection.
4      Calls for foundation. He doesn't know what people -- or
5      what she actually believed. He's not her. You can try to
6      answer the question if you understand it.
7 A.  I don't know that I can answer it. Yes. I deferred it
8      and it was because we have not gotten our -- does that
9      mean anything, that you changed the host?
10 BY MR. CROSS:
11 Q.  What?
12        MR. SCARBER:  Court Reporter -- no, okay. I
13      think the screen quit and he got sidetracked because our
14      screen switched. I'm sorry. I think the people --
15      something on the screen moved or switched around and I
16      think he got stuck in his answer.
17        Okay. So maybe repeat the question or repeat
18      his answer so he can figure out what he left off. I'm
19      sorry. Court Reporter, can you read back his answer so he
20      can figure out where he stopped? Sorry.
21        (At 12:24 p.m., record repeated by reporter as
22        follows: "A. I don't know that I can answer it.
23        Yes. I deferred it and it was because we have
24        not gotten our -- does that mean anything, that
25        you changed the host?")



Page 42

1      THE WITNESS:  Yeah.  Stop changing the host.

2 A.  Anyway, in my medical judgment, we needed to go get rid of

3      the constipation.  And a very large percentage of the time

4      you clear the constipation in this group, the patient gets

5      better, which did happen in this case.

6 BY MR. CROSS:

7 Q.  What was the last thing you just said?

8 A.  And it did, and it did happen in this case.

9 Q.  This patient got better?

10 A.  Yes.

11 Q.  So you think you made the right decisions with those three

12     requests we discussed today?

13 A.  Absolutely.  In my medical judgment, I made the right

14     decision.

15 Q.  Are you aware that Mr. Lyles has ulcerative colitis?

16 A.  Yes.  And he got a colonoscopy that showed he had

17     ulcerative colitis.

18 Q.  Do you know when he got a colonoscopy that showed he had

19     ulcerative colitis?

20 A.  I do not offhand.

21 Q.  Do you know approximately when?

22 A.  It was in the early summer, as I recall.

23 Q.  I'm going to direct your attention to this paragraph at

24     the bottom of the 407 request form.  It says, "Note:

25     Notify physician or midlevel practitioner immediately if

Page 43

1      unable to obtain an appointment within four weeks.  If

2      service is not completed within four weeks, have patient

3      reevaluated by physician or midlevel practitioner to

4      determine if service is still necessary and appropriate."

5      Is it common that if a service, that you do not

6      approve, cannot be performed within four weeks --

7 A.  It depends on the --

8 Q.  -- if they --

9      COURT REPORTER:  Are two people talking at the

10     same time?  I don't want to miss anything.

11     MR. SCARBER:  Yes, they were.  I didn't object.

12     This was one of those instances of pausing.  The doctor

13     was answering.  I think he started saying "it depends" and

14     then Mr. Cross came in with his question as he was

15     answering, not intentionally but because of the delay.

16     But go ahead and finish your answer if you can pick up.

17 A.  Yes.  There are many times procedures that are approved

18     cannot be done in four weeks.

19 BY MR. CROSS:

20 Q.  Is it important to promptly diagnose ulcerative colitis?

21 A.  It's important to diagnose anything.

22 Q.  Is it important to promptly diagnose cancer?

23 A.  Of course.

24 Q.  And rectal bleeding could be caused by ulcerative colitis,

25     Crohn's disease, cancer?

Page 44

1 A.  I would agree with that.  Yes.

2 Q.  So delaying the diagnosis of those serious medical

3      conditions could cause harm to a patient?

4      MR. SCARBER:  And let me place an objection to

5      relevance and foundation.  We know what Mr. Lyles'

6      situation was -- but go ahead, Doctor -- and it wasn't

7      everything counsel mentioned, but go ahead.

8 A.  Yes.  It's important to get diagnosed, get cancer

9      diagnosed.  It's important to get anything diagnosed so

10     that we aren't having to continue to do workup.

11     The concern is there are explicit risks to a

12     colonoscopy, and so we're getting rid of the things that

13     can cause the same symptoms, i.e., constipation, before we

14     go to a colonoscopy.

15 BY MR. CROSS:

16 Q.  Did you review any medical literature when issuing your

17     ATP's for Mr. Lyles in these three instances?

18 A.  I, I don't believe so.  It's purely medical judgment.

19 Q.  Do you remember what you reviewed?

20     MR. SCARBER:  Just going to place an objection.

21     I think he said he didn't, he doesn't believe he reviewed

22     any, any literature or something like that.

23     MR. CROSS:  I asked him if he remembers what he

24     reviewed.

25 A.  And I said I didn't.  There was no need to in this case.

Page 45

1 BY MR. CROSS:

2 Q.  So you do remember what you reviewed or you don't remember

3      what you reviewed?

4      MR. SCARBER:  Let me just object and note the

5      confusion.  I think he's thinking you're talking about

6      literature, but go ahead.

7 A.  This is a very common problem and typically handled always

8      the same way, so I do not know if I reviewed any new

9      literature.

10 BY MR. CROSS:

11 Q.  Do you know what UpToDate is?

12 A.  Of course.

13 Q.  What's UpToDate?

14 A.  It's a group of specialists' opinions on what to do next.

15 Q.  Do you use UpToDate to do your job?

16 A.  Yes.

17 Q.  How do you use it?

18 A.  I use it when I do not understand what's going on.  When

19     my medical judgment says that I see what's happening, I

20     don't need to go to UpToDate.

21 Q.  So you understood what was going on with Mr. Lyles in late

22     2016 and early 2017?

23 A.  I understood that the man had constipation that needed to

24     be removed from the diagnostic list.

25 Q.  Did you understand that he was passing bright red blood



Page 46

1  from his rectum?
2       MR. SCARBER:  I'm just going to place an
3  objection.  He's asked and answered what his understanding
4  was about that in very great detail before, step by step,
5  but go ahead.
6  A.  I understood that the patient was complaining of bright
7     red bleeding, with a normal hemoglobin and constipation.
8  BY MR. CROSS:
9  Q.  And did you understand that constipation was cleared per
10    your orders?
11      MR. SCARBER:  Just going to place an objection,
12   asked and answered, gone into great detail about
13   constipation, when it was cleared, what his understanding
14   was.  Go ahead.
15 A.  Do I need to answer that question again?
16 BY MR. CROSS:
17 Q.  You do have to answer the question unless your attorney
18    specifically tells you not to answer it.
19 A.  Are you looking at the -- are you discussing the 12-8
20    X-ray?
21 Q.  Yes.
22 A.  As I said earlier, it would depend upon who read that
23    X-ray.
24 Q.  So you're doubting the accuracy of the radiologist?
25 A.  No, I am not.  I know the radiologist, I know how he

Page 47

1  reads, and he doesn't believe that he can read
2  constipation from an X-ray.
3  Q.  So if he can't read constipation from an X-ray, why did
4     you order an X-ray to determine if Mr. Lyles was still
5     constipated?
6  A.  There are two radiologists reading X-rays and I would have
7     asked the second to read it.
8  Q.  So the other radiologist would be able to tell?
9  A.  Well, the other radiologist does not have a feeling that
10    constipation cannot be read from an X-ray.
11 Q.  Who are the two radiologists?
12 A.  Dr. Henderson and Dr. Mindlin.
13 Q.  And which one feels that constipation cannot be read from
14    an X-ray?
15 A.  Well, he doesn't any longer, that was what it was back
16    then, and that would be Mindlin.
17 Q.  Do you agree with Mindlin that constipation cannot be read
18    from an X-ray?
19 A.  Absolutely not.
20 Q.  So why wouldn't you trust this X-ray data that says no
21    constipation was seen?
22 A.  Because I believe it was read by Dr. Mindlin.
23 Q.  Can you tell, from the 407 request, which radiologist read
24    the X-ray?
25 A.  No.  That's why I told you earlier I would have to see the

Page 48

1     X-ray report.
2  Q.  But you don't know if you actually did request the X-ray
3     report?
4  A.  I did not request the X-ray report; I probably went and
5     looked at it.
6  Q.  And then you saw that it was read by Dr. Mindlin?
7       MR. SCARBER:  Just going to place an objection
8     to asked and answered.
9  A.  (No response.)
10 BY MR. CROSS:
11 Q.  Who's the other doctor -- I'm sorry -- who reads X-rays?
12 A.  Dr. Henderson.
13 Q.  Henderson.  So if we were to request the X-ray report in
14    discovery, would we be able to tell from the report which
15    radiologist read it?
16 A.  Absolutely.
17 Q.  Okay.  Did you receive any written discovery responses in
18    this case?
19 A.  What is that?
20      MR. SCARBER:  Can you rephrase your question,
21   counsel?
22 BY MR. CROSS:
23 Q.  Did you receive any interrogatories in this case?
24      Do you know what a interrogatory is?
25      MR. SCARBER:  Answer his question.  He's talking

Page 49

1  about the discovery answers.  Go ahead.
2  A.  Yeah.  I believe we had them; didn't we?  I don't know.
3  BY MR. CROSS:
4  Q.  Okay.  I'm going to show you what we will --
5       MR. CROSS:  What exhibit are we on; 6?
6       COURT REPORTER:  The curriculum vitae was
7     Exhibit 5, if that's the last one you remember marking.
8       (Deposition Exhibit Number 6 will be marked upon
9     receipt.)
10 BY MR. CROSS:
11 Q.  Exhibit 6.  So is that your signature there, sir?
12 A.  Yes.
13 Q.  And you signed these responses declaring, under penalty of
14    perjury, that the foregoing are true and correct?
15 A.  Correct.
16 Q.  All right.  I want to direct your attention to the first
17    interrogatory.  I asked, "What criteria and/or information
18    do you use to determine whether a given test, procedure,
19    or off-site referral is medically necessary?"
20      And you said, "In the present matter, no
21   specific policy or criteria was used in the present
22   matter"; correct?
23 A.  I think you're off one response.
24 Q.  Am I?
25 A.  Oh, you're talking about the last one?  There was no



Page 50

1   reason to go look anywhere.
2         MR. SCARBER:  Listen to his question and see
3   what he's trying to ask.  Is that what your answer says,
4   what he just read?  And we can get into what you mean and
5   all that kind of stuff based upon the question, but did he
6   read your answer correctly?
7         THE WITNESS:  Yeah.  He read it correctly, yeah,
8   off the form.
9         MR. SCARBER:  Okay.
10  BY MR. CROSS:
11  Q.  So there's no specific policy or criteria that was used to
12      determine whether any of the tests, procedures, or
13      off-site referrals in this case were medically necessary?
14  A.  It all, it all comes down to what I deem, in my medical
15      judgment, needs to be done.  I did not -- never mind.
16  Q.  What?  I'm sorry?  What was that?
17  A.  I didn't say he didn't need a colonoscopy; I said he
18      needed to have his constipation cleared.
19  Q.  When you say that a requested off-site procedure is not
20      medically necessary, that is not medically necessary for
21      what?
22  A.  At this time.
23  Q.  So when you used the word necessary, what are you
24      referring to?  Necessary to prevent some kind of harm?
25      Necessary for the patient's comfort?  What is that?

Page 51

1   A.  Well, it isn't for the patient's comfort.  It is for
2       whether it's necessary to be done at this time.
3   Q.  Okay.
4         MR. SCARBER:  And I'm going to place an
5   objection to asked and answered earlier a couple of times
6   at different places.
7   BY MR. CROSS:
8   Q.  So if a procedure is necessary to prevent death, would
9       that procedure be medically necessary?
10  A.  It depends on --
11        MR. SCARBER:  I'm going to place an objection.
12  Wait.  Go ahead.
13  A.  It depends on the situation.
14        MR. SCARBER:  And I'm going to object to
15  foundation.  It's not a real hypothetical.
16  BY MR. CROSS:
17  Q.  So sometimes procedures that are necessary to prevent
18      death are not medically necessary?
19        MR. SCARBER:  Mischaracterizes his testimony.
20  A.  I don't believe that's what I said to you.
21  BY MR. CROSS:
22  Q.  You said it depends on the situation; right?
23  A.  Correct.
24  Q.  And I asked you if a procedure that is necessary to
25      prevent death is medically necessary?

Page 52

1   A.  It depends on when it's asked for.  It depends on
2       supporting data.  There's -- that can't be answered.
3   Q.  What do you mean it can't be answered?
4   A.  That's a hypothetical question.  It has nothing to do with
5       this case.
6   Q.  Well, I'm asking it.
7         MR. SCARBER:  I'm going to place an objection.
8   I mean it's a, it's a very broad question.  It's not
9   delineated with any type of facts and circumstances
10  whatsoever.  The question is a procedure that's
11  necessary to prevent death medically necessary?  What kind
12  of procedure?  There's all kinds of procedures that, you
13  know, where they may not be appropriate, depending on what
14  the circumstances are, even in a situation like that, so I
15  don't, I don't really understand the question myself.
16  BY MR. CROSS:
17  Q.  I guess when we're saying something is medically necessary
18      or it's not medically necessary, medically necessary for
19      what?
20        MR. SCARBER:  Asked and answered many times.
21  BY MR. CROSS:
22  Q.  Go ahead.
23  A.  I don't know what else I can tell you.  I have told you
24      what it means.
25  Q.  How about a liver transplant for a patient with endstage

Page 53

1   liver disease, is that medically necessary?
2         MR. SCARBER:  It's hypothetical and it has
3   nothing to do with this case.  Mr. Lyles does not have
4   endstage liver disease.
5   BY MR. CROSS:
6   Q.  Well, I'm just trying to understand what you mean when you
7       say that a gastroenterology consult or a colonoscopy for
8       Mr. Lyles are not medically necessary.
9   A.  I have explained that.
10  Q.  Do you think that Mr. Lyles could benefit from a
11      gastroenterology consult?
12  A.  An off-site visit is approved; you can't do it on site.
13      And everything that we were working on could be done on
14      site.  There was no reason for a gastric --
15  Q.  So could you -- go ahead.  I'm sorry.
16  A.  There was no reason for a gastroenterology consult at that
17      time.
18        MR. SCARBER:  Hey, Ian, maybe give him a
19  two-second pause or something and that way you'll know
20  he's done before you chime in --
21        MR. CROSS:  Okay.
22        MR. SCARBER:  -- to the best of your ability.  I
23  know it's difficult.
24  BY MR. CROSS:
25  Q.  So could you do a colonoscopy on site?



Page 54

1        MR. SCARBER:  Asked and answered.
2 A.  I already told you no, they can order it on site.  They
3      don't need a GI consult to order a colonoscopy.
4 BY MR. CROSS:
5 Q.  So why wasn't your ATP, in January, colonoscopy?
6 A.  Because I didn't have the information that I needed to
7      prove that the colonoscopy, that the colonoscopy could be
8      done without a problem from the constipation.
9 Q.  Well, what did you want them to do for Mr. Lyles instead
10     of a colonoscopy or gastroenterology consult in January of
11     2017?
12        MR. SCARBER:  Well, I'm going to place an
13     objection because I think he's definitely gone through
14     this probably for about ten, fifteen minutes or more, but
15     go ahead.  I mean we're gonna rely on his testimony every
16     time you ask the same question, but go ahead.
17 A.  Can you read me the question back, please, Court Reporter?
18        COURT REPORTER:  Do you want me to read it back,
19     Mr. Cross?
20     MR. CROSS:  Yes.  Go ahead.
21        (At 12:46 p.m. record repeated by reporter as
22        follows:  "Q.  Well, what did you want them to do
23        for Mr. Lyles instead of a colonoscopy or
24        gastroenterology consult in January of 2017?")
25 A.  I think I was clear.  Clear the constipation, make sure

Page 55

1      the constipation is cleared and reevaluate the patient,
2      reevaluate the patient to see if he needed anything more.
3 BY MR. CROSS:
4 Q.  So then why does this ATP not request that they clear his
5      constipation and make sure the constipation is cleared?
6 A.  Because I had already done it twice and, thus, they had
7      reviewed that, those two ATP's, and knew exactly what I
8      needed.
9 Q.  And you don't believe they did that?
10 A.  I don't believe they did what?
11        MR. SCARBER:  Form, foundation, and asked and
12     answered.
13 BY MR. CROSS:
14 Q.  Gave him Senna twice daily, verified clearance with
15     abdominal film?
16        MR. SCARBER:  Asked and answered.  Go ahead.
17 A.  They had a film that was questionable, in my mind.
18 BY MR. CROSS:
19 Q.  And that's why you ATP'd this request?
20        MR. SCARBER:  Form --
21 A.  I --
22        THE WITNESS:  Oh, I'm sorry.  Go ahead.
23        MR. SCARBER:  Asked and answered, as to why he
24     ATP'd this, many times, but go ahead.
25 A.  I ATP'd this because I wasn't sure that the constipation

Page 56

1      had been cleared.
2 BY MR. CROSS:
3 Q.  Why didn't you write that in your ATP?
4        MR. SCARBER:  Asked and answered.  You just
5      asked him why he didn't write the same thing he wrote
6      before.
7 A.  (No response.)
8 BY MR. CROSS:
9 Q.  You wrote, "When symptoms demonstrate medical necessity,
10     resubmit".
11        So we're waiting for symptoms to necessitate
12     medical necessity; correct?
13 A.  Correct.
14 Q.  And when would symptoms demonstrate medical necessity?
15 A.  When there is no constipation, when the patient has been
16     reevaluated, if the reevaluation showed that the patient
17     does need a colonoscopy, he certainly would get it.
18 Q.  Well, what would the reevaluation consist of?
19 A.  Physician seeing the patient in the office and reviewing
20     labs, everything.
21 Q.  What are the risks associated with a colonoscopy?
22 A.  Rupture.
23 Q.  Uh-hum.
24 A.  Death.
25 Q.  Uh-hum.

Page 57

1 A.  Anaphylaxis to the medications used in a colonoscopy.
2 Q.  What are the risks of leaving ulcerative colitis
3      untreated?
4        MR. SCARBER:  I think that was asked and
5      answered, too, but go ahead.
6 A.  It does not cause any more -- any worsening of the
7      condition.
8 BY MR. CROSS:
9 Q.  What are the risks of leaving colon cancer untreated?
10        MR. SCARBER:  Foundation.
11 A.  Did this case have colon cancer?
12        MR. SCARBER:  Just, just answer the best you
13     can.  It's hypothetical, it sounds like.
14 A.  Yeah, it's hypothetical.  There's no colon cancer in this
15     case and the risk of not treating colon cancer could be
16     myriad but they may not be.
17 BY MR. CROSS:
18 Q.  When you say they could be myriad, what does that mean?
19 A.  That means there could be many things that happen because
20     it wasn't treated.
21 Q.  Are you being sued by any other prisoners besides
22     Mr. Lyles?
23        MR. SCARBER:  I'm sorry, Ian.  I didn't hear the
24     first part of your question.  What did you say?
25 BY MR. CROSS:



Keith Papendick, M.D.
08/23/2021

Pages 58..61

Page 58

1 Q.  Are you being sued by any other prisoners besides
2     Mr. Lyles?
3          MR. SCARBER:  I'm going to object to relevance.
4     I think you said sued?
5          MR. CROSS:  Yes.
6          MR. SCARBER:  Okay.  I'm going to object, I'm
7     going to object to relevance and undue prejudice; but for
8     purposes of discovery, you can answer.
9 A.  I don't understand how that relates to anything to do with
10    this case.
11         MR. SCARBER:  You can still answer the question
12    for purposes of a dep.
13         THE WITNESS:  Oh.  The question am I being sued?
14         MR. SCARBER:  Yes.
15 A.  Yes.  That comes with the territory.
16 BY MR. CROSS:
17 Q.  Do you know how many prisoners are suing you?
18 A.  No, I do not.
19 Q.  Were you ever sued before you started working in prisons?
20         MR. SCARBER:  I'm going to place an objection to
21    relevance and undue prejudice and no probative value, but
22    go ahead.
23 A.  Yes.
24 BY MR. CROSS:
25 Q.  How many times?

Page 59

1 A.  Twice.
2 Q.  How many times have you been sued since you started
3     working in utilization management?
4 A.  I do not know.
5          (Deposition Exhibit Number 7 will be marked upon
6          receipt.)
7 BY MR. CROSS:
8 Q.  All right.  I'm going to show you another document.  We'll
9     call this Exhibit 7.  I want you to read this paragraph
10    starting with "I", for the record.
11         MR. SCARBER:  Hang on a minute.  Can you
12    identify for the Court exactly what you want him to read,
13    please, and let the record reflect that this is -- go
14    ahead.
15         MR. CROSS:  The paragraph starting with "I".
16         MR. SCARBER:  What is it that you want him to
17    read?  What is the document?  Hang on before you answer it.
18         MR. CROSS:  It is a opinion in Pope v. Corizon
19    Health, Keith Papendick, et al.
20         MR. SCARBER:  Can you go back up to the top?
21         MR. CROSS:  (Indicating.)
22 BY MR. CROSS:
23 Q.  Go ahead.
24         MR. SCARBER:  Okay.  So this is a -- I'm going
25    to place an objection.  This is a pending case.  This

Page 60

1     isn't a final, an actual final opinion.  This case is
2     still pending.
3          MR. CROSS:  I'm just --
4          MR. SCARBER:  So for him to comment, for him to
5     comment on an ongoing lawsuit is inappropriate and
6     objectionable, and I'll probably only allow very limited
7     questioning on this because I think I'm well within my
8     right to instruct him not to answer on this stuff.
9 BY MR. CROSS:
10 Q.  Go ahead.
11         MR. SCARBER:  What do you want him to do?
12         MR. CROSS:  I want him to read the paragraph
13    starting with "I".
14 A.  Are you talking about the number one?
15 BY MR. CROSS:
16 Q.  Yes.
17         MR. SCARBER:  It's Roman Numeral I.
18 BY MR. CROSS:
19 Q.  Roman Numeral I.
20 A.  Roman Numeral I:  "As the Court noted in its screening
21    opinion, the case focuses on events that occurred while
22    Pope was incarcerated at Women's Huron Valley" -- or
23    excuse me -- "WHV."
24         MR. SCARBER:  All right.  That's as far as we're
25    gonna go with it.  Don't read any more.  It's a pending

Page 61

1     lawsuit.  I'm not letting him comment on it.  You can get
2     an order, you can get an order from the Court if you want
3     to have him comment and read opinions on pending lawsuits.
4 BY MR. CROSS:
5 Q.  Are you aware that you're a Defendant in this lawsuit?
6 A.  I could be.
7 Q.  Do you know what it's about?
8 A.  No, I do not.
9 Q.  No idea what the allegations are at all?
10         MR. SCARBER:  Same objection.  Don't answer any
11    more.  We'll get a protective order if it continues.
12 BY MR. CROSS:
13 Q.  All right.  I'm going to go back to the interrogatories.
14    I believe this was Request to Produce or -- I'm sorry.
15    It's Exhibit 6, Interrogatory --
16         MR. SCARBER:  Hang on one second, too.  Now that
17    I understand what you were doing, I'm gonna move to strike
18    this Exhibit 7 as well.  Go ahead, Doctor.
19         THE WITNESS:  I haven't got a question.
20         MR. SCARBER:  No.  He's back to another exhibit.
21         MR. CROSS:  We're talking about something else.
22         THE WITNESS:  Correct.  And I don't have a
23    question, so I can't go ahead.
24         MR. SCARBER:  Okay.  I'm dealing with my
25    objection.  Listen to his question and then answer.



Keith Papendick, M.D.
08/23/2021                                                        Pages 62..65

1 BY MR. CROSS:

2 Q.   So Interrogatory 3, we asked if between January 1, 2016

3      and January 1, 2018 you ever communicated with a medical

4      provider at a Michigan prison concerning the percentage of

5      that individual provider's 407 requests that are ATP'd,

6      and you indicated that you had not; correct?

7 A.   Correct.

8 Q.   And that's true you have not done that?

9 A.   There were reports put out every month that showed the

10     providers how many requests they had, how many were ATP'd,

11     and how many were deferred -- or I mean were NMI'd.

12 Q.   And you discussed those reports with the providers?

13 A.   No.  They were sent to them.  Their regional medical

14     directors discussed them and that would've --

15 Q.   Did you ever -- I'm sorry.  Go ahead.

16 A.   I'm sorry.  That would've been only until mid 2017.

17 Q.   Only until mid 2017?

18 A.   Correct.

19 Q.   So after January 1, 2016?

20 A.   Between January 1, 2016 and early 2017, I produced reports

21     of what was going on.  They were --

22 Q.   And what was -- sorry.  Go ahead.

23 A.   From January 2016 till early 2017, I produced reports from

24     the data.

25 Q.   And what was the purpose of those reports?

1 A.   My boss asked me to do it.

2 Q.   What was contained in the reports?

3 A.   There's --

4           MR. SCARBER:  I'm going to place an objection to

5      relevance.

6 A.   They're so old that I have no idea anymore.

7 BY MR. CROSS:

8 Q.   So it wasn't even -- well, let's switch gears.

9           Do you believe it's important to determine the

10     reason why someone is passing bright red blood from their

11     rectum?

12          MR. SCARBER:  Asked and answered, but go ahead.

13 A.   Yes.  It's important.

14 BY MR. CROSS:

15 Q.   Why is it important?

16 A.   Because there's a possibility that it could be pathologic

17     or it's a possibility that it is benign or it could be a

18     misread.

19 Q.   What's pathologic mean?

20 A.   Abnormal.

21 Q.   And were you able to determine for sure, from the 407

22     requests that were submitted to you, that Mr. Lyles'

23     rectal bleeding was caused by constipation?

24 A.   That's not my position.

25 Q.   Then what's your position?

1 A.   My position is to make sure that somebody looks at that.

2      That's the provider on site.

3 Q.   But were you able to ascertain that that was the cause?

4 A.   20/20 vision retrospect, no, I could not ascertain that.

5           MR. CROSS:  Okay.  I don't have further

6      questions.

7           MS. FOSTER:  I don't have any questions for this

8      witness.

9           MR. SCARBER:  Okay.  Let's take a quick break.

10          (At 1:00 to 1:08 p.m., recess taken.)

11          MR. SCARBER:  We can go back on.

12               EXAMINATION

13 BY MR. SCARBER:

14 Q.   Attorney Devlin Scarber appearing on behalf of the Corizon

15     Defendants, including Dr. Papendick.  Dr. Papendick, I

16     have a few follow-up questions for you.

17          Were you utilizing your medical judgment when

18     you were responding to the 407 requests concerning Andrew

19     Lyles?

20 A.   Absolutely.

21 Q.   And was it your medical judgment, regarding your

22     understanding of his particular conditions, that served as

23     a basis for your determinations and decisions?

24 A.   Yes.

25 Q.   Now, when receiving a 407 request regarding an undiagnosed

1      GI bleed in the stool, what are the differentials that you

2      are considering?

3 A.   You have to consider infection, such as C. difficile --

4      that's capital C period d-i-f-f-i-c-i-l-e -- constipation,

5      hemorrhoids, inflammatory bowel disease, irritable bowel

6      disease, and colon cancer, or polyps that could be

7      pre-colon cancer.

8 Q.   Now, do these conditions that you describe have common

9      symptoms, such as abdominal pain, change in bowel habits,

10     bright red blood in the stool and diarrhea?

11 A.   Yeah.

12 Q.   And you talked about, in your experience, many inmates

13     suffering from constipation in the prison.

14          Why?  Why is that?

15 A.   Well, they have a low fiber diet.  I will tell you when I

16     was working at Duane Waters, we had patients who had said

17     they didn't want to drink water because they thought we

18     had poisoned it.  They don't have full access to movement,

19     to get out and have exercise that would help them with the

20     constipation.

21 Q.   Do the inmates also complain of diarrhea and bloody stool

22     with positive FOB tests and that's often caused by

23     constipation?

24 A.   Yes.  It's called post-obstructive constipation or --

25     excuse me -- post-obstructive diarrhea, where the



**Keith Papendick, M.D.**
**08/23/2021**                                    Pages 66..69

1  constipation is obstructing the bowel, the bowel contents
2  from coming down to the colon and, thus, the body
3  liquifies the stool above the constipation, it goes around
4  the constipation, and they actually get leaking a lot from
5  that.
6 Q.  What is -- it's a term -- what is loose stool overflow?
7 A.  That's what I was just describing.
8 Q.  Okay.  Is that what you were describing?
9 A.  Post-obstructive diarrhea.
10 Q.  Have you experienced, in your position with Corizon and
11  working in this capacity with inmates or reviewing
12  requests concerning inmates, that relieving constipation
13  will very often relieve an inmate's symptoms?
14 A.  Absolutely.  And I've actually had inmates who I got notes
15  from the provider, that they wanted to thank me for taking
16  care of their constipation issue so that they didn't have
17  to have further testing and diagnostics.
18 Q.  Mr. Cross was asking you about the January 6, 2017 407
19  request and ATP, and he asked you about medical necessity,
20  the meaning of medical necessity not being demonstrated at
21  this time and when symptoms demonstrate medical necessity,
22  resubmit.
23       Do you believe that your decision at that point
24  was reasonable?
25 A.  Well, yes.

1 Q.  And can you give me some reasons why you believe that and
2  what your rationale is?
3 A.  Well, there was never a time that the provider said that
4  she didn't feel it was reasonable.  The X-ray still needed
5  to be redone.  We don't need a GI consult to do any of
6  those things.
7 Q.  Was his hemoglobin and iron levels normal?
8 A.  Yes.
9 Q.  Does that play a role -- and I think you were discussing
10  that with Mr. Cross -- in your decision?
11 A.  Yes.  Yes, it does.
12 Q.  And why is that important for you?
13 A.  Because significant, significant bleeding in the bowel, or
14  anywhere, would cause anemia.  And in this case there
15  wasn't anemia, so he hadn't lost a great deal of blood, if
16  he had lost any.  Like I said, they could've
17  misinterpreted what the red was.
18 Q.  Had there been a significant amount of time between when
19  the last physical was done and when you got the January
20  6th, 2017 report -- I'm sorry -- 407 request?
21 A.  Oh, I think it was a month.
22 Q.  Okay.  The last X-ray it looks like demonstrating or
23  referencing constipation was, I think, December 8th, 2016.
24       Could the Plaintiff have become constipated
25  again by the time the January 6th 407 was submitted?

1 A.  Absolutely.
2 Q.  Over a month later?
3 A.  Absolutely.
4 Q.  Between January 17th and March 17th of 2017, the testimony
5  in this case has been and the evidence in this case and
6  records has been that -- or has demonstrated -- I'm
7  sorry -- that Mr. Lyles' condition had improved, and I
8  think that you had referenced that in your testimony with
9  Mr. Cross?
10 A.  Correct.
11 Q.  Would that also be an indication to you that your
12  decisions at the time that you made them, in your mind and
13  in your medical judgment, were appropriate?
14 A.  Yes.  And he was, during that time as I recall, he was
15  treated with antibiotics, which would go along with the C.
16  diff diagnosis.
17 Q.  So the final question to you, Dr. Papendick, do you
18  believe, based upon the information, based upon the
19  training and experience that you have and the information
20  provided in the 407's, the information provided in the
21  records, what we've found out concerning Mr. Lyles'
22  condition, do you believe that with respect to all of
23  those things and in consideration of all of those things,
24  that your actions, regarding the 407 requests, were
25  appropriate at the time that you issued your 407

1  responses?
2 A.  Yes.  They were appropriate.
3       MR. SCARBER:  I don't have anything further.
4       MR. CROSS:  All right.  I have some cross,
5  unless, Jennifer, you want to go?
6            RE-EXAMINATION
7 BY MR. CROSS:
8 Q.  Okay.  Dr. Papendick, your attorney asked you some
9  questions about post-obstructive diarrhea; correct?
10 A.  Yes.
11 Q.  And you described a situation where there can be a
12  obstruction and the body liquifies the stool to move the
13  stool around the obstruction; correct?
14 A.  Around the colon or -- excuse me.  That's not quite
15  correct.
16 Q.  Okay.
17 A.  It's around the constipated, it's around the constipated
18  stool, not obstruction.
19 Q.  So there is a constipated stool and then there is a liquid
20  stool flowing around it?
21 A.  Correct.
22 Q.  Now, the constipated stool, is that something that could
23  be visible on an X-ray?
24 A.  Could be.
25 Q.  Or it could not be visible on an X-ray?



Page 70

1  A.  Well, it may be read as normal if there's only one piece.

2  Q.  Would that constipated stool affect the gaseous pattern of

3     the viscera?

4  A.  No.

5  Q.  Would it affect the gaseous pattern in the colon?

6  A.  Well, that is the viscera, but no.

7  Q.  Okay.  So how would one detect if this was a constipated

8     stool or not if you can't detect it with an X-ray?

9  A.  If they're having diarrhea, that makes no sense.

10 Q.  So diarrhea would be evidence of the constipation?

11 A.  Could be.

12 Q.  Could be?

13 A.  If he has post-obstructive diarrhea.

14 Q.  So you just know there's bloody diarrhea; you don't know

15    if it's postobstructive or not, but post-obstructive is

16    one possibility?

17 A.  First of all, I don't know that he's got bloody diarrhea.

18    I know he's saying that he has bloody diarrhea and he had

19    FOB positive studies that could be blood or may not be

20    blood, and he has diarrhea, and at the time of having his

21    diarrhea, he had X-rays demonstrating constipation.

22 Q.  When was the X-ray done that demonstrated constipation?

23 A.  I don't have that; you have it.  There was one in November

24    and I believe one in December.

25 Q.  Do you know which one of those two demonstrated

Page 71

1     constipation?

2  A.  I believe both of them.  It wasn't until January that it

3     was read that there was no constipation.

4  Q.  So blood in the stool could be caused by constipation;

5     right?

6  A.  Yes.

7  Q.  Would that also cause weight loss?

8  A.  If he's not eating correctly, yes.

9  Q.  Would it cause left lower quadrant pain?

10 A.  Yes.

11 Q.  Are there other possible causes of bloody stool, weight

12    loss and left lower quadrant pain besides constipation?

13 A.  Yes.

14       MR. SCARBER:  And I'll place an objection.

15    Asked and answered.

16 BY MR. CROSS:

17 Q.  And you were aware that it could have been one of those

18    other causes; correct?

19 A.  Certainly.

20 Q.  Okay.

21 A.  But the more common cause, the more common cause is

22    constipation and we wanted to get that ruled out before we

23    went further into this investigation, and he had to have

24    his constipation cleared before we could do a colonoscopy.

25       MR. CROSS:  All right.  I don't have further

Page 72

1  questions.  Thank you.

2       MS. FOSTER:  I still have no questions.

3       MR. SCARBER:  I have nothing further.  Thank you.

4       COURT REPORTER:  Can I just get your orders?

5       MR. CROSS:  I'd like an etrans.

6       MR. SCARBER:  I'd like the same.  Thank you.

7       MS. FOSTER:  I'm good with a PDF mini.  Thanks.

8       (At 1:23 p.m., Zoom deposition concluded.)

Page 73

1  STATE OF MICHIGAN          )
                              )   SS
2  COUNTY OF KENT             )

3

4

5          I certify that this transcript, consisting of 73 pages,

6  is a complete, true and correct record of the testimony of said

7  witness held in this case on Monday, August 23, 2021.

8          I also certify that prior to taking this deposition, the

9  witness was duly sworn to tell the truth.

10

11     Date:  09-02-2021

12

13

14

15

16         *Diane Murray*

17     Diane Murray, CSR-4019, RPR

18     County of Kent, State of Michigan

19     My Commission expires:  10-12-2025

20

21

22

23

24

25

**1**

**1**  14:17,22 39:14 62:2,3,19,20

**11-17**  21:2 32:4

**11-18**  21:3 32:5

**11-22**  21:3 32:5

**11-22-16**  26:20

**11-22-2016**  14:21 27:7

**11-8**  21:2 32:4

**11-9**  21:2 32:4

**11:02**  4:1

**11:15**  9:19

**11:23**  9:19,21

**11:37**  17:19

**12-20-16**  32:10

**12-22-2016**  33:18 34:24

**12-8**  28:19 46:19

**12-8-16**  28:20

**12:02**  31:15

**12:24**  41:21

**12:46**  54:21

**14**  13:15

**15.4**  33:2,4

**16**  22:10 28:22 35:14

**17**  28:10 36:7 40:19

**17th**  68:4

**1:00**  64:10

**1:08**  64:10

**1:23**  72:8

**2**

**2**  20:2,6 27:15 28:9 35:4

**20/20**  64:4

**2014**  8:15

**2016**  12:5,6,7,9 34:8 36:14 39:24 45:22 62:2,19,20,23 67:23

**2017**  20:21 45:22 54:11,24 62:16, 17,20,23 66:18 67:20 68:4

**2018**  62:3

**2021**  4:1

**22**  34:14,15

**22nd**  35:15

**23**  4:1

**2:04**  14:21

**3**

**3**  26:14,18 28:22 34:10 62:2

**4**

**4**  33:14,17

**407**  5:6 11:7,8,25 12:1,3,16,17, 20,23 13:2,5 20:8 23:16 26:3,20 29:13 37:9 42:24 47:23 62:5 63:21 64:18,25 66:18 67:20,25 68:24,25

**407's**  5:2,4 11:6 13:4 20:17 68:20

**5**

**5**  38:12,16 49:7

**6**

**6**  49:5,8,11 61:15 66:18

**6th**  20:21 67:20,25

**7**

**7**  59:5,9 61:18

**8**

**8.6**  27:14 35:3,4

**8th**  67:23

**A**

**a.m.**  4:1 9:19,21 17:19

**abbreviation**  19:9

**abdomen**  28:13 35:18

**abdominal**  27:16 28:13 30:13 34:6,13,16,20,21 35:5,7 55:15 65:9

**ability**  53:22

**Abnormal**  63:20

**Absolutely**  10:7 12:11 16:6 38:9 42:13 47:19 48:16 64:20 66:14 68:1,3

**absorb**  7:6

**absorbed**  7:2

**access**  65:18

**Accomplishment**  38:23

**Accomplishments**  38:22

**accuracy**  46:24

**acid**  6:20 7:10,12,14 8:3,5 25:1

**actions**  68:24

**actual**  60:1

**adequate**  28:2

**administering**  4:6

**affect**  70:2,5

**agree**  18:13 21:22 44:1 47:17

**ahead**  6:13 7:20 9:11 13:1 16:21 21:20 22:23 25:15 31:9 37:15 40:4,15 43:16 44:6,7 45:6 46:5, 14 49:1 51:12 52:22 53:15 54:15,16,20 55:16,22,24 57:5 58:22 59:14,23 60:10 61:18,23 62:15,22 63:12

**all-inclusive**  12:3

**allegations**  61:9

**Alternative**  19:9

**amount**  36:2,4 67:18



amylase  6:16,25

Anaphylaxis  57:1

and/or  11:19 49:17

Andrew  4:13 64:18

anemia  21:19,21 33:11,13 67:14, 15

anemias  33:9

anemic  30:11

annual  38:7

anoscope  18:6

anoscopy  15:14,16,19 16:8,10, 14,16,17,23 18:11 23:21

answering  43:13,15

answers  31:4 49:1

antibiotics  68:15

anus  5:24 15:17 24:1,7

anymore  63:6

apologize  9:9

appeared  28:15 35:19,22,25

appearing  36:5 64:14

appointment  43:1

approval  13:8,9 16:18 17:1,4 38:6,25 39:7

approve  29:14,15 43:6

approved  37:20 39:4 43:17 53:12

approving  19:10 27:24

approximately  42:21

area  23:21

ascertain  64:3,4

assume  29:9,11

assuming  32:21

ate  32:15

ATP  19:8 27:13,24 29:22 30:6 34:3,8,17,24 35:1,10,14 38:8 54:5 55:4 56:3 66:19

ATP'D  29:19 33:25 55:19,24,25

62:5,10

ATP's  19:10 44:17 55:7

attempt  14:1,2

attention  15:24 20:12,24 22:4 26:17 36:16 38:15 42:23 49:16

attorney  46:17 64:14 69:8

August  4:1

authorized  16:18

aware  42:15 61:5 71:17

---

**B**

back  17:17 28:9 31:13 39:16 41:19 47:15 54:17,18 59:20 61:13,20 64:11

bad  8:24

based  38:7 50:5 68:18

basic  7:1

basis  64:23

beets  22:2

beg  34:2

begins  32:2

behalf  64:14

believed  41:1,5

believes  23:10

benefit  10:6,8 53:10

benefits  17:15,24

benign  18:6,8 63:17

BID  35:4

big  14:5

bill  11:20

billing  11:20

Bismol  23:1

bit  33:21

black  14:6 22:16,18,24 32:16

bladder  28:17 35:21

bleed  22:16 24:16 65:1

bleeding  16:1,15 22:19,25 23:5 24:4,9 25:24 26:4,7 27:11 28:8 33:3,7,9,10,11 43:24 46:7 63:23 67:13

blood  21:5,8,9,11,13,16,18,22 22:12,13,15 23:4 25:10,12,16,19 26:11,12 30:12,21,22 31:1,18, 20,21 32:15,25 45:25 63:10 65:10 67:15 70:19,20 71:4

bloody  65:21 70:14,17,18 71:11

board  10:16,18

body  66:2 69:12

boss  63:1

bottom  27:1 29:17 42:24

bowel  7:6 25:22,23 30:25 31:18 35:24 65:5,9 66:1 67:13

BRB  22:9,11

break  6:9,15 64:9

breakdown  6:21

breaks  7:1

bright  22:12,13,15 23:4 24:4,9 25:9,12,16,19,23 28:7 30:20,22 31:1,18,20,21 32:25 45:25 46:6 63:10 65:10

broad  52:8

bunch  20:17

---

**C**

calculi  28:15 35:20

call  13:24 14:16 20:6 26:18 33:17 38:16 39:10 59:9

called  4:9 11:8 12:17 65:24

Calls  41:4

cancer  21:12,14,23 25:25 43:22, 25 44:8 57:9,11,14,15 65:6,7

capacity  66:11

capital  65:4



Keith Papendick, M.D.
08/23/2021

3

cards 32:11,17,20 33:5

care 8:9 10:4,24 11:2 13:14,16, 21 17:7,10 39:9 66:16

CARES 11:15,17,18,25 12:5,10 13:4,6

case 11:15 14:14 20:17 22:20 42:5,8 44:25 48:18,23 50:13 52:5 53:3 57:11,15 58:10 59:25 60:1,21 67:14 68:5

caused 33:10,11 43:24 63:23 65:22 71:4

center 8:18,20,22

certified 10:16,18

chance 16:12

change 65:9

changed 41:9,25

changing 42:1

check 24:2,8,14

chemical 8:2

chime 53:20

circumstances 52:9,14

clear 26:8 27:14,19 28:3 30:7 42:4 54:25 55:4

clearance 28:24 34:5,16 35:5,7 55:14

cleared 27:20 28:4,24 30:8 36:6, 8 46:9,13 50:18 55:1,5 56:1 71:24

clearing 32:11

clinical 36:3

colitis 25:20 42:15,17,19 43:20, 24 57:2

colon 23:5 36:2,25 57:9,11,14,15 65:6 66:2 69:14 70:5

colonoscopy 18:8,11 26:9,10,13 27:11,23,25 28:2 30:4 39:15,18, 19,20 40:7 42:16,18 44:12,14 50:17 53:7,25 54:3,5,7,10,23 56:17,21 57:1 71:24

colorectal 21:12,14,23

comfort 50:25 51:1

comment 60:4,5 61:1,3

comments 27:8,12

common 28:7 43:5 45:7 65:8 71:21

communicated 62:3

comp 36:19 37:1 38:1

Compact 36:19,21 37:2

companies 37:2,6

company 13:18,19 36:22,23 37:5,8

complain 65:21

complained 21:3

complaining 46:6

complains 21:18

complete 5:13,16 24:17

completed 40:16 43:2

component 5:24

components 5:22

computer 11:14

concern 44:11

concluded 72:8

condition 57:7 68:7,22

conditions 44:3 64:22 65:8

conducted 4:4

Condyloma 24:11

condylomata 23:24

confusion 45:5

connection 9:20

Consent 15:12

consideration 68:23

consist 56:18

consistently 39:2

constipated 26:8 28:1,2 47:5

67:24 69:17,19,22 70:2,7

constipation 25:17 26:9 27:14, 17,19 28:3,5,17,24 29:3 30:7 32:11 34:5,14,21,22 35:3,12 36:5,6,8,13,15 40:5,6 42:3,4 44:13 45:23 46:7,9,13 47:2,3,10, 13,17,21 50:18 54:8,25 55:1,5, 25 56:15 63:23 65:4,13,20,23,24 66:1,3,4,12,16 67:23 70:10,21, 22 71:1,3,4,12,22,24

consult 11:11 39:1,19 53:7,11,16 54:3,10,24 67:5

Consultation 27:7

contained 12:13 26:2 30:1 63:2

contents 7:6 66:1

continue 44:10

continued 11:10 16:2 30:19

continues 61:11

contribute 37:22

control 11:23 13:22,25

conversion 16:2

Corizon 11:18 59:18 64:14 66:10

correct 7:10,11 12:14 15:9,13,14, 15 16:8 17:15,24 24:24 25:2 28:21,25 36:2,4,8 39:13 40:12, 19 41:2 49:14,15,22 51:23 56:12,13 61:22 62:6,7,18 68:10 69:9,13,15,21 71:18

Corrections 8:9 11:10 27:6

correctly 50:6,7 71:8

cost 11:23

could've 67:16

counsel 44:7 48:21

couple 15:5 20:16 31:4 51:5

Court 4:2 8:24 9:1,17 31:12 41:12,19 43:9 49:6 54:17,18 59:12 60:20 61:2 72:4

covered 37:6,9

create 19:10



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Keith Papendick, M.D.
08/23/2021

4

criteria 49:17,21 50:11

Crohn's 25:20 43:25

cross 4:11,13 6:10 7:23 8:25 9:3,
7,15,25 12:25 14:5,16,21,24
16:25 17:17 18:3 19:4 20:4,18,
21,23 22:3 23:3 26:16 27:3
31:24 33:16 38:14 40:10,18,22
41:10 42:6 43:14,19 44:15,23
45:1,10 46:8,16 48:10,22 49:3,5,
10 50:10 51:7,16,21 52:16,21
53:5,21,24 54:4,19,20 55:3,13,
18 56:2,8 57:8,17,25 58:5,16,24
59:7,15,18,21,22 60:3,9,12,15,
18 61:4,12,21 62:1 63:7,14 64:5
66:18 67:10 68:9 69:4,7 71:16,
25 72:5

curriculum 38:18 49:6

—————————

D

d-i-f-f-i-c-i-l-e 65:4

daily 55:14

dangerous 16:17 18:5,11

data 28:11 29:2 30:9,14 35:14
47:20 52:2 62:24

date 14:19,21 20:16 28:18

dated 20:19,21 33:18

day 19:19,20 22:9 27:15

days 20:1

deal 67:15

dealing 61:24

death 16:1,10,12,14 51:8,18,25
52:11 56:24

December 22:10 34:15 35:14,15,
16,17 67:23 70:24

decision 12:13 42:14 66:23
67:10

decisionmaking 6:5

decisions 37:25 42:11 64:23
68:12

declaring 49:13

decreases 8:5

deem 50:14

Defendant 61:5

Defendants 64:15

defer 18:18 29:14,15

deferred 40:12,16,19 41:7,23
62:11

degree 5:17

delay 9:10 31:5 43:15

delaying 44:2

delays 9:17

delineated 52:9

demonstrate 27:17 29:24 30:17
34:13 40:24 56:9,14 66:21

demonstrated 27:13 29:23 34:4
35:2 66:20 68:6 70:22,25

demonstrating 67:22 70:21

dep 58:12

department 9:12 10:2 11:9 13:25
27:6 37:24

depend 46:22

depending 52:13

depends 19:20,21 36:9,11 43:7,
13 51:10,13,22 52:1

deposition 4:4,24 5:7 14:10,22
20:2,10 26:14,22 33:14,20 38:12
49:8 59:5 72:8

describe 11:12 65:8

describing 66:7,8

description 5:25

desk 39:5

detail 16:4 46:4,12

detect 70:7,8

determinations 64:23

determine 26:2,6,10 30:16 33:7
43:4 47:4 49:18 50:12 63:9,21

determining 37:22

Detroit 5:18

developed 11:18

Devlin 64:14

diagnose 43:20,21,22

diagnosed 44:8,9

diagnoses 25:21

diagnosis 44:2 68:16

diagnostic 40:9 45:24

diagnostics 66:17

diarrhea 65:10,21,25 66:9 69:9
70:9,10,13,14,17,18,20,21

diet 65:15

diff 68:16

difference 10:22 37:16

differentials 65:1

difficile 65:3

difficult 53:23

digestion 6:21 7:9

digestive 5:19 7:12

digests 6:20

direct 15:24 20:12,24 22:4 26:17
36:16 38:15 42:23 49:16

director 8:12,14,17 11:5

directors 62:14

discovery 48:14,17 49:1 58:8

discussed 16:4 42:12 62:12,14

discussing 46:19 67:9

disease 25:20 43:25 53:1,4 65:5,
6

doctor 5:11,14 10:14 17:12,21
18:14 21:9 31:3 43:12 44:6
48:11 61:18

doctor's 5:17 40:14

doctors 13:7

document 11:8 14:3 20:5,7,9



Keith Papendick, M.D.
08/23/2021

5

26:18,19,21 33:18 38:16,17
59:8,17

**documents** 4:23 12:1

**doubt** 32:24

**doubted** 33:1

**doubting** 46:24

**drink** 65:17

**drop** 33:21

**drug** 25:5

**Duane** 8:18,20 65:16

**duly** 4:9

**duodenum** 6:22,24

**duties** 11:4

---

**E**

**earlier** 24:22 46:22 47:25 51:5

**early** 42:22 45:22 62:20,23

**easiest** 40:8

**eat** 23:2

**eaten** 22:1

**eating** 71:8

**echoing** 8:24

**echos** 9:18

**education** 5:13,16

**employed** 8:8

**end** 36:25

**ending** 5:24

**endstage** 52:25 53:4

**entry** 13:6

**epigastric** 21:3 25:7

**esophagus** 6:17,18

**essentially** 13:17 24:1,7

**et al** 59:19

**etrans** 72:5

**eval** 38:7

**evaluate** 21:8 27:11

**evaluations** 38:4

**events** 60:21

**evidence** 28:15 35:20 68:5 70:10

**exam** 24:17

**EXAMINATION** 4:10 64:12

**excuse** 9:17 30:1 34:6 35:4 60:23
65:25 69:14

**exercise** 65:19

**exhibit** 14:17,22 20:2,6,16 26:14,
18 28:9,22 33:14,17 34:10
38:12,16 39:14,17 49:5,7,8,11 59:5,
9 61:15,18,20

**exhibits** 26:24

**experience** 38:18,21 65:12 68:19

**experienced** 66:10

**expert** 6:3

**explained** 18:21 53:9

**explicit** 44:11

**extensive** 6:14

**external** 24:16

---

**F**

**facts** 52:9

**Failed** 12:17,20 23:6,10,12,15,19

**failure** 16:1

**fair** 20:22

**fairly** 7:18

**family** 10:21,22,24

**fat** 7:1

**fault** 31:8

**Federal** 36:19 37:1

**feel** 67:4

**feeling** 47:9

**feels** 47:13

**fiber** 65:15

**fifteen** 54:14

**fifty** 19:25

**figure** 41:18,20

**file** 14:17

**film** 30:13 34:16,20,22 35:5,7
55:15,17

**films** 27:16 34:6,13

**final** 60:1 68:17

**find** 26:8 27:1

**finding** 40:7

**fine** 6:5 20:20

**finish** 21:25 31:4,9 43:16

**finished** 31:5

**fissure** 24:6,7 25:16

**fissures** 23:24 24:8

**flowing** 69:20

**FOB** 32:14 65:22 70:19

**FOBT** 21:2,4 22:2 32:4,10,17,20
33:5

**FOBT's** 21:11

**focuses** 60:21

**follow-up** 64:16

**food** 6:15,17,18,20 7:2

**foregoing** 49:14

**form** 6:1,6 12:22 15:12,18 23:7
27:7 36:12,17 42:24 50:8 55:11,
20

**FOSTER** 64:7 72:2,7

**found** 21:2,5 23:2 25:18 32:2,4
68:21

**foundation** 6:2,6 7:18 41:4 44:5
51:15 55:11 57:10

**fruition** 12:6,7

**full** 65:18



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Keith Papendick, M.D.
08/23/2021                                                      6

function  5:25 7:5 16:3

functions  6:18

---

### G

gas  36:2

gaseous  28:14 35:19,25 36:4
  70:2,5

gastric  25:20 53:14

gastroenterology  53:7,11,16
  54:10,24

gastrointestinal  5:23

Gave  55:14

gears  63:8

general  7:19

GI  39:18,19 54:3 65:1 67:5

give  5:24 35:10 53:18 67:1

good  72:7

great  10:2 46:4,12 67:15

group  42:4 45:14

guess  9:2 19:5 34:18 35:5 52:17

guessing  19:6

---

### H

habits  65:9

handled  45:7

hands  18:14

Hang  59:11,17 61:16

happen  16:7 42:5,8 57:19

happening  31:9 38:19 45:19

hard  14:17

harm  44:3 50:24

health  8:18,20,22 11:18 59:19

hear  7:21,24 10:1 29:10 57:23

heard  9:7

Hearing  4:5

helpful  26:25

hemoglobin  31:23 33:2,4,6,8,12
  46:7 67:7

hemorrhoid  23:25

hemorrhoids  23:24 24:2,5 25:17
  65:5

Henderson  47:12 48:12,13

Hey  20:14 53:18

highly  6:20

horrible  28:6

hospital  8:21

hospitalist  8:18

host  41:9,25 42:1

human  5:19,23 24:13,14

Huron  60:22

hypothetical  51:15 52:4 53:2
  57:13,14

---

### I

i.e.  44:13

Ian  4:13 8:24 14:5,14 20:14 31:8
  53:18 57:23

idea  37:11,12,13,17 38:3 61:9
  63:6

identify  5:22 14:13 20:15 26:24
  59:12

ileocecal  7:4

immediately  42:25

important  18:4 23:15 24:2 37:8
  43:20,21,22 44:8,9 63:9,13,15
  67:12

improved  68:7

inappropriate  39:15 40:1 60:5

incarcerated  60:22

include  6:25

including  64:15

increase  39:7,9

increased  38:25

increasing  22:8

Indicating  27:4 29:18 33:22
  39:17,22 59:21

indication  68:11

individual  27:9 28:2 62:5

infection  16:2,15 65:3

inflammatory  65:5

information  4:22 10:13 12:12,15
  18:24 26:2,6 29:14,15,20 30:11
  49:17 54:6 68:18,19,20

inhibitor  7:16 8:1 24:23,25

inmate's  66:13

inmates  65:12,21 66:11,12,14

inside  15:17

inspection  23:21

instances  43:12 44:17

instruct  60:8

insurance  13:17,19 36:18,22,23,
  24 37:2,5,6,8

intentionally  43:15

internal  10:23,25 11:1 25:24

interrogatories  48:23 61:13

interrogatory  48:24 49:17 61:15
  62:2

interrupt  20:15

Interstate  36:19,21 37:1

intestine  6:23 7:3,4,7,14

investigation  71:23

involves  7:10

iron  67:7

irritable  65:5

issue  17:3 27:24 40:5 66:16

issued  68:25

issuing  44:16



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Keith Papendick, M.D.
08/23/2021

7

**J**

**Jackson** 8:19

**January** 20:21 28:10 35:17 36:7
40:19 54:5,10,24 62:2,3,19,20,
23 66:18 67:19,25 68:4 71:2

**Jennifer** 69:5

**job** 8:11 11:4 13:14 38:4,21
45:15

**judge** 10:13

**judgment** 9:14 10:11,15 18:1,18
19:5,6 29:12 41:1 42:2,13 44:18
45:19 50:15 64:17,21 68:13

**juices** 6:25

**K**

**Kaelynn** 27:9

**Keith** 4:8 59:19

**Key** 38:22,23

**kidneys** 28:16 35:21

**kind** 14:19 50:5,24 52:11

**kinds** 52:12

**knew** 55:7

**knowing** 18:13

**L**

**lab** 28:11 29:2 30:9,11,14 31:22
35:13

**labs** 56:20

**large** 7:4,7,14 42:3

**late** 45:21

**lawsuit** 60:5 61:1,5

**lawsuits** 61:3

**lays** 18:14

**leaking** 66:4

**lean** 31:22

**leaving** 57:2,9

**left** 41:18 71:9,12

**letting** 61:1

**level** 25:1 33:12

**levels** 67:7

**limited** 60:6

**lipase** 6:25 7:1

**lips** 6:14

**liquid** 7:7,8 69:19

**liquifies** 66:3 69:12

**list** 37:6,8,17,19,20,23 38:2 45:24

**listed** 12:20

**Listen** 50:2 61:25

**literature** 5:9 44:16,22 45:6,9

**liver** 52:25 53:1,4

**living** 8:6

**located** 7:12

**location** 4:3

**long** 8:13 30:20 38:5

**longer** 10:17 47:15

**looked** 28:22 48:5

**loose** 66:6

**loss** 16:3 22:9 71:7,12

**lost** 67:15,16

**lot** 66:4

**lots** 18:7,9

**low** 33:12 65:15

**lower** 71:9,12

**Lyles** 4:13 6:4 32:25 39:15 41:1
42:15 44:17 45:21 47:4 53:3,8,
10 54:9,23 57:22 58:2 64:19

**Lyles'** 44:5 63:22 68:7,21

**M**

**M.D.** 4:8

**macromolecules** 6:22

**Madam** 31:12

**made** 42:11,13 68:12

**major** 17:3

**make** 10:3 12:13 13:21 17:9,14,
22 54:25 55:5 64:1

**makes** 37:14,16,24 70:9

**making** 8:3,5 17:7 19:6

**male** 33:2

**man** 45:23

**managed** 13:13,16

**management** 8:12,13,16,23 9:5,
11,12,16,23 10:2,5 11:5,19,22
13:17,20 17:1,6 59:3

**manager** 19:7

**March** 68:4

**marked** 14:22 20:2 26:14 33:14
38:12 49:8 59:5

**marking** 49:7

**matter** 49:20,22

**MDOC** 36:25 37:7

**meaning** 66:20

**means** 4:18,21 21:5 23:9,10
27:19 31:21 36:21,24 39:4 52:24
57:19

**meat** 22:1 23:2

**mechanism** 13:22

**medical** 4:25 5:1,4,6,11,14,17,20
8:12,13,17 9:13 10:10,15 11:2,5
12:2 13:13 14:18 18:1,18 19:5,6
27:13 29:12,23,24,25 30:17 34:4
35:2 39:9 40:24 41:1 42:2,13
44:2,16,18 45:19 50:14 56:9,12,
14 62:3,13 64:17,21 66:19,20,21
68:13

**medically** 39:12 40:4 49:19
50:13,20 51:9,18,25 52:11,17,18
53:1,8

**medication** 8:2



Keith Papendick, M.D.
08/23/2021

8

medications 57:1

medicine 5:18 10:23,25 11:1 17:25

melena 22:17,20

mentioned 7:9 44:7

Michigan 8:10 11:9 27:6 62:4

mid 62:16,17

midlevel 42:25 43:3

milligrams 27:15 35:4

mind 50:15 55:17 68:12

Mindlin 47:12,16,17,22 48:6

mini 72:7

minute 35:15 59:11

minutes 54:14

mischaracterizes 16:20 40:3 51:19

misinterpreted 67:17

misquoting 40:14

misread 32:17,22,23 63:18

misrepresenting 40:15

mix 6:24

mixing 6:16

molecules 7:2

Monday 4:1

month 35:8 40:12 62:9 67:21 68:2

Morning 4:12

mouth 5:23 6:15

move 6:18 61:17 69:12

moved 41:15

movement 65:18

movements 31:1,18

Multi-view 28:13 35:18

myriad 57:16,18

## N

name's 4:12

necessarily 13:11 26:12

necessitate 56:11

necessitating 40:7

necessity 27:13 29:23,24,25 30:18 34:4 35:2 40:24 56:9,12, 14 66:19,20,21

needed 42:2 45:23 50:18 54:6 55:2,8 67:4

neutral 7:15

Nice 4:12

ninety 39:1,4

NMI'D 62:11

nomenclature 11:11

normal 23:21 26:12 28:15 31:22 33:2 35:20,25 36:5 46:7 67:7 70:1

note 34:14 42:24 45:4

noted 33:1 60:20

notes 66:14

Notify 42:25

November 12:9 28:22 30:22 31:1,19 34:8,14 35:16 39:24 70:23

number 14:22 16:12,14 19:22 20:2 26:14 33:14 38:12 49:8 59:5 60:14

numbers 22:8

Numeral 60:17,19,20

nurse 11:15

nursing 32:18

## O

o-c-c-u-l-t 21:6

oath 4:6

OB 10:25 11:3

object 6:1 22:23 43:11 45:4 51:14 58:3,6,7

objection 6:6,9 7:17 12:21 16:19 19:1 26:24 40:2,13 41:3 44:4,20 46:3,11 48:7 51:5,11 52:7 54:13 58:20 59:25 61:10,25 63:4 71:14

objectionable 60:6

objections 4:5

observation 30:23

obstructing 66:1

obstruction 69:12,13,18

obtain 43:1

obvious 40:8

occasion 12:4 29:8

occult 21:5,6

occurred 60:21

off-site 9:13 10:9,10,14 15:22 17:2,5 18:20 19:11 30:1,2 41:2 49:19 50:13,19 53:12

offhand 42:20

office 56:19

Oliver 15:8,10,18 16:17 18:19,25 40:23

on-site 15:22 17:2,10 18:5 19:11

one-on-one 38:25 39:6

ongoing 60:5

open 16:3,15

opinion 59:18 60:1,21

opinions 45:14 61:3

options 29:13

oral 6:16,19

order 30:6 47:4 54:2,3 61:2,11

ordered 30:7

orders 46:10 72:4

outlines 28:14 35:19,22

Keith Papendick, M.D.
08/23/2021

9

**P**

**outpatient** 12:17,20 23:7,11,12, 16,20 39:1

**outweigh** 17:15,24

**overflow** 66:6

**P.C.** 8:10

**p.m.** 14:21 31:15 41:21 54:21 64:10 72:8

**paid** 11:21 38:1

**pain** 16:2 21:3 65:9 71:9,12

**palpation** 23:22

**pancreatic** 6:24

**Papendick** 4:8,12 6:2 59:19 64:15 68:17 69:8

**paper** 11:9

**papillomavirus** 24:13,14

**paragraph** 15:25 20:13,25 22:5,6 24:18 42:23 59:9,15 60:12

**pardon** 34:2

**part** 6:23 13:24 24:17 37:24 57:24

**pass** 26:12

**passing** 26:11 45:25 63:10

**passthrough** 37:17,19,23 38:2

**pathologic** 63:16,19

**patient** 9:14 10:3,6,8,11 11:2 13:11,21 15:19 17:7,9,13,15,21, 24 18:1,13,14,15,16,19,23,25 21:8,18,19,21,23 22:1,25 24:3,8, 15 25:3,7 26:8,11 27:22 30:20 33:8 38:19 39:10 42:4,9 43:2 44:3 46:6 52:25 55:1,2 56:15,16, 19

**patient's** 21:10,14,16,22 25:1,6,9 26:3 50:25 51:1

**patients** 7:20 10:24 23:2 40:6 65:16

**pattern** 28:14 35:19,25 70:2,5

**patterns** 36:4

**pause** 53:19

**pausing** 43:12

**pays** 38:3

**PDF** 72:7

**pediatric** 10:24

**pediatrics** 11:3

**penalty** 49:13

**pending** 59:25 60:2,25 61:3

**people** 19:21 25:19 33:7 41:4,14 43:9

**Pepto** 23:1

**percent** 16:11 19:16,17 39:1,4

**percentage** 38:8 42:3 62:4

**perforation** 25:22,23

**perform** 15:11,19

**performance** 38:4,7

**performed** 18:5,6,9 43:6

**performs** 5:25

**period** 65:4

**Perirectal** 23:21

**perjury** 49:14

**person** 15:2

**Pfeil** 27:9

**pharynx** 6:17,19

**physical** 67:19

**physician** 8:7 15:5 32:19 40:25 42:25 43:3 56:19

**physician's** 19:11 32:9

**physicians** 18:7,9

**pick** 43:16

**piece** 70:1

**pieces** 6:16

**place** 7:17 12:5,21 16:19 19:1

26:23 40:2,13 41:3 44:4,20 46:2, 11 48:7 51:4,11 52:7 54:12 58:20 59:25 63:4 71:14

**places** 15:5 51:6

**Plaintiff** 4:13 67:24

**Plaintiff's** 14:17

**plan** 19:9

**play** 67:9

**point** 7:3 30:21 66:23

**poisoned** 65:18

**policy** 49:21 50:11

**polyp** 25:18

**polyps** 26:1 65:6

**Pope** 59:18 60:22

**population** 28:5,8

**portion** 38:7

**position** 63:24,25 64:1 66:10

**positive** 21:2 32:4,10,14,20 65:22 70:19

**possibility** 63:16,17 70:16

**post-obstructive** 65:24,25 66:9 69:9 70:13,15

**postobstructive** 70:15

**potential** 37:2

**PPI** 24:22,23

**practice** 10:21,22,24 13:13

**practitioner** 42:25 43:3

**pre-colon** 65:7

**predominantly** 7:5

**prejudice** 58:7,21

**preparation** 4:23

**prepare** 14:9 20:9 26:21 33:19

**prescribe** 25:3

**present** 49:20,21

**prevent** 50:24 51:8,17,25 52:11


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

previous 34:17

previously 10:18

prison 28:5 62:4 65:13

prison's 8:21

prisoners 39:11 57:21 58:1,17

prisons 13:7 15:6 58:19

PRN 27:15

probative 58:21

problem 28:6 40:8 45:7 54:8

problems 23:18 30:19 40:6

procedure 15:12,22,23 16:3,11,
  15 18:5,6,9,20 38:5 49:18 50:19
  51:8,9,24 52:10,12

procedures 13:8 17:2,10 18:22
  37:20,22 38:1 43:17 50:12 51:17
  52:12

process 7:9 11:12 12:5

Produce 61:14

produced 62:20,23

program 11:18

promptly 43:20,22

proposed 17:14,23

propriety 10:13

protease 6:25

protective 61:11

protein 7:1

proton 7:16 8:1 24:23,25

Protonix 24:19,21 25:3,9

prove 27:19 28:3 30:8 34:5,16
  35:4,7 54:7

proved 28:24

provided 68:20

provider 14:25 16:22 23:10,13,
  15 62:4 64:2 66:15 67:3

provider's 62:5

providers 12:15 17:1 38:25 39:6,

11 62:10,12

PTO 19:21

pump 7:16 8:1 24:23,25

purely 10:15 44:18

purpose 9:16,22 10:5 62:25

purposes 58:8,12

put 12:22 13:4 23:15 62:9

puts 11:15

putting 39:8

### Q

quadrant 71:9,12

quality 8:9 13:22,25

question 4:16,17,21 6:3,7,8,12,
  14 7:20,24 9:7,10,24 17:16,17
  22:21 31:14 41:6,17 43:14
  46:15,17 48:20,25 50:2,5 52:4,8,
  10,15 54:16,17 57:24 58:11,13
  61:19,23,25 68:17

questionable 55:17

questioning 60:7

questions 6:7 7:18 64:6,7,16
  69:9 72:1,2

quick 64:9

quit 41:13

quote 30:12

### R

radiologist 36:14 46:24,25 47:8,
  9,23 48:15

radiologists 47:6,11

rate 16:1 39:1,7

rationale 67:2

RE-EXAMINATION 69:6

read 15:25 17:17 21:1 22:2,7
  23:19 27:9,12 29:22 31:25
  32:17,18 34:23 35:1,13 36:9,11

37:3,4 38:23 41:19 46:22 47:1,3,
  7,10,13,17,22,23 48:6,15 50:4,6,
  7 54:17,18 59:9,12,17 60:12,25
  61:3 70:1 71:3

reading 36:15 47:6

reads 47:1 48:11

real 16:5 51:15

reason 16:23 21:13,15 31:2 50:1
  53:14,16 63:10

reasonable 66:24 67:4

reasons 21:16 28:7 32:14 67:1

recall 29:11 42:22 68:14

receipt 14:23 20:3 26:15 33:15
  38:13 49:9 59:6

receive 38:4 48:17,23

received 11:25 13:14 32:24

receiving 64:25

recess 9:19 64:10

recognize 20:7 26:19 38:17

record 4:2,25 5:6 9:21 14:14
  15:25 17:19 22:7 23:20 27:10
  29:22 31:15 38:24 41:21 54:21
  59:10,13

records 5:1,5 12:2,4 14:18 68:6,
  21

rectal 26:3 27:11 33:10,11 43:24
  63:23

rectally 33:7,9

rectum 46:1 63:11

red 22:12,13,15 23:2,4 24:4,9
  25:9,12,16,19,23 28:7 30:21,22
  31:1,18,20,21 32:25 45:25 46:7
  63:10 65:10 67:17

redone 67:5

reduce 25:1

reevaluate 27:16,22 34:7 35:6,7
  55:1,2

reevaluated 43:3 56:16



reevaluation  34:6 56:16,18

refer  12:22 26:25

referenced  68:8

referencing  67:23

referral  49:19

referrals  50:13

referring  50:24

reflect  59:13

region  28:16 35:21

regional  62:13

relates  58:9

relevance  22:23 44:5 58:3,7,21 63:5

relieve  66:13

relieving  66:12

rely  54:15

remember  31:11 44:19 45:2 49:7

remembers  44:23

remotely  4:4,6

removed  45:24

repeat  16:3 17:16 31:13 41:17

repeated  9:21 17:19 31:15 41:21 54:21

rephrase  48:20

report  29:4,6,8 48:1,3,4,13,14 67:20

reported  36:12

reporter  4:2 8:24 9:1,17,21 17:19 31:12,13,15 41:12,19,21 43:9 49:6 54:17,18,21 72:4

reports  32:6 62:9,12,20,23,25 63:2

represent  4:13

request  11:11,12,14,25 12:1,13 15:10,18 17:13,22 19:11 20:21 26:3 27:7,11,25 28:10,23 29:13, 16 32:1,24 33:18,24 34:15,18,

20,21 36:12 39:14,18,20,24 42:24 47:23 48:2,4,13 55:4,19 61:14 64:25 66:19 67:20

requested  18:22 34:17 35:8 50:19

requesting  39:11

requests  9:13 10:3,8 19:18 29:5 38:8 39:1 42:12 62:5,10 63:22 64:18 66:12 68:24

resolution  27:17 34:13,20,22

respect  6:5 7:19 17:10 68:22

respond  33:24

responding  29:13 64:18

response  36:7 48:9 49:23 56:7

responses  48:17 49:13 69:1

resubmit  29:24 56:10 66:22

result  16:10 33:11

retrospect  64:4

returned  32:10

revealed  28:13 35:18

review  4:23 5:1,7,9 10:8 11:6,15 17:13,22,25 19:18 29:5 44:16

reviewed  5:4 14:9 20:9 26:21 27:2 33:19 44:19,21,24 45:2,3,8 55:7

reviewer  27:12

reviewing  56:19 66:11

reviews  9:12 11:19,20

rid  42:2 44:12

risk  16:12 57:15

risks  16:1,5 17:14,23 44:11 56:21 57:2,9

role  67:9

Roman  60:17,19,20

ruled  71:22

rupture  16:11 56:22

**S**

Scarber  6:1,12 7:17,22 9:6,8 12:21 14:13,19 16:19 19:1 20:14,19 21:25 22:23 25:14 26:23 31:3,8,12 40:2,13,20 41:3, 12 43:11 44:4,20 45:4 46:2,11 48:7,20,25 50:2,9 51:4,11,14,19 52:7,20 53:2,18,22 54:1,12 55:11,16,20,23 56:4 57:4,10,12, 23 58:3,6,11,14,20 59:11,16,20, 24 60:4,11,17,24 61:10,16,20,24 63:4,12 64:9,11,13,14 69:3 71:14 72:3,6

scheduled  27:15 34:5 35:3

school  5:18,20

screen  14:5,6 21:14 41:13,14,15

screening  21:12 60:20

section  12:17 38:22

sections  6:22

send  15:10,18 17:12,21

Senna  27:14 34:5 35:3 55:14

sense  70:9

sentence  15:24 20:12,24 22:5 23:23 24:10 31:25 35:1,13

served  64:22

service  10:14 17:13,14,22,23 19:11 43:2,4,5

services  10:9,10

seven-pounds  22:9

sharing  14:5

Sharon  15:8

show  12:23 14:1,3 20:5 33:17 49:4 59:8

showed  42:16,18 56:16 62:9

sidetracked  41:13

signature  49:11

signed  49:13

Keith Papendick, M.D.
08/23/2021                                                    12

**significance** 36:3

**significant** 67:13,18

**significantly** 33:3

**Signs** 20:13,25 22:5,6 32:1,21

**sir** 26:19 38:4 49:11

**site** 10:14 16:24 17:13,21 30:3,4
53:12,14,25 54:2 64:2

**situation** 44:6 51:13,22 52:14
69:11

**slight** 9:9

**small** 6:23 7:3

**smaller** 6:16,22

**sounds** 57:13

**source** 22:19 26:3,7

**specialists'** 45:14

**specialty** 10:16,18,20

**specific** 6:4 16:1 49:21 50:11

**specifically** 46:18

**staff** 32:18

**standpoint** 32:9

**starch** 7:1

**started** 14:5 43:13 58:19 59:2

**starting** 5:23 20:13 28:12 59:10,
15 60:13

**State** 5:17

**step** 46:4

**stomach** 6:19,24 7:13 8:2,5
22:16,25 25:1

**stool** 21:5,8,10,11,14,17,18,22
22:15 23:4,5 25:10,13,16,19,24
26:11 30:12,21 32:16,25 65:1,
10,21 66:3,6 69:12,13,18,19,20,
22 70:2,8 71:4,11

**stools** 22:8,18,24

**stop** 6:8 42:1

**stopped** 41:20

**stops** 8:2

**strike** 15:11 30:16 61:17

**stuck** 41:16

**studies** 70:19

**stuff** 14:20 50:5 60:8

**subjective** 30:23 32:6,8,9,13

**submitted** 27:7 63:22 67:25

**sued** 57:21 58:1,4,13,19 59:2

**suffering** 65:13

**sufficient** 29:3,4

**suing** 58:17

**summer** 42:22

**supplied** 5:2

**support** 30:14

**supporting** 52:2

**supposed** 7:8 40:23

**surgery** 16:3

**swear** 4:6

**switch** 63:8

**switched** 41:14,15

**sworn** 4:9

**symptoms** 20:13,25 22:5,6 25:6
29:24 30:17 32:1,21 40:23 44:13
56:9,11,14 65:9 66:13,21

**system** 5:19

**T**

**tabs** 27:15 35:4

**takes** 10:24 38:5

**taking** 66:15

**talked** 65:12

**talking** 9:8 12:23 43:9 45:5 48:25
49:25 60:14 61:21

**taught** 5:19

**tear** 24:7

**teeth** 6:15

**telling** 13:23

**tells** 46:18

**ten** 19:16,17,23 54:14

**tenderness** 25:7

**term** 66:6

**terms** 18:13

**territory** 58:15

**test** 21:7,11,13,16 22:2 33:5,8
49:18

**testified** 12:12 24:25

**testimony** 16:21 40:3,14 51:19
54:15 68:4,8

**testing** 66:17

**tests** 31:22 33:6 50:12 65:22

**therapies** 12:18,20 23:7,11,16,
17,20

**therapy** 23:12,13

**thing** 10:11 34:19 35:8 42:7 56:5

**things** 16:7 39:8,12 44:12 57:19
67:6 68:23

**thinking** 45:5

**thinks** 23:13 31:21

**Third-party** 36:18,24

**thought** 65:17

**till** 62:23

**time** 4:15 19:16,17 27:13,16
29:23 34:4 35:3 36:14 40:4,5,17
42:3 43:10 50:22 51:2 53:17
54:16 66:21 67:3,18,25 68:12,
14,25 70:20

**times** 22:8 29:7 43:17 51:5 52:20
55:24 58:25 59:2

**title** 8:11

**today** 42:12

**today's** 4:24 14:10 20:9 26:21
33:20



Keith Papendick, M.D.
08/23/2021

13

**told**  12:15 28:23 30:25 31:17 47:25 52:23 54:2

**top**  25:21 36:16 59:20

**total**  6:21

**touched**  18:15

**tract**  5:23 7:12

**training**  5:13,16 13:10,12 68:19

**trans**  17:3

**transcript**  5:7

**transplant**  52:25

**transportation**  17:4,5

**treat**  25:5 34:4 35:3

**treated**  57:20 68:15

**treating**  57:15

**treatment**  19:9

**trouble**  4:15

**troubleshoot**  9:20

**true**  31:6,7 49:14 62:8

**trust**  47:20

**twenty-five**  13:13

**two-second**  53:19

**type**  52:9

**typically**  7:15 22:16,24 24:16 25:23 29:5 32:18 45:7

---

**U**

**Uh-hum**  56:23,25

**ulcer**  25:20

**ulcerative**  25:20 42:15,17,19 43:20,24 57:2

**unable**  43:1

**undergo**  16:7

**understand**  4:18 6:12 17:12,20 41:6 45:18,25 46:9 52:15 53:6 58:9 61:17

**understanding**  46:3,13 64:22

**understood**  45:21,23 46:6

**undiagnosed**  64:25

**undue**  58:7,21

**unfortunate**  14:7

**University**  5:18

**unremarkable**  28:14 35:19,23

**untreated**  57:3,9

**unusual**  30:12

**Uptodate**  5:9 45:11,13,15,20

**ureters**  28:16 35:21

**urinary**  28:16 35:21

**utilization**  8:12,13,16,23 9:4,5, 11,12,16,23 10:2,5 11:4,19,22 13:17,19 17:1,6 19:7 59:3

**utilizing**  27:14 64:17

---

**V**

**VA**  36:19 37:1

**Valley**  60:22

**valve**  7:4

**varicose**  24:1

**vein**  24:1

**verified**  55:14

**viscera**  70:3,6

**visceral**  28:14 35:18,22

**visible**  69:23,25

**vision**  64:4

**visit**  17:5 30:2 41:2 53:12

**visits**  9:13

**vitae**  38:18 49:6

---

**W**

**Wait**  35:15 36:24 51:12

**waiting**  56:11

**wanted**  66:15 71:22

**warranted**  27:23

**warts**  24:13,14

**water**  7:6 65:17

**Waters**  8:18,20 65:16

**Wayne**  5:17

**week**  19:21

**weeks**  43:1,2,6,18

**weight**  22:9 71:7,11

**What'd**  36:10

**whatsoever**  52:10

**WHV**  60:23

**witness'**  16:20

**Women's**  60:22

**word**  24:10 50:23

**wording**  35:9

**work**  15:6 39:6

**worked**  23:13 38:25

**working**  53:13 58:19 59:3 65:16 66:11

**workmen's**  36:19 37:1 38:1

**works**  15:5

**workup**  30:5,6 40:9 44:10

**worsening**  57:6

**would've**  30:13 62:14,16

**write**  56:3,5

**written**  48:17

**wrong**  22:2

**wrote**  56:5,9

---

**X**

**X-RAY**  28:11,13,25 29:1,2,4,5,8, 12,21 30:9 35:13 36:11 46:20,23 47:2,3,4,10,14,18,20,24 48:1,2, 4,13 67:4,22 69:23,25 70:8,22

**X-RAYS**  47:6 48:11 70:21

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Keith Papendick, M.D.
08/23/2021                                          14

| Y |
|---|
| **yearly** 21:11 |
| **years** 13:13 |

| Z |
|---|
| **Zoom** 9:20 72:8 |

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100