**Sharon Oliver, M.D.**
**07/12/2021**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

ANDREW LYLES, #667516,

    Plaintiff,

 vs.     Case No. 2:19-cv-10673

PAPENDICK, et al,

    Defendants.

_____/

PAGE 1 TO 55

The Deposition of SHARON OLIVER, M.D.,

Taken Via Hanson Remote,

Commencing at 10:30 a.m.,

Monday, July 12, 2021,

Before Laurel A. Frogner, RMR, CRR, CSR-2495.

(Court reporter, attorneys & witness appearing remotely)



HANSON RENAISSANCE COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

## Sharon Oliver, M.D.
### 07/12/2021

**Page 2**

APPEARANCES:

MR. IAN T. CROSS (P83367)

Margolis & Cross

214 South Main Street

Suite 200

Ann Arbor, Michigan  48104

734-994-9590

ian@lawinannarbor.com

    Appearing on behalf of the Plaintiff


MS. MADELINE YOUNG (P82140)

Chapman Law Group

1441 West Long Lake Road

Suite 310

Troy, Michigan  48098

248-644-6326

myoung@chapmanlawgroup.com

    Appearing on behalf of the Defendants

    Sharon Oliver, M.D. and Keith Papendick, M.D.


**Page 3**

APPEARANCES (Continued):

MS. JENNIFER A. FOSTER (P75947)

Michigan Department of Attorney General

P.O. Box 30217

Lansing, Michigan  48909

517-335-3055

fosterj15@michigan.gov

    Appearing on behalf of the MDOC Defendants

          *   *   *   *   *   *   *


**Page 4**

TABLE OF CONTENTS

Witness                                                    Page

EXAMINATION BY MR. CROSS                                      6

EXAMINATION EXAMINATION BY MS. YOUNG                         48

FURTHER EXAMINATION BY MR. CROSS                             51

INDEX TO EXHIBITS

(Exhibits retained by counsel)

Exhibit                                                    Page

OLIVER DEPOSITION EXHIBIT A,                                14

NOTE IN MEDICAL CHART

OLIVER DEPOSITION EXHIBIT B,                                22

REQUEST FOR COLONOSCOPY

OLIVER DEPOSITION EXHIBIT C,                                23

ALTERNATIVE TREATMENT PLAN REQUEST

OLIVER DEPOSITION EXHIBIT D,                                26

KITE RESPONSE

OLIVER DEPOSITION EXHIBIT E,                                28

PROVIDER VISIT


**Page 5**

OLIVER DEPOSITION EXHIBIT F,                                29

REQUEST FOR GASTROENTEROLOGY CONSULT

OLIVER DEPOSITION EXHIBIT G,                                31

RESPONSE TO REQUEST FOR CONSULT

OLIVER DEPOSITION EXHIBIT H,                                33

ATP REQUEST

(EXHIBIT I WAS NOT MARKED)

OLIVER DEPOSITION EXHIBIT J,                                42

1-11-17 PROVIDER VISIT

OLIVER DEPOSITION EXHIBIT K,                                38

DR. PAPENDICK CV


HANSON RENAISSANCE COURT REPORTERS & VIDEO   hansonreporting.com   313.567.8100

Page 6

Remote Deposition

Monday, July 12, 2021

About 10:30 a.m.

COURT REPORTER:  My name is Laurel Frogner, a Michigan Notary Public and Certified Shorthand Reporter, and this deposition is being held via videoconferencing equipment.  The witness and reporter are not in the same room.  The witness will be sworn in remotely pursuant to agreement of all parties.  The parties stipulate that the testimony is being given as if the witness was sworn in person.

EXAMINATION BY MR. CROSS:

Q.  Good morning, Dr. Oliver.  Have you ever had your deposition taken before?

A.  **I'm sorry, can you repeat that?  You kind of broke up a little.**

Q.  Have you ever had your deposition taken before?

A.  **Many years ago.**

Q.  When was that?

A.  **I believe it was 1994.**

Q.  And what was the case about?

A.  **It was a case involving the death of a patient.**

Q.  Okay.  So it's been a while.  So before we start, I'm just going to lay down some ground rules.

Page 7

This isn't an endurance test, so if you need a break, you need to use the bathroom, et cetera, just let me know.  The only rule I have is if there is a question on the table, I ask that you answer the last question posed before the break, okay?

A.  **Yes.**

Q.  And if you don't understand any of my questions, I don't want you to guess.  I want you to ask me to clarify the question.

A.  **Okay, yes.**

Q.  Did you review any documents to prepare for today's deposition?

A.  **I reviewed my notes, the records.  I reviewed Mr. Lyles' deposition, and I believe that was everything.**

Q.  Did you review any medical literature?

A.  **No.**

Q.  Okay.  Can you give us an overview of your education and training since high school?

A.  **Since high school?  So I went to the University of Michigan for undergrad where I studied psychology. From there I went to Wayne State University to complete my prerequisites so that I could go into medical school.**

**I went into medical school in 1982,**

Page 8

**graduated in 1988, went into residency at Providence Hospital in Southfield, Michigan, and then into practice from there.  Since --**

Q.  Okay, continue.  Sorry.

A.  **Since, I have done some post-op work with alternative medicine.**

Q.  Do you have a medical specialty --

A.  **Go ahead.**

Q.  -- such as internal medicine?

A.  **I trained in internal medicine.**

Q.  What is internal medicine?

A.  **What is internal medicine?  Internal medicine essentially is the practice of medicine for adult patients.**

Q.  And what is the difference between internal medicine and family medicine?

A.  **Family medicine incorporates the entire family, so it can include children, OB-GYN, other aspects of different specialty groups.**

Q.  Okay.  Can you give us an overview of your employment history since you graduated from medical school.

A.  **I practiced in an internal medicine practice in Jackson, Michigan, and from there I spent a year in emergency medicine.  After that I had my own practice for the past 20 years where I practice alternative**

Page 9

**medicine.  I closed that practice in 2015 to go and work in the prison system.**

Q.  Okay.  So you have been working in the prison system since the beginning or the middle of 2015?

A.  **Towards the end.**

Q.  Towards the end, okay.  Do you work at the Saginaw Correctional Facility?

A.  **Yes, I do.**

Q.  Do you work there part-time or full-time?

A.  **I'm not sure how to answer that question.  I work at Saginaw and I also work at St. Louis, so I'm not sure how to answer that.**

Q.  Okay.  So you're full-time employed practicing medicine in prisons?

A.  **Yes.**

Q.  You split your time between Saginaw and St. Louis?

A.  **Yes.**

Q.  About how many hours a week do you work at Saginaw?

A.  **Currently?**

Q.  Uh-huh.

A.  **About 40 hours a week.**

Q.  In 2016 and 2017 about how many hours a week did you work at Saginaw?

A.  **More like 50 hours.**

Q.  Wow.  Is there another physician who works at the


HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                    **Pages 10..13**

Page 10

Saginaw Correctional Facility?

A. No.

Q. So it's just you?

A. Are you asking if there's other staff, medical providers?

Q. Are there mid-levels?

A. Yes.

Q. What's a mid-level?

A. A mid-level is a physician's assistant or a nurse practitioner.

Q. In 2016 and 2017 how many mid-levels worked at the Saginaw Correctional Facility?

A. One.

Q. And was his name Joshua Buskirk?

A. Yes.

Q. Okay. When you're practicing medicine in correctional facilities, do you ever encounter situations in which you don't know what to do?

A. I cannot say that that is something that has happened.

Q. So you are so experienced that you pretty much know what tests to order or what diagnosis to make or what treatment to prescribe for all of the conditions that you see?

MS. YOUNG: I'm going to object to form.

Page 11

THE WITNESS: So -- I'm sorry -- you're asking if my experience encompasses proper treatment and diagnosis?

BY MR. CROSS:

Q. What I'm asking is are there ever times when you need to call someone or refer to a reference material to find out what to do with a given patient?

A. You're asking if I ever discuss a case with someone?

Q. Do you ever seek information outside of your own experience in treating a patient because you need additional information?

MS. YOUNG: I'm going to object to form again.

THE WITNESS: I will look into information to verify what I know and to continue my education, but I'm not sure how -- if that's the answer to your question.

BY MR. CROSS:

Q. Okay. So you don't typically use reference materials in your practice?

MS. YOUNG: I'm going to object to form.

THE WITNESS: If it's some information that I want to verify, I will look up some information.

BY MR. CROSS:

Q. And what reference materials do you use to look up or

Page 12

verify that information?

A. The information that I like to -- sorry, the references that I like to look up is one particular one called UpToDate.

Q. Okay. Are there any others that you use?

A. No.

Q. Okay. Can you identify each component of the human gastrointestinal tract beginning with the mouth and ending with the anus, and for each component give us a brief description in layman's terms of the function that it performs?

MS. YOUNG: I'm going to object to form and foundation. I think there is multiple questions within that, and there's no foundation to establish that she's a GI expert.

BY MR. CROSS:

Q. Go ahead. You can answer.

A. Okay. Well, there is -- there's the mouth that deals with digestion and some absorption occurs, so that's where you have the initial breakdown of substances that go into the mouth.

It goes through the mouth into the esophagus which transports the material into the stomach where the digestive process continues with mixing and further mechanical and chemical breakdown

Page 13

of the substances.

From there into the small intestine which is divided into three parts. They have various abilities, but essentially that is where you have the first part of absorption of the digestive material.

It travels from the small intestine into the large intestine where the final part of digestion occurs.

I should back up, also. There is also the liver that adds some components to the digestive process that occurs in the small intestine.

From the small intestine to the large intestine you have the final process of absorption, and the remaining material is being prepared for evacuation in the form of feces or stool.

Q. So you said there were three parts of the small intestine. What are they?

A. The duodenum, the jejunum, and the ileum.

Q. And how are they different from each other?

A. Position is one. Function, although it's not a lot of difference, is another part.

Q. So how is the function of the duodenum, and what was the second one, I'm sorry?

A. Jejunum.

Q. Jejunum, how do their functions differ?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                    **Pages 14..17**

Page 14

A.   I can't say exactly right now.  That's not something that I can pull up exactly.

Q.   Okay.

A.   But they are not that -- it's very discrete, it's not very different.  I'm saying it's a minor difference.

Q.   Okay.  What about the large intestine?

MS. YOUNG:  I'm going to object to form, foundation.

BY MR. CROSS:

Q.   What exactly is it doing at the end of the digestive process?

A.   At the end of the digestive process?

Q.   Uh-huh.

A.   The end of the digestive process is evacuation of stool.

Q.   Okay, but prior to that when the material is in the large intestine, what is the large intestine supposed to be doing to the material?

A.   So what -- so what the large intestine does is to facilitate the absorption of the water soluble aspects of the digestive material.

OLIVER DEPOSITION EXHIBIT A,
NOTE IN MEDICAL CHART,
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

Page 15

BY MR. CROSS:

Q.   Okay.  I'm going to show you an exhibit.  Can you see a document on your screen?

A.   Yes.

Q.   Okay.  Do you have any idea what the document is?

A.   It says Andrew Lyles, Michigan Department of Corrections-Bureau of Healthcare Services.  So it appears to be a note that was placed in his chart.

Q.   Okay.  And if we go down here to the bottom of the note where it says Document Generated by Sharon Oliver, does that mean you wrote the document or what does that mean?

A.   Yes, it does, it means that I wrote it.

Q.   Okay.  So coming back to the top, you wrote FOBT positive.  What is FOBT?

A.   Fecal occult blood positive test.

Q.   Okay.  What's a fecal occult blood test?

A.   It is a test that looks at a small sample of stool that tests for occult blood.

Q.   And what is occult blood?

A.   Occult blood is blood that is not apparent with the naked eye.

Q.   Okay.  After the comma you write BRBPR w/bowel movement.

A.   Uh-huh.

Page 16

Q.   What is BRBPR?

A.   Bright red blood per rectum.

Q.   Isn't blood always bright red?

A.   No.

Q.   And what circumstances would blood not be bright red?

A.   Well, there can be many circumstances, but if it's been old or if it comes from the upper parts of the GI tract.

Q.   Okay.  What color would it be if it came from the upper parts of the GI tract?

A.   It can be bright red, but more likely than not it's called melena, which is a dark tarry black-looking stool.

Q.   Okay.  So what is the clinical significance of bright red blood per rectum with bowel movement and bright red blood per rectum without bowel movement?

A.   That it is a -- it more likely than not comes from the large intestine.

Q.   Okay.  I see on the third sentence you say pertinent negatives.  What's a pertinent negative?

A.   A pertinent negative is what is negative.  A pertinent negative helps you to rule out other etiologies of his symptoms.

Q.   Okay.  What is dysphagia?

A.   Dysphagia is difficulty swallowing.

Page 17

Q.   Why is that a pertinent negative in this instance?

A.   Because that helps you to eliminate problems with the esophagus potentially.

Q.   How about nausea and vomiting, why are those pertinent negatives?

A.   Because that helps with eliminating the etiologies originating in the stomach.

Q.   Okay.  Loss of appetite, why is that a pertinent negative?

A.   For both the stomach and the esophagus.

Q.   Okay.  Rectal pain, why is that a pertinent negative?

A.   That helps to eliminate problems such as hemorrhoids or fissures, tears in the rectum.

Q.   Recent diarrhea?

A.   That lets you know whether or not this is something that is more rapid or could have been caused by diarrhea.

Q.   Rectal pain associated with bleeding?

A.   Rectal pain associated with bleeding?  That also looks at -- helps you to eliminate hemorrhoids.

Q.   All right.  What's a hemorrhoid?

A.   A hemorrhoid is an enlarged blood vessel in the rectum.  It's very fragile, and with the process of defecation can cause bleeding.

Q.   Why is weight loss a pertinent negative?


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                                        **Pages 18..21**

Page 18

A.  That lets you know whether or not he is absorbing food.

Q.  And so the fact that he is not losing weight indicates that he is absorbing food at this time?

A.  It lends to that.

Q.  So additional information, inmate continues to have pain in the LLQ.  What's the LLQ?

A.  Left lower quadrant.

Q.  Where is that on the body?

A.  The left lower quadrant is when you look at the person and you divide the abdomen into four quadrants, it would be the left lower quadrant.

Q.  What are some of the possible causes of left lower quadrant pain?

A.  Wow, constipation, gas, ulcers, polyps, cancers, ulcers, diverticulitis, those are some of the possible ones.

Q.  Okay.  So I see here you conducted a physical exam of Mr. Lyles on this date?

A.  Yes.

Q.  And you examined his rectum?

A.  Yes.

Q.  What were you looking for when you examined his rectum?

A.  I was looking for anything that could contribute to

Page 19

the diagnosis of his pain and bleeding.

Q.  Such as what would you find or not find that would contribute to that?

A.  Well, I was looking for any fissures, hemorrhoids, any type of warts, anything that could -- whatever I could find that would help to make the diagnosis.

Q.  Okay.  And did you find any hemorrhoids, fissures, or warts?

A.  No.

Q.  It says in this abdomen section negative for palpable masses.  Did you palpate Mr. Lyles' abdomen?

A.  Yes.

Q.  Why did you palpate his abdomen?

A.  Well, that's one of the parts of the examination that you do to see if there are any masses that are prominent.

Q.  And what does that tell you that there are no masses?

A.  That there were no masses to palpate.

Q.  So why were you looking to check if there was a mass?

A.  Okay.  Sometimes if he had like an enlarged tumor, sometimes you can feel those when you palpate the abdomen.

Q.  A tumor would be cancer?

A.  It could be.

Q.  Okay.  So in this Assessment Plan, it says abdominal

Page 20

pain - poor.  What does that mean?

A.  That he continued to have pain and it wasn't any -- well, that he continued to have pain.

Q.  Okay.  In the Plan Comments:  Inmate scheduled for anoscopy.  What is an anoscopy?

A.  An anoscopy is a procedure that looks -- inserts a tube into the rectum.  It goes only a short way into the anus, and it's looking to see if there is any masses or ulcers in the lower part of the colon.

Q.  And you would be checking for those why?

A.  I was looking for the source of his pain and bleeding.

Q.  Okay.  Next sentence:  Will consider 407 if negative.

A.  Yes.

Q.  What does that mean?

A.  What does 407 mean?

Q.  What does the sentence mean?

A.  That I would consider submitting a request for further procedures if the anoscopy did not contribute to the diagnosis.

Q.  And the anoscopy would not contribute to the diagnosis if you didn't find a source of bleeding when doing the anoscopy?

A.  Correct.

Q.  Okay.  So next part it looks like you ordered a

Page 21

medication at this visit, Protonix.  Am I saying that correctly?

A.  Protonix.

Q.  Protonix.  Does Protonix have anything to do with protons?

A.  I don't know why they named that medication that name.  That's a brand name, so I couldn't speculate as to why they named it that way.

Q.  Is Protonix a proton pump inhibitor?

A.  Yes.

Q.  What is a proton pump?

A.  It helps to submit or place the acids into the digestive system to help with digestion.

Q.  Okay.  So if a person takes Protonix, what is going to happen to the level of acids in their digestive tract?

A.  It would decrease.

Q.  They would decrease.  And where in the digestive tract that we discussed before are the acids?

A.  In the stomach and in the small intestine.

Q.  Okay.  The acids are not in the large intestine, correct?

A.  No.

Q.  Okay.  So did you conduct an anoscopy for Mr. Lyles?

A.  Yes.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                                    **Pages 22..25**

Page 22

Q.  And do you remember what you found?
A.  I don't have a clear memory, but I believe it was a normal exam.
Q.  Okay.  I'm going to show you a second exhibit.  We'll call this Exhibit B.  The previous one was Exhibit A.
    OLIVER DEPOSITION EXHIBIT B,
    REQUEST FOR COLONOSCOPY,
    WAS MARKED BY THE REPORTER
    FOR IDENTIFICATION
BY MR. CROSS:
Q.  Do you recognize what this form is?
A.  Yes.
Q.  What is it?
A.  It's a request for a colonoscopy.
Q.  All right.  I want to direct your attention to this section down here that says failed outpatient therapies.  What is a failed outpatient therapy?
A.  It's a therapy that did not relieve his symptoms.
Q.  And why do you need to put failed outpatient therapies in this form?
A.  I put them there because I wanted to give as much information as to the treatments that have been already attempted.
Q.  All right.  So it's fair to say that Protonix did not relieve Mr. Lyles' symptoms?

Page 23

A.  Not at that time.
Q.  Okay.  And why did you request a colonoscopy for Mr. Lyles?
A.  Because he continued to have symptoms, and the anoscopy was apparently normal, so I was looking to find a diagnosis, the etiology of his pain and bleeding.
Q.  What's etiology?
A.  The cause.
Q.  The cause of his pain and bleeding?
A.  Yes.
Q.  And when you submit this request, who are you submitting the request to?
A.  Utilization Management.
Q.  What is Utilization Management?
A.  They are the people that approve whether or not we can have an outside expert.
Q.  Okay.  I'm going to show you another exhibit.  We'll call this Exhibit C.
    OLIVER DEPOSITION EXHIBIT C,
    ALTERNATIVE TREATMENT PLAN REQUEST,
    WAS MARKED BY THE REPORTER
    FOR IDENTIFICATION
BY MR. CROSS:
Q.  And I believe this is the response that you got from

Page 24

Utilization Management to your request.  See where why where it says Reviewer Comments:  ATP?
A.  Yes.
Q.  What is ATP?
A.  Alternative treatment plan.
Q.  What is the purpose of alternative treatment plans?
A.  Well, the sentence says Alternative Treatment Plan:  Medical necessity not demonstrated.  So what the purpose is is to direct you to evaluating or treating other possible causes of the symptoms.
Q.  The purpose is to direct you to evaluating or treating the possible causes of the symptoms?
A.  Other possible.
Q.  Other possible causes.  I see.  So the ATP in this instance was clear constipation utilizing Senna 8.6 mg up to 2 tabs b.i.d., scheduled not prn, and reevaluate at the time that abdominal films demonstrate resolution of constipation.
A.  Yes.
Q.  What does Senna 8.6 mg up to 2 tabs b.i.d., scheduled not prn mean?
A.  What does that mean?
Q.  Yes.
A.  Is that we are to give that dosage, 2 tabs twice daily, b.i.d. means twice daily, and around the

Page 25

clock, not as needed.
Q.  Okay.  And abdominal films, what are abdominal films?
A.  An x-ray of the abdomen.
Q.  Okay.  So fair to say the ATP is to clear his constipation using Senna and re-evaluate after you have an x-ray showing that he is not constipated?
A.  Correct.
Q.  What is Senna?
A.  Senna is a laxative.
Q.  Okay.  So down here, this reviewer name, Keith Papendick, are you familiar with a Dr. Keith Papendick?
A.  Yes.
Q.  Who is he?
A.  He is the reviewer for U.M., Utilization Management.
Q.  In your time working at the Saginaw Correctional Facility, are you aware of Dr. Papendick ever coming to the facility?
A.  I am not aware of any time that he came to the facility.
Q.  Do you know if Dr. Papendick personally treats patients in his current role?
A.  I do not know.
Q.  Would you agree that a patient's regular doctor who sees the patient on a regular basis, lays hands on


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Page 26

the patient, is typically going to be in a better position to know what's going on with the patient than someone who has never examined the patient?

MS. YOUNG:  I'm going to object to form and foundation.

**THE WITNESS:  I am not sure what you're asking, but from what I understand, Dr. Papendick's role is different from mine, so I can't really speak to that.  I know that I understood what the patient, Mr. Lyles, was complaining of, and I addressed those complaints.**

BY MR. CROSS:

Q.  Okay.  I'm going to show you another exhibit.  We'll call this Exhibit D.

OLIVER DEPOSITION EXHIBIT D,
KITE RESPONSE,
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. CROSS:

Q.  It says Kite Response.  Do you know what this is?

**A.  What a kite response is?**

Q.  Uh-huh.

**A.  Yes.**

Q.  What is a kite response?

**A.  A kite is a way of delivering a message between the**

Page 27

**patients -- and I should really say the inmates and other departments in the facilities.**

Q.  So did you author this document?

**A.  Yes.**

Q.  And what's the purpose of the kite response?

**A.  To deliver messages.**

Q.  To an inmate?

**A.  Yes.**

Q.  Okay.  So you wrote X-Ray Results.  The x-ray of your abdomen were normal.

**A.  Yes.**

Q.  So is it fair to say -- and this was on 12-13-2016?

**A.  Yes.**

Q.  And we got this ATP on 11-29-2016?

**A.  Yes.**

Q.  So fair to say between 11-29-2016 and 12-13-2016 an x-ray was performed on Mr. Lyles' abdomen?

**A.  Yes.**

Q.  And the results of that x-ray were normal?

**A.  Yes.**

Q.  And when we say normal, does that mean that constipation has been cleared?

**A.  Yes.**

Q.  Okay.  So I'm going to show you another document, and we'll call this Exhibit E.

Page 28

OLIVER DEPOSITION EXHIBIT E,
PROVIDER VISIT,
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. CROSS:

Q.  Does this look like a provider visit that you authored?

**A.  Yes.**

Q.  So you wrote on 11-22-2016, FOBT positive and bright red blood per rectum with bowel movement, meaning that at that time Mr. Lyles was still bleeding?

**A.  That was on 12-22-2016, and yes, he was still complaining of symptoms.**

Q.  All right.  And, now, among the associated symptoms you include weight loss?

**A.  Yes.**

Q.  Why is weight loss associated with the bloody bowel movements?

**A.  It's not necessarily associated with bloody bowel movements.  The symptoms that were associated included that he lost some weight, he's starting to lose weight.**

Q.  What does that indicate to you about the possible cause of the bright red blood per rectum?

**A.  I can't say that it indicated anything as to the**

Page 29

**possible cause, but it does indicate that his symptoms were worsening.**

Q.  Okay.  And you write that he states he has liquid stools three to five times a day.

**A.  Yes.**

Q.  So is it fair to say that at this point he's not constipated if he's having liquid stools?

**A.  You can still have liquid stools even if you're constipated.**

Q.  Oh, okay.  But the abdominal x-ray showed a normal abdomen, right?

**A.  Correct.**

Q.  So he was not constipated?

**A.  He was not constipated at that time.**

Q.  So I'm going to show you another exhibit, we'll call it Exhibit F.

OLIVER DEPOSITION EXHIBIT F,
REQUEST FOR GASTROENTEROLOGY CONSULT,
WAS MARKED BY THE REPORTER
FOR IDENTIFICATION

BY MR. CROSS:

Q.  And do you recognize what this document is?

**A.  Yes.**

Q.  And what is it?

**A.  It's a request for a gastroenterology consult.**


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                    **Pages 30..33**

Page 30

Q.  And you are the author of the document?

A.  I would have to -- yes, because it says completed by myself.

Q.  Okay.  Why did you submit this request?

A.  Because I followed the recommendations of the alternative treatment plan, and the patient continued to have symptoms, and so I was still looking for the cause of his symptoms.

Q.  What are some potential causes of his symptoms at this point?

A.  Well, he could have ulcers in the stomach or in the duodenum because he was also having the pain.  He could have polyps, he could have tears or fissures and diverticulosis, and, of course, he could have colitis, Crohn's disease or ulcerative colitis.

Q.  Could he have cancer?

A.  Well, yeah, but that would be unusual in a man his age.

Q.  You mentioned tears.  Where would those tears typically be in the gastrointestinal tract?

A.  They can still be anywhere but typically they -- they can be anywhere in the tract.

Q.  Where would they be in the tract?

A.  Yeah.

Q.  Where would they typically be?

Page 31

A.  Typically they could be in the rectum with fissures.

Q.  But you inspected his rectum for fissures and tears and didn't find any, right?

A.  That's true.

Q.  All right.  I'm going to show you Exhibit G.

    OLIVER DEPOSITION EXHIBIT NUMBER G, RESPONSE TO REQUEST FOR CONSULT, WAS MARKED BY THE REPORTER FOR IDENTIFICATION

BY MR. CROSS:

Q.  This is the response to your request, and could you read the reviewer comments for the record?

A.  "ATP medical necessity not demonstrated at this time.  Treat constipation with scheduled Senna 8.6, 2 tabs b.i.d., prove clearance with abdominal film and re-evaluate."

Q.  Isn't that what you just did?

A.  I thought so.

Q.  So why are they telling you to do it again?

    MS. YOUNG:  I'm going to object to foundation.  You're asking about Dr. Papendick's medical judgment.

    THE WITNESS:  I cannot comment on the why; I just know that that is what he wrote.

BY MR. CROSS:

Page 32

Q.  Did you agree with this ATP?

A.  Did I agree with it?  No.

Q.  Why didn't you agree with it?

A.  Because I felt that the constipation had been already treated successfully.

Q.  Do you know if Dr. Papendick is a gastroenterologist?

A.  I do not know what his specialty is.

Q.  Do you know if he has access to information, any information that you don't have access to regarding your patients that would allow him to create better treatment plans than you?

A.  I don't know what he has access to.

Q.  At the time you made this request, did you have the authority to send a patient offsite for a colonoscopy without Dr. Papendick's approval?

A.  No.

Q.  Why not?

    MS. YOUNG:  I'm going to object to foundation for that.

    THE WITNESS:  This is the process as far as I know for getting approval for outside consults.

BY MR. CROSS:

Q.  Now, you ordered an x-ray prior to this.  Did you need approval to order the x-ray?

A.  No.

Page 33

Q.  Why do you need permission for the colonoscopy but not for the x-ray?

    MS. YOUNG:  I'm going to again object to foundation.

    THE WITNESS:  As far as I can see, the x-rays are something that is done onsite, but to get an outside consult we would need to get approval.

BY MR. CROSS:

Q.  Is there anything you can do if you disagree with Dr. Papendick's ATP?

A.  What I did was to resubmit the request.

Q.  Okay.  Let's look at Exhibit H.

    OLIVER DEPOSITION EXHIBIT NUMBER H, ATP REQUEST, WAS MARKED BY THE REPORTER FOR IDENTIFICATION

BY MR. CROSS:

Q.  Is this the request you resubmitted?

A.  Could you scroll down or --

Q.  Sure.

A.  Or maybe up.  Yes.

Q.  Okay.  And what was different between this request and the last one?

A.  If you scroll down just a few more lines is that I changed the order of the presentation of his labs and


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100

**Sharon Oliver, M.D.**
07/12/2021                                      Pages 34..37

Page 34

x-rays.

Q.  Is that the only thing you changed?

A.  I don't know.  I'd have to see them side-by-side to see.

Q.  Okay.  Let's just flip back and forth between them.  So this one is 12-22-16.  And I believe Exhibit H is 1-6-17.  So it looks like inmate has rectal bleeding since October.

A.  Okay.

Q.  Noted here now with increasing number of stools 6 to 7 times a day with bright red blood and he has a 7-pound weight loss since 12-1-16, correct?

A.  Yes.

Q.  And on this request you did not include that information, correct?

A.  That is correct.

MS. YOUNG:  I'm sorry, which request was this, what date?

MR. CROSS:  It's the Exhibit F, 12-22-16 request.

MS. YOUNG:  All right, thank you.

BY MR. CROSS:

Q.  So you added the information about the weight loss, the increasing number of stools, and you changed the order of the lab and x-ray data.  Anything else that

Page 35

you included in this request that you didn't include in the last one?

A.  So this is the one on --

Q.  January 6.

A.  January 6.  Can you scroll down just a little more again?

Q.  Sure.

A.  Not that far.  Thank you.  It seems to be everything.  Can you go back to the previous one?

Q.  Sure.

A.  Yeah.  It looks as if I also included more of his labs.  I got updated labs.  Go to the previous one, I'm sorry, yeah.  No, I just included the labs again.

Q.  Okay.  And I believe in both of these you wrote the same thing for the failed outpatient therapy section, right?

A.  It looks like that, yes.

Q.  So you listed the 11-22-16 anoscopy as a failed outpatient therapy?

A.  Yes.

Q.  Why is that pertinent as a failed outpatient therapy?

A.  It is actually a procedure, but it shows that it was a normal exam.

Q.  So the source of his bleeding wasn't anything having

Page 36

to do with his anus or his rectum; is that correct?

A.  On that time it wasn't.

Q.  And you included Protonix again as a failed outpatient therapy?  His Protonix wasn't resolving his symptoms; is that correct?

A.  Correct.

Q.  All right.  And let's look at the response you got on 1-9-17.  Can you read the ATP here for the record?

A.  "ATP medical necessity not demonstrated at this time.  When symptoms demonstrate medical necessity, resubmit."

Q.  What is medical necessity?

A.  That is it necessary to have this particular avenue of discovery.

Q.  Did you agree with this ATP?

A.  You know, I don't think I agree or disagree, but at that time I did choose to look for other avenues to address Mr. Lyles' symptoms.

Q.  What do you mean when you say you don't agree or disagree?

A.  What do I mean by that?  Hmm, it's something that at that time didn't seem as if we were going to get a gastroenterology consult, so I felt it was important to further address the patient's symptoms.

Q.  Turning to the second sentence of the ATP, "When

Page 37

symptoms demonstrated medical necessity, resubmit."  When would Mr. Lyles' symptoms demonstrate medical necessity for a colonoscopy?

MS. YOUNG:  I'm going to object to foundation and also form.

THE WITNESS:  I think that if he continued to have the symptoms or the symptoms were worsening.

BY MR. CROSS:

Q.  Had the symptoms worsened by this point from when he began having them?

A.  I felt they had.

Q.  Did you feel that it was medically necessary for him to have a colonoscopy at this point?

A.  I submitted for a colonoscopy twice I think at this point or was it three times?

Q.  Three times.

A.  You know, I did feel that it was something that was important to get to the diagnosis.

Q.  And why was it important to get to the diagnosis?

A.  So that we would know exactly what we were trying to treat.

Q.  Is there anything that you can do if you disagree with Dr. Papendick's ATP?

A.  What I did was to resubmit it.

Q.  Okay.  This one is the resubmission of the last one


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**      **Pages 38..41**

Page 38

that you said you disagreed with.

MS. YOUNG: Sorry, Ian, you broke up there. Do you mind repeating the question or having the court reporter repeat it back.

BY MR. CROSS:

Q. Is there an appeals process for ATPs?

A. **Not at that time.**

Q. There was not an appeals process?

A. **No.**

Q. So Dr. Papendick's decisions were final?

A. **Yes.**

Q. When was an appeals process implemented?

A. **See, we just started with a new electronic medical record system, and it was around that time.**

Q. Okay. So if they instruct you to resubmit when symptoms -- I'm sorry, I already asked you that question, strike that.

I'm going to show you another document.

OLIVER DEPOSITION EXHIBIT NUMBER K, DR. PAPENDICK CV, WAS MARKED BY THE REPORTER FOR IDENTIFICATION

BY MR. CROSS:

Q. This is a resume for Dr. Keith Papendick. We'll call it Exhibit K. I want to direct your attention to

Page 39

this paragraph indicating that he now has the support and structure of the U.M. Core Process which includes a dual appeals process led by Corizon Health's chief medical officers. First of all, what is Corizon Health, if you know?

A. **Corizon Health was the entity that I was working under.**

Q. Do you know -- are you familiar with this dual appeals process referenced in the resume?

A. **I think at this -- yes.**

Q. Can you describe how it works?

A. **Now?**

Q. Yeah.

A. **Okay. So the way it works now is that if we disagreed with the decision of Utilization Management, that we can appeal it. It goes -- the appeal is submitted to the regional medical director who may or may not uphold the appeal.**

**If the regional medical director does not uphold the appeal and we still disagree with that, then we can resubmit it. It would go to the Chief Medical Officer who may or may not uphold the appeal.**

**Once more, if it is not -- if we do not agree with it, then we can resubmit the appeal and it would go to the State of Michigan medical officers**

Page 40

who may or may not uphold the appeal. If they do not uphold the appeal, then at that point we are bound by that final decision.

Q. All right. I want to direct your attention to the last sentence here where it says, "Utilizing InterQual reviews as provided by Corizon Health's Utilization Management nurses in combination with Corizon Health's standard medical guidelines."

Do you have any familiarity with Corizon Health's standard medical guidelines?

A. No.

Q. Okay. Do you know if they exist or what they are at all?

A. No.

Q. I'm going to take you down here to the Key Accomplishments Section. "Worked with providers one-on-one and increased approval rate for outpatient consult requests to 90 percent consistently."

Did Dr. Papendick ever work with you to increase your approval rate for outpatient consult requests?

MS. YOUNG: I'm going to object to the form of the question. What does it mean by work with you?

BY MR. CROSS:

Q. You may answer.

Page 41

A. **Oh, so with that, I'm not sure what that means, but he would explain in his comments what needed to happen in order to approve medical necessity.**

Q. Do you mean comments in an ATP or comments outside of an EMR?

A. **In the ATP.**

Q. Okay. So he never gave you any general advice about what to include in your 407 requests to get them approved?

A. **General comments?**

Q. I'm sorry, let me repeat the question. Did he ever give you any general advice about what to put in your 407 requests to get them approved?

A. **Besides what he put in for the -- in his reviewer comments?**

Q. Yes.

A. **That was all that I remember.**

Q. Okay. Did you receive any training from anyone about what to put in 407 requests to get them approved?

A. **I relied on my medical training and my experience, so I put in what I thought was pertinent for that particular patient.**

Q. Okay. So when it says approval rate for outpatient consult requests, are you aware that you have a personal approval rate for outpatient consult


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                                    **Pages 42..45**

Page 42

requests?

A.  No.

MS. YOUNG:  I'm going to object, sorry, delayed objection to form and foundation.  Thanks.

THE WITNESS:  No.

BY MR. CROSS:

Q.  Okay.  All right.  I'm going to direct your attention to what we will call Exhibit J.

OLIVER DEPOSITION EXHIBIT NUMBER J, 1-11-17 PROVIDER VISIT, WAS MARKED BY THE REPORTER FOR IDENTIFICATION

BY MR. CROSS:

Q.  This is another provider visit with Mr. Lyles.  Can you confirm that you are the author of this document?

A.  Yes.

Q.  Okay.  And this is on 1-11-17?

A.  Yes, I'm sorry.

Q.  BRBPR with bowel movement?

A.  Yes.

Q.  So he is still bleeding on 1-11-17?

A.  Yes.

Q.  And at this point he has been bleeding for over three months?

A.  Yes.

Page 43

Q.  And you write, "He states the pain is worsening despite taking Protonix."

A.  Protonix.

Q.  Protonix, I'm sorry.  Did you believe that?

A.  Did I believe it?

Q.  So you write, "He states the pain is worsening despite taking Protonix."  Did you believe he was lying about that?

A.  There's no evidence to say that I believed he was lying.

Q.  Okay.  So you believed that his pain was, in fact, worsening at this point?

A.  I believe that he felt that his pain was worsening.

Q.  All right.  In the gastrointestinal section you wrote, "Associated symptoms include hematochezia," am I saying that correctly?

A.  Hematochezia.

Q.  Hematochezia, what is that?

A.  Blood in the stool.

Q.  Does it refer to a specific type of blood in the stool?

A.  Bright red blood in the stool.

Q.  What is melena?

A.  Melena is dark tarry blood.

Q.  So hematochezia indicates what about the source of

Page 44

the blood?

A.  That it's more likely to be the lower GI tract.

Q.  And what's the lower GI tract?

A.  The large intestine.

Q.  All right.  And then you noted that he had lost almost 11 pounds?

A.  It looks like a little over 11 pounds.

Q.  Oh.  11.8 pounds, yeah.  And then for the physical examination you wrote, "His overall pattern is chronically ill appearing."  What did you mean by that?

A.  That he was starting to look ill.

Q.  Like what signs or symptoms would indicate to you that a person is chronically ill appearing?

A.  It could be various, but it's basically an appearance of not being well.

Q.  And would you agree that his condition was not improving with Protonix at this point?

A.  At that point I would agree that he had not gotten the relief that I had hoped for.

Q.  All right.  Was there ever a time when you advised Mr. Lyles to drink a large amount of water?

A.  I advised Mr. Lyles to make sure that he kept up with his hydration several times.

Q.  You stated that you reviewed Mr. Lyles' deposition

Page 45

testimony in preparation for today's deposition, correct?

A.  Yes.

Q.  Did you notice a part of his deposition testimony where he referred to a request that he drink a large amount of water prior to taking labs?

A.  Yes.

MS. YOUNG:  I'm going to object to the form of the question since that's not the entirety of his testimony.

THE WITNESS:  Yes, I did notice.

BY MR. CROSS:

Q.  Were those statements true or false?

A.  I think that that was something that was much later, and what I believe I told him was to make sure he drank water to maintain his hydration.

Q.  So you did not tell him to drink water to make his labs look a certain way?

A.  I honestly don't recall exactly what was said, but if it is to maintain his hydration, which could appear as being normal as far as his anemia, if he was dehydrated, then yeah, improving his hydration would change his labs.

Q.  And did you want him to improve his hydration to change his labs?



**Sharon Oliver, M.D.**
**07/12/2021**                                    **Pages 46..49**
Page 46                                          Page 48

A. I wanted him to improve his hydration so that he wouldn't be dehydrated.

Q. Okay. I'm going to show you another document. Do you recognize this document?

A. Yes.

Q. What is it?

A. It is from a former website of my former practice.

Q. Can you read the first paragraph for the record.

A. "If a smoke alarm startled you out of your sleep in the middle of the night, would you stumble to the alarm, smash it with a hammer, and go back to bed? You might be temporarily satisfied. That awful piercing noise would be gone, but wouldn't it be tragic if there were a fire brewing in one of your rooms? When we merely suppress or hammer our symptoms with quick fixes without investigating the cause of the symptoms, we're playing with fire. We're ignoring what's brewing within us."

Q. Did you write that?

A. Yes.

Q. Do you agree with it?

A. Yes.

Q. Do you think it was important to determine the cause of Mr. Lyles' rectal bleeding in late 2016?

A. Yes, I did.

Page 47

Q. Did you attempt to determine the cause of his rectal bleeding in late 2016?

A. Yes.

Q. And did you need a colonoscopy to determine the cause of his rectal bleeding at that time?

A. I believed it would be helpful.

Q. Were you able to determine the cause without a colonoscopy?

A. No.

Q. What prevented you from obtaining a colonoscopy for Mr. Lyles?

A. It was not approved.

Q. By whom?

A. By Utilization Management.

Q. And who within Utilization Management made that decision?

A. Dr. Papendick.

Q. Okay. I have no further questions. Thank you for your time.

THE WITNESS: You're welcome.

MS. YOUNG: Jennifer, do you have any questions?

MS. FOSTER: I don't think I have any questions for this witness.

MS. YOUNG: Okay. I just have a few

Page 48

follow-up.

EXAMINATION EXAMINATION BY MS. YOUNG:

Q. Did you ever purposely ignore any signs and symptoms that Mr. Lyles was demonstrating?

A. Not at all.

Q. Do you think that overall Mr. Lyles' signs and symptoms were being appropriately assessed and treated as he presented?

A. Yes, I do.

Q. And that's throughout the whole time period between November of 2016 through August of 2017 when he appeared at I believe McLaren Hospital for ulcerative colitis?

A. Yes.

Q. You believe that the care you provided was adequate and appropriate?

A. Yes.

Q. You testified earlier that Dr. Papendick's opinion was final in nature. Can you just clarify for the record that I guess the recourse you would have had at that time would have been to just keep resubmitting or pursuing alternative treatment plans?

A. Correct, that's true.

Q. After the January 9, 2017 ATP, which was after that third 407 request that you submitted, was it your

Page 49

choice to exhaust alternative options as opposed to resubmitting a 407 request at that time to treat Mr. Lyles' signs and symptoms?

A. Yes.

Q. You testified earlier that Mr. Lyles had been bleeding for over three months in January of 2017. Do you know for a matter of fact whether he was consistently bleeding, or were there potential time periods where he could have been waxing and waning in his symptoms?

A. I think that he had actually admitted that he had waxed and waned, that there were times when he had improvement --

Q. Okay.

A. -- and times when it deteriorated.

Q. So after the January 9th, 2007 ATP where you chose to exhaust alternative options, did Mr. Lyles' signs and symptoms improve before you submitted the 407 in April of 2017?

A. It did improve.

Q. Why did you submit the 407 in April of 2017?

A. Because after a period of him having an improved state, then he started to deteriorate again.

Q. And that's why you submitted a 407 --

A. Yes.



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                    **Pages 50..53**

Page 50

Q.  -- for colonoscopy?

A.  Yes.

Q.  And to your knowledge, was that colonoscopy approved by Dr. Papendick?

A.  It was.

Q.  And that colonoscopy led to his ultimate diagnosis of ulcerative colitis?

A.  Yes.

Q.  And after he was diagnosed with ulcerative colitis, did you provide him with the appropriate medication to treat that underlying diagnosis?

A.  Yes, I did.

Q.  To your knowledge, is ulcerative colitis a preventative disease?

A.  No.

Q.  Even if you had provided him with the appropriate treatments for ulcerative colitis, could he have still decompensated after that?

A.  Yes.

Q.  Is it your opinion that had a colonoscopy been performed sooner, had he been diagnosed with ulcerative colitis, had he been put on the appropriate medication, that he more likely than not would have still decompensated after that?

A.  I've seen patients decompensate even though they were

Page 51

treated appropriately.  It's impossible to say whether he would have or not.

Q.  The entire time period that you were treating Mr. Lyles between November of 2016 and April of 2017, was his BMI index within the normal range to your knowledge?

A.  For a large part of that time it was.

Q.  Okay.  I have no further questions.

FURTHER EXAMINATION BY MR. CROSS:

Q.  I have some follow-up.  So you just testified that you submitted a request for a colonoscopy for Mr. Lyles in April of 2017?

A.  Yes.

Q.  Was the colonoscopy performed in April of 2017?

A.  No.

Q.  When was the colonoscopy performed?

A.  I'm not sure.

Q.  Do you know how long it typically takes after a request is approved for an offsite consult for the consult to occur in your experience?

A.  In my experience, it can vary.  I'm not sure of the details of what would precipitate an appointment time.

Q.  Do you have any influence over how quickly the appointment is scheduled?

Page 52

A.  No.

Q.  Who schedules the appointments?

A.  There is a secretary that schedules the appointments.

Q.  Is a two-month delay between approval and an appointment common?

A.  It depends on the case and the specialty.

Q.  So how about in the gastroenterology specialty?

A.  I think that that was actually common, but I don't remember.

Q.  Between November of 2016 and June of 2017 did Mr. Lyles experience pain, in your opinion?

A.  Can you repeat that, please?  I'm sorry.

Q.  Between November of 2016 and June of 2017 did Mr. Lyles experience pain?

A.  Yeah, he complained of pain.  That was one of his initial complaints.

Q.  Would you say that at that time he had a serious medical condition?

MS. YOUNG:  I'm going to object to the form of the question because it calls for a legal conclusion.

MR. CROSS:  You may answer.

THE WITNESS:  I believe that all medical conditions are serious medical conditions.

Page 53

BY MR. CROSS:

Q.  What is the purpose of treating ulcerative colitis?

A.  The purpose of treating ulcerative colitis?

Q.  Uh-huh.

A.  To relieve the symptoms, to improve quality of life, and hopefully to prevent any progression of the disease.

Q.  Is it important to provide treatment for ulcerative colitis?

A.  I believe it is.

Q.  Is it important to provide treatment early when the symptoms are first detected?

A.  I believe that in order to relieve a patient's symptoms, if at all possible the sooner that you can treat them so that they can experience relief, the better it is for the patient.

Q.  And the sooner you can treat them, does that improve the chances that the treatment will be successful?

A.  Not necessarily in this case.

Q.  Why do you say not necessarily in this case specifically?

A.  Because with ulcerative colitis, like I said earlier, they can have early treatment and still progress.

Q.  So then what's the purpose of providing early treatment?


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                                    **Pages 54..55**
Page 54

**A.  I thought I answered that.**

Q.  To relieve the pain?

**A.  Yeah.**

Q.  And I believe to --

**A.  To stop the progression.**

Q.  To stop the progression?

**A.  Can't guarantee it.**

Q.  Do you have any training specific to gastroenterology?

**A.  As far as my training in internal medicine?**

Q.  (Nods head.)

**A.  No more than that.**

Q.  Are you Board-Certified in internal medicine?

**A.  No.**

Q.  Were you in 2016?

**A.  No.**

Q.  Do you have any particular experience with treating ulcerative colitis besides this patient, obviously?

**A.  I have experience in treating it in my practice and also with multiple patients in my current practice.**

Q.  Okay.  Thank you.  I don't have further questions.

        MS. FOSTER:  I have nothing for this witness.

        MS. YOUNG:  I have no further questions.

        (The deposition was concluded at 11:57 a.m.)

Page 55

CERTIFICATE OF NOTARY

STATE OF MICHIGAN        )

                         ) SS

COUNTY OF OAKLAND        )

    I, Laurel A. Frogner, Certified Shorthand Reporter, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was first duly sworn to testify to the truth and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full, and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to any party, nor interested in the event of this cause.

        Laurel A. Frogner, CSR-2495, RMR, CRR

        Notary Public,

        Oakland County, Michigan

        My Commission expires:  4-22-2022


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Sharon Oliver, M.D.
07/12/2021
1

**1**

**1-11-17** 42:10,17,21

**1-6-17** 34:7

**1-9-17** 36:8

**10:30** 6:3

**11** 44:6,7

**11-22-16** 35:19

**11-22-2016** 28:9

**11-29-2016** 27:14,16

**11.8** 44:8

**11:57** 54:25

**12** 6:2

**12-1-16** 34:12

**12-13-2016** 27:12,16

**12-22-16** 34:6,19

**12-22-2016** 28:12

**1982** 7:25

**1988** 8:1

**1994** 6:21

**2**

**2** 24:16,20,24 31:14

**20** 8:25

**2007** 49:16

**2015** 9:1,4

**2016** 9:22 10:11 46:24 47:2 48:11 51:4 52:10,13 54:15

**2017** 9:22 10:11 48:11,24 49:6, 19,21 51:4,12,14 52:10,13

**2021** 6:2

**4**

**40** 9:21

**407** 20:13,16 41:8,13,19 48:25

49:2,18,21,24

**5**

**50** 9:24

**6**

**6** 34:10 35:4,5

**7**

**7** 34:11

**7-pound** 34:12

**8**

**8.6** 24:15,20 31:14

**9**

**9** 48:24

**90** 40:18

**9th** 49:16

**A**

**a.m.** 6:3 54:25

**abdomen** 18:11 19:10,11,13,22 25:3 27:10,17 29:11

**abdominal** 19:25 24:17 25:2 29:10 31:15

**abilities** 13:4

**absorbing** 18:1,4

**absorption** 12:19 13:5,13 14:20

**access** 32:8,9,12

**Accomplishments** 40:16

**acids** 21:12,15,19,21

**added** 34:23

**additional** 11:11 18:6

**address** 36:18,24

**addressed** 26:10

**adds** 13:10

**adequate** 48:15

**admitted** 49:11

**adult** 8:13

**advice** 41:7,12

**advised** 44:21,23

**age** 30:18

**agree** 25:24 32:1,2,3 36:15,16,19 39:24 44:17,19 46:21

**agreement** 6:10

**ahead** 8:8 12:17

**alarm** 46:9,11

**alternative** 8:5,25 23:21 24:5,6,7 30:6 48:22 49:1,17

**amount** 44:22 45:6

**Andrew** 15:6

**anemia** 45:21

**anoscopy** 20:5,6,19,21,23 21:24 23:5 35:19

**anus** 12:9 20:8 36:1

**apparent** 15:21

**apparently** 23:5

**appeal** 39:16,17,18,20,22,24 40:1,2

**appeals** 38:6,8,12 39:3,9

**appearance** 44:15

**appeared** 48:12

**appearing** 44:10,14

**appears** 15:8

**appetite** 17:8

**appointment** 51:22,25 52:5

**appointments** 52:2,3

**appropriately** 48:7 51:1

**approval** 32:15,21,24 33:7 40:17, 20 41:23,25 52:4

HANSON RENAISSANCE
Court Reporters & Video
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**

2

approve 23:16 41:3

approved 41:9,13,19 47:12 50:3
  51:19

April 49:19,21 51:4,12,14

aspects 8:18 14:21

assessed 48:7

Assessment 19:25

assistant 10:9

ATP 24:2,4,14 25:4 27:14 31:13
  32:1 33:10,14 36:8,9,15,25
  37:23 41:4,6 48:24 49:16

ATPS 38:6

attempt 47:1

attempted 22:23

attention 22:15 38:25 40:4 42:7

August 48:11

author 27:3 30:1 42:15

authored 28:7

authority 32:14

avenue 36:13

avenues 36:17

aware 25:17,19 41:24

awful 46:12

---

**B**

b.i.d. 24:16,20,25 31:15

back 13:9 15:14 34:5 35:9 38:4
  46:11

basically 44:15

basis 25:25

bathroom 7:2

bed 46:11

began 37:10

beginning 9:4 12:8

believed 43:9,11 47:6

black-looking 16:12

bleeding 17:18,19,24 19:1 20:12,
  22 23:7,10 28:11 34:7 35:25
  42:21,23 46:24 47:2,5 49:6,8

blood 15:16,17,19,20,21 16:2,3,
  5,15,16 17:22 28:10,24 34:11
  43:19,20,22,24 44:1

bloody 28:17,19

BMI 51:5

Board-certified 54:13

body 18:9

bottom 15:9

bound 40:2

bowel 16:15,16 28:10,17,19
  42:19

brand 21:7

BRBPR 15:23 16:1 42:19

break 7:2,5

breakdown 12:20,25

brewing 46:14,18

bright 16:2,3,5,11,14,15 28:9,24
  34:11 43:22

broke 6:16 38:2

Buskirk 10:14

---

**C**

call 11:6 22:5 23:19 26:14 27:25
  29:15 38:24 42:8

called 12:4 16:12

calls 52:20

cancer 19:23 30:16

cancers 18:15

care 48:15

case 6:22,23 11:8 52:6 53:19,20

caused 17:16

Certified 6:5

cetera 7:3

chances 53:18

change 45:23,25

changed 33:25 34:2,24

chart 14:23 15:8

check 19:19

checking 20:10

chemical 12:25

chief 39:3,21

children 8:18

choice 49:1

choose 36:17

chose 49:16

chronically 44:10,14

circumstances 16:5,6

clarify 7:10 48:19

clear 22:2 24:15 25:4

clearance 31:15

cleared 27:22

clinical 16:14

clock 25:1

closed 9:1

colitis 30:15 48:13 50:7,9,13,17,
  22 53:2,3,9,22 54:18

colon 20:9

colonoscopy 22:7,14 23:2 32:14
  33:1 37:3,13,14 47:4,8,10 50:1,
  3,6,20 51:11,14,16

color 16:9

combination 40:7

comma 15:23

comment 31:23

comments 20:4 24:2 31:12 41:2,
  4,10,15

common 52:5,8



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**

3

complained 52:15

complaining 26:10 28:13

complaints 26:11 52:16

complete 7:23

completed 30:2

component 12:7,9

components 13:10

concluded 54:25

conclusion 52:21

condition 44:17 52:18

conditions 10:23 52:24

conduct 21:24

conducted 18:18

confirm 42:15

consistently 40:18 49:8

constipated 25:6 29:7,9,13,14

constipation 18:15 24:15,18
  25:5 27:22 31:14 32:4

consult 29:18,25 31:7 33:7 36:23
  40:18,20 41:24,25 51:19,20

consults 32:21

continue 8:4 11:15

continued 20:2,3 23:4 30:6 37:6

continues 12:24 18:6

contribute 18:25 19:3 20:19,21

Core 39:2

Corizon 39:3,4,6 40:6,8,9

correct 20:24 21:22 25:7 29:12
  34:12,15,16 36:1,5,6 45:2 48:23

correctional 9:7 10:1,12,17
  25:16

Corrections-bureau 15:7

correctly 21:2 43:16

court 6:4 38:4

create 32:10

Crohn's 30:15

CROSS 6:13 11:4,18,24 12:16
  14:9 15:1 22:10 23:24 26:12,19
  28:5 29:21 31:10,25 32:22 33:8,
  17 34:19,22 37:8 38:5,23 40:24
  42:6,13 45:12 51:9 52:22 53:1

current 25:22 54:20

CV 38:20

---

**D**

---

daily 24:25

dark 16:12 43:24

data 34:25

date 18:19 34:18

day 29:4 34:11

deals 12:18

death 6:23

decision 39:15 40:3 47:16

decisions 38:10

decompensate 50:25

decompensated 50:18,24

decrease 21:17,18

defecation 17:24

dehydrated 45:22 46:2

delay 52:4

delayed 42:4

deliver 27:6

delivering 26:25

demonstrate 24:18 36:10 37:2

demonstrated 24:8 31:13 36:9
  37:1

demonstrating 48:4

Department 15:6

departments 27:2

depends 52:6

deposition 6:1,6,15,18 7:13,15

14:22 22:6 23:20 26:15 28:1
  29:17 31:6 33:13 38:19 42:9
  44:25 45:1,4 54:25

describe 39:11

description 12:10

details 51:22

detected 53:12

deteriorate 49:23

deteriorated 49:15

determine 46:23 47:1,4,7

diagnosed 50:9,21

diagnosis 10:22 11:3 19:1,6
  20:20,22 23:6 37:18,19 50:6,11

diarrhea 17:14,17

differ 13:25

difference 8:15 13:21 14:5

difficulty 16:25

digestion 12:19 13:7 21:13

digestive 12:24 13:5,10 14:10,
  12,14,21 21:13,15,18

direct 22:15 24:9,11 38:25 40:4
  42:7

director 39:17,19

disagree 33:9 36:16,20 37:22
  39:20

disagreed 38:1 39:15

discovery 36:14

discrete 14:4

discuss 11:8

discussed 21:19

disease 30:15 50:14 53:7

diverticulitis 18:16

diverticulosis 30:14

divide 18:11

divided 13:3

doctor 25:24



HANSON RENAISSANCE COURT REPORTERS & VIDEO   hansonreporting.com   313.567.8100

Sharon Oliver, M.D.
07/12/2021

4

**document** 15:3,5,10,11 27:3,24 29:22 30:1 38:18 42:15 46:3,4

**documents** 7:12

**dosage** 24:24

**drank** 45:16

**drink** 44:22 45:5,17

**dual** 39:3,8

**duodenum** 13:18,22 30:12

**dysphagia** 16:24,25

---

**E**

**earlier** 48:18 49:5 53:22

**early** 53:11,23,24

**education** 7:18 11:15

**electronic** 38:13

**eliminate** 17:2,12,20

**eliminating** 17:6

**emergency** 8:24

**employed** 9:13

**employment** 8:20

**EMR** 41:5

**encompasses** 11:2

**encounter** 10:17

**end** 9:5,6 14:10,12,14

**ending** 12:9

**endurance** 7:1

**enlarged** 17:22 19:20

**entire** 8:17 51:3

**entirety** 45:9

**entity** 39:6

**equipment** 6:7

**esophagus** 12:23 17:3,10

**essentially** 8:13 13:4

**establish** 12:14

**etiologies** 16:23 17:6

**etiology** 23:6,8

**evacuation** 13:15 14:14

**evaluating** 24:9,11

**evidence** 43:9

**exam** 18:18 22:3 35:24

**examination** 6:13 19:14 44:9 48:2 51:9

**examined** 18:21,23 26:3

**exhaust** 49:1,17

**exhibit** 14:22 15:2 22:4,5,6 23:18,19,20 26:13,14,15 27:25 28:1 29:15,16,17 31:5,6 33:12, 13 34:6,19 38:19,25 42:8,9

**exist** 40:12

**experience** 11:2,10 41:20 51:20, 21 52:11,14 53:15 54:17,19

**experienced** 10:21

**expert** 12:15 23:17

**explain** 41:2

**eye** 15:22

---

**F**

**facilitate** 14:20

**facilities** 10:17 27:2

**facility** 9:7 10:1,12 25:17,18,20

**fact** 18:3 43:11 49:7

**failed** 22:16,17,19 35:16,19,22 36:3

**fair** 22:24 25:4 27:12,16 29:6

**false** 45:13

**familiar** 25:11 39:8

**familiarity** 40:9

**family** 8:16,17

**fecal** 15:16,17

**feces** 13:15

**feel** 19:21 37:12,17

**felt** 32:4 36:23 37:11 43:13

**film** 31:15

**films** 24:17 25:2

**final** 13:7,13 38:10 40:3 48:19

**find** 11:7 19:2,6,7 20:22 23:6 31:3

**fire** 46:14,17

**fissures** 17:13 19:4,7 30:13 31:1, 2

**fixes** 46:16

**flip** 34:5

**FOBT** 15:14,15 28:9

**follow-up** 48:1 51:10

**food** 18:2,4

**form** 10:25 11:12,21 12:12 13:15 14:7 22:11,20 26:4 37:5 40:22 42:4 45:8 52:19

**FOSTER** 47:23 54:22

**found** 22:1

**foundation** 12:13,14 14:8 26:5 31:21 32:19 33:4 37:5 42:4

**fragile** 17:23

**Frogner** 6:5

**full-time** 9:9,13

**function** 12:10 13:20,22

**functions** 13:25

---

**G**

**gas** 18:15

**gastroenterologist** 32:6

**gastroenterology** 29:18,25 36:23 52:7 54:9

**gastrointestinal** 12:8 30:20 43:14

**gave** 41:7



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**

5

general  41:7,10,12

Generated  15:10

GI  12:15 16:8,10 44:2,3

give  7:18 8:20 12:9 22:21 24:24 41:12

Good  6:14

graduated  8:1,21

ground  6:25

groups  8:19

guarantee  54:7

guess  7:9 48:20

guidelines  40:8,10

**H**

hammer  46:11,15

hands  25:25

happen  21:15 41:3

happened  10:20

head  54:11

Health  39:5,6

Health's  39:3 40:6,8,10

Healthcare  15:7

held  6:7

helpful  47:6

helps  16:22 17:2,6,12,20 21:12

hematochezia  43:15,17,18,25

hemorrhoid  17:21,22

hemorrhoids  17:12,20 19:4,7

high  7:19,20

history  8:21

Hmm  36:21

honestly  45:19

hoped  44:20

Hospital  8:2 48:12

hours  9:18,21,22,24

human  12:7

hydration  44:24 45:16,20,22,24 46:1

**I**

Ian  38:2

idea  15:5

IDENTIFICATION  14:25 22:9 23:23 26:18 28:4 29:20 31:9 33:16 38:22 42:12

identify  12:7

ignore  48:3

ignoring  46:18

ileum  13:18

ill  44:10,12,14

implemented  38:12

important  36:23 37:18,19 46:23 53:8,11

impossible  51:1

improve  45:24 46:1 49:18,20 53:5,17

improved  49:22

improvement  49:13

improving  44:18 45:22

include  8:18 28:15 34:14 35:1 41:8 43:15

included  28:21 35:1,11,13 36:3

includes  39:2

incorporates  8:17

increase  40:20

increased  40:17

increasing  34:10,24

index  51:5

indicating  39:1

influence  51:24

information  11:9,11,14,22,23 12:1,2 18:6 22:22 32:8,9 34:15,23

inhibitor  21:9

initial  12:20 52:16

inmate  18:6 20:4 27:7 34:7

inmates  27:1

inserts  20:6

inspected  31:2

instance  17:1 24:15

instruct  38:15

internal  8:9,10,11,12,15,22 54:10,13

Interqual  40:6

intestine  13:2,6,7,11,12,13,17 14:6,17,19 16:18 21:20,21 44:4

investigating  46:16

involving  6:23

**J**

Jackson  8:23

January  35:4,5 48:24 49:6,16

jejunum  13:18,24,25

Jennifer  47:21

Joshua  10:14

judgment  31:22

July  6:2

June  52:10,13

**K**

Keith  25:10,11 38:24

Key  40:15

kind  6:16

kite  26:16,20,21,24,25 27:5

knowledge  50:3,13 51:6

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**L**

**lab**  34:25

**labs**  33:25 35:12,13 45:6,18,23, 25

**large**  13:7,12 14:6,17,19 16:18 21:21 44:4,22 45:5 51:7

**late**  46:24 47:2

**Laurel**  6:4

**laxative**  25:9

**lay**  6:25

**layman's**  12:10

**lays**  25:25

**led**  39:3 50:6

**left**  18:8,10,12,13

**legal**  52:20

**lends**  18:5

**lets**  17:15 18:1

**level**  21:15

**life**  53:5

**lines**  33:24

**liquid**  29:3,7,8

**listed**  35:19

**literature**  7:16

**liver**  13:10

**LLQ**  18:7

**long**  51:18

**lose**  28:22

**losing**  18:3

**loss**  17:8,25 28:15,17 34:12,23

**lost**  28:21 44:5

**lot**  13:20

**Louis**  9:11,16

**lower**  18:8,10,12,13 20:9 44:2,3

**lying**  43:8,10

**Lyles**  15:6 18:19 21:24 23:3 26:10 28:11 42:14 44:22,23 47:11 48:4 49:5 51:4,12 52:11, 14

**Lyles'**  7:15 19:11 22:25 27:17 36:18 37:2 44:25 46:24 48:6 49:3,17

**M**

**made**  32:13 47:15

**maintain**  45:16,20

**make**  10:22 19:6 44:23 45:15,17

**man**  30:17

**Management**  23:14,15 24:1 25:15 39:16 40:7 47:14,15

**MARKED**  14:24 22:8 23:22 26:17 28:3 29:19 31:8 33:15 38:21 42:11

**mass**  19:19

**masses**  19:11,15,17,18 20:9

**material**  11:6 12:23 13:5,14 14:16,18,21

**materials**  11:19,25

**matter**  49:7

**Mclaren**  48:12

**meaning**  28:10

**means**  15:13 24:25 41:1

**mechanical**  12:25

**medical**  7:16,24,25 8:7,21 10:4 14:23 24:8 31:13,22 36:9,10,12 37:1,2 38:13 39:4,17,19,22,25 40:8,10 41:3,20 52:18,23,24

**medically**  37:12

**medication**  21:1,6 50:10,23

**medicine**  8:6,9,10,11,12,13,15, 16,17,22,24 9:1,14 10:16 54:10, 13

**melena**  16:12 43:23,24

**memory**  22:2

**mentioned**  30:19

**message**  26:25

**messages**  27:6

**mg**  24:16,20

**Michigan**  6:5 7:21 8:2,23 15:6 39:25

**mid-level**  10:8,9

**mid-levels**  10:6,11

**middle**  9:4 46:10

**mind**  38:3

**mine**  26:8

**minor**  14:5

**mixing**  12:25

**Monday**  6:2

**months**  42:24 49:6

**morning**  6:14

**mouth**  12:8,18,21,22

**movement**  15:24 16:15,16 28:10 42:19

**movements**  28:18,20

**multiple**  12:13 54:20

**N**

**naked**  15:22

**named**  21:6,8

**nature**  48:19

**nausea**  17:4

**necessarily**  28:19 53:19,20

**necessity**  24:8 31:13 36:9,10,12 37:1,3 41:3

**needed**  25:1 41:2

**negative**  16:20,21,22 17:1,9,11, 25 19:10 20:13

**negatives**  16:20 17:5


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Sharon Oliver, M.D.
07/12/2021

7

night  46:10

nods  54:11

noise  46:13

normal  22:3 23:5 27:10,19,21
  29:10 35:24 45:21 51:5

Notary  6:5

note  14:23 15:8,10

noted  34:10 44:5

notes  7:14

notice  45:4,11

November  48:11 51:4 52:10,13

number  31:6 33:13 34:10,24
  38:19 42:9

nurse  10:9

nurses  40:7

**O**

OB-GYN  8:18

object  10:25 11:12,21 12:12 14:7
  26:4 31:20 32:18 33:3 37:4
  40:22 42:3 45:8 52:19

objection  42:4

obtaining  47:10

occult  15:16,17,19,20,21

occur  51:20

occurs  12:19 13:8,11

October  34:8

Officer  39:22

officers  39:4,25

offsite  32:14 51:19

Oliver  6:14 14:22 15:11 22:6
  23:20 26:15 28:1 29:17 31:6
  33:13 38:19 42:9

one-on-one  40:17

onsite  33:6

opinion  48:18 50:20 52:11

opposed  49:1

options  49:1,17

order  10:22 32:24 33:25 34:25
  41:3 53:13

ordered  20:25 32:23

originating  17:7

outpatient  22:16,17,19 35:16,20,
  22 36:4 40:17,20 41:23,25

overview  7:18 8:20

**P**

pain  17:11,18,19 18:7,14 19:1
  20:1,2,3,11 23:6,10 30:12 43:1,
  6,11,13 52:11,14,15 54:2

palpable  19:10

palpate  19:11,13,18,21

Papendick  25:11,12,17,21 32:6
  38:20,24 40:19 47:17 50:4

Papendick's  26:7 31:21 32:15
  33:10 37:23 38:10 48:18

paragraph  39:1 46:8

part  13:5,7,21 20:9,25 45:4 51:7

part-time  9:9

parties  6:10

parts  13:3,16 16:7,10 19:14

past  8:25

patient  6:23 11:7,10 25:25 26:1,
  2,3,9 30:6 32:14 41:22 53:16
  54:18

patient's  25:24 36:24 53:13

patients  8:14 25:22 27:1 32:10
  50:25 54:20

pattern  44:9

people  23:16

percent  40:18

performed  27:17 50:21 51:14,16

performs  12:11

period  48:10 49:22 51:3

periods  49:9

permission  33:1

person  6:12 18:11 21:14 44:14

personal  41:25

personally  25:21

pertinent  16:19,20,21,22 17:1,5,
  8,11,25 35:22 41:21

physical  18:18 44:8

physician  9:25

physician's  10:9

piercing  46:13

place  21:12

plan  19:25 20:4 23:21 24:5,8
  30:6

plans  24:6 32:11 48:22

playing  46:17

point  29:6 30:10 37:9,13,15 40:2
  42:23 43:12 44:18,19

polyps  18:15 30:13

poor  20:1

posed  7:5

position  13:20 26:2

positive  15:15,16 28:9

post-op  8:5

potential  30:9 49:8

potentially  17:3

pounds  44:6,7,8

practice  8:3,13,22,24,25 9:1
  11:20 46:7 54:19,20

practiced  8:22

practicing  9:13 10:16

practitioner  10:10

precipitate  51:22

preparation  45:1



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                                                                  8

prepare  7:12

prepared  13:14

prerequisites  7:23

prescribe  10:23

presentation  33:25

presented  48:8

pretty  10:21

prevent  53:6

preventative  50:14

prevented  47:10

previous  22:5 35:9,12

prior  14:16 32:23 45:6

prison  9:2,3

prisons  9:14

prn  24:16,21

problems  17:2,12

procedure  20:6 35:23

procedures  20:19

process  12:24 13:11,13 14:11,
  12,14 17:23 32:20 38:6,8,12
  39:2,3,9

progress  53:23

progression  53:6 54:5,6

prominent  19:16

proper  11:2

proton  21:9,11

Protonix  21:1,3,4,9,14 22:24
  36:3,4 43:2,3,4,7 44:18

protons  21:5

prove  31:15

provide  50:10 53:8,11

provided  40:6 48:15 50:16

Providence  8:1

provider  28:2,6 42:10,14

providers  10:5 40:16

providing  53:24

psychology  7:21

Public  6:5

pull  14:2

pump  21:9,11

purpose  24:6,9,11 27:5 53:2,3,24

purposely  48:3

pursuant  6:9

pursuing  48:22

put  22:19,21 41:12,14,19,21
  50:22

---

**Q**

---

quadrant  18:8,10,12,14

quadrants  18:12

quality  53:5

question  7:4,5,10 9:10 11:17
  38:3,17 40:23 41:11 45:9 52:20

questions  7:8 12:13 47:18,22,24
  51:8 54:21,24

quick  46:16

quickly  51:24

---

**R**

---

range  51:5

rapid  17:16

rate  40:17,20 41:23,25

re-evaluate  25:5 31:16

read  31:12 36:8 46:8

recall  45:19

receive  41:18

Recent  17:14

recognize  22:11 29:22 46:4

recommendations  30:5

record  31:12 36:8 38:14 46:8

48:20

records  7:14

recourse  48:20

rectal  17:11,18,19 34:7 46:24
  47:1,5

rectum  16:2,15,16 17:13,23
  18:21,24 20:7 28:10,24 31:1,2
  36:1

red  16:2,3,5,11,15,16 28:10,24
  34:11 43:22

reevaluate  24:17

refer  11:6 43:20

reference  11:6,19,25

referenced  39:9

references  12:3

referred  45:5

regional  39:17,19

regular  25:24,25

relied  41:20

relief  44:20 53:15

relieve  22:18,25 53:5,13 54:2

remaining  13:14

remember  22:1 41:17 52:9

Remote  6:1

remotely  6:9

repeat  6:16 38:4 41:11 52:12

repeating  38:3

reporter  6:4,6,8 14:24 22:8 23:22
  26:17 28:3 29:19 31:8 33:15
  38:4,21 42:11

request  20:18 22:7,14 23:2,12,
  13,21 24:1 29:18,25 30:4 31:7,
  11 32:13 33:11,14,18,22 34:14,
  17,20 35:1 45:5 48:25 49:2
  51:11,19

requests  40:18,21 41:8,13,19,24
  42:1


hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                                                                                          **9**

residency 8:1

resolution 24:18

resolving 36:4

response 23:25 26:16,20,21,24
  27:5 31:7,11 36:7

resubmission 37:25

resubmit 33:11 36:11 37:1,24
  38:15 39:21,24

resubmitted 33:18

resubmitting 48:22 49:2

results 27:9,19

resume 38:24 39:9

review 7:12,16

reviewed 7:14 44:25

reviewer 24:2 25:10,15 31:12
  41:14

reviews 40:6

role 25:22 26:8

room 6:8

rooms 46:15

rule 7:3 16:22

rules 6:25

---

**S**

---

Saginaw 9:6,11,16,18,23 10:1,12
  25:16

sample 15:18

satisfied 46:12

scheduled 20:4 24:16,20 31:14
  51:25

schedules 52:2,3

school 7:19,20,24,25 8:21

screen 15:3

scroll 33:19,24 35:5

secretary 52:3

section 19:10 22:16 35:16 40:16

43:14

seek 11:9

sees 25:25

send 32:14

Senna 24:15,20 25:5,8,9 31:14

sentence 16:19 20:13,17 24:7
  36:25 40:5

Services 15:7

Sharon 15:10

short 20:7

Shorthand 6:6

show 15:2 22:4 23:18 26:13
  27:24 29:15 31:5 38:18 46:3

showed 29:10

showing 25:6

shows 35:23

side-by-side 34:3

significance 16:14

signs 44:13 48:3,6 49:3,17

situations 10:18

sleep 46:9

small 13:2,6,11,12,16 15:18
  21:20

smash 46:11

smoke 46:9

soluble 14:20

sooner 50:21 53:14,17

source 20:11,22 35:25 43:25

Southfield 8:2

speak 26:8

specialty 8:7,19 32:7 52:6,7

specific 43:20 54:8

specifically 53:21

speculate 21:7

spent 8:23

split 9:16

St 9:11,16

staff 10:4

standard 40:8,10

start 6:24

started 38:13 49:23

starting 28:21 44:12

startled 46:9

state 7:22 39:25 49:23

stated 44:25

statements 45:13

states 29:3 43:1,6

stipulate 6:10

stomach 12:24 17:7,10 21:20
  30:11

stool 13:15 14:15 15:18 16:13
  43:19,21,22

stools 29:4,7,8 34:10,24

stop 54:5,6

strike 38:17

structure 39:2

studied 7:21

stumble 46:10

submit 21:12 23:12 30:4 49:21

submitted 37:14 39:17 48:25
  49:18,24 51:11

submitting 20:18 23:13

substances 12:20 13:1

successful 53:18

successfully 32:5

support 39:1

supposed 14:17

suppress 46:15

swallowing 16:25

sworn 6:9,12

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Sharon Oliver, M.D.
07/12/2021

10

symptoms  16:23 22:18,25 23:4
  24:10,12 28:13,14,20 29:2 30:7,
  8,9 36:5,10,18,24 37:1,2,7,9
  38:16 43:15 44:13 46:16,17
  48:3,7 49:3,10,18 53:5,12,14

system  9:2,3 21:13 38:14

---

### T

table  7:4

tabs  24:16,20,24 31:14

takes  21:14 51:18

taking  43:2,7 45:6

tarry  16:12 43:24

tears  17:13 30:13,19 31:2

telling  31:19

temporarily  46:12

terms  12:10

test  7:1 15:16,17,18

testified  48:18 49:5 51:10

testimony  6:11 45:1,4,10

tests  10:22 15:19

therapies  22:17,20

therapy  22:17,18 35:16,20,22
  36:4

thing  34:2 35:16

thought  31:18 41:21 54:1

time  9:16 18:4 23:1 24:17 25:16,
  19 28:11 29:14 31:13 32:13
  36:2,9,17,22 38:7,14 44:21 47:5,
  19 48:10,21 49:2,8 51:3,7,23
  52:17

times  11:5 29:4 34:11 37:15,16
  44:24 49:12,15

today's  7:12 45:1

told  45:15

top  15:14

tract  12:8 16:8,10 21:16,19
  30:20,22,23 44:2,3

tragic  46:14

trained  8:10

training  7:19 41:18,20 54:8,10

transports  12:23

travels  13:6

treat  31:14 37:21 49:2 50:11
  53:15,17

treated  32:5 48:8 51:1

treating  11:10 24:10,12 51:3
  53:2,3 54:17,19

treatment  10:23 11:2 23:21 24:5,
  6,7 30:6 32:11 48:22 53:8,11,18,
  23,25

treatments  22:22 50:17

treats  25:21

true  31:4 45:13 48:23

tube  20:7

tumor  19:20,23

Turning  36:25

two-month  52:4

type  19:5 43:20

typically  11:19 26:1 30:20,21,25
  31:1 51:18

---

### U

U.M.  25:15 39:2

Uh-huh  9:20 14:13 15:25 26:22
  53:4

ulcerative  30:15 48:12 50:7,9,13,
  17,22 53:2,3,8,22 54:18

ulcers  18:15,16 20:9 30:11

ultimate  50:6

undergrad  7:21

underlying  50:11

understand  7:8 26:7

understood  26:9

University  7:20,22

unusual  30:17

updated  35:12

uphold  39:18,20,22 40:1,2

upper  16:7,10

Uptodate  12:4

Utilization  23:14,15 24:1 25:15
  39:15 40:7 47:14,15

utilizing  24:15 40:5

---

### V

vary  51:21

verify  11:15,23 12:1

vessel  17:22

videoconferencing  6:7

visit  21:1 28:2,6 42:10,14

vomiting  17:4

---

### W

w/bowel  15:23

waned  49:12

waning  49:9

wanted  22:21 46:1

warts  19:5,8

water  14:20 44:22 45:6,16,17

waxed  49:12

waxing  49:9

Wayne  7:22

website  46:7

week  9:18,21,22

weight  17:25 18:3 28:15,17,21,
  22 34:12,23

work  8:5 9:2,6,9,10,11,18,23
  40:19,23

worked  10:11 40:16

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sharon Oliver, M.D.**
**07/12/2021**                                            11

**working**  9:3 25:16 39:6

**works**  9:25 39:11,14

**worsened**  37:9

**worsening**  29:2 37:7 43:1,6,12,
 13

**Wow**  9:25 18:15

**write**  15:23 29:3 43:1,6 46:19

**wrote**  15:11,13,14 27:9 28:9
 31:24 35:15 43:15 44:9

---

**X**

---

**x-ray**  25:3,6 27:9,17,19 29:10
 32:23,24 33:2 34:25

**x-rays**  33:6 34:1

---

**Y**

---

**year**  8:23

**years**  6:19 8:25

**YOUNG**  10:25 11:12,21 12:12
 14:7 26:4 31:20 32:18 33:3
 34:17,21 37:4 38:2 40:22 42:3
 45:8 47:21,25 48:2 52:19 54:24



hansonreporting.com
313.567.8100