```
0001
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF MICHIGAN
 3                         SOUTHERN DIVISION
 4     - - - - - - - - - - - - - - - - -
                                          )
 5     DOUGLAS WRIGHT,                     )
                                          )
 6                          Plaintiff,    )
                                          )
 7          -vs-                          )No. 2:16-cv-12113
                                          )Judge Battani
 8     CORIZON HEALTH, INC., a Tennessee  )Mag. Patti
       Corporation, Betsy Spreeman,       )
 9     Dr. Keith Papendick and            )
       Dr. Bergman, in their individual   )
10     and official capacities,           )
                                          )
11                         Defendants.    )
       - - - - - - - - - - - - - - - - -  )
12
13                     D E P O S I T I O N
14     of KEITH PAPENDICK, M.D., a witness called by
15     Plaintiff, taken before Tamara Staley Heckaman,
16     Certified Shorthand Reporter and Notary Public, at
17     525 West Ottawa Street, 5th Floor, Lansing,
18     Michigan, on Monday, June 25, 2018, noticed for
19     the hour of
20     12:00 p.m.
21
22
                     HECKAMAN & NARDONE, INC.
23                Certified Shorthand Reporters
                          P.O. Box 27603
24                   Lansing, Michigan 48909
                         (517) 349-0847
25                    theckaman@live.com
0002
 1     APPEARANCES:
               THOMAS E. KUHN, J.D.
 2             615 Griswold
               Suite 515
 3             Detroit, Michigan 48226
 4                 On behalf of Plaintiff.
 5     CHAPMAN LAW GROUP
               40950 Woodward Avenue
 6             Suite 120
               Bloomfield Hills, Michigan 48304
 7             By
               JOHN C. CARDELLO, J.D.
 8
                   On behalf of Corizon Defendants.
 9
10
```

```
11              EXAMINATION INDEX
12  ATTORNEY'S NAME  EXAMINATION RE-EXAMINATION
13  BY MR. KUHN:          3
14  MR. CARDELLO:
15              *         *         *
16              INDEX OF EXHIBITS
17  EXHIBIT                            PAGE
18  No. 1  Mr. Wright's medical file, Bates
19         No. 679-981, 1545-1550, 1432-1439
20     (Marked in Kyle Sperling's deposition)
21  No. 2  Mr. Wright's medical file, Bates    3
22         No. 1778-1904
23  No. 3  Photocopied diagram of torn meniscus  3
24         with handwritten designations
25
0003
1               Lansing, Michigan
2               Monday, June 25, 2018
3               12:00 p.m.
4               R E C O R D
5               (Whereupon Deposition Exhibits No.
6                2 & 3 marked for identification.)
7               KEITH PAPENDICK, M.D.,
8      having been duly sworn, testified as follows:
9               EXAMINATION
10  BY MR. KUHN:
11     Q.   Sir, my name is Tom Kuhn.  I represent
12  the plaintiff.  This deposition is being taken
13  pursuant to notice and may be used for any purpose
14  allowable under the applicable court rules.
15           If there are any questions that are
16  unclear to you or you don't understand what I'm
17  trying to ask please have me restate, okay?  Is
18  that all right, sir?  It has to be oral because
19  she won't get it down if you just nod your head?
20     A.   Yes.
21     Q.   Okay, thank you.  What's your current
22  address, sir?
23     A.   It's at my home actually.
24     Q.   And what's your current home address?
25     A.   21215 North Uldriks Drive, North Uldriks.
0004
1      Q.   North?
2      A.   North, Battle Creek.
3      Q.   Battle Creek, okay.  And Uldriks is
4   spelled how?
5      A.   U-l-d-r-i-k-s.
6      Q.   And how old are you, sir?
7      A.   60 years old.
8      Q.   Can you give me a brief chronology of
9   your formal education starting with high school,
10  where you attended, degrees, programs, dates, that
11  sort of thing?
12     A.   I went to a small junior college near
```

13    Midland, Michigan, where I was born.  I
14    transferred after one year to Northern Michigan
15    University.  I transferred after one year to
16    Anderson University in Anderson, Indiana.  I got
17    my BA in biology from Anderson University in
18    Anderson, Indiana, in 1981.  I subsequently went
19    to Wayne State University and got a master's of
20    biological science, and then Wayne State
21    University School of Medicine I received my
22    doctorate degree.
23        Q.   Any other formal education after high
24    school?
25        A.   Residency.
0005
1         Q.   Okay.
2         A.   I had a residency at Hamot, H-a-m-o-t,
3    medical center in Erie, Pennsylvania.  It was in
4    family practice.  It was a three year program.
5    Some people like to say that it was one year of
6    internship and two years of family practice but
7    that's not the way it really works out.
8         Q.   And can you -- any other formal education
9    after high school?
10        A.   I don't think so.  Not that I recall.
11   Oh, I did get a master's from my first stint at
12   Wayne.
13        Q.   Master's of biology or something
14   different?
15        A.   Master's in biology.
16        Q.   Okay.
17        A.   Oh, I did tell you that, didn't I?
18        Q.   Yeah, you did tell me that so at least we
19   have that down.  Thank you, sir, I appreciate it.
20   Have you had a chance to review any records prior
21   to your deposition, sir?
22        A.   Some.
23        Q.   What records have you reviewed?
24        A.   Essentially what's here.
25        Q.   What does that mean, what's here?
0006
1         A.   These are the records from the Michigan
2    Department of Corrections.
3         Q.   So they're records for Douglas Wright
4    from the Michigan Department of Corrections?
5         A.   Right, that had anything to do with me.
6         Q.   Any other records that you reviewed prior
7    to your deposition?
8         A.   No.
9         Q.   Have you ever testified by deposition
10   before, sir?
11        A.   A number of times.
12        Q.   Have you ever been a defendant in a
13   lawsuit related to your job?
14        A.   I have been noted in lawsuits because of

```
15   my job.
16        Q.   And noted means were you a defendant?
17        A.   I assume so.
18        Q.   Can you give me an estimate of how many
19   times you've had a deposition taken?
20        A.   In my career including my private
21   practice probably a dozen times.
22        Q.   Were you ever sued in private practice?
23        A.   Yes.
24        Q.   And what was that for?
25        A.   One was a lady who wanted her uterus out
0007
 1   because she was cheating on her husband, and after
 2   she left her husband her boyfriend wanted children
 3   so I was sued because I consulted the surgeon that
 4   took her uterus out because of bleeding.
 5             And the second was a gentleman who
 6   overused medication, even though he was told not
 7   to on more than one occasion, and he said that it
 8   was my fault.
 9        Q.   Any others while you were in private
10   practice?
11        A.   Not that I can think of.
12        Q.   Can you give me an estimate of the number
13   of depositions that relate just to your job in the
14   correctional area?
15        A.   Probably half a dozen.
16        Q.   Okay.  Can you give me a brief chronology
17   of your professional career, where you've worked,
18   general time frames, that sort of thing?
19        A.   I worked in private practice from 1993
20   until January of 2011, actually it was January 1st
21   of 2011, in Galesburg.  My last part of that was
22   in Galesburg and the first part was in Augusta,
23   which are three miles apart.
24        Q.   And those are in Michigan, right?
25        A.   Yes, I'm sorry.
0008
 1        Q.   That's all right.
 2        A.   I then went to work for Borgess Medical
 3   Center for a year, and then I am now -- as I am
 4   now, went to work for Corizon Health,
 5   Incorporated, in Brentwood, Tennessee.  That's
 6   C-o-r-i-z-o-n.
 7        Q.   And why did you leave private practice in
 8   2011?
 9        A.   Private practice is not what it used to
10   be and Borgess and I talked and negotiated for
11   them to take over my practice.  In other words, I
12   didn't have to supply management and the like to
13   the practice.
14        Q.   All right.  And why did you leave Borgess
15   Medical Center?
16        A.   I didn't like the way they managed the
```

```
17     practice, and they didn't like the way I said I
18     didn't like them managing my practice.
19         Q.    And what kind of job responsibilities
20     have you held with Corizon since you joined them?
21         A.    I was a hospitalist from June of 2012
22     until January of 2014.  I am a -- I was a medical
23     director of utilization management from 2014 until
24     June of 2017, and that was under the Michigan
25     division, and now I'm under the national or
0009
 1     corporate division in the same function.
 2         Q.    Is there any difference between your job
 3     responsibilities in the Michigan division as
 4     opposed to the corporate division?
 5         A.    Only as far as the reporting goes.  I had
 6     to do all the reporting when I was in the Michigan
 7     division, and reporting being the number of cases
 8     seen, from what sites, from what physician or
 9     provider.  I assisted with the hepatitis C
10     initiative.
11         Q.    So when you say you had to report the
12     cases seen, are you talking seen by outside
13     consultants?
14         A.    Well, as seen by outside consultants,
15     people that we have to refer to and those that
16     were deferred.
17         Q.    Those that were deferred.  What does
18     deferred mean?
19         A.    Well, you either get approved or you get
20     an alternative treatment plan.  That's what we
21     call deferred.
22         Q.    I see.  And what -- so what kind of
23     reporting would you give on those that are
24     deferred as opposed to those that are seen?
25         A.    Just numbers.
0010
 1         Q.    When you say just numbers, there has to
 2     be something besides numbers, right?
 3         A.    Not in the reporting.  In the reporting
 4     it's purely numbers.
 5         Q.    And what do the -- what are they numbers
 6     of?
 7         A.    Occurrences.
 8         Q.    Okay, so all that you have are numbers of
 9     cases seen and the number of cases deferred,
10     that's the only information on these reports?
11         A.    That was the information requested.  If
12     they -- if somebody wanted to go look at them we
13     could tell you what specialists have the same --
14     which specialists had been requested were approved
15     and which ones were deferred, the numbers of them
16     that were deferred.
17         Q.    Okay.  You could tell which specialist,
18     is that what you said?
```

```
19        A.    Specialty.
20        Q.    Specialty, okay.  Any other kind of
21   reporting that you had to do as utilization
22   management?
23        A.    That was essentially it.
24        Q.    And what did -- what was your job
25   responsibilities in utilization management other
0011
 1   than reporting?
 2        A.    Well, I evaluated cases -- case requests
 3   for whether they would be approved to go or be
 4   requested to make an alternative treatment plan.
 5        Q.    And where would the request come from?
 6        A.    One of the providers on site.
 7        Q.    Can you describe what the process is for
 8   a provider to request and --
 9        A.    They fill out a form on the electronic
10   medical record and e-mail it to the secretarial
11   staff that they have placed the form -- or placed
12   the request, then review and place it into the
13   computer for me to review.
14        Q.    Okay.  And with regard to your job as
15   utilization management for Michigan, was there any
16   other individual who had a similar responsibility
17   at the same time as you?
18        A.    No.
19        Q.    So you would deal with all the requests
20   for referrals coming from the Michigan -- from
21   Michigan --
22        A.    Directly or indirectly.
23        Q.    What does directly -- how would you do it
24   directly as opposed to indirectly?
25        A.    There are a number of requests and
0012
 1   procedures that are automatically approved.
 2        Q.    Okay.  So what does that mean?
 3        A.    That means before it gets to me it's
 4   approved.
 5        Q.    So it's automatically approved.  Then
 6   that means that you indirectly approve that
 7   because it's automatically approved?
 8        A.    Correct.
 9        Q.    Were there any policies or procedures on
10   what was automatically approved, I mean written
11   documents?
12        A.    I don't know we'd be able to get any now.
13        Q.    No, I'm just asking were there any?
14        A.    There may have been but I think it was
15   more common knowledge this is going to be.
16        Q.    What things were automatically approved?
17        A.    It's changed so much that -- follow-up
18   for chemotherapy, follow-up while under active
19   chemotherapy.  I don't recall all of them back at
20   that time.
```

```
21          Q.   Okay, I don't need to know all of them.
22     Which ones do you recall?
23          A.   The chemotherapies are the ones that
24     stick out.
25          Q.   So you don't recall anything besides
0013
 1     chemotherapy; is that what you're saying?
 2          A.   Correct.
 3          Q.   How about today, what are automatic?
 4          A.   I don't know how that's -- okay, today
 5     we're under the corporate -- we're doing this
 6     under corporate and first surgical follow-up on
 7     large surgical cases, the chemotherapy still.
 8     See, I don't see them so I don't have a -- I don't
 9     have a direct recollection of them because I don't
10     see them.  They go -- they never come to me.
11          Q.   Are you saying those are the only two
12     that you recall that you currently have as --
13          A.   Offhand, yes.
14          Q.   Okay, offhand.  What does offhand mean?
15          A.   That I can give you without going and
16     asking someone or getting a report.
17          Q.   Okay.  And so would you have any criteria
18     for determining whether some cases referred to or
19     given an alternative treatment plan?
20               MR. CARDELLO:  Object to form.  You
21     can answer if you understand it.
22               THE WITNESS:  Well, it's a problem.
23     If you're asking -- can you say it again?
24               MR. KUHN:  Sure, go ahead.  Repeat
25     the question for me.
0014
 1               (Reporter read back last question.)
 2               THE WITNESS:  Medical necessity.
 3     Medical necessity primarily is difficulty with
 4     activities of daily living, risks to life or limb.
 5     BY MR. KUHN:
 6          Q.   All right.  Any other criteria that you
 7     would use?
 8          A.   Well, we look at UpToDate as -- we tell
 9     the providers if it's in UpToDate that it will
10     most likely be done.
11          Q.   And what is UpToDate?
12          A.   It's a database online that specialists
13     put in their practice into documents that we can
14     look at.
15          Q.   Do you refer to UpToDate in making your
16     decisions on whether to refer a person for
17     consultation or give them an alternative treatment
18     plan?
19          A.   UpToDate tends to be specialty driven,
20     and so as you can imagine, if a specialist has a
21     chance of seeing the patient they're going to say
22     that they need to be seen.  A lot of problems they
```

```
23   will say refer to specialist if, you know, there's
24   certain conditions.  And they are purely
25   recommendations; they are not set in stone.
0015
 1                   MR. KUHN:  I'm sorry, could you
 2   repeat my question?
 3                   (Reporter read back last question.)
 4   BY MR. KUHN:
 5        Q.   Do you understand what the question is,
 6   sir?
 7        A.   Yes.
 8        Q.   Could you answer that question?
 9        A.   Yes.
10        Q.   Okay, please do.
11        A.   The answer is, yes, we refer to UpToDate.
12        Q.   How frequently would you refer to
13   UpToDate?
14                   MR. CARDELLO:  Object to form.
15                   THE WITNESS:  Officially four times
16   a day.
17   BY MR. KUHN:
18        Q.   And when you say officially, what does
19   that mean?
20        A.   Well, I know what UpToDate says.  I'm not
21   going to have to refer to it because I've already
22   done the work of finding out what is being
23   requested or recommended.
24        Q.   All right.  But you said officially you
25   have to do it four times a day.  Why is that?
0016
 1        A.   Did not say that, I said I do officially.
 2   In other words, I refer to UpToDate on everything
 3   that comes through because I have been through
 4   UpToDate for most problems.
 5        Q.   Okay, so what is this four times a day,
 6   what does that mean?
 7        A.   You asked how often I refer to it.
 8        Q.   Right.
 9        A.   And I said four times a day is about the
10   average --
11        Q.   Oh, that's an average?
12        A.   -- of how many times a day I refer to it.
13        Q.   Okay.  Are you familiar with different
14   versions of UpToDate?
15        A.   Yeah, it changes continually.
16        Q.   Have you -- are you familiar with what
17   UpToDate says on meniscal -- torn meniscus?
18        A.   If it's unstable it needs to go to the
19   surgeon, but, no, I don't have the exact
20   recommendations.  I'd have to look it up again.
21        Q.   You would have to look it up if you
22   saw --
23        A.   Sure.
24        Q.   -- if that came to you?
```

```
25          A.    If I was not certain that it was not --
0017
 1     if I was concerned that it be an unstable knee.
 2          Q.    And when you say unstable knee, what does
 3     that mean?
 4          A.    If you look at the data the treatment of
 5     a knee meniscal tear is identical whether you do
 6     surgery -- the outcome is identical whether you do
 7     surgery or you do exercise at two years.
 8               MR. KUHN:  Can you repeat my
 9     question, please?
10               (Reporter read back last question.)
11     BY MR. KUHN:
12          Q.    Can you answer that question, sir?
13          A.    If a knee is giving out or locks we tend
14     to do more sooner.  But I don't have a
15     photographic memory, so I can't tell you what
16     UpToDate says about that.
17          Q.    Are you familiar with different versions
18     of UpToDate?
19          A.    I think I answered that, it changes all
20     the time.
21          Q.    Okay.
22          A.    So what was in effect in 2015 is not the
23     same as now.
24          Q.    Do you know if it's actually changed with
25     regard to torn meniscus?
0018
 1          A.    I haven't got a clue.
 2          Q.    So it might be exactly the same as today,
 3     correct?
 4          A.    Correct.
 5          Q.    What is MTRAX?
 6          A.    MTRAX is a database that's no longer
 7     used.
 8          Q.    Okay.  And what kind of a database is it?
 9          A.    It was a database that held reports from
10     specialists, and it was a communication tool
11     between the providers and the main office in
12     Lansing.
13          Q.    What is ASGR database?
14          A.    That is the main company that houses
15     MTRAX or operates MTRAX.
16          Q.    And when did Corizon stop or you stop
17     using MTRAX?
18          A.    I don't recall.
19          Q.    Is ASGR database different than MTRAX?
20          A.    Same.
21          Q.    How about NCCN guidelines, what is that?
22          A.    NCCN guidelines are guidelines for the
23     treatment of cancer, which is published open to
24     anyone on the Internet for treatment, surveillance
25     of cancer once it's been treated.
0019
```

```
 1       Q.   Okay.  Are you familiar with an
 2  individual by the name of Doctor Borgerding?  I'm
 3  not sure if I pronounced that right.
 4       A.   Yes.
 5       Q.   And who is that?
 6       A.   He no longer works for the State.  He was
 7  the assistant chief medical officer for the State
 8  of Michigan.
 9       Q.   Would you ever have any communications
10  with Doctor Borgerding as part of your role of
11  utilization management?
12       A.   Certainly.
13       Q.   And what kind of communications would you
14  have with him?
15       A.   Doctor Borgerding reviewed every ATP that
16  came out of my office for the MDOC, and sometimes
17  he would call and say I want you to go ahead and
18  do that instead of doing the ATP.
19       Q.   And are you familiar with an individual
20  by the name of Doctor Bergman?
21       A.   Certainly.
22       Q.   And who is Doctor Bergman?
23       A.   Doctor Bergman is a -- I don't know what
24  his title is.  His title back then was assistant
25  regional medical director for Corizon.
0020
 1       Q.   And what is the role of regional medical
 2  director?
 3       A.   He supervises physicians at any number of
 4  sites.
 5       Q.   Would you have any direct contact with
 6  Doctor Bergman in the course of your
 7  responsibilities as -- with regard to utilization
 8  management?
 9       A.   If there is an appeal.
10       Q.   What is an appeal?
11       A.   If I say, no, you don't want to do that,
12  you want to do an alternative treatment plan, the
13  provider has the ability to appeal that.
14       Q.   And how does the provider appeal that?
15       A.   They contact the regional medical
16  director.
17       Q.   And what happens next in that so-called
18  appeal process?
19       A.   Regional medical director typically would
20  contact me, we would discuss the case, and if I
21  said, no, I'm going to leave my decision the way
22  it is, and he didn't like that he could go to the
23  State medical director for Corizon.
24       Q.   Is there some sort of written policy on
25  this so-called appeal?
0021
 1       A.   Sure.  Oh, it's different now so I don't
 2  know if there's a written policy about what it was
```

```
 3  then that you can get to.
 4      Q.   Well, I'm just asking was there a written
 5  policy on appeal?
 6      A.   Yes, it was in the provider handbook.
 7      Q.   And what is the provider handbook?
 8      A.   It's information that the provider needed
 9  to supply care the way the State of Michigan and
10  Corizon wants it supplied.
11      Q.   And who generates this provider handbook?
12      A.   Predominantly Corizon.  There are some
13  Michigan Department of Corrections direction in
14  it.
15      Q.   Are you familiar with a physician
16  assistant by the name of Kyle Sperling?
17      A.   Yes.
18      Q.   Have you had any contact with Kyle
19  Sperling?
20      A.   Yes.
21      Q.   Do you recall any contact with Kyle
22  Sperling with regard to Mr. Wright's case?
23      A.   No.
24      Q.   Do you recall contact with Mr. Sperling
25  with regard to any other case?
0022
 1      A.   No, typically they would contact us --
 2  they would contact me.  I would not contact them.
 3  They might contact me to say I have an urgent case
 4  coming.  If they're going to appeal they're
 5  supposed to contact me first.
 6      Q.   Do you recall any appeals by Kyle
 7  Sperling?
 8      A.   No.
 9      Q.   Oh, and I forgot to ask this, I should
10  have, are you board certified in any area?
11      A.   Not any longer.
12      Q.   And were you previously board certified
13  in some area?
14      A.   Yes, family practice.
15      Q.   And when was that?
16      A.   Until 2009.
17      Q.   And can you tell me what a meniscus tear
18  is?
19      A.   It's a piece of tissue between two bones
20  and if it -- and sometimes it gets torn.
21      Q.   And how is a meniscus tear determined or
22  diagnosed?
23      A.   First it should be diagnosed with a
24  physical exam, and then the extent of it can be
25  diagnosed with a CAT scan or an MRI.
0023
 1      Q.   Would you agree that left untreated large
 2  complex tears impair smooth motion of the knee,
 3  cause joint effusions, and lead to premature
 4  osteoarthritis?
```

```
 5              MR. CARDELLO:  Object to foundation.
 6              THE WITNESS:  I don't know that you
 7    can make that statement.
 8    BY MR. KUHN:
 9        Q.   I'm just asking if you can agree with
10    that?
11        A.   No.
12        Q.   And why don't you agree with that, sir?
13        A.   Because I've seen many that didn't have
14    joint effusions or, what was the other word,
15    premature arthritic changes that have undergone
16    treatment, conservative treatment.
17        Q.   Would you agree that arterial flow to the
18    inner portions of the menisci is limited compared
19    to the peripheral or outer portions and that
20    explains why tears of the inner menisci often do
21    not heal?
22              MR. CARDELLO:  Object to foundation.
23              THE WITNESS:  I would not agree with
24    that.
25    BY MR. KUHN:
0024
 1        Q.   Okay, and why not?
 2        A.   Okay.  I guess I need to explain that.
 3        Q.   Yes, please.
 4        A.   Healing is a subjective thing.  If you
 5    look at it from the subjective standpoint healing
 6    is I'm getting better, I have no pain, and I can
 7    walk.  Healing from the objective standpoint is an
 8    MRI or a CAT scan that shows that it's healed.  In
 9    the first point if there is, quote, healing, then
10    you don't -- it doesn't really matter what the
11    second point is.  Conservative therapy for a
12    meniscus tear is physical therapy, exercise, rest
13    when indicated.
14        Q.   Is that your full answer, sir?
15        A.   Pardon me?
16        Q.   Is that your full answer?
17        A.   That's my full answer.
18        Q.   Okay.  Would you agree, sir, that most
19    patients can ambulate after a small meniscal tear
20    occurs and can continue to participate in the
21    activity that caused the injury?
22        A.   I would not recommend anyone continue the
23    activity that caused an injury.
24        Q.   I'm not asking about whether you -- what
25    you recommend, sir.  I'm just asking if you can
0025
 1    agree with that statement?
 2        A.   No.
 3        Q.   Would you agree that severe meniscal
 4    tears are usually associated with more significant
 5    pain and early restriction of knee motion.  Some
 6    patients describe a tearing or popping sensation
```

```
 7  at the time of injury.  Would you agree with that?
 8      A.  No.
 9      Q.  Why not?
10      A.  Because you can have tearing and popping
11  sensation or sound and not have an injury, and you
12  can have an injury and not have a tearing and
13  popping sensation or sound.
14      Q.  Okay.
15      A.  So it's not an automatic assumption.
16      Q.  Well, the statement was some patients
17  describe a tearing or popping sensation at the
18  time of injury; would you agree with that?
19      A.  Sure, they do.
20      Q.  Okay.
21      A.  But that does not necessarily mean that
22  they have been injured.  They can have a tearing
23  and popping sensation and never have a meniscal
24  tear.
25      Q.  I see.  Would you agree with the
0026
 1  statement that severe meniscal tears are usually
 2  associated with more significant pain and early
 3  restriction of knee motion?
 4      A.  No.
 5      Q.  And why not?
 6      A.  Because it's not a constant.  You can
 7  have a horrible meniscal tear and do just fine
 8  with it.  You can have a minor meniscal tear and,
 9  depending on the patient, you may not do very well
10  with it.
11      Q.  Would you agree that effusions are common
12  in patients with meniscal injury particularly with
13  large or common tears?  Is that a fair statement;
14  would you agree with that?
15              MR. CARDELLO:  Object to form and
16  foundation.
17              THE WITNESS:  Yeah, I would have to
18  say that people who have a tear may have an
19  effusion but it is not a given.  And it's not a
20  given that if you don't have an effusion -- or if
21  you do have an effusion that you have a tear.
22  BY MR. KUHN:
23      Q.  Would you agree that patients with a
24  suspected meniscal injury should be examined for
25  joint line tenderness?
0027
 1      A.  Certainly.
 2      Q.  Would you agree that patients with
 3  suspected meniscal injury should be examined for
 4  abnormal knee motion?
 5      A.  Certainly.
 6      Q.  Would you agree that patients with
 7  suspected meniscal injury should be examined for
 8  inability to squat or kneel?
```

```
 9      A.   Okay, that's not a given.
10      Q.   All I'm asking is would you agree that
11   patients with suspected meniscal injuries should
12   be examined for inability to squat or kneel?
13      A.    That has absolutely -- that has very
14   little to do with how bad the meniscal tear is.
15   It has to do with how the patient is tolerating
16   the pain or if the pain is being treated by
17   conservative measures.
18      Q.    So you would not agree with that; is that
19   what you're saying?
20      A.    I'm saying it's not a given.  Correct,
21   okay, I will --
22      Q.    I'm just asking a simple question, sir,
23   would you agree with that?  If you do, fine, if
24   you don't, fine, I just want to know what your
25   answer is.
0028
 1      A.    No, I don't agree with it.
 2      Q.    Would you agree that patients with
 3   suspected meniscal injuries should be examined for
 4   palpable catching at the joint line as detected by
 5   the McMurray maneuver?
 6               MR. CARDELLO:  Object to foundation.
 7               THE WITNESS:  Yes, that's part of
 8   the examination of a knee.
 9   BY MR. KUHN:
10      Q.    All right.  Would you agree that patients
11   with suspected meniscal injuries should be
12   examined for pain elicited by specific provocative
13   tests?
14               MR. CARDELLO:  Object to foundation.
15               THE WITNESS:  If there's suspected
16   knee injury there is a knee exam that is -- should
17   be done, and that is part of the knee exam whether
18   they have a meniscal tear or not.
19   BY MR. KUHN:
20      Q.    And would you agree that patients with
21   suspected meniscal injuries should be examined for
22   joint effusion?
23      A.    Same answer.  That's part of a normal
24   knee exam whether they have a meniscal tear or you
25   think they have a meniscal tear.
0029
 1      Q.    All right.  Would you agree that multiple
 2   positive examination findings make the diagnosis
 3   of meniscal injury likely?
 4      A.    No.
 5               MR. CARDELLO:  Object to form and
 6   foundation.
 7   BY MR. KUHN:
 8      Q.    And why not?
 9      A.    Okay, we've already been through this
10   that meniscal tears can be treated conservatively,
```

11    so if they're seen enough times they're going to
12    have the exact same findings until the
13    conservative therapy is effective.
14         Q.   Well, I didn't ask about conservative
15    therapy, sir.
16              MR. KUHN:  But, go ahead, repeat my
17    question.  Maybe I can get an answer to that.
18              (Reporter read back question
19              page 29, lines 1-3.)
20              THE WITNESS:  I said no.
21    BY MR. KUHN:
22         Q.   Okay.  No, you didn't say no, but, okay,
23    I'll take your no as an answer.  Would you agree
24    that a presumptive diagnosis of meniscal tear is
25    based upon the mechanism of injury in the case of
0030
1     acute tears, characteristic symptoms such as
2     mechanical catching and locking, and corroborating
3     science from physical examination, including joint
4     line tenderness and positive provocative tests
5     such as McMurray?
6              MR. CARDELLO:  Object to form and
7     foundation.
8              THE WITNESS:  Can you repeat the
9     question?
10             MR. KUHN:  Go ahead.
11             (Reporter read back last question.)
12             MR. CARDELLO:  Same objection.
13    Answer if you can.
14             THE WITNESS:  All I would say to
15    that is those are all symptoms of a meniscal
16    problem, but they are also symptoms of other
17    problems.
18    BY MR. KUHN:
19         Q.   Okay.  So do you agree or not agree with
20    that statement?
21         A.   I don't agree that you can presume that
22    that's what the diagnosis is.
23         Q.   Would you agree that the presence of a
24    combination of suggestive historical features such
25    as knee locking and examination findings such as
0031
1     focal line tenderness and positive tests,
2     provocative tests, significantly increases the
3     likelihood of meniscus injury while reducing the
4     likelihood of other conditions?
5              MR. CARDELLO:  Object to form and
6     foundation.
7              THE WITNESS:  It could.
8     BY MR. KUHN:
9          Q.   And can you tell us what a differential
10    diagnosis is?
11         A.   A list of diagnoses that would cause the
12    same problem.

```
13        Q.   Can you tell us what patellofemoral pain
14   syndrome is?
15        A.   Yes, it's caused by a mistracking of the
16   patella, typically it's to the inside of the knee,
17   and because it's not tracking correctly in the
18   groove that it's supposed to be tracking in it
19   causes irritation of the patella and the tissue of
20   the knee.
21        Q.   Would you agree that patellofemoral pain
22   syndrome is often gradual in onset, typically
23   causes vague symptoms around the patella rather
24   than the joint line, does not cause true locking
25   of the knee, and is often associated with weak
0032
1    quadriceps and hip abductors?
2              MR. CARDELLO:  Object to form.
3              THE WITNESS:  I would agree it's
4    related to weak quadriceps and hip abductors but
5    the rest are not necessary.
6    BY MR. KUHN:
7         Q.   So you don't agree with the rest; is that
8    what you're saying?
9         A.   Correct.
10        Q.   Would you agree, sir, that with regard to
11   meniscal injury the following factors suggest
12   conservative therapy will be successful, that the
13   symptoms develop over 24 to 48 hours after the
14   acute injury as opposed to immediately after?
15        A.   No.
16        Q.   Would you agree that the following
17   factors suggest conservative therapy will be --
18   the -- successful, the patient is able to bear
19   weight?
20        A.   No.
21        Q.   And, again, the following factors suggest
22   conservative therapy will be successful, there is
23   minimal swelling?
24        A.   Absolutely not.
25        Q.   Another, would you agree that the
0033
1    following factors suggest conservative therapy
2    will be successful, the knee has a full range of
3    movement with pain only at or near full flexion?
4              MR. CARDELLO:  Object to form.  Tom,
5    I didn't -- did you say will or will not on that
6    one?  I'm sorry, I didn't...
7              MR. KUHN:  I'm sorry?
8              MR. CARDELLO:  You just said it kind
9    of fast.
10             MR. KUHN:  Okay.  Well, do you want
11   to repeat it for him?
12             (Reporter read back last question.)
13             THE WITNESS:  Yes, with the
14   understanding that the decrease in the amount of
```

```
15   pain allows the patient to do the exercise
16   necessary to treat the symptom.
17   BY MR. KUHN:
18      Q.   Would you agree that large complex tears
19   associated with persistent effusions, tears that
20   frequently cause disabling symptoms, and large
21   vertical tears in contact with the articular
22   cartilage should be referred to an orthopedist
23   without delay?
24              MR. CARDELLO:  Object to form and
25   foundation.
0034
 1              THE WITNESS:  The answer is -- the
 2   question is should they be sent to an orthopedist,
 3   correct?
 4              MR. KUHN:  No.  Do you want to
 5   repeat the question for him?
 6              (Reporter read back last question.)
 7              MR. CARDELLO:  And I'm going to
 8   object to the form, that's multiple, and the
 9   foundation.  But go ahead if you can.
10              THE WITNESS:  I...
11              MR. CARDELLO:  The form objection is
12   it's compound is what I meant, compound question.
13              THE WITNESS:  I'm going to say no.
14   BY MR. KUHN:
15      Q.   Would you agree that the following
16   factors suggest surgery will be required, one, a
17   severe twisting injury occurred and activity could
18   not be resumed thereafter?
19      A.   No.
20      Q.   Two, the knee is locked or motion is
21   severely restricted?
22      A.   Yes.
23      Q.   Three, pain develops with McMurray
24   testing?
25              MR. CARDELLO:  Object to foundation.
0035
 1              THE WITNESS:  I have to say no.
 2   BY MR. KUHN:
 3      Q.   Four, there's little improvement in
 4   symptoms after three weeks despite proper
 5   conservative treatment?
 6              MR. CARDELLO:  Object to foundation
 7   and form.
 8              THE WITNESS:  No.
 9   BY MR. KUHN:
10      Q.   Would you agree that an MRI of the knee
11   should be obtained for any patient with notable
12   mechanical symptoms or recurrent effusions that
13   persist for three to four weeks despite the
14   initial conservative management?
15              MR. CARDELLO:  Object to form and
16   foundation.
```

```
17                  THE WITNESS:  No.
18   BY MR. KUHN:
19        Q.   Would you agree that consultation with an
20   orthopedic surgeon is needed if the MRI
21   demonstrates a large or complex meniscal tear
22   or -- well, let me start with that.  Would you
23   agree that consultation with an orthopedic surgeon
24   is needed if the MRI demonstrates a large or
25   complex meniscal tear?
0036
 1        A.   Not adequate information.
 2        Q.   I'm sorry?
 3        A.   If they had no response to conservative
 4   therapy, yes.
 5        Q.   All right.  Would you agree that
 6   consultation with an orthopedic surgeon is needed
 7   if the patient continues to develop joint
 8   effusions, frequent locking of the knee, or other
 9   disabling symptoms after four to six weeks of
10   conservative management?
11                  MR. CARDELLO:  Object to form and
12   foundation.
13                  THE WITNESS:  I would say should be
14   considered.  Again, if the patient is not having
15   major symptoms and he's following conservative
16   therapy, no.
17   BY MR. KUHN:
18        Q.   Would you agree that some observational
19   data suggests that early surgical repair, for
20   example, within three months of injury, improves
21   the outcomes compared with later repair?
22        A.   No.
23        Q.   Would you agree that meniscal injury does
24   predispose patients to the development of
25   osteoarthritis over the long term?
0037
 1        A.   May predispose.
 2        Q.   Would you agree with regard to
 3   patellofemoral pain syndrome the pain usually
 4   comes on over time without one specific episode of
 5   injury?
 6        A.   No.
 7        Q.   Would you agree that with regard to
 8   patellofemoral pain syndrome -- would you agree
 9   that patellofemoral pain syndrome almost never
10   results in a swollen knee?
11        A.   No.
12                  MR. CARDELLO:  Object to form.
13   BY MR. KUHN:
14        Q.   Sir, we have marked Exhibit 3.  Can you
15   identify that exhibit for us, please?
16        A.   It's a drawing of a knee.
17        Q.   Okay.  And can you identify with the pen
18   I've just handed you -- this is -- it's a -- okay,
```

```
19   can you identify with the pen I just handed you
20   where the patella is?
21        A.   (Pointing.)
22        Q.   With the pen that I just handed you.
23        A.   What would you like me to do with it?
24   Put an X on it?
25        Q.   I would like you to put an X on it and
0038
 1   put a line indicating patella.
 2              Can you put -- can you identify
 3   similarly the meniscus?  All right, did you put a
 4   line there, sir?  I know you put an X there.
 5        A.   Oh.
 6        Q.   Okay, thank you.  Can you identify the
 7   quadriceps muscle?  Can you identify the tibia?
 8   Can you identify the femur?  On that drawing can
 9   you tell us where the joint line would be?  Do you
10   see any ligaments on that drawing, sir?
11        A.   Um-hum.
12        Q.   Yes, is that a yes?
13        A.   Yes, it is.
14        Q.   Okay.  And can you identify similarly the
15   ligaments that you see in that drawing?  Are you
16   finished?
17        A.   Yes.
18        Q.   And LCL stands for what, sir?
19        A.   LCL is lateral collateral.
20        Q.   Ligament?
21        A.   Correct.
22        Q.   And MCL means what, sir?
23        A.   Medial collateral.
24        Q.   And ACL?
25        A.   Anterior cruciate.
0039
 1        Q.   And PCL?
 2        A.   Posterior cruciate ligament.
 3        Q.   Okay, thank you.  As part of your role in
 4   utilization management do you ever do a clinical
 5   exam of any patient?
 6        A.   No.
 7        Q.   Do you have access to the patient's
 8   electronic medical record?
 9        A.   Yes.
10        Q.   And is that something that you review in
11   doing your utilization management?
12        A.   Yes.
13        Q.   And when you say you have access to the
14   electronic medical record, is this something that
15   you have right on your computer, you can access
16   any individual's electronic medical record that's
17   within the corrections system?
18        A.   There are some that are only on paper and
19   there are some that -- or some of the data that is
20   available for patients is only on paper.
```

```
21        Q.   Okay, but --
22        A.   But I have access to the other data that
23   is on the electronic medical records.
24        Q.   So you have all the data that's on the
25   electronic medical record; is that correct?
0040
 1        A.   Correct.
 2        Q.   In this case with regard to Mr. Wright do
 3   you recall what you reviewed?
 4        A.   No.
 5        Q.   And what would you typically review when
 6   there's a request for an outside consult of some
 7   sort or outside referral?
 8        A.   We review what is sent to us by the
 9   provider.
10        Q.   Okay.  You would not review the
11   electronic medical record?
12        A.   Possibly not, possibly may.
13        Q.   So -- and you don't recall if you did or
14   didn't in this case?
15        A.   No.
16        Q.   So when you say you only review or you
17   might only review what's sent to you by the
18   provider, are you talking about the 407?
19        A.   Yes.  I got your paper wet.
20        Q.   Oh, well.
21        A.   I'll hang it over the edge and hope it
22   dries out.
23        Q.   Maybe that will dry it out.  All right,
24   well, let's look through some records here.  We've
25   got what's been marked here --
0041
 1        A.   Exhibit 1.
 2        Q.   -- as Exhibit 1, and if you could just
 3   take that and not get it wet that would be good.
 4   And this was provided by the Department of
 5   Corrections, and it's sort of funny in one regard
 6   and that is -- I guess it's not necessarily
 7   funny -- that the older records -- the newer --
 8   yeah, the older records are in the back.  Maybe
 9   that's how it always works.  I don't know.
10        A.   That's how it always is.
11        Q.   All right.  And so even though the first
12   page is 676, correct, down at the bottom; do you
13   see that?
14        A.   Yes.
15        Q.   I want you to go near the back and to
16   page, wow, 920.
17        A.   Oh, it's on the back.
18        Q.   Do you see page 920?
19        A.   Yes, I have 920.
20        Q.   And this is a nurse protocol dated
21   April 12th, 2015, correct?
22        A.   Correct.
```

```
23       Q.   And halfway down under accident report
24   states while walking outside today something in my
25   left knee snapped and I fell to the ground, in a
0042
 1   lot of pain especially with weight applied; do you
 2   see that?
 3       A.   Yeah.
 4       Q.   That's the report, correct?
 5       A.   That's what the nurse reported.
 6       Q.   Correct.  And the nurse also reported
 7   tenderness of the left knee, correct?
 8       A.   Yes.
 9       Q.   Pain with movement?
10       A.   Yes.
11       Q.   Weakness?
12       A.   Yes.
13       Q.   Warm to touch?
14       A.   Yes.
15       Q.   Swelling?
16       A.   Yes.
17       Q.   And that the prisoner states he cannot
18   bend knee flat, is able to swing back and forth
19   slightly while seated on the edge of a gurney,
20   correct?
21       A.   Okay.
22       Q.   Is that correct?
23       A.   Yes, that's what it says.
24       Q.   All right.  I want you to move to page
25   916.
0043
 1       A.   Okay.
 2       Q.   Skip that actually.  If you can go to
 3   page 907.
 4       A.   Okay.
 5       Q.   All right.  And page 907 is dated
 6   April 17th, 2015, correct?
 7       A.   Correct.
 8       Q.   Five days after this injury that
 9   Mr. Wright suffered, correct?
10       A.   Can you tell me what page the injury was
11   on?
12       Q.   That was on page 920.
13       A.   No, that's not correct.
14       Q.   Okay, and what -- why do you say it's not
15   correct?
16       A.   On the note dated 4-12 --
17       Q.   Yes.
18       A.   Oh, I'm sorry, same note.
19       Q.   It's page 920, sir, if that helps you.
20       A.   It does not help.
21       Q.   I see, okay.  Well, just to expedite
22   things can you go to page 920 again, sir?
23       A.   Certainly.
24       Q.   Are you at that page?
```

```
25        A.   Yes.
0044
 1        Q.   All right.  Halfway through the page it
 2   says accident report states while walking outside
 3   today something in my left knee snapped and I fell
 4   to the ground; do you read that?
 5        A.   Yes, I do.
 6        Q.   Okay.  Does that indicate that an injury
 7   occurred on April 12th, 2015?
 8        A.   That indicates that that's what the
 9   patient said.
10        Q.   Okay.  And do you have any reason to
11   believe that the patient was saying something
12   inaccurate?
13        A.   I have reason to believe that that was
14   not the initial -- initial injury.
15        Q.   And why is that?
16        A.   Because on -- well, maybe I'd better
17   check the date first -- 7-27-16 --
18        Q.   Okay, that's a year later, sir.  That's a
19   year later when he was being treated after -- for
20   however many years --
21        A.   Okay, I have it backwards.  I thought
22   that was earlier.
23        Q.   I see.
24        A.   I would have to review the record because
25   the number of times that the patients say today
0045
 1   and it was weeks earlier are -- are large.
 2        Q.   I see.  You don't have any evidence
 3   sitting here today that Mr. Wright when he went in
 4   to see the nurse on April 12th, 2015, was saying
 5   something incorrect when he said that he had an
 6   injury that day?
 7        A.   Not unless you let me look through those
 8   records.
 9        Q.   I'll let you do that at the end of this
10   deposition, sir.  I know your attorney's had the
11   opportunity to let you look through them
12   previously, and I will but I don't have all day.
13   Maybe you do.
14             All right, so let's go to page 907,
15   sir.
16        A.   I'm on page 907.
17        Q.   Okay, great.  And so we're at April 17th,
18   which is five days after April 12th, is it not?
19        A.   Correct.
20        Q.   And April 12th was the date when Mr.
21   Wright reported his left knee injury, correct?
22        A.   Correct.
23        Q.   And this is a provider visit with
24   Mr. Sperling, correct?
25        A.   Yes.
0046
```

```
 1      Q.   And Mr. Sperling did a knee exam, did he
 2 not, based on this record?
 3      A.   Yes.
 4      Q.   And he found that Mr. Wright's left knee
 5 had swelling and stiffness, correct?
 6      A.   Correct.
 7      Q.   And that his -- the exam was limited by
 8 stiffness and pain, is that correct?
 9      A.   Correct.
10      Q.   And that Mr. Sperling suspected a
11 meniscus injury, correct?
12      A.   Misspelling of the words.
13           MR. CARDELLO:  Object to form.
14           THE WITNESS:  He says that he has a
15 suspected medical menical involvement.  I have to
16 assume that he was talking about a medial meniscus
17 and a medial collateral ligament involvement given
18 the limited physical exam in the office today.
19 BY MR. KUHN:
20      Q.   Okay.  And down under assessment/plan,
21 number one, left knee injury most likely involving
22 the MCL and the medial meniscus, correct,
23 misspelled medial?
24      A.   That's what it says, yes.
25      Q.   Okay.  And if you can go to page 884,
0047
 1 sir.
 2      A.   Okay.
 3      Q.   And this is dated June 2nd, 2015,
 4 correct?
 5      A.   Correct.
 6      Q.   And again it's a document generated by
 7 Kyle Sperling, if you look on page 886.
 8      A.   Yes.
 9      Q.   And if you could go to page 871.
10      A.   Okay.
11      Q.   Okay, and 871 a is month later, correct,
12 January -- July 2nd, 2015, correct?
13      A.   Correct.
14      Q.   And this is a provider visit with Kyle
15 Sperling again, correct?
16      A.   Correct.
17      Q.   And it indicates that the patient has
18 been with inability to walk without assistance for
19 the past three to four months; do you see that?
20      A.   Yeah, yes.
21      Q.   And under physical exam it says left knee
22 is slightly swollen and larger than the right
23 knee?
24      A.   Yes.
25      Q.   Apprehension is noted with McMurray test?
0048
 1      A.   Yes.
 2      Q.   Laxity and tenderness is noted with varus
```

```
 3   stress?
 4        A.   Yes.
 5        Q.   Limitations with full extension and
 6   flexion is noted; do you see that?
 7        A.   Yeah, yes.
 8        Q.   All right.  And if you could turn then to
 9   page 879 -- or 869, I'm sorry.  Do you see page
10   869?
11        A.   Yes.
12        Q.   And this is a 407, correct?
13        A.   Yes.
14        Q.   And it's dated July 2nd, 2015, correct?
15        A.   Correct.
16        Q.   And it's a request for a consultation; is
17   that not correct?
18        A.   Yeah, yes.
19        Q.   Orthopedic consultation?
20        A.   Correct.
21        Q.   And under signs and symptoms it indicated
22   patient has been with left leg knee injury since
23   April 2015 time frame.  Patient reports something
24   snapped in left knee while he was walking.  He
25   reports falling at that time.  Notes he has had to
0049
 1   use crutches or other supporting DME ever since;
 2   do you see that?
 3        A.   Yes.
 4        Q.   Do you know what DME stands for?
 5        A.   Durable medical equipment.
 6        Q.   All right.  And on the next page, 868?
 7        A.   Okay.
 8        Q.   And this is your response --
 9        A.   Yes.
10        Q.   -- rejecting that request for a consult,
11   correct?
12        A.   Deferring to an alternative treatment
13   plan.
14        Q.   Okay.  It says --
15        A.   Because there's no --
16        Q.   Just so I understand something, it says
17   criteria met and it has no after his X; is that a
18   fair statement, sir?
19        A.   It's a fair statement but that is not
20   what that means.  This was an old form that is
21   being used in a not old way.
22        Q.   I see.  All right.  And up to this point
23   based on what Mr. Sperling has done did he find
24   any  femoral syndrome?
25        A.   No.  Well, let me take that back.  He
0050
 1   does not state that.
 2        Q.   Okay.  I'm sure he doesn't.
```

```
0075
 1   STATE OF MICHIGAN )
                       )  SS
 2   COUNTY OF CLINTON )
 3
 4          I, Tamara Staley Heckaman, Certified
 5   Shorthand Reporter and Notary Public in and for
 6   the County of Clinton, State of Michigan, do
 7   hereby certify that the foregoing Deposition was
 8   taken before me at the time and place hereinbefore
 9   set forth.
10          I further certify that said witness was
11   by me duly sworn in said cause; that the testimony
12   then given was reported by me stenographically;
13   subsequently with computer-aided transcription,
14   produced under my direction and supervision; and
15   that the foregoing is a full, true, and correct
16   transcript of my original shorthand notes.
17          IN WITNESS WHEREOF, I have hereunto set
18   my hand and seal this 10th day of July, 2018.
19
20
                    _____
21                  Tamara Staley Heckaman, CSR-3443,
                    Certified Shorthand Reporter,
22                  and Notary Public, County of
                    Clinton, State of Michigan.
23
                    My Commission Expires:  5-20-24
24
25
```