# Transcript of the Testimony of

# Keith Papendick, M.D.

**Date:**

March 27, 2019

**Eddie Spiller v. Jeffrey Stieve**

American Reporting, Inc.
Phone:248-559-6750
Fax:248-559-9919
Email:scheduling@american-reporting.com
Internet: american-reporting.com

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN


EDDIE SPILLER,

                                    Case No.:

    Plaintiffs,                     18-cv-00692

vs

                                    Honorable Janet T. Neff

                                    Magistrate Ellen S. Carmody

JEFFREY STIEVE, WILLIAM BORGERDING,

CORIZON OF MICHIGAN a/k/a

CORIZON HEALTH, INC., KEITH PAPENDICK,

ROBERT LACY, and JEFFREY BOMBER,

    Defendants.

_____/


DEPOSITION OF:  KEITH PAPENDICK, M.D.

LOCATION:       525 West Ottawa, Lansing, Michigan

DATE:           March 27, 2019

TIME:           2:00 p.m.

Taken in the above-entitled cause, before James A. Hengstebeck,

Certified Electronic Recorder, CER #4623, and Notary Public for

the County of Oakland.

1

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

APPEARANCES:  KEITH ALTMAN, ESQUIRE
              MADELINE SINKOVICH, ESQUIRE
              Excolo Law PLLC
              26700 Lahser Rd Ste 400
              Southfield, MI 48033-2618
              Appearing on behalf of the Plaintiff.
              kaltman@excololaw.com

              CARLY VAN THOMME, ESQUIRE
              Chapman Law Group
              1441 W Long Lake Rd Ste 310
              Troy, MI 48098-4476
              Appearing on behalf of the Corizon Defendants.
              cvanthomme@chapmanlawgroup.com

              SARAH R. ROBBINS, ESQUIRE
              Assistant Attorney General
              Department of the Attorney General
              PO Box 30754
              Lansing, MI 48909-8254
              Appearing on behalf of Drs. Stieve and
              Borgerding.

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

I N D E X

WITNESS:                                                    PAGE:

KEITH PAPENDICK, M.D.

  Cross-Examination by Mr. Altman                    5

  Redirect Examination by Ms. Van Thomme           126

  Cross-Examination by Ms. Robbins                 127

  Recross-Examination by Mr. Altman                130


EXHIBITS:

  Deposition Exhibit Number 1                       22

3

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1                           Lansing, Michigan
 2                           March 27, 2019, 1:45 p.m.
 3          VIDEO TECHNICIAN:  We are on the record.  The
 4     following is the video deposition of Dr. Keith Papendick
 5     taken in the matter of Eddie Spiller V Jeffrey Stieve.
 6     This case is to be held in the United States District
 7     Court, Western District of Michigan before the
 8     Honorable Janet Neff.  The case number is 18-cv-00692.  We
 9     are located at 535 West Ottawa Street in Lansing,
10     Michigan.  Today's date is March 27, 2019.  The time is
11     1:47.  I'll have counsel introduce yourselves, please
12          MR. ALTMAN:  Keith Altman on behalf of the plaintiff.
13          MS. ROBBINS:  Assistant Attorney General
14     Sarah Robbins on behalf of defendants Dr. Borgerding and
15     Dr. Stieve.
16          MS. VAN THOMME:  Carly Van Thomne on behalf of the
17     Corizon defendants, including Dr. Papendick.
18          VIDEO TECHNICIAN:  Doctor, if you'd raise your right
19     hand.
20          MR. ALTMAN:  Wait, we have one more.
21          VIDEO TECHNICIAN:  I'm sorry.
22          MS. SINKOVICH:  Madeleine Sinkovich on behalf of the
23     plaintiff.
24          VIDEO TECHNICIAN:  Doctor, if you'd raise your right
25     hand, please.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1                    KEITH PAPENDICK, M.D.,
 2   a witness herein, after having first been duly sworn, testified
 3   as follows:
 4                      CROSS-EXAMINATION
 5   BY MR. ALTMAN:
 6   Q.   Good afternoon, Dr. Papendick.  How are you today?
 7   A.   It's a hard long walk.
 8   Q.   Have you ever had your deposition taken before?
 9   A.   Yes, a few times.
10   Q.   When you say a few, can you be a little more precise?
11   A.   Probably 10 or better.
12   Q.   Is it more than 20?
13   A.   No.
14   Q.   So between 10 and 20 times?
15   A.   Probably.
16   Q.   When was the last time you had your deposition taken?
17   A.   Four months ago.
18   Q.   Okay.  I'd just like to go over a couple of things even
19        though you've had your deposition taken a few times.
20             This is not an endurance test and any time you think
21        you need a break, we'll take a break to meet your needs,
22        okay?
23   A.   Yes.
24   Q.   One of the things that is going to take some practice is
25        for you to wait for me to finish asking my questions and
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        for me to wait for you to finish answering my questions so
 2        that we get a clean record, okay?
 3   A.   Yes.
 4   Q.   If I ask you a question you don't understand, please let
 5        me know.
 6   A.   I will.
 7   Q.   If you don't tell me that you don't understand the
 8        question, I'll assume that you did, okay?
 9   A.   Yes.
10   Q.   And you have to use verbal responses.  Nods of the head,
11        shakes of the head don't work very well.
12   A.   Yes.
13   Q.   Dr. Papendick, why hasn't Mr. Spiller had his shoulder
14        surgery to date?
15             MS. VAN THOMME:  Object to foundation.
16             THE WITNESS:  I don't have anything to do with that.
17   Q.   (By Mr. Altman)  I don't understand what you mean when you
18        have nothing to do with it.
19   A.   I am not involved with patient care.
20   Q.   But you are involved in approving surgeries, correct?
21   A.   Correct.
22   Q.   Why hasn't Mr. Spiller had his surgery yet?  Strike that.
23             Why haven't you approved Mr. Spiller's surgery as of
24        yet?
25             MS. VAN THOMME:  Object to form.
```

6

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  Doctor, let me take a step back.  You are
 2        aware that Mr. Spiller was just paroled, right?
 3   A.   Yeah.
 4   Q.   So obviously, I'm only discussing in the time period
 5        before he was paroled, okay?
 6   A.   Yes.
 7   Q.   Why haven't you approved Mr. Spiller's surgery during the
 8        time he was in prison for his shoulder?
 9   A.   I never received an adequate request for his surgery.
10   Q.   What do you mean by that?
11   A.   I receive forms.
12   Q.   Right.
13   A.   That are called 407s.
14   Q.   Okay.
15   A.   Or requests for referral.
16   Q.   Okay.
17   A.   Data for requests for referral have to be inclusive and if
18        it is not all there or there is no specific reason for it
19        to be done, it doesn't get approved, it gets deferred to
20        an alternative treatment plan.
21   Q.   So as you sit here right now, you're saying you had no
22        knowledge at any time that any specialist had recommended
23        that Mr. Spiller have surgery?
24             MS. VAN THOMME:  Object to form.
25             THE WITNESS:  I don't believe I said that.
```

7

Keith Papendick, M.D.     Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  Well, I'm asking you that question.  As
 2        you sit here right now, were you ever presented
 3        information from an orthopedist recommending that
 4        Mr. Spiller have surgery on his shoulder?
 5   A.   I may have received information from a provider at a site
 6        from the Michigan Department of Corrections that said
 7        that, but I don't recall ever seeing the actual report
 8        from the orthopedic surgeon.
 9   Q.   So as you sit here right now, you were aware that a
10        specialist, at least one specialist had recommended that
11        Mr. Spiller have shoulder surgery, correct?
12   A.   Yeah.
13   Q.   And you said it wasn't approved because they didn't fill
14        out the form correctly?
15             MS. VAN THOMME:  Object to form.
16             THE WITNESS:  I don't believe I said that, either.
17   Q.   (By Mr. Altman)  Okay.  So why didn't he have his surgery?
18   A.   Well, I don't have the form in front of me and if you want
19        to go through these, I will, and get you that answer.
20   Q.   Did you review the forms in preparation for today's
21        deposition?
22   A.   Yes, and a hundred a day other than seeing these forms in
23        preparation for this deposition.
24   Q.   Well, maybe we'll do that, but as best as you can
25        recollect, what was that about the request for surgery
```

8

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1          that didn't satisfy you to approve it?
 2               MS. VAN THOMME:  Object to form.
 3               THE WITNESS:  Would you like me to go through this
 4          and find that answer for you --
 5     Q.   (By Mr. Altman)  Sure.
 6     A.   -- or do you want me to guess?
 7     Q.   I'd like you to do that, if it's there.
 8     A.   This request was in the Upper Peninsula and the patient
 9          needed to come down state to have their surgery done
10          because of utilization of a secure unit at either Henry
11          Ford Allegiance Hospital, which was Allegiance Hospital at
12          the time, I believe, or McLaren Lansing.
13     Q.   So there's no medical reason why he didn't get his
14          surgery, correct?
15     A.   No, there's a security reason.
16     Q.   What was the security reason?
17     A.   There is no secure unit in the Upper Peninsula.
18     Q.   So that means a prisoner doesn't get necessary surgery
19          because there is no security?
20               MS. VAN THOMME:  Object to form.
21               THE WITNESS:  That's not what was said.
22     Q.   (By Mr. Altman)  Well, I'm asking you what was said.  What
23          did you mean?
24     A.   What was said was that he had to come downstate to a
25          facility that had a secure unit which was Henry Ford
```

                                                                          9

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        Allegiance, which used to be Allegiance Hospital in
 2        Jackson, or McLaren Hospital in Lansing.
 3   A.   So why didn't that happen?
 4             MS. VAN THOMME:  Object to foundation.
 5             THE WITNESS:  That, I have no clue why the provider
 6        didn't take care of that.
 7   Q.   (By Mr. Altman)  So it's the provider's fault he didn't
 8        have the surgery?
 9             MS. VAN THOMME:  Object to form, foundation.
10             THE WITNESS:  I am telling you I get a piece of
11        paper, which you obviously have gone through and it gives
12        me information.  It is approved or deferred to an
13        alternative treatment plan from that information.  The
14        information on this form from February 18th of 2015,
15        states that they wanted to do an overnight surgery by
16        Dr. Ganzhorn at Sault Ste. Marie.  At the time, we were
17        not doing overnight surgeries at Sault Ste. Marie because
18        of the security issue.  The secure unit in Lansing and in
19        Jackson both have the same facilities as a Michigan
20        Department of Corrections prison.  Thus, it is secure.
21   Q.   (By Mr. Altman)  I see, so are you saying that Mr. Spiller
22        didn't get his surgery for logistical reasons?
23             MS. VAN THOMME:  Object to form.
24             THE WITNESS:  Am I saying what?
25   Q.   (By Mr. Altman)  That Mr. Stiller didn't get his surgery
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        for logistical reasons.
 2             MS. VAN THOMME:  Object to form.
 3             THE WITNESS:  That's not what I said.
 4    Q.  (By Mr. Altman)  Well, you said he didn't get his surgery
 5        because there wasn't a secure facility there, didn't you?
 6             MS. VAN THOMME:  Object to form.
 7             THE WITNESS:  So he had to be transported downstate
 8        to either Lansing McLaren or Allegiance -- excuse me,
 9        Henry Ford Allegiance Hospital, previously Allegiance
10        Hospital, where there was a secure unit to be utilized for
11        overnight stay.
12    Q.  (By Mr. Altman)  I understand, and so medically he needed
13        the surgery, but for logistical reasons, he didn't get it?
14             MS. VAN THOMME:  Object to form.
15             THE WITNESS:  Let me see if I can clarify that.
16    Q.  (By Mr. Altman)  Well, let me ask you, you know what I
17        mean -- do you understand what I mean by logistical
18        reasons?
19    A.  Yeah, nonmedical.
20    Q.  Okay.
21    A.  After I told them that they had to have their surgery at a
22        site that had a -- because it was an overnight stay,
23        right, I'm looking to see if there was another request
24        placed that I approved for surgery.
25    Q.  What was the date of the one -- you just said that, just
```

11

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1          so I get the dates, you just said that it was approved on
 2          whatever date that you were looking through there, what
 3          date was that?
 4     A.   It was not approved on that date, it was deferred to an
 5          alternative treatment plan for the patient to be
 6          transferred downstate.
 7     Q.   That's not a treatment plan, that's a logistical plan,
 8          isn't it?
 9               MS. VAN THOMME:  Object to form.
10               THE WITNESS:  If it includes a consult with a new
11          orthopedic surgeon, it is a treatment plan.
12     Q.   (By Mr. Altman)  Why did he need a consult with a new
13          orthopedic surgeon when he already had one that said he
14          needed surgery?
15     A.   Because the orthopedic surgeon in Sault Ste. Marie does
16          not travel to Lansing McLaren Hospital where there is a
17          secure unit to do the surgery.
18     Q.   So I'll come back to you had an orthopedist who said he
19          needed the surgery and simply because the surgery wouldn't
20          be done there, he didn't get his surgery, right?
21               MS. VAN THOMME:  Object to form and foundation.
22               THE WITNESS:  I guess I am not understanding your
23          question.
24     Q.   (By Mr. Altman)  Is there any reason other than the fact
25          that the surgery couldn't be done in the UP, why
```

12

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        Mr. Spiller didn't have his surgery in 2015?
 2   A.   I didn't have a reason --
 3             MS. VAN THOMME:  Object to form and foundation.
 4             THE WITNESS:  I didn't have an orthopedic surgeon who
 5        used a secure unit in order to do the procedure.
 6   Q.   (By Mr. Altman)  So just because you didn't have a person
 7        there -- you didn't have a person in a secure unit, there
 8        was a surgeon there, correct?
 9             MS. VAN THOMME:  Object to form.
10             THE WITNESS:  Okay.
11   Q.   (By Mr. Altman)  Is that correct?
12   A.   Yeah.
13   Q.   Now, what was the date?  You referred to a document.  I
14        just don't remember what date you said.
15   A.   I believe it was February 18.
16   Q.   Of?
17   A.   '15.  February 18, 2015.  You have this, correct?
18   Q.   I probably do, I just may not have them with me, if I look
19        at this for a second.
20             Now, the surgery that was recommended here, was that
21        going to be inpatient or outpatient?
22   A.   Irregardless of whether it's inpatient or outpatient, if
23        there is an overnight stay, it doesn't matter.  You can be
24        inpatient and have an overnight stay or you can be
25        outpatient and have an overnight stay.
```

13

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   I understand, but based upon the treatment that was
 2        recommended by that orthopedist, would you have expected
 3        that to be an overnight stay or not?
 4   A.   I can't answer that question.
 5   Q.   You are not an orthopedist, correct?
 6   A.   Correct, I'm a family doctor.
 7   Q.   Okay.  So you would agree that an orthopedist, as a
 8        general proposition, is going to know more about treating
 9        an orthopedic condition then you would, correct?
10   A.   Yeah.
11   Q.   If an orthopedist were to say for an MDOC patient that a
12        person needed surgery, when would you go against what the
13        orthopedist had to say?
14            MS. VAN THOMME:  Object to form.
15            THE WITNESS:  That is a hypothetical situation and I
16        don't know that I can answer that.
17   Q.   (By Mr. Altman)  Have you ever denied a 407 where an
18        orthopedist said the patient needed surgery?
19   A.   Yeah.
20   Q.   And what are the bases in which you've done that?
21   A.   Again, this is a hypothetical situation and I don't know
22        that I can answer that.
23   Q.   It's not a hypothetical.  You said you denied --
24   A.   Sir, I do a hundred of these a day, a hundred.
25   Q.   Okay.
```

14

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   I review at least a hundred of these a day.
 2   Q.   Okay.
 3   A.   I cannot remember everything about a 100 papers every day
 4        forever.
 5   Q.   Is there a single time you denied a 407 where an
 6        orthopedist recommended surgery that you can remember?
 7   A.   Not offhand, not specifics for a case, no.
 8   Q.   What are the list of possible reasons for you denying a
 9        407 when an orthopedist has actually examined a patient
10        and said that patient needs surgery?
11             MS. VAN THOMME:  Object to form.
12             THE WITNESS:  You are asking for a hypothetical
13        answer.
14   Q.   (By Mr. Altman)  I'm not asking -- I'm asking for the
15        bases that you've used in the past.  You must know the
16        bases by which you deny a 407, right?
17   A.   What does that have to do with my case?
18   Q.   I'm the one that's asking the questions here,
19        Dr. Papendick, please answer my question.
20   A.   I don't have an answer to that question.
21   Q.   So you can't tell me the criteria that you used to
22        evaluate whether a 407 has been approved or not?
23   A.   No.
24   Q.   I see.  So how do you -- so are you saying it's just
25        random whether a 407 gets approved or not?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   No.
 2   Q.   Do you roll a die?
 3   A.   I beg your pardon.
 4   Q.   Do you take a die and roll it to decide whether it's going
 5        to get approved or not?
 6   A.   No.
 7   Q.   So you must have some criteria that you use, right?
 8   A.   UpToDate.
 9   Q.   So what does the -- what do you mean by UpToDate?
10   A.   UpToDate is a program that is available to all providers
11        in the state of Michigan that gives information about
12        treatment plan.
13   Q.   I see.  And so if UpToDate says that it's an acceptable
14        treatment, it gets approved?
15   A.   Not necessarily.
16   Q.   So what are the bases by which it wouldn't get approved?
17        Let's say UpToDate says this is an appropriate course of
18        treatment, what are the other reasons by which you might
19        deny a 407?
20             MS. VAN THOMME:  Object to form.
21             THE WITNESS:  First of all, we don't deny.  We offer
22        alternative treatment plans.
23   Q.   (By Mr. Altman)  I see, okay, but --
24   A.   When you see ATP on these, that's what that means,
25        alternative treatment plan.  Medical necessity not
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        demonstrated and what is our alternative treatment plant.
 2   Q.   So when you say medical necessity not demonstrated, does
 3        that mean that UpToDate says this is not an appropriate
 4        treatment or for this particular patient it's not an
 5        appropriate treatment?
 6   A.   At this particular time with this particular patient with
 7        the information that I have been given by the provider.
 8   Q.   I see.  So if an orthopedist says that this patient needs
 9        surgery and UpToDate says that is an appropriate
10        treatment, there are still circumstances under which you
11        would override the orthopedist?
12             MS. VAN THOMME:  Object to form.
13             THE WITNESS:  First of all, the orthopedist doesn't
14        ask me to approve surgery.  The provider at the MDOC site
15        aska me to approve surgery.  I have to follow what they
16        have given me for that approval or deferral.
17   Q.   (By Mr. Altman)  So you are saying that the treatment that
18        a prisoner receives is dependent on how well his
19        healthcare professional documents what they need?
20             MS. VAN THOMME:  Object to form.
21             THE WITNESS:  No, that's not what I said.
22   Q.   (By Mr. Altman)  Well, it sure sounds like what you
23        implied.  Let me make sure I understand it.
24        You said -- if you've got -- let's assume we have an
25        orthopedist who has evaluated the patient, who has laid
```

17

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        his hands on the patient, said that this patient needs
 2        surgery as a specialist, okay, you're saying that there
 3        are conditions, there are times where you would still
 4        defer that surgery and come up with an alternative
 5        treatment plan, which means you are going against the
 6        recommendations of a specialist, right?
 7              MS. VAN THOMME:  Object to form.
 8              THE WITNESS:  There's a difference between deferring
 9        and going against.
10   Q.   (By Mr. Altman)  If the specialist says he needs surgery
11        and he doesn't get the surgery, you are going against the
12        specialist, aren't you?
13              MS. VAN THOMME:  Object to form.
14              THE WITNESS:  No.
15   Q.   (By Mr. Altman)  How can they both be true?  The
16        specialist says he needs surgery and you say I'm not going
17        to give him surgery now, you are not contradicting what
18        the specialist has said?
19              MS. VAN THOMME:  Object to form.
20              THE WITNESS:  No.
21   Q.   (By Mr. Altman)  How is that true?  Can you explain that
22        answer?
23   A.   This is all hypothetical.  What is it -- I'm not allowed
24        to ask that question, am I?
25   Q.   So please answer my question.  Please explain to me how if
```

18

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        a specialist says he needs surgery and you don't approve
 2        it, you are not going against the specialist.
 3              MS. VAN THOMME:  Object to form.
 4              THE WITNESS:  I'm not going against the specialist.
 5        I may be doing something different than the specialist
 6        requests.
 7   Q.   (By Mr. Altman)  I see, so we are playing word games now,
 8        right?
 9              MS. VAN THOMME:  Object to form.
10   Q.   (By Mr. Altman)  If the specialist says he needs surgery
11        and you say he's not going to get it, you are -- you are
12        countermanding the recommendation of the specialist,
13        aren't you?
14   A.   No, I am not.
15   Q.   How is that not so?
16   A.   Because I'm not.
17   Q.   Really?  So he's not getting the surgery that the
18        specialist says he needs, right?
19              MS. VAN THOMME:  Object to form and foundation.
20              THE WITNESS:  He didn't get the surgery because he
21        wasn't in a facility that he could have the surgery.
22   Q.   (By Mr. Altman)  I'm not talking about Mr. Spiller.  I'm
23        talking generally.
24   A.   I don't know what that has to do with the case.
25   Q.   So you're saying the only time that you would not approve
```

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        a surgery that's recommended by a specialist is if there's
 2        no facility there to do it?
 3   A.   No.
 4   Q.   Okay.  So when you don't approve it, you are going
 5        against -- strike that.  Let me ask it this way.
 6            Can you explain to the jury how when you don't do
 7        what the specialist says needs to be done, you are not
 8        following that specialist's recommendations?
 9            MS. VAN THOMME:  Object to form.
10            THE WITNESS:  It's a hypothetical situation, there's
11        no jury here.
12   Q.   (By Mr. Altman)  But this will be played for the jury,
13        so --
14            MS. VAN THOMME:  Object to form.
15   Q.   (By Mr. Altman)  -- it's not a hypothetical.  Just answer
16        the question.
17   A.   Your question wasn't clear, because you went in two
18        different directions with that.
19   Q.   Please explain to the jury who will be watching this how
20        when you don't follow the recommendations of a surgeon, of
21        an orthopedist who says that an MDOC prisoner needs
22        surgery and you don't approve it, that that's not going
23        against that specialist recommendation?
24            MS. VAN THOMME:  Object to form.
25            THE WITNESS:  It's not going against the specialist
```

                                                              20

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1          recommendation.  It is following instructions within the
 2          Michigan Department of Corrections.  All patients who are
 3          going to have surgery should be referred to a facility and
 4          a physician that can do the procedure at the facility that
 5          has a secure unit if it is an overnight stay.  This is
 6          clearly an overnight stay and the patient needed to be
 7          transferred to a facility and the physician who uses that
 8          facility for that surgery to be completed.
 9   Q.     (By Mr. Altman)  That's a logistical problem, isn't it?
10          That is not a medical issue, right?
11               MS. VAN THOMME:  Object to form.
12               THE WITNESS:  It is -- okay.  I will answer at the
13          same way I did before.  It is a security reason.
14   Q.     (By Mr. Altman)  Let's put it this way.  How does that
15          help a patient who needs surgery on their shoulder.  The
16          orthopedist says they need it and they don't get it
17          because there's nobody at that facility?  That doesn't
18          help the patient, does it?
19               MS. VAN THOMME:  Object to form.
20               THE WITNESS:  There are people at that facility, but
21          the facility is not able to do the procedure.
22   Q.     (By Mr. Altman)  That doesn't help the patient, though,
23          does it?
24               MS. VAN THOMME:  Object to form.
25               THE WITNESS:  No, what helps the patient is if they
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        are then referred to an orthopedic surgeon who does the
 2        procedure at a secure unit.  This is public safety.
 3   Q.   (By Mr. Altman)  That has nothing to do with whether you
 4        treated the patient's medical condition.
 5   A.   It has to do with the security of the people of the state
 6        of Michigan.
 7   Q.   I see.  Was there no place in the state of Michigan that
 8        could have done Mr. Spiller's surgery?
 9   A.   Was there no place?  Yes, there was.
10   Q.   So why wasn't he transferred to a facility that could have
11        done his surgery?
12   A.   I don't have anything to do with that.  I have no clue why
13        he was not transferred to a facility -- or to a physician
14        who could do this procedure.  That is not my job.
15   Q.   Now, you also said that no -- that no surgeries that could
16        be, other than outpatient surgery would ever be approved
17        for Mr. Spiller, right?
18             MS. VAN THOMME:  Object to form.
19             THE WITNESS:  I did not say that there would never be
20        an inpatient surgery for Mr. Spiller.
21             (Whereupon Deposition Exhibit Number 1 was marked for
22             identification.)
23   Q.   (By Mr. Altman)  Okay.  I'm going to hand you what's been
24        marked as Exhibit 1.
25             This is a record from the 26th of January 2015.  You
```

                                                                    22

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        see that at the top?
 2   A.   Yes.
 3   Q.   Does this document appear to be --
 4            MS. VAN THOMME:  I'm going to object that the first
 5        page of this document is missing, which Dr. Papendick
 6        might need to be able to understand the document.
 7            THE WITNESS:  I would definitely need to be able
 8        to --
 9            MR. ALTMAN:  You will be able to deal with that on
10        yours, because this is still medical records.
11   Q.   (By Mr. Altman)  Does this appear to be a standard -- at
12        least a portion of a standard medical record from the MDOC
13        records in the state of Michigan?
14   A.   It is the second page.
15   Q.   Okay.  Does it appear to be a portion of the medical
16        record?
17   A.   Yes.
18   Q.   Do you see anything about it to suggest that this is been
19        altered in any way, the page you're looking at?
20   A.   There's no way I could tell you if that's been altered or
21        not.
22   Q.   I didn't ask you that.  I said, did you see anything to
23        suggest that this record has been altered.
24   A.   I am not a specialist on records to know whether that has
25        been altered or not.
```

23

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   I didn't ask you that.

 2   A.   That's exactly what you're asking.

 3   Q.   No, I didn't.

 4             MR. ALTMAN:  First of all, Carly, it is not

 5        appropriate for you to hand pages to the witness.

 6             MS. VAN THOMME:  Well, if you are going to staple the

 7        first page of this record to the back of the packet and

 8        not show it to the witness, I'm going to look for it and

 9        this is my copy of the exhibit.  I can do what I want with

10        it.

11             MR. ALTMAN:  Hold on a second.  You can do that and

12        you could've asked him about it on your time.  It's

13        inappropriate that you just handed him a document.  It's

14        totally inappropriate.

15             MS. VAN THOMME:  I set it on the table and I don't --

16             MR. ALTMAN:  You put it in front of him.

17             THE WITNESS:  I cannot do anything with this without

18        the entire document.

19             MS. VAN THOMME:  If you want to play games, play

20        games.

21             MR. ALTMAN:  I'm not playing games.

22             THE WITNESS:  Yes, you are.

23   Q.   (By Mr. Altman)  Okay.  Really?  Do you see reviewer's

24        comments right there?

25   A.   Yes.
```

24

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   You are the reviewer of this document, correct?
 2   A.   Yes.
 3   Q.   Okay.  Would you please read for the jury --
 4             MS. VAN THOMME:  Object to form.
 5   Q.   (By Mr. Altman)  -- what you wrote where it says reviewer
 6        comments.
 7   A.   No surgery other than outpatient surgery without overnight
 8        stay will be approved.
 9   Q.   Will ever be approved, correct?
10   A.   Will ever be approved.
11   Q.   Okay.  So that's contradictory to what you just said.  I
12        asked you if you ever said that.  You said you never said
13        such a thing.
14             MS. VAN THOMME:  Object to form.
15   Q.   (By Mr. Altman)  That contradicts your last -- the
16        question.  Would you like to amend that now?
17   A.   Certainly.  I made a mistake when I put ever in there.
18   Q.   I didn't ask you to explain.  I asked you, you wrote that,
19        right?
20   A.   You just asked me to explain.
21   Q.   No, I didn't ask you to explain.
22   A.   You asked me if I wanted to amend my answer.
23   Q.   No, I asked you -- before I asked you if you ever said
24        such a thing and you said, no, I didn't.  I handed you
25        this exhibit, it appears to completely contradict
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1      your -- that last question.
 2  A.  And then you asked me if I wanted to amend it.
 3  Q.  Amend your answer as to whether you ever said that.  Not
 4      amend this.
 5  A.  I just amended my answer.
 6  Q.  Okay.  So you did say the following, no surgery other than
 7      OP, outpatient surgery, without overnight stay will ever
 8      be approved.
 9  A.  Because they were asking --
10  Q.  I didn't ask you -- did you say that?  Did you write that?
11          MS. VAN THOMME:  Object to form.
12  Q.  (By Mr. Altman)  Did you write that?
13  A.  Yeah.
14  Q.  Okay.  Thank you.
15  A.  May I make a statement?
16  Q.  No.
17          MS. VAN THOMME:  You can finish your answer if your
18      answer wasn't complete.
19          MR. ALTMAN:  No, he can't.  I'm sorry.  The answer
20      was did you write that, it's a yes/no.
21          MS. VAN THOMME:  Well, you can't require him to just
22      say yes or no.
23          MR. ALTMAN:  Yes, I can.
24          MS. VAN THOMME:  There is no rule that says that's
25      all you can let a witness say.
```

26

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1              MR. ALTMAN:  No, he can't just sit and say anything
 2         he wants.  It would be nonresponsive.  I asked him a
 3         direct question.
 4              MS. VAN THOMME:  You know --
 5              You know what, Carly, on your time, you can ask him
 6         whatever you want.
 7              MS. VAN THOMME:  Yeah, okay.
 8              THE WITNESS:  Well --
 9              MS. VAN THOMME:  Let's take a quick break.
10              MR. ALTMAN:  Let's do that.
11              VIDEO TECHNICIAN:  The time is 2:14.  We are now off
12         the record.
13              (Brief recess.)
14              VIDEO TECHNICIAN: The time is 2:22.  We are now back
15         on the record.
16    Q.   (By Mr. Altman)  Dr. Papendick, what is your current
17         title?
18    A.   Utilization management medical director.
19    Q.   How long have you been with Corizon?
20    A.   Since June of 2012.
21    Q.   Where were you before that?
22    A.   Private practice, Western Michigan.
23    Q.   How long were you in private practice?  Pretty much since
24         you came out of med school?
25    A.   Since 1993.
```

                                                                    27

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   That's when you got your medical degree?
 2   A.   Excuse me?
 3   Q.   That's when you got your medical degree, in '93?
 4   A.   No, it's when I finished my residency in family practice
 5        in Erie, Pennsylvania.
 6   Q.   Are you board certified?
 7   A.   Not any longer, I let it lapse.
 8   Q.   When was the last time you were currently board certified?
 9   A.   Probably 2010.
10   Q.   What were you board certified in?
11   A.   Oh, yeah.
12   Q.   What were you board certified in?
13   A.   Oh, family practice.
14   Q.   And do you consider family practice to be a specialty in
15        the medical profession?
16   A.   Yes, it is.
17   Q.   And what is the description of family practice as a
18        specialty?
19   A.   It's a specialty, it includes the entire family from
20        babies, I deliver the babies, I took care of the kids, I
21        took care of the mothers and their families.
22   Q.   Would a pediatrician know more about treating children
23        than you as a family practice doctor?
24   A.   Not necessarily.
25   Q.   Would an OB/GYN typically no more about women's issues and
```

28

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        delivering babies than a family practitioner?  I'm not
 2        saying you specifically, I'm just saying overall if
 3        somebody were to ask.
 4   A.   No, you can't make that statement.  An OB/GYN would.
 5   Q.   Okay.  And the same thing with an orthopedist, an
 6        orthopedist would probably know more about treating
 7        orthopedic injuries generally than a family practitioner
 8        would, right?
 9   A.   I trained with an orthopedic residency.
10   Q.   I understand that, but as a general proposition a
11        practicing board certified orthopedist would probably know
12        more about family practice than a family practitioner,
13        right?
14   A.   I'm going to repeat this just like I did before.  Not
15        necessarily.
16   Q.   I didn't say always, I asked as a general proposition.
17   A.   Possibly.
18   Q.   So you wouldn't say probably?
19   A.   No.
20   Q.   So you think somebody who trains -- got some orthopedic
21        training 20 years in the past is probably going to know
22        more about orthopedics then somebody who is board
23        certified currently in orthopedics?
24   A.   Definitely not.
25   Q.   And so you trained in orthopedics 25 years ago, right?
```

29

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   I trained in family practice alongside orthopedic
 2        residency.
 3   Q.   But you finished your residency in 1993, right?
 4   A.   Correct.
 5   Q.   That's 25 years ago, correct?
 6   A.   Correct.
 7   Q.   So you'd agree that an orthopedist that is currently board
 8        certified probably knows more about orthopedics then you
 9        do based upon your training 25 years ago?
10   A.   Possibly.
11   Q.   Possibly or probably?
12   A.   Probably.
13   Q.   Do you subscribe to any orthopedic journals?
14   A.   No.
15   Q.   When's the last time you read an orthopedic journal?
16   A.   I read orthopedic articles.
17   Q.   When is the last time you looked at a journal that focused
18        on orthopedics?
19   A.   I don't know that I ever have.
20   Q.   Have you ever published any articles?
21   A.   No.
22   Q.   By the way, are you an M.D. or D.O.?
23   A.   An M.D.
24   Q.   Okay.  What is the difference between an M.D. and a D.O.?
25   A.   An osteopath believes that medical problems can be related
```

30

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1          to adjustments of the spine.
 2   Q.     You'd agree that an M.D. and a D.O. might have divergent
 3          beliefs in how to treat a certain patient with a certain
 4          condition?
 5   A.     It depends.
 6   Q.     They could have divergent treatment plans, right?
 7   A.     Could, yes.
 8   Q.     Does that mean one is right and one is wrong?
 9   A.     No.
10   Q.     So in other words, it's possible for medical doctors to
11          have disagreement amongst others and still be acting
12          reasonably?
13   A.     Yes.
14   Q.     It happens all the time, doesn't it?
15   A.     Yes.
16   Q.     It's part of the normal practice, correct?
17   A.     Say it again.
18   Q.     Is part of the normal medical practice that doctors don't
19          always agree on stuff?
20   A.     I have a hearing deficit.
21   Q.     I'm sorry?
22   A.     I don't have my hearing aids in, so I may ask you what.
23   Q.     I do that all the time and I don't have a hearing problem,
24          so
25   A.     Yeah.
```

31

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   So it's not unusual for doctors to have different views on
 2        how to treat a patient?
 3   A.   No.
 4   Q.   In fact, it's pretty common, isn't it?
 5   A.   Everyone has their own way of doing it.
 6   Q.   Now, you said you are the utilization manager at Corizon
 7        now, is that just for the state of Michigan?
 8   A.   It depends on your definition.  I am the utilization
 9        management medical director for the State of Michigan,
10        Michigan Department of Corrections contract.  I also cover
11        other states for my colleagues.
12   Q.   And is there somebody else that covers for you in
13        Michigan?
14   A.   Oh, yeah.  I went on a cruise a week ago and, yeah, there
15        was somebody that covered for me.
16   Q.   And as part of -- please describe what it is that you do?
17   A.   I evaluate requests for procedures and decide whether they
18        are appropriate or need to have an alternative treatment
19        plan.
20   Q.   And in performing those tasks, do you have to use medical
21        judgment?
22   A.   Yes.
23   Q.   So someone without medical training couldn't do your job,
24        correct, not properly?
25   A.   No.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    Q.   And what resources do you use in performing your job?  You
 2         said UpToDate, is there anything else that you use?
 3    A.   Interqual.
 4    Q.   What is that?
 5    A.   Interqual.
 6    Q.   And what is Interqual?
 7    A.   It's actually an insurance product that decides whether a
 8         procedure is appropriate or not.  No, whether it should be
 9         done or not, appropriate or not, and if it doesn't meet
10         Interqual, then I better have a pretty good reason to
11         approve it.
12    Q.   Do you ever go against Interqual?
13    A.   All the time.
14    Q.   How often do you go against Interqual?
15    A.   Daily.
16    Q.   Go ahead.
17    A.   If you'd like me to, I will give you an example.
18    Q.   Yeah, please.
19    A.   The EMG -- I have to look through here --
20    Q.   That's an electromyelogram, right?
21    A.   Pardon me?
22    Q.   An electromyelogram?
23    A.   Yeah.  I don't think it was approved by Interqual for
24         Mr. Spiller's but it was approved to be completed.
25    Q.   Okay.
```

33

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   Because my decision was it needed to be done.
 2   Q.   What percentage of the time do you think you go against
 3        Interqual or you don't -- where Interqual and you --
 4   A.   I don't have a clue.  I have no way of knowing it.
 5   Q.   Is it more than 50 percent of the time?
 6   A.   No.
 7   Q.   Is it more than 25 percent of the time?
 8   A.   Probably not.
 9   Q.   Is it more than 10 percent of the time?
10   A.   I rarely look at Interqual unless I have a question about
11        what I feel needs to be done.
12   Q.   So of the times you look at Interqual, let's just limit it
13        to -- strike that.
14            You say you look at a hundred of these a day, right?
15   A.   Yeah.
16   Q.   How many times you go to Interqual in an average day?
17   A.   Well, I don't go to Interqual.
18   Q.   You use the resource.
19   A.   My nurse -- my nurse writes on here what the Interqual
20        guidelines, whether they are Interqual appropriate or not.
21   Q.   Does she do that every time?
22   A.   If there is an Interqual for it, yeah.  There are things
23        that there are no Interquals.
24   Q.   Can you give me an example?
25   A.   Like ENT follow-up.  Anything that's a follow-up
```

                                                                    34

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        appointment doesn't have an Interqual.  That all comes
 2        down to me and whether UpToDate, I feel UpToDate makes the
 3        difference.
 4    Q.  Now, you'd agree that in terms of knowing the patient, the
 5        doctor, the medical provider, professional who lays their
 6        hands on the patient probably knows more about the patient
 7        than anybody that hasn't touched the patient, right?
 8    A.  Absolutely.
 9    Q.  And you'd agree that it's really hard to treat a patient
10        in the absence of actually touching the patient yourself
11        or seeing the records of somebody who's touched the
12        patient, right?
13    A.  I don't treat them.
14    Q.  I know you don't, but I'm saying you, in doing your -- in
15        doing what you do, you could not do it unless you
16        had -- let me take a step back.
17            If all you've got is a piece of paper that says
18        patient has shoulder pain, needs surgery, you'd probably
19        never approve that, right?  If that's all you had.
20    A.  I might do an NMI, which is needed more information.
21    Q.  But that's what I mean.  There's no realistic way that you
22        could make an assessment based on that information that
23        the patient needs the surgery, right?
24    A.  Correct.
25    Q.  And if --
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.    But if I defer it and do an ATP, it still can be appealed.
 2    Q.    I got that.  I'm just saying at that particular instance
 3          in time, I'm not saying what might happen in the future,
 4          at that particular incident in time, there would be no way
 5          for you to realistically do your job properly without more
 6          information, right?
 7    A.    Correct, that's why we have that NMI, need more
 8          information.
 9    Q.    Now, if you have something to the effect of a patient has
10          shoulder pain, needs some surgery and 10 years ago they
11          had an MRI that says maybe they had a problem, you know,
12          suggested maybe they need surgery, would you need more
13          information in that circumstance, because the MRI is 10
14          years old?
15    A.    I would get a need more information or a new MRI or an ATP
16          so you could get a new MRI.
17    Q.    Just something.  It would not be reasonable to rely upon
18          an MRI from 10 years ago, right?
19    A.    No.
20    Q.    Even maybe five years ago, right?
21    A.    Right.
22    Q.    Orthopedic, your orthopedics, they tend to change over
23          time, correct?
24    A.    Orthopedic --
25    Q.    I mean, an orthopedic condition tends to change over time.
```

36

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        It could get worse, it could heal, but they rarely stay
 2        exactly the --
 3    A.  Could, but doesn't have to.
 4    Q.  But they rarely stay exactly the same over a long period
 5        of time, right?
 6    A.  But the change doesn't necessarily make a difference.
 7    Q.  Change may not make a difference, but they still tend to
 8        change over time, correct?
 9    A.  I've seen a lot of static cases.
10    Q.  Static in terms of symptoms or static in terms of --
11    A.  Both.
12    Q.  -- exactly what's going on?  That's fair.
13            By the way, would it surprise you if one of the
14        doctors who treat patients said she has no idea that there
15        was an appeals process for a denial of a 407?
16            MS. VAN THOMME:  Object to form.
17            THE WITNESS:  Would it surprise me?
18    Q.  (By Mr. Altman)  Yeah.
19    A.  Well, if I was involved with onboarding and onboarding is
20        a process of bringing physicians in and having them
21        understand what we are doing and why were doing it and of
22        the ones that I onboarded, they all knew there was an
23        appeals process and the appeal process was very clear.  Do
24        specific steps.  So for someone to say that they did not
25        know there was an appeals process, that's a very difficult
```

37

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        thing to hear.
 2            Now, I didn't treat every -- I didn't teach everyone,
 3        but the process was in place when I came to the company in
 4        2012, and it was continued through when I came into
 5        medical directorship for utilization management in 2014
 6        through early 2017.  It was always the same.
 7   Q.   What did you do between 2012 and 2014?
 8   A.   I was a hospitalist for Corizon Health, contracted to the
 9        MDOC.
10   Q.   And what did that mean?
11   A.   Huh?
12   Q.   What did you say, you were what?
13   A.   Hospitalist.
14   Q.   What does a hospitalist do?
15   A.   Someone who takes care of people in a hospital.  And the
16        MDOC has their own hospital.  Well, it's called Health
17        Center now.  It used to be a full hospital.  It's called
18        Duane Waters Health Center, and us old guys call it Duane
19        Waters Hospital, but I rounded every day.  That's all I
20        did every day was take care of 157 rooms at Duane Waters.
21   Q.   So basically tanalog of somebody who's physically in a
22        prison who's treating the prisoners in a prison, you were
23        just doing that in a hospital?
24   A.   No.
25   Q.   Okay.
```

38

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1  A.  They come from the prison when they are bad enough to be
 2      at the hospital.
 3  Q.  Now, I understand.  What I'm saying, though, is that you
 4      were treating patients directly, you know, similarly to
 5      somebody who is treating the patients in a --
 6  A.  And the procedure for 407s and denial or deferral and
 7      approval and appeal are all the same.
 8  Q.  You'd agree that from the patient's perspective, a
 9      referral, denial, doesn't really matter if they are not
10      getting their condition treated, right?
11  A.  It depends on how it's explained to them.
12  Q.  Well, if they don't get relief, then the words don't
13      really mean anything to them, right?
14  A.  That would be a denial, not a deferral or ATP.
15  Q.  Well, being asked --
16  A.  An ATP means you are going to do something different than
17      what's being asked for.  That will give you the same or
18      better results.  Example, back pain.
19  Q.  What about it?
20  A.  Everybody wants to go directly to a neurosurgeon and every
21      neurosurgeon that's worth their oats sends them off for
22      either a new MRI or a new EMG, physical therapy and
23      epidural steroids by a pain clinic before they will ever
24      do surgery.  Why?  Because those other modalities do just
25      as well as surgery.
```

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    Q.    For some people?
 2    A.    I didn't say it was for everybody, but it does at least 50
 3          percent of the time better than surgery.
 4    Q.    So in other words, medicine is an iterative process, shall
 5          we say?
 6    A.    I'm sorry?
 7    Q.    It's an iterative process.  You don't always know the best
 8          answer right up front.  You have to try certain things in
 9          some kind of a progression to try to find the minimal
10          treatment that achieves the results.  Is that a fair --
11    A.    You wouldn't make a very good doctor, because I know all
12          the answers.  Do you see what I'm saying?
13    Q.    Okay.  But realistically, you can't tell up front that a
14          particular treatment is absolutely going to work for that
15          particular person?
16    A.    No, in a back pain, 50 percent of the time physical
17          therapy, epidural steroids will take care of the problem
18          without having to have to have surgery.
19    Q.    I mean, it's just like diabetes, you don't put somebody on
20          an incretin the first time.  You start off with metformin,
21          you see if that works and you move to, you know, maybe to
22          glipizide or something like that, see if that works, and
23          then you might move on to progress, right?
24    A.    It's not quite how it's typically --
25    Q.    But the bottom line is there is an algorithm to find the
```

40

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        minimal treatment that will achieve --
 2   A.   Correct.
 3   Q.   -- the best result, reasonable results, correct?
 4   A.   Correct.
 5   Q.   The converse of that is when you try to, all the previous
 6        things when they haven't achieved the results, you keep
 7        going forward, right?
 8   A.   I don't understand that.
 9   Q.   Back surgery, say, that's a last resort?
10   A.   Part of it is my hearing.
11   Q.   I understand.  Back pain, like you said, if you tried all
12        those other things and they haven't worked and you still
13        have somebody that has some severe debilitating back pain,
14        they may, in fact, be a candidate for surgery at that
15        point, right?
16   A.   May.
17   Q.   After you tried everything else and failed, right?
18   A.   May, yeah.
19   Q.   Now, you'd agree that not providing treatment is not a
20        reasonable option, correct?
21   A.   Which is why I said you are talking about denial, not
22        deferral.  We don't deny, we still want our patients
23        treated.  We have patients that I get requests for CAT
24        scans and I defer them to an MRI.
25   Q.   Okay, and --
```

41

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.    And do you know why they asked for a CAT scan?

 2    Q.    Because they don't know any better.

 3    A.    It's less expensive.  You know why I defer to an MRI?  It

 4          wasn't because it was more expensive, that looks bad on

 5          me.  Why do I defer to an MRI?  Because I can get better

 6          and more information.

 7    Q.    It's more helpful, I got that.

 8          During your regular duties, do you sit down with

 9          anyone at Corizon and/or the MDOC to review the cost of

10          the treatments for which you've been responsible for

11          recommending?

12    A.    The only thing I have is a monthly report that says cost

13          per hundred -- or per thousand patients.

14    Q.    So the costs are assessed and you are in part responsible

15          for providing information on the costs?

16    A.    The costs are not assessed on specific items.

17    Q.    I'm not saying on specific items, but overall, cost per

18          thousand patients, so you're looking at -- strike that.

19          Is it fair to say that one of your goals as a

20          utilization manager is to spend the least amount of money

21          to provide the maximum results?

22    A.    No.

23    Q.    Okay.  How would you phrase that?

24    A.    Value.  Value is cost divided by outcome.

25    Q.    I think we are kind of saying the same thing.  I said the
```

42

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        least cost to provide the best results.  I think we are
 2        saying the same thing, maybe not just phrased the same.
 3   A.   Value.
 4   Q.   So you would agree that a treatment that provides better
 5        results but costs more than an alternative treatment that
 6        cost less but provides less optimal results, you should
 7        select the more efficacious treatment, right?
 8             MS. VAN THOMME:  Object to form.
 9             THE WITNESS:  It depends.
10   Q.   (By Mr. Altman)  On what?
11   A.   What the -- okay.  If you look at vaccinations,
12        preventative medicine.  Preventative medicine looks at the
13        cost per thousand to the benefit.  If there is minimal
14        benefit and it costs a lot or if there's a lot of benefit
15        and the cost is not able to be justified.  There was a
16        study that showed that if you treat every single patient
17        who has chest pain, not cardiac, chest pain in the ER with
18        Plavix that there's a better outcome and the cost was
19        about a million dollars to one patient.  From a community
20        standpoint, that's not justified.  For an individual,
21        yeah, I want that, but it's not justified by a community
22        standpoint, so when you look at -- what you're saying is
23        if you get better outcome, it's okay to go break the bank,
24        no.
25   Q.   On an individual patient, it may be, though?
```

43

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   To the patient it might be.
 2   Q.   Well, not just to the patient, to evaluate an individual
 3        patient?
 4   A.   It might be.
 5   Q.   Well, you may say that Plavix example that you gave, a
 6        million dollars to save one patient, but there may be
 7        certain patients where there would be a much less cost for
 8        those particular patients.
 9   A.   The cost to the --
10   Q.   I'm not talking to the community.
11   A.   It doesn't matter what the cost is to individual patients.
12        You are not going to recommend it if it's absurd to do it.
13   Q.   For every patient, but for a particular patient, it would
14        make perfect sense to do it, right?
15   A.   Certainly.  They've got a million dollars, go for it.
16   Q.   Well, it might not cost a million dollars -- it doesn't
17        cost a million dollars -- it doesn't cost a million
18        dollars for every patient.  It cost a million dollars to
19        save one patient?
20   A.   Correct.
21   Q.   But certainly, there are certain groups of patients where
22        it might cost ten million dollars to save one patient and
23        there are other patients where it only cost $1000 to save
24        one patient.
25   A.   Okay, so --
```

44

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   It's an average.
 2   A.   -- I don't know how this is related to the -- to the case.
 3        I'm just giving you an example.
 4   Q.   In trying to understand -- I mean, let's take the -- was
 5        it Harvoni and is it hep C?
 6   A.   Uh-huh.
 7   Q.   It's clear there's no other alternative treatment that
 8        cures hep C.  I mean, maybe there's something --
 9   A.   There are several of them.
10   Q.   That are related to Harvoni, but they are all very
11        expensive.  I mean, it's --
12   A.   Yeah, 60,000.
13   Q.   Okay.  So we are talking about same class.  We are not
14        talking about -- there's no $20 cure --
15   A.   I wish.  We are paying that 60,000 for every one of those
16        patients.
17   Q.   I mean, the bottom line, there may be an alternative
18        between Harvoni and something similar to Harvoni,
19        whatever, but --
20   A.   Correct.
21   Q.   -- realistically, other than those extremely expensive
22        drugs, there is no real --
23   A.   No.
24   Q.   -- alternative to --
25   A.   Right.
```

45

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   -- treat hep C?

 2   A.   Right.

 3   Q.   So in the Corizon way of doing things, when would somebody

 4        who has hep C who was a prisoner not get Harvoni or

 5        something comparable?

 6             MS. VAN THOMME:  Object to foundation.

 7             THE WITNESS:  There is no one who has hep C in the

 8        Michigan Department of Corrections who does not get

 9        treated.

10   Q.   (By Mr. Altman)  I didn't say get treated.  I mean treated

11        with Harvoni or something comparable?

12   A.   That's what I'm talking about.

13   Q.   So there's no patients that have been refused Harvoni?

14             MS. VAN THOMME:  Object to form and foundation.

15   Q.   (By Mr. Altman)  Or something -- I'm going to say Harvoni.

16        We understand --

17   A.   I understand what you are saying.  I'm trying to explain.

18        There's only so many we can do at a time.  We can't treat

19        everybody all the time.  You have to treat them, we

20        started with class fours, we went to class threes, we are

21        on class twos and eventually we will get to class ones.

22        Medicaid now covers everyone, and do you know why it's

23        important to cover them?

24   Q.   Why?

25   A.   Treatment of liver cancer is way more expensive than
```

46

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        $60,000, even though it's a small percentage who actually
 2        go to liver cancer.  The treatment of liver cancer is way
 3        more expensive per person than treatment of their
 4        hepatitis C earlier on.  No, hepatitis C is a very
 5        important issue with us.
 6             I have a feeling I'm going to need my glasses.
 7   Q.   Maybe not.  What kind of -- aside from surgery, what kind
 8        of medication, whether prescription or over-the-counter,
 9        is appropriate for somebody who's got shoulder pain to
10        relieve, to help relieve -- excuse me, the pain?
11   A.   That is on formulary?
12   Q.   Let's start with on formulary.
13   A.   Nonsteroidal anti-inflammatory drugs and Tylenol.
14   Q.   Which ones are on formulary, the NSAIDs?
15   A.   Excuse me?
16   Q.   NSAIDs are on formulary?
17   A.   I don't have a clue.  I don't do patient care.
18   Q.   Well, if somebody wants and NSAID that is not on
19        formulary, would that go through you for approval?
20   A.   No.
21   Q.   Who would be approving that?
22   A.   The ACMO.
23   Q.   And who is the ACMO for  --
24   A.   Well, at that time it was -- I don't want to throw him
25        under the bus, because he was good.  Help me.  Not Stieve.
```

47

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        Dr. Borgerding.  I love that name.
 2   Q.   So it would be an MDOC person who would approve the use of
 3        a nonformulary drug?
 4   A.   Correct, a physician.
 5   Q.   But it would not be a Corizon person?
 6   A.   No, at that time.  Now, it is.
 7   Q.   And who does it now?
 8   A.   I don't think it has anything to do with this case.  It
 9        would be Ricky Coleman.
10   Q.   In your opinion, should a person have to wait four or five
11        years after a diagnosis by an orthopedist that they need
12        shoulder surgery or receive that surgery regardless of any
13        logistic issues?
14             MS. VAN THOMME:  Object to form.
15             THE WITNESS:  I have nothing to do with that.
16   Q.   (By Mr. Altman)  I didn't ask you that.  I asked you as a
17        medical doctor, do you think it's appropriate that a
18        person should have to wait several years after an
19        orthopedist says they need surgery to receive that
20        surgery?
21             MS. VAN THOMME:  Object to form.
22             THE WITNESS:  It depends on what is going on in the
23        meantime.
24   Q.   (By Mr. Altman)  From a medical perspective, you mean?
25   A.   Correct.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   Let's say there's no medical reason.  Let me ask it
 2        differently.  Do you think a person should have to wait
 3        several years to get shoulder surgery because of
 4        logistical issues in terms of where to send them or how to
 5        get security?
 6   A.   If you are having -- if you are trying to relate that to
 7        this patient, he didn't have to wait.
 8   Q.   I just asked you as a general proposition, should a
 9        patient at the MDOC, should a patient have to wait several
10        years to get -- to get specialist-recommended shoulder
11        surgery because of logistical issues?
12             MS. VAN THOMME:  Object to form.
13             THE WITNESS:  I can't -- that question is too vague.
14   Q.   (By Mr. Altman)  What part of it is vague?
15   A.   The logistical issues.
16   Q.   We talked about it before where there's a physician,
17        whether there's security, et cetera, and stuff like that.
18        All right --
19   A.   What about --
20   Q.   Hold on.  I'll ask it.  Let's be clear.  Should a patient
21        have to wait several years to receive an orthopedist
22        specialist-recommended shoulder surgery because of
23        difficulties of where to send them within the state of
24        Michigan to receive that surgery?
25   A.   If you are relating that to this case, we did not have
```

49

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1       that.
 2   Q.  I didn't ask you about this case.  I asked you as a
 3       general proposition.
 4   A.  We don't have that problem.
 5   Q.  So you say it didn't happen here.  How did it not happen
 6       here?
 7   A.  We had people that could do the surgery at Henry Ford
 8       Allegiance Hospital, which used to be Allegiance Hospital
 9       in Jackson who would use the security unit.
10   Q.  But that didn't happen for Mr. Spiller, did it?
11   A.  It had nothing to do with me.
12   Q.  I didn't ask whether it had anything to do with you.  The
13       reality, you know Mr. Spiller at the time he left the
14       MDOC's custody, never had the shoulder surgery, right?
15   A.  From the time he left?
16   Q.  Up until the time he left --
17   A.  Oh, up until the time he left.
18   Q.  -- the custody of the MDOC, he never --
19   A.  As far as I know, no.
20   Q.  Okay.  And you know in 2015, because we've seen doctors
21       from 2015, you knew, at least you knew and certainly the
22       MDOC knew and certainly his treating physicians knew that
23       a specialist said he needed shoulder surgery since at
24       least 2015, right?
25   A.  That would depend on the new specialist that was being
```

50

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        consulted in Lansing.
 2   Q.   Forget about that.  We talked about this --
 3   A.   This person can say -- okay, you already pointed this out
 4        that one surgeon can feel one way and another one can feel
 5        another.  I had --
 6   Q.   Well, in this particular -- I'm sorry.  I didn't mean to
 7        interrupt you.  Go ahead.  You said I've had.
 8   A.   I have had several patients that one orthopedic surgeon
 9        said they need to do this procedure and I said you've got
10        to do it at a secure unit.  They are trained surgeons and
11        went to the security unit or to a surgeon that would use a
12        secure unit and that surgeon said there is no way in the
13        world I'm doing that surgery.  I will do a different
14        surgery or we will do something in between, but we are not
15        doing the surgery that the first one recommended.  So I
16        can't tell you for certain that if he went to a different
17        surgeon he would've got the surgery that Dr. Ganzhorn
18        wanted to do.  You see, the comment that was made here has
19        all to do with Dr. Ganzhorn.
20   Q.   I'm listening.
21   A.   So the no surgery would ever be approved is related to the
22        fact that it was at Dr. -- with Dr. Ganzhorn in Sault Ste.
23        Marie at War Memorial Hospital.  It had nothing to do with
24        what surgery was or what symptoms the patient had.
25   Q.   Did you ever deny or defer -- strike that.
```

51

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1              Whose responsibility is it to see that a patient has
 2        a second opinion when a specialist recommends a treatment
 3        plan?
 4    A.  We don't do second opinions in the Michigan Department of
 5        Corrections.
 6    Q.  I don't understand what you're saying.  So you are saying
 7        that --
 8    A.  Because a patient wants a second opinion, we don't do it.
 9    Q.  I didn't say a second opinion.  If a surgeon says -- an
10        orthopedist says this person needs shoulder surgery, then
11        they ought to have that shoulder surgery absent some other
12        orthopedist saying they don't need it, right?
13              MS. VAN THOMME:  Object to form.
14              THE WITNESS:  Depending on where it's done.
15    Q.  (By Mr. Altman)  That's a logistical issue, right?
16    A.  It is not.  It is a medical issue, as well.
17    Q.  How is that a medical issue?
18    A.  Because the first surgeon can't go to McLaren Lansing or
19        Henry Ford Allegiance, Allegiance Hospital in Jackson.
20    Q.  Is there a medical reason why they can't do that?
21    A.  They don't have privileges.
22    Q.  Well, that's not really a medical reason, that's an
23        administrative reason, isn't it?
24    A.  It's all 100 percent medical.  They can't go to a hospital
25        and do surgery unless they have privileges.
```

52

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   I understand that, but it's not --
 2   A.   And it's medical privileges.
 3   Q.   I got that, but that's an administrative issue, that's not
 4        a medical issue, as in the medicine.  That has nothing to
 5        do with this patient.  That has to do with the doctor,
 6        doesn't it?
 7   A.   So the --
 8   Q.   I'm just trying to separate out, I'm not trying to trick
 9        you.  There are medical needs, there is the medical needs
10        of the patient, the specialist says the medical needs of
11        this patient says he needs to have shoulder surgery.
12        There are administrative issues that says that person
13        can't do this surgery here, but that has nothing to do
14        with the patient's medical needs, right?  Correct?
15   A.   Yes.
16   Q.   Okay.  I'm just trying to say, because we seem to be
17        having this thing with logistical, administrative.
18   A.   It's all medicine.
19   Q.   But it's not the medical needs of the patient?
20   A.   The medical needs of the patient could not be met in Sault
21        Ste. Marie at War Memorial Hospital with Dr. Ganzhorn
22        doing the surgery because he has to go to a different
23        hospital downstate that Dr. Ganzhorn does not have
24        privileges at, which is a medical privilege that is given
25        to the physician by the hospital.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   I understand that, but it has nothing to do with the
 2        medical condition of the patient, does it?
 3   A.   If he needs an overnight stay at Sault Ste. Marie for his
 4        surgery, yes.
 5   Q.   That is a logistical problem, isn't it, that they don't
 6        have the facility there?  That's not because of any
 7        medical issue.
 8   A.   So shall we close all -- I can't ask questions.
 9   Q.   I think you're suggesting -- I can hear what you're
10        saying, the point is that why if an orthopedist says a
11        patient needs surgery was he not promptly -- shouldn't he
12        have been probably sent to a place that could have done
13        the surgery given the appropriate security requirements?
14             MS. VAN THOMME:  Object to form, foundation.
15             THE WITNESS:  I don't understand why I'm being asked
16        that question.  I had nothing to do with it.
17   Q.   (By Mr. Altman)  That's not relevant.  You are a medical
18        doctor.  I'm asking you as a medical doctor.  Shouldn't a
19        patient who needs surgery be sent to an appropriate place
20        to get their surgery?
21   A.   Well, wait a minute.  He needs to be sent to an
22        appropriate physician that uses appropriate facilities and
23        if that, if that physician decides that he needs the same
24        surgery that the first orthopedic surgeon said he needed,
25        then he would have gotten it.
```

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   So you're saying that didn't happen here?
 2   A.   I don't think so.  The x-ray was transferred downstate
 3        when we opened up Sault Ste. Marie to do the
 4        hospital's -- or to do that surgery.
 5   Q.   I understand that, but he did see a second orthopedist,
 6        didn't he?
 7   A.   He saw a second orthopedist at McLaren in Traverse City,
 8        where there is no secure unit.
 9   Q.   So once again, his medical needs were not met simply
10        because he happened to be in the wrong place at the wrong
11        time?
12   A.   He was not seen by a physician who could use a secure unit
13        in Lansing or in Jackson, Michigan.
14   Q.   So once again, he was in the wrong place at the wrong
15        time.  His medical needs were not met simply because he
16        was in a place that didn't have the appropriate doctor,
17        right?
18             MS. VAN THOMME:  Object to form and foundation.
19             THE WITNESS:   No, he had an appropriate doctor.
20        Dr. Ganzhorn was a very good orthopedic surgeon.
21   Q.   (By Mr. Altman)  That was the second person that he saw?
22   A.   That was the first person that he saw.
23   Q.   What about the second person?  You said he was
24        transferred.  The first person --
25   A.   No, he was not transferred.  He was seen there as an
```

55

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1       outpatient.
 2   Q.  Right.
 3   A.  At the surgeon's office.
 4   Q.  Right.
 5   A.  And he's requested or suggested a surgery.  I don't know
 6       what it is.  I don't even have paperwork to say what that
 7       second surgery was.
 8   Q.  I understand.  So you just said -- is this the second
 9       orthopedist he's seen or the first?
10   A.  The second, Traverse City.
11   Q.  So once again, that surgeon said he needed a surgery also,
12       right?
13   A.  But he couldn't do the surgery.
14   Q.  Correct, but once again, Mr. Spiller was in the wrong
15       place at the wrong time.  He had two surgeons now that
16       he --
17   A.  If you want to call it that.
18   Q.  Well, if he had two surgeons that said he needed surgery
19       and even if there was a slight disagreement as to exactly
20       what surgery, you'd agree if there was any question,
21       though, on the part of the two surgeons that he needed
22       some kind of surgical treatment, right?
23   A.  I don't know what the second surgeon offered.
24   Q.  But he offered something, right?
25   A.  I'm assuming.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    Q.   Okay.  So once again, why didn't Mr. Spiller -- strike
 2         that.
 3              As a medical doctor, don't you think it was
 4         appropriate when after the second surgeon said he needed
 5         surgery that he should've got it somewhere within the
 6         state of Michigan?
 7    A.   I didn't have anything to do with that.
 8    Q.   I didn't ask you that.  I'm asking you as a medical
 9         doctor.  You were a medical doctor long before you were a
10         utilization physician, right?
11    A.   Correct -- well, no -- well, kind of.
12    Q.   I mean, you follow medical principles, right?
13    A.   Yeah, but that's got nothing to do with utilization
14         management.
15    Q.   Well, it has to have something to do with it?
16    A.   I was brought in to medicine at the time when managed care
17         started, so everything I did was utilization management.
18    Q.   But you said before that you use your medical judgment
19         when you are approving or deferring or whatever you do
20         with a 407, right?
21    A.   Correct.
22    Q.   Okay, so you're not just some -- I don't mean this, you're
23         not just a dummy who's following some algorithm with no
24         thought.  If it fits here, it fits here, and you have no
25         discretion, that's not what you do, right?
```

57

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.   That would be Interqual.
 2    Q.   So you are using your medical judgment.  You practice as a
 3         doctor every single day, right?
 4    A.   Not --
 5    Q.   I didn't say you are treating patients, but you act using
 6         your medical training --
 7    A.   Yes.
 8    Q.   -- and your medical judgment every single day, right?
 9    A.   Correct.
10    Q.   Okay.  As a medical doctor, do you think it's appropriate
11         that after having seen two surgeons, both of which
12         recommended some kind of surgery, that Mr. Spiller waited
13         years and still hadn't had that surgery?
14              MS. VAN THOMME:  Object to form and foundation.
15              THE WITNESS:  I said before it depends on the
16         situation.
17    Q.   (By Mr. Altman)  When would it be okay not to --
18    A.   May I finish?
19    Q.   Yes, you may.
20    A.   May I finish --
21    Q.   Sorry.
22    A.   If a prisoner, and I'm not saying Mr. Spiller did, gets
23         himself in trouble and asked to be transferred to
24         a -- because you are talking general, I am going to talk
25         general, gets himself transferred to another prison, the
```

58

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        second set of people in the second prison have to then
 2        review the entire chart over time and figure it out.  They
 3        then have to use their judgment whether they think he
 4        needs to see an orthopedic surgeon and then if he does see
 5        an orthopedic surgeon at that facility and the orthopedic
 6        surgeon doesn't go to an appropriate hospital, we are in
 7        the same boat again with more time, but it was not MDOC or
 8        the physician's problem that caused -- or action that
 9        caused him not to have that surgery, if that was
10        happening.  So that's what I mean by depends on the
11        situation.
12            I don't get involved with daily issues with these
13        patients.  I have no clue what is happening to them that's
14        keeping them from being sent downstate, which he did end
15        up doing.
16   Q.   That wasn't my question.  As a medical doctor, if a
17        patient needs surgery confirmed by specialists, is it
18        appropriate for them to have to wait years to receive that
19        surgery?
20   A.   It could very well be.
21   Q.   When would it be -- so are you saying it would be
22        appropriate if he got himself into some trouble and got
23        sent down to --
24   A.   That's what I'm saying.  I don't know the whole situation.
25        I don't know why.
```

59

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   I didn't ask you why.  I didn't ask you about a particular
 2        patient.  I'm asking you as a medical doctor.
 3   A.   Okay.  That had -- I don't understand how that relates to
 4        this case in any way, shape or form or at least my input
 5        to this case in any way, shape or form.
 6   Q.   You may not understand --
 7   A.   I didn't ask a question.  I just made a statement.
 8   Q.   I hear you.  You may not understand why, but it's still a
 9        legitimate question that I'm asking you and you still
10        haven't answered it.
11   A.   And I can't answer it.
12   Q.   So you can't as a medical doctor say whether that's
13        appropriate?
14   A.   No, because of all the other parts of the world that
15        rotate around us.
16   Q.   Would it be appropriate outside of -- on the outside of
17        the MDOC?
18   A.   You have the same rotating world out there that we have
19        inside the MDOC.
20   Q.   So I want to see if I understand something that you said,
21        though.  Are you saying that if he got transferred to
22        another facility, they basically start over?
23   A.   No.
24             MS. VAN THOMME:  Object to foundation.
25             THE WITNESS:  I say they have to review the chart,
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        they would have to get a new orthopedic surgeon and if
 2        that orthopedic surgeon didn't go to a facility that has a
 3        secure unit, they will be in the same situation they are
 4        now.
 5   Q.   (By Mr. Altman)  So the patient should just wait longer if
 6        there is no physician --
 7   A.   I didn't say should.  Did I say should?
 8   Q.   Okay.  Well, does it bother you that that's what happened
 9        in the MDOC?
10   A.   It depends on what the situation is.  Because he started a
11        fight and got his nose broken and that now has more
12        importance than the other.  Why did he suddenly
13        have -- well, no, I can't ask questions.
14            I will give you an example on the outside.  I had an
15        orthopedic surgeon tell me that that patient needs his
16        knee replaced.  I said no.  He said, Keith, it's too bad.
17        I mean, this is a good friend of mine, he says it's too
18        bad, it's going to have to be replaced.  I says no.  I
19        gave that patient one injection and another injection five
20        months.  She never had a knee replacement ever.  Now,
21        which is the better outcome, two injections that are about
22        one-tenth of the cost of surgery or a surgery?  Now, with
23        that question hanging there, did I object to what the
24        surgeon said he wanted to do?  Yes.  But was it the right
25        medical thing to do?  Yes.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   What treatment did Mr. Spiller receive as an alternative
 2        to the surgery?
 3   A.   I know he had physical therapy consult, that's all I know
 4        offhand.  I don't know if they injected him with steroids
 5        or not.  If this were my patient, I would have had him on
 6        a specific physical therapy regimen that I decided upon
 7        and he would have injections prior to starting those.
 8   Q.   And would you do that without an orthopedic consult?
 9   A.   Absolutely, and actually, today, I sometimes say, before
10        you send them to an orthopedic, why don't you put some
11        steroid in his shoulder and see what happens.  I never
12        said that about Mr. Spiller, because I think he probably
13        already had that before I got the case.  Medicine
14        isn't -- if medicine was that cut and dried, we'd have
15        computers doing it.
16   Q.   Agreed.
17   A.   We wouldn't have people doing it.
18   Q.   What were you going to say?  I'm asking you a question,
19        what were you going to say?
20   A.   There was a study in January of 2018, published, that
21        showed that people who had meniscal tears that were not
22        obstructing, have the same or better outcome at two years
23        than people who had a scope for that meniscal tear.
24   Q.   So that may be -- that may be.
25   A.   What does an orthopedist want to do every single time
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        without exception?  Do you know that answer?  If you
 2        don't, I'd be happy to tell you.
 3   Q.   Sure.  Tell me.
 4   A.   They want to do a scope.  Do you know why they want to do
 5        a scope?
 6   Q.   Why?
 7   A.   They don't get any money for an exercise program.
 8   Q.   Now, with what you just said there, though, that doesn't
 9        mean just because you do a study that says overall, you
10        know, when you take an average of all the people that they
11        do just as well, that does not mean that there are not
12        some people who do benefit from the surgery better than an
13        exercise regimen, right?
14   A.   On average.
15   Q.   I'm not asking on average.  I said --
16   A.   That's how studies go.
17   Q.   I don't care about studies.
18   A.   Oh, well, then --
19   Q.   Listen, metformin is generally efficacious to bring
20        down -- to bring down --
21   A.   It depends on who you talk to.
22   Q.   It will reduce A1C to some degree, maybe not enough,
23        right?
24   A.   Correct.
25   Q.   But that doesn't mean A1C goes down in every person that
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        takes metformin, right?
 2   A.   Oh, absolutely not.
 3   Q.   That doesn't mean it doesn't work wonderfully for some
 4        people and reduces their A1C down to below seven and they
 5        are good on just metformin, right?
 6   A.   With what risk?
 7   Q.   With what risk.  Well, let's say there CK is less than
 8        1.4, they don't have any problems along those lines.  The
 9        point is that you can have whatever you say on an average,
10        but by and large variability says that individuals may
11        react differently than what the average says, right?
12   A.   And?
13   Q.   Is that correct?
14   A.   Yes.
15   Q.   And so --
16   A.   So what's the point?
17   Q.   You can't say for sure in a given individual who takes
18        metformin and does lifestyle changes and eats better that
19        their reduction in A1C is due to the metformin, can you?
20   A.   No, it may be due to the eating and drinking, right?
21   Q.   Right, but it could be due to the metformin, right?
22   A.   Yeah.
23   Q.   It could be entirely due to the metformin and have nothing
24        to do with their lifestyle changes, right?
25   A.   Or it could have nothing to do with the metformin and have
```

64

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        all to do with his lifestyle changes, right?
 2   Q.   But on average, the studies say that metformin should
 3        reduce A1C, right?
 4   A.   Yeah.
 5   Q.   So the average doesn't tell you what's going to happen in
 6        individual patient, right?
 7   A.   Correct, which is what the physician is all about.
 8   Q.   Right.
 9   A.   I just told you, if it was that cut and dried, a computer
10        can do medicine.  A computer can't do medicine.  There has
11        to be evaluation.  There has to be re-evaluation.  I tell
12        these people, do the exercises for patellofemoral syndrome
13        before you send them for an MRI and to see an orthopedic
14        surgeon, and if it goes away in four weeks, guess what,
15        it's patellofemoral syndrome.
16   Q.   But you would also agree that you could, not being an
17        orthopedist, your alternative treatment plan could also
18        cause some harm in a given individual patient, right?
19             MS. VAN THOMME:  Object to form.
20             THE WITNESS:  Rarely happens.
21   Q.   (By Mr. Altman)  It could happen, though.  When you say
22        rarely.
23   A.   Actually, I've never seen it happen.
24   Q.   Well, you may not know --
25   A.   That a conservative treatment plan that has been shown to
```

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        do improvement has actually caused damage.
 2   Q.   Well, that wouldn't even make any sense given a study that
 3        purports and -- listen, when you have a study that reports
 4        an average result, that means some people did better than
 5        the average, right?
 6   A.   Okay.
 7   Q.   And that means some people did worse than the average,
 8        right?
 9   A.   Okay, but that doesn't mean they got worse.  That means
10        they are worse than the average and if the average is well
11        above normal -- if the new average is well above the old
12        average, right?
13   Q.   That could also be caused --
14   A.   The people below average on the study are still better
15        than they were when they started, so no, they don't
16        necessarily have to be worse.
17   Q.   But sometimes they are.  Sometimes there is harm caused by
18        the drug, correct?
19   A.   We aren't talking about a drug.
20   Q.   Well, let's just take a drug.  Any treatment whatsoever,
21        there's no difference between whether it's a drug or some
22        kind of physical therapy.  When you do a study, you take
23        your hypothesis, you take the treatment -- you take a
24        comparator and you look and see how people do, right?
25   A.   Yeah.
```

66

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   Okay.  And that doesn't mean that some people don't do
 2        worse than they started with during the study, even though
 3        the study on average appears to be efficacious, right?
 4   A.   Worse, and then the new average, yes.
 5   Q.   It could be worse than they started, they could have
 6        caused harm, right?
 7   A.   Not typically.
 8   Q.   I'm not asking typically.  I said it can happen.
 9   A.   Rare.
10   Q.   How would you know without looking at an individual's
11        study results?  You don't know that it's rare.
12   A.   I have actually read that study.
13   Q.   What study?
14   A.   January of 2018.
15   Q.   I don't know what study we are talking about.
16   A.   The one with the scope of the knee.
17   Q.   Oh, I didn't realize that was the  --
18   A.   Which is the one we were talking about.
19   Q.   I didn't realize that when you said the studies?
20             MR. ALTMAN:  Let's take a break for a few minutes.
21             VIDEO TECHNICIAN:  The time is 3:15.  We are now off
22        the record.
23             (Brief recess.)
24             VIDEO TECHNICIAN:  The time is 3:28.  We are back on
25        the record.  This is disc two in Dr. Papendick's
```

67

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1       deposition.
 2   Q.  (By Mr. Altman)  You'd agree that just because somebody
 3       has limited use of their right arm doesn't mean they don't
 4       need shoulder surgery, right?
 5            MS. VAN THOMME:  Object to form.
 6            THE WITNESS:  I guess you need to restate that.  I'm
 7       not understanding your question.
 8   Q.  (By Mr. Altman)  Can you say unequivocally that because
 9       somebody has limited mobility in their right arm means
10       they do not need shoulder surgery?
11            MS. VAN THOMME:  Object to form.
12   Q.  (By Mr. Altman)  I'll ask it this way.  Is it possible
13       that somebody who needs shoulder surgery can still have
14       the ability to use their right -- their arm in a limited
15       manner?
16   A.  That question is problematic.  Are you saying that if they
17       can use their arm, could it be a possibility they still
18       need shoulder surgery?
19   Q.  Yes.
20   A.  Yes, and shoulder does not necessarily have anything to do
21       with hand or wrist.
22   Q.  Now, in 2016, you would have been the person who approved
23       surgeries, correct?
24            MS. VAN THOMME:  Object to form.
25            THE WITNESS:  Did it have my name on it?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  That has nothing to do with anything.  In
 2        2016, you generally would've been the person to approve
 3        surgeries, right?
 4   A.   Are you talking on a specific 407?
 5   Q.   As a general proposition, yeah.  Well, all
 6        surgeries -- strike that.
 7             All surgeries would require a 407, right?
 8   A.   Yeah.
 9   Q.   Okay.
10   A.   Unless they are done through the ER emergently.
11   Q.   Assuming that this was not an emergency.
12   A.   It's an outpatient procedure, yes.
13   Q.   Well, even an inpatient procedure, you still would have
14        approved it, right?
15   A.   It still has to be considered as an outpatient until they
16        get admitted.
17   Q.   Okay, but there are certain surgeries you know are not
18        going to be done on an outpatient basis, correct?
19   A.   Oh, sure.
20   Q.   I mean, you know they are going to be inpatient --
21   A.   Absolutely.
22   Q.   -- in the first minute?
23   A.   The surgery that they were requesting for him, I knew that
24        he was going to be in overnight at least, if not more.
25   Q.   All right.  How do you interpret the phrase use of the
```

69

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        right arm in a medical context, in a medical record?  If
 2        you saw patient could use his right arm, what would that
 3        mean to you?
 4   A.   That the patient can use his right arm.  There is nothing
 5        to be inferred.
 6   Q.   Do you agree -- strike that.
 7             What is shoulder replacement surgery?
 8   A.   A pretty nasty mess.
 9   Q.   What is it?
10   A.   That's where they replace the joint.
11   Q.   Is that kind of like knee replacement surgery, but in the
12        shoulder?
13   A.   Essentially.
14   Q.   Okay.
15   A.   They put in a new place for it to rub and a new thing to
16        rub on because there is no real joint there, it's just two
17        bones rubbing against one another.
18   Q.   Now, some people who need knee replacement surgery can
19        walk, correct?
20   A.   People who need knee replacement surgery usually can
21        barely walk.
22   Q.   But they can walk some, right?
23   A.   Most of them are in a wheelchair.
24   Q.   Most people who have knee replacements are in wheelchairs?
25   A.   With MDOC.
```

70

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   Not the MDOC, as a general proposition.
 2   A.   Oh, yeah.  Orthopedists recommend knee surgeries all the
 3        time.
 4   Q.   It's not a question -- just assume someone needs knee
 5        replacement surgery, it's appropriate.  That doesn't mean
 6        they can't walk at all, correct?
 7   A.   There's a difference between need and being -- being
 8        approved for it.
 9   Q.   Put that aside.  We are missing each other here.  It's not
10        a question of being approved or anything like that.  I'm
11        asking you, some people who need knee replacement surgery
12        still have limited ability to walk, correct?
13   A.   Limited, yes, limited is the keyword.
14   Q.   It does not mean they cannot bend their knee at all,
15        correct?
16   A.   No, right.
17   Q.   Does that mean that they can't stand at all, correct?
18   A.   Correct.
19   Q.   Okay.  Some people that need shoulder replacement surgery
20        can still move their arm to some degree, correct?
21   A.   Usually not.  Usually --
22   Q.   The arm hangs at the side, they can't do anything?
23   A.   Usually, it's pretty much cuff damage.  Can I --
24   Q.   Sure.
25   A.   When I was in the orthopedist's office when I was a
```

71

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        resident, the orthopedic surgeon asked me, so what's the
 2        best exercise for the shoulder?  I said, for what
 3        condition.  It doesn't matter.  So I'm just totally
 4        flabbergasted because, you know, I learned all these
 5        exercises, how to do this, how to do this, you know, all
 6        that stuff from them and he said to me this is the best
 7        shoulder exercise.  People who need shoulder surgery
 8        cannot do that.  Rarely can they do much more than this,
 9        rather than this.
10   Q.   But they could do something, correct?
11   A.   Very minimal.
12   Q.   Can they write?
13   A.   Yes, but it's very minimal.
14   Q.   Can they write?
15   A.   Well, sure.  Writing has nothing to do with the shoulder.
16   Q.   Now, if there was a medical record -- in a medical record
17        within the MDOC referencing to approval of something, that
18        generally meant you were involved, correct?
19             MS. VAN THOMME:  Object to form and foundation.
20             THE WITNESS:  No.  Because if it's approval of a
21        drug, it's another person.  If it's an approval of
22        something that has to do with the MDOC policy, that's all
23        MDOC.
24   Q.   (By Mr. Altman)  From a medical perspective, if they are
25        talking about a treatment, you know, a --
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.   A surgical procedure?
 2    Q.   -- a procedure.
 3    A.   Or a consult outpatient, yeah.
 4    Q.   Yeah.  If it's something about approval --
 5    A.   It probably came to me.
 6    Q.   Okay.  Let me find the page for you.
 7    A.   So yes, I need my glasses.
 8    Q.   Before we get to that.
 9    A.   I beg your pardon?
10    Q.   Is it -- is the following sentence, would you agree with
11         this as a general proposition, without examining a
12         particular patient, shoulder surgery, shoulder replacement
13         surgery is not necessary if the patient has the use of
14         their right arm?
15              MS. VAN THOMME:  Object to form.
16              THE WITNESS:  Shoulder replacement surgery of the
17         right shoulder?
18    Q.   (By Mr. Altman)  Of the right shoulder.
19    A.   If they have the use of the right arm?
20    Q.   Correct.
21    A.   Typically, they don't have use of the arm.
22    Q.   Well, we just talked about they can write.
23    A.   Yeah, but that is not use of the arm, that's use of the
24         hand.
25    Q.   Okay, but you've got to use your arm to write?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   No, it's a hand issue.
 2   Q.   Okay, so typically -- okay, so use of their right --
 3   A.   It's not a shoulder issue.  It might be an arm, an elbow,
 4        a hand, but not a shoulder issue.  There's no muscles that
 5        have anything to do with writing that affects the
 6        shoulder.  Elbow, yeah, wrist, yeah, but not shoulder.  So
 7        it depends on what your definition of use is.
 8   Q.   Well, where would it be appropriate to deny shoulder
 9        replacement surgery -- strike that.
10        What kind of use of the right arm would not be
11        disqualifying of shoulder replacement surgery?
12             MS. VAN THOMME:  Object to form.
13             THE WITNESS:  Would not be disqualifying.
14   Q.   (By Mr. Altman)  You said before, if somebody can do this,
15        right, they --
16   A.   Yeah, they don't need shoulder --
17   Q.   -- don't need shoulder replacement surgery, right?
18   A.   Right.
19   Q.   If somebody, this is all they can do, they might need
20        shoulder replacement surgery?
21   A.   Might.
22   Q.   So somewhere in between generally is where there would be
23        a threshold where they probably don't need shoulder
24        replacement surgery.  How much should they be able to do
25        in order to be disqualified from shoulder replacement
```

74

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        surgery?  Do you understand my question now?
 2   A.   I understand your question quite well, actually.
 3   Q.   Okay.
 4   A.   If somebody came to me the first time and said this
 5        patient can do this much.
 6   Q.   Okay.
 7   A.   And have never had physical therapy work done, never
 8        strengthened their rotator cuff, never had an MRI, never
 9        had the things that need to be done to allow that's
10        shoulder to move, I would say it's not medically necessary
11        until you've done those things to make certain that this
12        isn't something that's repairable without surgery.
13   Q.   Okay.  Assuming --
14   A.   That surgery is horrible.
15   Q.   Understood.  So let's be more precise.  Assuming that
16        those things have been done, okay, and that that's all
17        they get, is that time for shoulder replacement surgery?
18   A.   I haven't got a clue unless I've seen the MRI.
19   Q.   Now, when you get a 407, do you look at the MRIs?
20   A.   I don't see the MRI.  I see the MRI report.
21   Q.   Right.
22   A.   And short of one physician and he doesn't read MRIs, I've
23        not had a problem with any of the physicians being
24        incorrect.  I mean, the radiologist will read it, the
25        orthopedist reads it again and when they all seem to agree
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        that that's what it is, I don't have a problem with that,
 2        so I read the reading.  I never look at the MRI itself.
 3   Q.   I'm going to hand you what is page 6 of Exhibit 1 and
 4        would you read to yourself point number two, which is
 5        musculoskeletal and I want to ask you some questions about
 6        it.
 7   A.   Okay.
 8             MS. VAN THOMME:  For the record, this also does not
 9        appear to be a complete record.
10             MR. ALTMAN:  That's fine.
11             THE WITNESS:  Also, this is not a 407, right?  You
12        understand I never saw this.
13   Q.   (By Mr. Altman)  That's not my point.  The sentence that's
14        here, shoulder replacement surgery was recommended, but
15        would not be approved if he has use of his right arm, that
16        would have come from you, correct?
17   A.   No.
18   Q.   Well, who talked about approving that surgery but you?
19             MS. VAN THOMME:  Object to foundation.
20             THE WITNESS:  There are many other physicians in the
21        office now.  That wasn't from me.  That's too vague.  I'd
22        have to have a reason.  I can't just say, oh, he can't use
23        his right arm, no, you would not hear that for me.  That's
24        not me.  This is a physician writing a note in the office.
25        This is not a 407.  I never saw this.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  I know you didn't see this, but you
 2        would've been the one talking about whether surgery
 3        would've been approved or not, right?
 4            MS. VAN THOMME:  Object to form and foundation.
 5            THE WITNESS:  Maybe.
 6   Q.   (By Mr. Altman)  Well, who else?
 7   A.   Well, I tell you what, if I had read this whole paragraph,
 8        I would say you've got a lot of work to do before I'm
 9        going to approve surgery.  You've got to find out why his
10        hand is numb, why his fingers are numb, why he gets neck
11        cramps.  Neck has nothing to do with the shoulder, except
12        if it's a neck problem causing the shoulder, which is even
13        worse than just the shoulder, because you have another
14        structure that's causing the shoulder to have pain that
15        somebody thinks needs to be replaced.  No, this is nothing
16        I've seen or I would've said or done.
17   Q.   I see.
18   A.   His neck is locking up a lot.  That's got absolutely
19        nothing to do with the shoulder joint.  And I would love
20        to see how Tylenol causes you to bleed.  From a medical
21        standpoint, what is the pathophysiology?  There isn't one.
22   Q.   That's page six.  Go to page four.  It's two pages before
23        that, please.
24   A.   Are they numbered?
25   Q.   All the way to the lower right-hand side you'll see number
```

                                                                      77

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        four.  I think you've got one more page.
 2   A.   Oh, got you.  Okay.  MSJ Opp 04.
 3            MS. VAN THOMME:  Just for the record, again, this is
 4        page one of what appears to be a multiple page document
 5        without the other page or pages.
 6   Q.   (By Mr. Altman)  Okay.  Would you read paragraph three to
 7        yourself and I'm going to ask you some questions about it.
 8   A.   I beg your pardon?
 9   Q.   Would you read paragraph number three, musculoskeletal, to
10        yourself and I'm going to have some questions for you.
11            Did you have an opportunity to read that?
12   A.   Yeah, I read it.
13   Q.   Based on the summary that you see here, do you think there
14        was sufficient information to have shown that he had -- he
15        had already met with two orthopedists, right?  Strike
16        that.
17            This is a medical record that's made by the
18        healthcare professional, right?
19            MS. VAN THOMME:  Object to foundation.
20            THE WITNESS:  I don't know who it was made by.  It
21        doesn't say.  It doesn't say down here to know.
22   Q.   (By Mr. Altman)  I'm not saying who particularly, I'm
23        saying as a general proposition they are the ones who put
24        entries into these notes, right?
25   A.   Correct.  That's a visit.
```

American Reporting, Inc.
248-559-6750

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   It's not the patient making these entries, correct?
 2   A.   No, this is a description of what the patient tells them.
 3   Q.   And you'd agree that these records are generally expected
 4        to be reliable?
 5   A.   Yeah.
 6   Q.   You review the medical records on a regular basis,
 7        correct?
 8   A.   No.
 9   Q.   You don't ever look at the medical records when you review
10        a 407?
11   A.   Rarely.  They have to supply me all information necessary
12        to make a decision.  The 407 has to be all-inclusive.  The
13        407 for especially an orthopedic surgery, I'm not even in
14        the -- I'm not -- are not able to get to -- well, I could,
15        but in order -- I mean, I wouldn't even know who to ask
16        for this information.
17   Q.   Okay.  You would agree that it appears he had had two
18        orthopedic consults, right?
19   A.   Yeah.
20   Q.   He was recommended for right shoulder arthroscopy?
21   A.   Correct.
22   Q.   A near Mumford procedure?
23   A.   Correct.
24   Q.   It's not describing any disagreement between the two
25        orthopedists, right?
```

                                                              79

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   No --
 2              MS. VAN THOMME:  Object to foundation.
 3              THE WITNESS: -- it doesn't describe them, no.
 4   Q.   (By Mr. Altman)  Would a reasonable interpretation be that
 5        the orthopedists are in agreement?
 6   A.   No.
 7   Q.   So you don't think this means they are in agreement?
 8   A.   If the second one says he needs shoulder surgery, does not
 9        mean that he needs everything that's here.
10   Q.   It doesn't say that in the medical record, though, that
11        there's any disagreement between the two orthopedists?
12   A.   No.
13   Q.   It says, had ortho consult times two and was recommended
14        for right shoulder arthroscopy.  Do you think it's a
15        reasonable interpretation that both orthopedic consults
16        found the same thing?
17              MS. VAN THOMME:  Object to foundation.
18              THE WITNESS:  Both orthopedists wanted to do
19        arthroscopy.
20   Q.   (By Mr. Altman)  Is that a reasonable interpretation of
21        this?
22   A.   Yeah.
23   Q.   They didn't disagree on that, right?
24   A.   Not that I know of.
25              MS. VAN THOMME:  Object to foundation.
```

80

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  You would expect that if there was
 2        disagreement between the two orthopedists, that that would
 3        be reflected in the note, right?
 4   A.   No.
 5   Q.   So they would just not say that two -- so --
 6   A.   It's not necessary that they would have.
 7   Q.   That they would have what?
 8   A.   Said it.
 9   Q.   So if they had two orthopedic consults and the
10        orthopedists had different impressions --
11   A.   They don't.  They both want arthroscopy.
12   Q.   I know, I'm asking, not in this case, if there had been
13        two orthopedic consults -- you said sometimes the
14        orthopedists would disagree?
15   A.   Right.
16   Q.   If the orthopedists had disagreed with one another, would
17        you have expected to see that reflected in the record?
18   A.   Maybe.
19   Q.   Why would it not be reflected in the record?
20   A.   If the provider didn't put it there.
21   Q.   Would you have expected that the provider would have put
22        in a disagreement -- strike that.
23   A.   I would have hoped, yes.
24   Q.   That would be your expectation that they would do that,
25        right?
```

81

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   That would be what I would want, yes.
 2   Q.   Would that be what you would expect there to be?  Let me
 3        ask the question.  If two orthopedic consults had taken
 4        place and there was disagreement between the orthopedists,
 5        would you expect that the healthcare professional would
 6        have reflected that there were two orthopedic consults and
 7        there was disagreement?
 8   A.   But they didn't.
 9   Q.   Would you have -- if that happened, would you have
10        expected that to be in the record in that way?
11             MS. VAN THOMME:  Object to form.
12             THE WITNESS:  Maybe.
13   Q.   (By Mr. Altman)  You say maybe, but you don't have an
14        expectation one way or the other?
15   A.   I could hope.
16   Q.   Would it have been important for the medical professional
17        to put in that there were two orthopedic consults and
18        there was disagreement?  Would that have been important?
19             MS. VAN THOMME:  Object to form and foundation.
20             THE WITNESS:  To me, it would be important.  To them,
21        it may not be.
22   Q.   (By Mr. Altman)  So there's that much of a disagreement
23        between the medical professionals as to what should be
24        documented in the medical record?
25             MS. VAN THOMME:  Object to form.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  Strike that.  Let's take a step back.
 2        Medical records, the purpose is to reflect the condition
 3        of a patient, correct?
 4   A.   Correct.
 5   Q.   You're supposed to put relevant information in there,
 6        correct?
 7   A.   Correct.
 8   Q.   There shouldn't be too much disagreement amongst medical
 9        professionals as to what information is relevant to go in
10        a medical record, right?
11   A.   Okay.  Second opinions, which is what this was, correct?
12   Q.   I'm asking --
13   A.   I'm sorry.
14   Q.   I'm asking as a general proposition.
15   A.   And I'm talking about a general proposition.  That's why I
16        didn't say the second opinion.  Second opinions in general
17        are do you agree with this procedure or do you not agree
18        with this procedure, not what procedure would you do.  So
19        by this procedure request going to the second physician,
20        whether it's appendicitis, appendectomy or not, if I say
21        that needs an appendectomy and the second one says, yeah,
22        that's logical, that's reasonable, he will then say
23        patient needs appendectomy.  That's how second opinions
24        work.
25   Q.   I understand that.
```

83

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   They aren't trying to defeat each other.  They aren't
 2        trying to compete with each other.  They're trying to say
 3        is that an appropriate action.
 4   Q.   So you're saying you wouldn't have a situation where a
 5        specialist one says he needs A, and specialist who says he
 6        needs to B, not A?
 7   A.   Yes, we do get that all the time.
 8   Q.   Okay.  And when that happens, would it be important to put
 9        what both specialists had to say if there is a divergence
10        in their opinions?
11             MS. VAN THOMME:  Object to form and foundation.
12             THE WITNESS:  Yes, but it doesn't necessarily mean
13        that it would be put here.
14   Q.   (By Mr. Altman)  Where would it be put if not here?
15   A.   Typically, it's on a piece of paper that came from the
16        orthopedic surgeon telling him what their opinion is
17        slipped in the chart.  I wouldn't even have access to it
18        in a computer.
19   Q.   But why wouldn't it be reflected in a summary of the
20        notes?
21   A.   It may be.
22   Q.   Isn't it supposed to be?
23             MS. VAN THOMME:  Object to form and foundation.
24             THE WITNESS:  In my opinion, it needs to be there if
25        there is a difference.  That's not everybody's opinion.
```

84

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        So the answer to your question is they both said do
 2        arthroscopy.
 3   Q.   (By Mr. Altman)  They both said the near Mumford
 4        procedure.  I guess that's a kind of --
 5   A.   No, we can't say that.  I don't see that second physician
 6        note.
 7   Q.   It says had orthopedic consult times two, was recommended
 8        for right shoulder arthroscopy, near Mumford procedure,
 9        are you saying the near Mumford procedure isn't part
10        of --
11   A.   Wait a minute.  That is what Ganzhorn wanted to do, the
12        initial orthopedic surgeon before he was supposed to go
13        down to Lansing, not Traverse City.  So the guy in
14        Traverse City says yeah, that's an appropriate thing to
15        do, do the arthroscopy, and then he wrote down what the
16        first person said.  There's nothing to do with what the
17        second person said unless you have that piece of paper
18        called a 409 from the second physician that says do a near
19        Mumford procedure, possible RC repair and chondroplasty of
20        the glenoid joint.
21   Q.   So you're saying it's not a reasonable interpretation that
22        both of them suggested the same procedure?
23   A.   No.
24             MS. VAN THOMME:  Object to foundation.
25             THE WITNESS:  Oh, yeah, arthroscopy, yes.
```

85

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  What about the near Mumford procedure?
 2   A.   No.
 3   Q.   Isn't that a kind of -- what is a near Mumford procedure?
 4   A.   I haven't got a clue.  It's a replacement of the shoulder
 5        in some way.  If it made a difference, I could have looked
 6        it up.
 7   Q.   It says it excises the distal end of the clavicle.
 8   A.   Oh.
 9   Q.   Nevertheless, you're saying it's not a reasonable
10        interpretation that both of them suggested the near
11        Mumford procedure?
12   A.   No, it is not.
13   Q.   And it's not a reasonable procedure that -- not a
14        reasonable interpretation they both said possible RC
15        repair?  That's not a reasonable interpretation, either?
16             MS. VAN THOMME:  Object to form and foundation.
17             THE WITNESS:  I don't have the data in order to say
18        that.
19   Q.   (By Mr. Altman)  Okay.
20   A.   We need the paper from the second surgeon that says what
21        he recommends.
22   Q.   Isn't the point of these electronic medical records that
23        you would have to look at every single piece of paper in
24        order to be able to see what's going on about a patient?
25   A.   It is not in the electronic medical record.
```

86

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   This isn't an electronic medical record?
 2   A.   No.  The paper from the second surgeon with his
 3        recommendation is not in the medical record.
 4   Q.   That's not what I'm talking about.  This document that we
 5        are looking at here are his medical records, aren't they?
 6   A.   Part of it, yeah.
 7   Q.   Generally, people will rely upon reviewing the electronic
 8        medical records, right?
 9   A.   No.  That's only part of it, where is the rest of it?
10   Q.   Well, there's thousands of pages of these electronic
11        medical records.
12   A.   There are things that are not electronic.
13   Q.   I got that, but isn't the expectation that everything
14        important should be in the electronic medical record?
15   A.   Not for the MDOC.  Everybody knows that there's our paper
16        chart and a non-paper chart in the Michigan Department of
17        Corrections.
18   Q.   I see.
19   A.   You wanted me to read all this.
20   Q.   No I mean, I asked you, but that was the only sentence I
21        cared about.
22   A.   Oh.  I have one I would like to ask about.
23   Q.   Sure.  Go ahead.
24   A.   How is it that he cannot do raising arm from 90 to 180 and
25        in the next second he can't raise his arm at all?  But he
```

87

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        can do all but that exercise.
 2   Q.   I don't know.  I guess we would have to ask the
 3        orthopedist, wouldn't we?
 4   A.   No, not the orthopedist --
 5   Q.   The guy who actually laid his hands on him.
 6   A.   -- you'd have to ask the person who wrote the record and,
 7        of course, you can't say who it is because there's no name
 8        on it, but the point is, is that Mr. Spiller is telling
 9        two different stories.
10   Q.   How do you know that's Mr. Spiller's story and not an
11        error in transcription by the medical professional?
12   A.   He's been doing all the exercises in the book but is
13        unable to do two exercises which involve raising the arm
14        from 90 to 180, not to 90, but from 90 to 180, right?
15   Q.   Okay.
16   A.   The next sentence states is unable to raise his right arm
17        at all.  So how did he get it to 90 to know that he can't
18        raise it to 180?
19   Q.   That could also mean that there were two exercises, one
20        raising it to 90 degrees and one raising it to 180 degrees
21        and wasn't articulately written, couldn't it?
22   A.   So let's --
23             MS. VAN THOMME:  Object to foundation.
24             THE WITNESS:  -- make assumptions that are not here.
25   Q.   (By Mr. Altman)  Well, he talks about two exercises and
```

88

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        you only talked about it -- it says can't do two exercises
 2        and then you -- there's only one described there.
 3   A.   He's doing 98 exercises.  There's only two that he can't
 4        do.
 5   Q.   Okay.
 6   A.   So if he can't move his arm at all, what are the other 98
 7        exercises that his shoulder is doing.
 8   Q.   Where does it say that he couldn't move his arm at all?
 9   A.   It states, is unable to raise right arm at all.  I mean,
10        that's pretty clear.  Sorry.  I'll quit.
11   Q.   Nevertheless, two experts, two specialists says he needs
12        surgery, right?
13   A.   Yeah, but --
14   Q.   But what?
15   A.   This says he needs more than surgery, because this
16        shoulder surgery that you keep going back to has nothing
17        to do with his neck surgery or his neck spasms or his neck
18        locking up in the same part you asked me to read.
19   Q.   That's fine.
20   A.   It has nothing to do with those.
21   Q.   That's fine.  Nevertheless --
22   A.   So it's not just his shoulder that needs to be looked at.
23   Q.   Maybe so, but two orthopedists says he needs shoulder
24        surgery, right?
25   A.   So?  That's because orthopedists do shoulder surgeries.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   Did you ever defer Mr. Spiller's shoulder surgery request?
 2   A.   I think that's already been covered.
 3   Q.   I don't remember the answer.  Did you ever defer --
 4   A.   February 13th of -- February 18th of 19 -- of 2015.
 5   Q.   I think that's in your other document.  You deferred his
 6        shoulder surgery, right?
 7   A.   Correct, because it could not be done at -- by
 8        Dr. Ganzhorn and it could not be done at Sault Ste. Marie.
 9   Q.   Do you recall being asked to provide answers to some
10        questions in conjunction with this case, something called
11        interrogatories?
12   A.   Yes.
13   Q.   Who helped you prepare those interrogatory responses?
14   A.   My attorney.
15   Q.   And who is that?
16   A.   She's right here.
17   Q.   Okay.  Anybody else?
18   A.   No.
19   Q.   Did you go and ask anybody any questions to help you with
20        any of the answers?  I'm talking about Corizon employees.
21   A.   Do you --
22   Q.   Did you?  That's a yes/no.
23   A.   No.
24   Q.   No, okay.  Did you review any of the medical records
25        yourself in answering any of these interrogatories?
```

90

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.    I reviewed the 407s that I had any input on, but I
 2          haven't -- that's all.
 3    Q.    Just 407s, none of the electronic records?
 4    A.    No.
 5    Q.    I'm not going to mark it as an exhibit, but these were
 6          provided to us as your Answers to Interrogatories.  I just
 7          want to know if generally that document looks familiar to
 8          you?
 9    A.    It looks like a legal document that is interrogatories.
10    Q.    But does that document, that specific document.  I know it
11          says it's interrogatories.  Do you remember seeing that
12          document?
13    A.    Yes.
14    Q.    Did you create that document?
15    A.    No.
16    Q.    Was it given to you and said -- I'm paraphrasing a little
17          bit, but these are what we think are the answers to these
18          questions.  Would you review them and make sure that these
19          answers are correct?
20    A.    I had input on every one of them.
21    Q.    Okay.  So you basically answered the -- provided
22          information to your counsel to fill that out?
23    A.    About this, yes.
24    Q.    Okay.  And were any of the answers filled out for you in
25          advance and given to you?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   I don't --
 2             MS. VAN THOMME:  Object to form.
 3             THE WITNESS:  I don't recall.
 4             MS. VAN THOMME:  And object on the basis of
 5        attorney-client privilege --
 6             THE WITNESS:  It's been a long time.
 7             MS. VAN THOMME:  -- to the extent that you are asking
 8        about communications between my client and myself.
 9             MR. ALTMAN:  I wasn't asking about communications.  I
10        was asking was any of them filled out and he was just
11        asked to verify them.
12             THE WITNESS:  Is that communication?
13   Q.   (By Mr. Altman)  Not really.
14             MS. VAN THOMME:  I would say so.
15   Q.   (By Mr. Altman)  No, it's not, because I'm entitled to
16        know how these interrogatory responses were prepared.
17        Were any of them written by your counsel with you asked to
18        review them to make sure that they were accurate?
19   A.   I don't have a program to put those on a computer.
20        Somebody put them together after we got the discussion
21        done.
22   Q.   I understand that.
23   A.   So I don't know what you want me to say to this.
24   Q.   Did you get a copy of them before you signed them?
25   A.   I had to have.  Somebody had to put them into a computer
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        and print them out in this nice form and it wasn't me.
 2   Q.   That's good.  Did you do anything to check to see if the
 3        answers were accurate before signing?
 4   A.   That was done beforehand.
 5   Q.   Well, how do you know -- as I understand, you were shown
 6        these questions, you provided some answers, somebody took
 7        all that information and formatted it into this nice
 8        format.  It was given back to you.
 9   A.   To sign.
10   Q.   To sign?
11   A.   Yeah.
12   Q.   Did you do anything to review the document when you got
13        this nice formatted document before you signed it?
14   A.   Of course I would.  I don't sign things without reading
15        them.
16   Q.   I understand that you read them.  Did you verify any of
17        the answers or did you rely upon your previous discussion
18        with your counsel?
19   A.   I did not just sign them.  I read it and approved it.
20   Q.   I got that, but did you check any of the medical records?
21        For example, let me show you --
22   A.   The only medical records I checked were 407s.
23   Q.   I understand that.  So if I understand what you are saying
24        here -- with the 407, anything you -- actions you take
25        based on that 407, how are those documented?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.   In the reviewer's comment.
 2    Q.   Can I see that record from February 18 that we talked
 3         about before in 2015?  That's not here.  You looked at it.
 4         It was in that --
 5              MS. VAN THOMME:  I think you marked it as an exhibit.
 6              MR. ALTMAN:  No, I --
 7              THE WITNESS:  Yes, you did.  You marked it as -- oh,
 8         no.
 9    Q.   (By Mr. Altman)  No, I didn't.  It's in your stack there.
10    A.   It's in the same stack.
11    Q.   I don't think it's here.
12              MS. VAN THOMME:  Yeah, I don't know if I got it back.
13         Let me check.  Yeah, I didn't get it back.  Is that it?
14              MR. ALTMAN:  No, I don't have it.  It's not in this.
15         It was a separate -- you had the pile, he grabbed it --
16              MS. VAN THOMME:  Yeah, and I was just looking.  I
17         have them chronologically and I don't --
18              MR. ALTMAN:  They are not here.  I don't have it.
19              MS. VAN THOMME:  Oh, wait, I do have it.
20              THE WITNESS:  What, did you keep it?
21              MS. VAN THOMME:  I'm sorry.
22              MR. ALTMAN:  Can I see that?
23              MS. VAN THOMME:  Wait.  Maybe that's -- that's not
24         the response.  That's the request.  Let me -- I didn't see
25         it.  That's it.  Does that have the comment on the second
```

94

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        page?
 2              MR. ALTMAN:  Does not.
 3              THE WITNESS:  That was before the secretary put my
 4        review on it.
 5              MS. VAN THOMME:  I'll keep looking and see if it got
 6        out of order.
 7              THE WITNESS:  It looks like this.
 8              MR. ALTMAN:  Well, I understand that.
 9              MS. VAN THOMME:  I really don't think I got it back.
10              MR. ALTMAN:  I don't know that he ever -- I mean,
11        it's not here.
12              MS. VAN THOMME:  Yeah, I don't think I got it back.
13              THE WITNESS:  It was the back page of one of these.
14              MS. VAN THOMME:  No, because that's a different 407.
15        That's January.
16              MR. ALTMAN:  Okay.  Don't worry about it for right
17        now.  It's not --
18   Q.   (By Mr. Altman)  But I do want to ask you a question.  You
19        saw Exhibit 1, the first page review of comments.  That is
20        your response from a 407, correct?
21   A.   Correct.  To a specific 407.
22   Q.   To a specific 407.
23   A.   That was for an outpatient surgery that they want to do at
24        a overnight stay without a security on it.
25   Q.   Got that.
```

95

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.    That's why it said what it said.
 2    Q.    I understand.  I'd just like you to look at these
 3          interrogatory responses that appear to be chronological in
 4          terms of your involvement with Mr. Spiller, right?
 5    A.    Yeah.
 6    Q.    Do you see this January 26, 2015, 407 reflected anywhere
 7          there?
 8    A.    No.
 9    Q.    Do you have an explanation as to why?
10    A.    I beg your pardon?
11    Q.    Can you explain why?
12    A.    No.
13    Q.    You don't dispute that there was a January 26, 2015,
14          interaction, right?
15    A.    No, I can't say that either.  I can tell you that this
16          page was done on January 26 with my response.
17    Q.    Okay, but you don't know --
18    A.    I don't know what day it came in.
19    Q.    Well --
20    A.    That's why the first page would've been helpful.
21    Q.    Well, supposedly it's the last page, so if it's the last
22          page, go flip to the last page.
23    A.    That is the last -- oh --
24    Q.    The last page is maybe the first page?
25    A.    Date of request, 1-23.
```

96

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   1-23, okay.  You don't see that request reflected in this
 2        document, do you?
 3   A.   No.
 4             MS. VAN THOMME:  I think that's an oversight.  So we
 5        can supplement our response.  We did not intentionally
 6        leave out that.
 7             MR. ALTMAN:  I didn't suggest -- I didn't suggest you
 8        did.  I'm just trying -- my next question is:  Is that
 9        there -- you know, how do we know that you've got all of
10        your 407s reflected here, is where this is going.  I'm not
11        saying that you intentionally --
12             THE WITNESS:  Do you have any other ones that aren't
13        on here?
14   Q.   (By Mr. Altman)  I don't know.  I don't know what I don't
15        have.  Dr. Papendick, I'm not suggesting that somebody
16        intentionally withheld this to hide something.
17   A.   Correct, and it was not.
18   Q.   But there's the possibility that there were others that
19        are not reflected on this document that may exist, right?
20        We know of one, there is possibly more, correct?
21   A.   Doubtful.
22   Q.   Well, you didn't even know that this one was missing, so
23        how could you say doubtful?
24   A.   Okay, you have this one and it's not on here.  Do you have
25        any others that are not on here.
```

97

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   That is not the point, Doctor.
 2   A.   So you're saying that if you did get this and it's not on
 3        here, you didn't get these from us.
 4   Q.   Yes, I did.
 5   A.   You got these from --
 6   Q.   This came from -- okay, you're right.
 7   A.   It came from the Michigan Department of Corrections.
 8   Q.   All right.
 9   A.   They aren't going to intentionally or unintentionally
10        leave it off here so it's not on here.
11   Q.   I understand that.  That is not what the point is,
12        Dr. Papendick, it's that we have a document here that
13        supposedly reflects all of your interactions where we know
14        of at least one interaction that isn't there.  I am trying
15        to find out if there are others.
16   A.   Wait.  You have two different sources of information.  You
17        have our response to the interrogatories that is missing
18        one 407 that you have the copy of that you got from your
19        second source of information, correct?
20   Q.   That isn't the point, Dr. Papendick.  How do you know
21        there are others that are missing?
22   A.   That can happen in any case.
23   Q.   You're right, it can, but it was your obligation in
24        answering interrogatories to provide a complete
25        response -- that's my copy -- to provide a complete --
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   I think this is yours, too.
 2   Q.   No, no, that's going to be -- that's the exhibit.
 3   A.   Oh, that's not an exhibit?
 4   Q.   No.
 5   A.   Oh, okay, sorry.  That's the one that we signed today?
 6   Q.   Yeah, but that's something that happened new.  It might
 7        even be after this was -- after this was done.  Oh, no,
 8        this wasn't.  This was recent, okay.  Now, you were asked
 9        to admit to placing plaintiff's Tylenol medication on
10        restricted access.  You denied that, right?
11   A.   I had nothing to do with that.
12   Q.   Okay.
13   A.   I don't do daily care.  That is a daily care issue.
14   Q.   I got you.  I got you.  I'm just asking, do you dispute
15        his Tylenol was placed on restricted status?
16   A.   I have no clue.  I saw somewhere a note from him saying it
17        was, but that doesn't mean it was.
18   Q.   I understand.  Number three was admit to denying
19        plaintiff's surgery request in July of 2015.  You denied
20        that, correct?  You denied that you denied it?
21   A.   There's a request in July 2015?
22   Q.   I believe there was.  I'm just saying, take a look at
23        request to admit number three.
24   A.   First of all, I don't deny, so I gave an alternative
25        treatment plan --
```

99

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.  I don't want to get --
 2   A.  So you can say that it's all words, but it isn't.
 3   Q.  I don't want to get into --
 4   A.  So I would've said noted that anyway even if there was an
 5       ATP given on July --
 6   Q.  Forget about the word deny.  The word deny -- we have two
 7       different denies here.  From a legal perspective, you
 8       denied that that happened because you wrote denied.  Do
 9       you see that?  Was that a word here that created --
10   A.  No, I denied that I denied.
11   Q.  I got you.  I agree.  I understand.  I'm just trying to
12       check, first of all --
13   A.  It had absolutely nothing to do with denial of patient
14       care.
15   Q.  I'm trying to understand.  If I change the word to
16       deferred, would you still deny that?
17   A.  I don't know.  I haven't seen --
18   Q.  If the sentence is --
19   A.  I haven't seen a 407 from July that says that.
20   Q.  That's what I'm trying to figure out and it says, admit to
21       deferring plaintiff's surgery request in July of 2015.
22   A.  I haven't seen one.  Do you have one?
23   Q.  I'm asking you, would you still deny that, based on
24       what --
25   A.  I would have to look on the record.
```

100

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   That's fine.  I get it.  I get it.
 2   A.   If you have a 407 that has that on there, my secretaries
 3        are very good.
 4   Q.   I understand that.
 5   A.   If I said ATP on that in July, it was my ATP.  We just
 6        have a real problem with denying and you --
 7   Q.   I understand.  Listen, I understand what you're saying.
 8   A.   It's a UM problem.
 9   Q.   That's why I asked if I put the word defer in there would
10        that change your answer and you're saying you would need
11        to look at the document?
12   A.   I'd have to see the document.
13   Q.   You don't know -- as you sit here right now, you don't
14        know that that would change your answer?
15   A.   Correct.
16   Q.   Okay.  That is fair enough.
17   A.   Because I don't know that there ever was a request.  I
18        didn't think there was.  I thought there was only the one
19        in February.
20   Q.   From the perspective of a patient who is in pain, is there
21        any fundamental difference between a denial and deferral
22        in terms of alleviating the pain?
23   A.   Absolutely.
24   Q.   What's the difference?
25   A.   A deferral is an ATP, an alternative treatment plan, which
```

101

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        allows for other treatment that may work and we've already
 2        been through this, right, about PT and injections and all
 3        that.
 4   Q.   But you never -- there never was an ATP for Mr. Spiller at
 5        this point.  You know, from this point on he'd already
 6        gone through all that and had been to see two surgeons,
 7        right?
 8            MS. VAN THOMME:  Object to foundation.
 9            MR. ALTMAN:  Strike that.
10   Q.   (By Mr. Altman)  Okay.  We looked at this note from
11        February the 3rd of 2016.
12   A.   Correct.
13   Q.   That's the one we looked at before that says was seen by
14        two orthopedists, EMG done, everything that we read.  The
15        only thing that kept him from getting his surgery at that
16        point was getting him to a secure place for it could be
17        done, right?
18   A.   No.
19   Q.   So you are still going to --
20   A.   The only thing that kept him from having a surgery was
21        getting him to a physician who worked at the secure unit
22        who would then decide to do the same procedure.
23   Q.   But there was no -- but there was no -- you were not
24        suggesting an ATP at that point, right?
25            MS. VAN THOMME:  Object to form.
```

                                                              102

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1          THE WITNESS:  Correct, it was approved, but with the
 2     statement that he would not be able to have a
 3     surgery -- the consult was approved on February 18.
 4  Q.  What I'm getting at is this was not deferred because you
 5     wanted to try something else, this was deferred because we
 6     needed to get him to a place with a physician who could do
 7     it at that place, right?
 8  A.  It wasn't deferred.
 9  Q.  It didn't happen, right?  So what was it?
10  A.  Was it not -- was it February the 18th?
11  Q.  We don't have the -- your comments.  I mean, I don't have
12     it.
13          MS. VAN THOMME:  I don't think I got it back.
14          MR. ALTMAN:  I think that's the only document he
15     looked at.
16          THE WITNESS:  Okay, so --
17          MS. VAN THOMME:  Let's just use the one I just pulled
18     out, because I was looking for it.
19          MR. ALTMAN:  No, you have it, okay.
20          THE WITNESS:  That's the blank one.
21          MS. VAN THOMME:  That's the request.  I didn't have a
22     response.
23  Q.  (By Mr. Altman)  Anyway, getting back to -- so what was
24     it -- I mean, there's --
25  A.  I don't have it in front of me.
```

103

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   No, no, no.
 2   A.   I thought it was an approval for orthopedics.
 3             MS. VAN THOMME:  You know what I think the confusion
 4        is?  According to my notes, there was not a response
 5        because that was canceled.  So I don't know what we looked
 6        at earlier, but it was not a response to that.
 7   Q.   (By Mr. Altman)  This is a February 18th, I just want to
 8        keep this together.  This is my document.
 9   A.   This is February 18th.  She said it was canceled.
10   Q.   Now, is this a February 18th?
11             MS. VAN THOMME:  Yeah.
12             THE WITNESS:  That's why there's not one with a
13        response, because this provider canceled it.
14             MS. VAN THOMME:  Yeah, I think I might have that
15        cancellation letter.
16             THE WITNESS:  Yeah, see that's the surgery.  She
17        canceled because I told her she wasn't going to be able to
18        do it up there.  She had to get it done in Lansing.  Well,
19        she couldn't have even got it done in Lansing.  She had to
20        have it done in Jackson.  It used to be they could have it
21        done at Duane Waters Health Center, but not anymore.
22   Q.   (By Mr. Altman)  Okay.  I'm still trying to get to the
23        point that a lot of times when you defer something, you
24        provide -- strike that.
25             What alternative was provided to Mr. Spiller at the
```

104

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1      time?
 2  A.  What date?
 3  Q.  Let's say at this point in time it was canceled because
 4      you didn't have a place to do it.  Was he given any
 5      alternative treatment plan?
 6          MS. VAN THOMME:  Object to foundation.
 7          THE WITNESS:  I didn't write it.  I didn't have that
 8      response, because she canceled it before I responded.  And
 9      the ultimate treatment plan would have find a surgeon at a
10      facility that had will use a --
11  Q.  (By Mr. Altman)  My point -- that's what I'm getting at.
12      There was no alternative treatment plan, do steroid -- do
13      steroid injections, try exercises.  He was past all that
14      at this point, right?
15  A.  I assume so.
16  Q.  That's really what I've ultimately been trying to get it
17      is that at this point, it was he needs to have surgery.
18      We need to find --
19  A.  According to the surgeons in Sault Ste. Marie.
20  Q.  And nobody disputed that at this point, right?
21  A.  There was no way to dispute it.
22  Q.  Interqual didn't dispute it, right?
23  A.  I have no clue what Interqual said.
24  Q.  UpToDate?  You would've checked UpToDate, right, to make
25      sure that this is --
```

105

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   That wouldn't have mattered whether I checked it or not.
 2        It wouldn't have been that specific.  See, there's no
 3        Interqual on here and the reason Interqual is not on here
 4        is because that's done in a program, billing program.
 5   Q.   How are you paid?
 6   A.   Salary.
 7   Q.   Do you get bonuses?
 8   A.   No. I haven't had a raise since 2014.
 9   Q.   Do --
10   A.   No, 2017.
11   Q.   Do you have performance reviews?
12   A.   No.  They start this coming fall.
13   Q.   Has anybody ever sat down with you, you talked about your
14        cost per thousand patients, has anybody ever sat down with
15        you and had discussions about your cost per thousand
16        patients being too high?
17   A.   No, it's not.  I'm not the highest.  I'm not the worst.
18   Q.   I'm not asking how much -- I'm just asking has anybody
19        ever had discussions with you?
20   A.   No.  About it being too high?  No.
21   Q.   Has your cost per thousand patients gone up or down since
22        you've been there?
23   A.   It originally went up and malpractice cases went down.
24        The number of malpractice cases filed went down and they
25        attributed the end -- the number of admissions were down
```

106

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        and the number of ER runs went down and they attributed
 2        that to the fact that things were being done as an
 3        outpatient, rather than an inpatient.
 4   Q.   That's my document.
 5   A.   Huh?
 6   Q.   That's my document.
 7   A.   Is it?  Okay.  It doesn't have holes, that's why I --
 8   Q.   No, no, I understand, I know.  Your copy of it is right
 9        there.
10   A.   Oh, okay.  Thank you.
11   Q.   Dr. Papendick, I'm going to hand you a document, which is
12        the answers that were provided by you in this case.  Have
13        you seen this document before?
14   A.   These are answers that were provided by me what?
15   Q.   To the complaint in this case, the legal complaint.
16   A.   Okay.
17   Q.   Have you ever seen this document before?
18   A.   Yeah.
19   Q.   Did you review this document when you saw it?
20   A.   Well, I typically walk through them, yes.  Do I remember
21        this specific document, no.
22   Q.   I didn't think it would.  I didn't expect --
23   A.   I have 10 cases right now.  I just had one summary
24        judgment off.  Because my name is on everything, I get
25        sued.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   Can I take a look -- have that back for a second?
 2   A.   Yeah, it's not mine.  It one of those you can have it, I
 3        don't want it.
 4   Q.   You would agree you make the decisions as to whether 407s
 5        are approved or not, correct?
 6            MS. VAN THOMME:  Object to form.
 7            THE WITNESS:  I may, yes.
 8   Q.   (By Mr. Altman)  Is there a process, does anybody else
 9        decide whether to approve a 407, assuming you are on duty
10        and not on vacation?
11   A.   There is somebody else will do my 407s when I am not
12        there.
13   Q.   But assuming you not away, you're the one that makes a
14        decision, correct?
15   A.   Today, I have some help.  In the past, I did not.  I don't
16        know whether this was any of those times.
17   Q.   Assuming that you are in your office, you're the one who
18        decides the 407s, correct?
19   A.   There are a number that are sent to another physician to
20        do today.  I mean, not just because I'm here.  Every day a
21        certain number are sent to a physician to do because the
22        hundred I'm doing takes me 10 hours a day.
23   Q.   And who is that other physician?
24   A.   Vivian Dorsey.
25   Q.   Okay.  Here in Michigan?
```

108

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   No, she lives in Miami Beach.  I am required to live in
 2        Michigan.  It's under contract that I am required to live
 3        in Michigan.
 4   Q.   You are an employee of Corizon, right?
 5            THE WITNESS:  Corizon Health, Inc.
 6            MS. VAN THOMME:  Object to form.
 7   Q.   (By Mr. Altman)  Do you have anybody working under you?
 8   A.   My direct supervision?
 9   Q.   Yeah.
10   A.   No.
11   Q.   So you said you have a secretary, under your supervision?
12   A.   In the department, under somebody else.
13   Q.   When you say under somebody else, what do you mean?
14   A.   They are on medical.  There is a nurse, but she is still
15        not under me, she is under the vice president of
16        utilization management.
17   Q.   And who is that?
18   A.   Mignon Ernst.
19   Q.   Is this person at corporate headquarters or --
20   A.   Supposedly.
21   Q.   Who do you report to?
22   A.   Right now, she's in Maryland.  Corporate is in Brentwood,
23        Tennessee.
24   Q.   Is that who you report to, though?  Is she your
25        supervisor?
```

109

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    A.    No.

 2    Q.    Who do you report to?

 3    A.    The CMO.

 4    Q.    And who is that?

 5    A.    Working on it.

 6    Q.    What?

 7    A.    Working on it.  Pete Powell.

 8    Q.    Is he in headquarters?

 9    A.    Brentwood.

10    Q.    Is there anybody in Michigan that you report to?

11    A.    Not direct.

12              MS. VAN THOMME:  Can we take a quick break?

13              MR. ALTMAN:  Of course.

14              VIDEO TECHNICIAN:  The time is 4:26.  We are now off

15         the record.

16              (Brief recess.)

17              VIDEO TECHNICIAN:  The time is 4:37.  We are now back

18         on the record.

19              MR. ALTMAN:  Dr. Papendick indicated that there is

20         something he wanted to correct during the break and before

21         he got into it, I wanted to make sure that you were here,

22         so --

23              MS. VAN THOMME:  Yeah.

24    Q.    (By Mr. Altman)  So go ahead and --

25              THE WITNESS:  You hadn't showed up.
```

110

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1              MS. VAN THOMME:  Well, yeah, that's writing to do,
 2       so --
 3              THE WITNESS:  Do you know how difficult that is?
 4          I do not work for Corizon Health.
 5   Q.   (By Mr. Altman)  Okay.  Who do you work for?
 6   A.   I work for Quality Correctional Care of Michigan, PC.
 7   Q.   Okay.
 8   A.   Who is contracted to supply physician care for Corizon
 9        Health in the state of Michigan.  Michigan will not allow
10        a physician to work for a corporation, that would be the
11        corporate practice of medicine, and you can only be a
12        member of a professional corporation.
13   Q.   Okay.  So --
14   A.   Okay.  We got that out of the way.
15   Q.   Corizon, though, has charged you with making utilization
16        decisions in the state of Michigan for its MDOC contract,
17        correct?
18   A.   That would be correct.  They are the ones who owned the
19        contract.
20   Q.   But you are the person, correct?
21   A.   I am listed in the contract, name, complete.
22   Q.   Right, and aside from some additional backup support or
23        when you're not there, you are the person who primarily
24        accomplishes that task to the tune of a hundred or so per
25        day?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   Correct.
 2   Q.   Now, you said that takes about 10 hours, right?  That's
 3        about 10 per hour, say on average that's five minutes
 4        apiece.  Do you find that's enough time to do your job or
 5        are you doing just what you need to do to do the job as
 6        best you can?  Do you understand my question?
 7   A.   I cannot refer to the medical records other than what is
 8        supplied to me and do that many, and I am not supposed to.
 9   Q.   Does it bother you at all that Mr. Spiller hasn't had a
10        shoulder surgery yet?
11            MS. VAN THOMME:  Object to form.
12   Q.   (By Mr. Altman)  As a doctor, does it bother you?
13   A.   No.
14   Q.   Why not?
15   A.   Because I told them what had to be done.
16   Q.   Told who, Mr. Spiller?
17   A.   No, the provider had to come down to Lansing or Jackson to
18        go to Allegiance Hospital, used to be called or is now
19        called Henry Ford Allegiance Hospital where there is a
20        secure unit.
21   Q.   But that is all wrapped up in procedure.  I am talking
22        about as between a doctor and a patient and I know that
23        you didn't direct --
24   A.   He's not my patient.
25   Q.   Hold on.  I know you didn't directly treat him.
```

112

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   Correct.
 2   Q.   But sitting here as a doctor, you would agree your goal is
 3        to see the patients get treated, right?  As a doctor --
 4   A.   Maybe.
 5   Q.   -- doesn't it bother you that he didn't get his treatment
 6        because nobody got him to the right facility?
 7             MS. VAN THOMME:  Object to form and foundation.
 8             THE WITNESS:  I'm afraid to tell you that we don't
 9        know the whole story.  Like I told you before, if he had
10        done something that got him put into the seg unit, that
11        would have held him up.  We don't have the big picture.
12        We only have what is given us.
13   Q.   (By Mr. Altman)  So people who are in seg units aren't
14        entitled to the same medical care, you're saying?
15             MS. VAN THOMME:  Object to form.
16             THE WITNESS:  Now, it might be delayed.
17   Q.   (By Mr. Altman)  Okay.  It's been at least three years.
18   A.   But he wasn't in a seg unit, so I'm talking about other
19        things that go on that we don't have anything to know now.
20   Q.   I'm talking about Mr. Spiller.  You're a doctor.  You're
21        saying it doesn't bother you that he hasn't been treated
22        for three years at least?
23             MS. VAN THOMME:  Object to form and foundation.
24             THE WITNESS:  Yeah.  You have to understand.  Five
25        minutes isn't enough to get a patient, a physician-patient
```

113

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        relationship.  And that physician-patient relationship is
 2        what is needed to feel bad about Mr. Spiller not having a
 3        procedure, which is -- the patient relationship is made by
 4        the people on site.
 5            If you shut that off, I'll tell you where I work.
 6   Q.   (By Mr. Altman)  The answer that you looked at before that
 7        you said you had seen, did you write any part of it?
 8            MS. VAN THOMME:  Object to foundation.
 9            THE WITNESS:  Write any part of?
10   Q.   (By Mr. Altman)  You didn't type any of this document into
11        a computer, did you?
12   A.   Oh, Lord, no.  I can type fast, but I can't type that
13        fast.
14   Q.   Did you provide any input into this document or was it
15        just given to you and asking you to review and sign.
16            MS. VAN THOMME:  Object to form and foundation.
17            THE WITNESS:  I put input.
18   Q.   (By Mr. Altman)  What input did you provide?
19   A.   Too long ago.  I get the -- I have 10 open cases right now
20        where I have been sued because my name is on the chart.
21        So I do the same thing with all of them.  I give my input,
22        I say yes or no and they send it back to me to sign.
23   Q.   In response to what plaintiffs put in their complaint,
24        paragraph number 19, it says, in May of 2010, plaintiff
25        injured his right shoulder while exercising in an MDOC
```

114

```
 1        facility.  That's what plaintiff wrote.  Do you see that?
 2   A.   Okay.
 3   Q.   Now, in response to that, your answer says, in response to
 4        paragraph 19, defendants neither admit nor deny the
 5        allegations therein because they lack sufficient knowledge
 6        and/or information sufficient to form a belief as to the
 7        truth of these allegations and thusly plaintiff to his
 8        proofs.  That's what you wrote.
 9   A.   I didn't even work for them at the time.
10             MS. VAN THOMME:  Object to form and foundation.
11   Q.   (By Mr. Altman)  What?
12   A.   I didn't even work for them at the time.  I wasn't even in
13        the MDOC at the time.  I was seeing patients in my office
14        in Kalamazoo, Michigan.
15   Q.   I understand that, but that would mean you had access in
16        preparing this response, you had access to his medical
17        records, correct?
18             MS. VAN THOMME:  Object to form and foundation.
19             THE WITNESS:  Okay.
20   Q.   (By Mr. Altman)  Did you have access to his -- do you have
21        access to his medical records?
22   A.   Yes.
23   Q.   Okay.  Did you --
24   A.   Did I look at the medical records --
25   Q.   That's not my question.  Do you have access to them?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   Yes.
 2   Q.   Did you have access to them at the time that this answer
 3        was prepared in your name?
 4             MS. VAN THOMME:  Object to foundation and form.
 5             THE WITNESS:  Do I have to answer it if you object to
 6        it?  Can I just -- can we just go on to the next question?
 7   Q.   (By Mr. Altman)  You have to answer.
 8   A.   I know.
 9             MS. VAN THOMME:  You have to answer to the extent you
10        know the answer.
11             THE WITNESS:  I know.
12   Q.   (By Mr. Altman)  Did you know at the time this answer was
13        prepared on September 18, 2018 --
14   A.   Yes, I had access to it.
15   Q.   And you had access to it at the time you prepared this
16        complaint, correct?
17   A.   Yes.
18             MS. VAN THOMME:  Object to form.
19   Q.   (By Mr. Altman)  Now, you would agree in sum and
20        substance, your answer to paragraph 19 means you can't
21        answer the question, right?  Is that a fair paraphrasing
22        of what's written there?
23             MS. VAN THOMME:  Object to foundation and form.
24             THE WITNESS:  Is that what?  I'm sorry.
25   Q.   (By Mr. Altman)  Is it a fair paraphrase that your
```

American Reporting, Inc.
248-559-6750

```
 1        response to paragraph 19, you can read it again, is it a
 2        fair paraphrase that you can't answer the question one way
 3        or the other, you can neither admit nor deny the
 4        paragraph?
 5             MS. VAN THOMME:  Object to foundation and form.
 6             THE WITNESS:  Okay.  I don't look at medical records.
 7        I look at 407s.
 8   Q.   (By Mr. Altman)  That's not my -- we're missing each other
 9        here.  I'm talking about in preparation to the answer to
10        this complaint.  That's what we are talking about here.
11        I'm trying to understand what you meant, because this is
12        you.  This answer came in in your name.
13   A.   I signed it.
14             MS. VAN THOMME:  Object to form.
15   Q.   (By Mr. Altman)  You actually -- I don't think you signed
16        this.  I think your counsel signed this, but you said you
17        reviewed it.  This answer was provided in your name.  I'm
18        asking how to interpret your response to paragraph 19.
19             MS. VAN THOMME:  Object to foundation.
20             THE WITNESS:  In order for me to know, to have
21        sufficient knowledge about this allegation that he hurt
22        himself in March of 2010, I would have to go through the
23        medical record, other than my 407 work.
24   Q.   (By Mr. Altman)  And without doing that --
25   A.   Which I don't do.
```

117

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   I'm not asking what you did then.  You didn't do it now,
 2        right?
 3              MS. VAN THOMME:  Object to form and foundation.
 4              THE WITNESS:  Okay.  You're not asking me what I did
 5        when I signed this?
 6              MS. VAN THOMME:  Object --
 7   Q.   (By Mr. Altman)  I'm asking you, let's just be precise.  I
 8        understand that in the routine course of business, you
 9        don't review the medical records.
10   A.   And I don't review the medical record for these.  I review
11        what I have done, which are 407s.  I'm getting sued for
12        malpractice -- or, no, for deliberate indifference for
13        what I did or did not do, so why would I go back and look
14        at March the 10th when my job is to look at what I'm given
15        and decide.
16   Q.   Okay.  Then why did you deny -- paragraph 20 says,
17        plaintiff immediately requested treatment for his shoulder
18        injury, but did not receive treatment until 2011.  Do you
19        notice that you didn't say that you cannot confirm or deny
20        that paragraph, you denied it?  Do you see that?
21              MS. VAN THOMME:  Object to foundation.
22              THE WITNESS:  I had no clue.  I have no clue what he
23        had done before I --
24   Q.   (By Mr. Altman)  Then why did you deny it?
25              MS. VAN THOMME:  Object to foundation.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  Why did you deny it if you had no clue?
 2              MS. VAN THOMME:  Object to foundation.
 3              THE WITNESS:  Because I had no clue.  How can
 4        I -- what else can I say if I don't know?
 5   Q.   (By Mr. Altman)  What you said in paragraph 19 says you
 6        could neither confirm nor deny.
 7              MS. VAN THOMME:  Object to foundation.
 8   Q.   (By Mr. Altman)  Do you --
 9   A.   In order for me to --
10   Q.   Wait.  Hold on.  Let me ask it.  Is it a reasonable
11        interpretation to your response to paragraph 19 you didn't
12        know the answer one way or the other?  Is that a
13        reasonable interpretation?
14   A.   Correct.
15              MS. VAN THOMME:  Object to foundation.
16   Q.   (By Mr. Altman)  Okay.  You could've put that for
17        paragraph 20, correct?
18   A.   But I didn't.
19              MS. VAN THOMME:  Object to foundation.
20   Q.   (By Mr. Altman)  So what is the -- why did you -- you
21        don't think there is a difference between saying I can't
22        confirm or deny and denying it?  You don't see the
23        difference --
24              MS. VAN THOMME:  Object to foundation.
25   Q.   (By Mr. Altman)  You don't see a difference between the
```

119

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
1        answer to paragraph 19 and the answer to paragraph 20?
2             MS. VAN THOMME:  Object to foundation.
3             THE WITNESS:  Not really.
4    Q.  (By Mr. Altman)  So they mean the same thing?
5             MS. VAN THOMME:  Object to foundation.
6             THE WITNESS:  Probably.
7    Q.  (By Mr. Altman)  So just to be clear, you're saying the
8        following two paragraphs mean the same thing.  In response
9        to paragraph 19, defendants neither admit nor deny the
10       allegations contained therein because they lack sufficient
11       knowledge and/or or information sufficient to form a
12       belief as to the truth of these allegations and thus
13       leaves plaintiffs to its proofs means the same thing
14       as --
15   A.  Okay.  This means the same as each of those.
16   Q.  They mean the same thing?
17   A.  Yes.
18            MS. VAN THOMME:  Object to foundation.
19            THE WITNESS:  In my understanding.
20   Q.  (By Mr. Altman)  Why didn't you use that same language in
21       each of those?
22            MS. VAN THOMME:  Object to foundation.
23            THE WITNESS:  It doesn't -- I don't know -- it
24       doesn't matter.  I didn't type this, did I.
25   Q.  (By Mr. Altman)  So you don't think it matters what these
```

120

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        words say?
 2             MS. VAN THOMME:  Object to foundation.
 3             THE WITNESS:  There's no way I could have known.
 4   Q.   (By Mr. Altman)  So why didn't you just say I don't know?
 5             MS. VAN THOMME:  Object to foundation.
 6             THE WITNESS:  I would never say that in a legal
 7        document.  I would have to find something else.
 8   Q.   (By Mr. Altman)  Well, you did in paragraph 19, you said I
 9        don't know.
10             MS. VAN THOMME:  Object to foundation and form.
11             THE WITNESS:  Well, not really, it says because I
12        have lack of sufficient knowledge.
13   Q.   (By Mr. Altman)  Is that not the same thing as I don't
14        know, Dr. Papendick?  Come on.
15   A.   Well --
16             MS. VAN THOMME:  Object to foundation.
17             THE WITNESS:  -- but I don't particularly care to
18        have it said that way.
19   Q.   (By Mr. Altman)  Okay.  Why didn't you say for paragraph
20        20 you lack sufficient knowledge?
21   A.   I don't know.  I've already told you that.
22   Q.   You don't know why you didn't say I don't know?
23             MS. VAN THOMME:  Object to foundation.
24             THE WITNESS:  Well, they mean the same to me.
25   Q.   (By Mr. Altman)  Why didn't you admit it, then?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1              MS. VAN THOMME:  Object to foundation.
 2              THE WITNESS:  Admit what?
 3    Q.   (By Mr. Altman)  Why did you say in response to paragraph
 4         20, defendants admit the allegations contained therein?
 5         Does that mean something different?
 6    A.   Because I didn't know.
 7              MS. VAN THOMME:  Object to foundation.
 8    Q.   (By Mr. Altman)  So when you don't know, you deny it.  Why
 9         is it more appropriate to deny something you don't know
10         than admit it?
11              MS. VAN THOMME:  Object to foundation.
12    Q.   (By Mr.Altman)  Strike that.  Let me ask a question.
13         You'd agree that the actual answer to paragraph 19, it
14         could be true or it could be false, right?
15              MS. VAN THOMME:  Object to foundation.
16              THE WITNESS:  Correct.
17    Q.   (By Mr. Altman)  Okay.
18    A.   The actual answer to paragraph 20 and 21 could be true or
19         false, he could have had not or he could have gotten help.
20    Q.   Then why didn't you say that instead of just denying it?
21              MS. VAN THOMME:  Object to foundation.
22    Q.   (By Mr. Altman)  So any time that it says denied in your
23         answer really should be taken to mean you don't know the
24         answer?
25    A.   No.
```

122

Case 2:19-cv-10685-LJM-KGA  ECF No. 62-5, PageID.1073  Filed 04/06/21  Page 124 of 161

```
 1              MS. VAN THOMME:  Object to foundation.
 2              THE WITNESS:  Did I say that?
 3   Q.  (By Mr. Altman)  You just said that --
 4   A.  In these two cases.
 5   Q.  Okay.  So let's take another time where you deny
 6        something.  Let's see.  Paragraph 32, let's just -- I'm
 7        going to read.  Well, let's just say paragraph 32, you
 8        denied the allegations, okay?  Is that really a denial or
 9        is that maybe a denial, could be true?
10              MS. VAN THOMME:  Object to foundation.
11              THE WITNESS:  What's the question?
12   Q.  (By Mr. Altman)  It says, expecting an imminent surgery,
13        plaintiff was informed on July 27, 2015, by Nurse Rogers,
14        that an orthopedic surgeon could not be found in the
15        Lansing area and that plaintiff's surgery needed to be
16        delayed.  Nurse Rogers further advised plaintiff that
17        Defendant Papendick ordered plaintiff's Tylenol medication
18        to be placed in restricted access to confirm that
19        plaintiff was regularly taking his medications.
20              MS. VAN THOMME:  Object to form.
21              THE WITNESS:  That is a denial.
22   Q.  (By Mr. Altman)  Now, let's break this apart.  There's
23        multiple things and there.
24   A.  But wait --
25   Q.  Wait.  Hold on.
```

123

```
 1   A.   There's only one thing that attributes to me and that's
 2        the Tylenol being and RML.
 3   Q.   Hold on.  We talked about the July 27th, 2015.  Is this a
 4        true statement:  Expecting an imminent surgery, plaintiff
 5        was informed on July 27th, 2015, by Nurse Rogers that an
 6        orthopedic surgeon could not be found in the Lansing area
 7        and that plaintiff's surgery needed to be delayed.  Is
 8        that a true statement?
 9             MS. VAN THOMME:  Object to foundation.
10             THE WITNESS:  I don't do daily care.  I have no clue
11        what she had done or had not done.  I do know that he
12        could have had it done at Allegiance, which is a half an
13        hour down the road -- excuse me, Henry Ford Allegiance
14        Hospital.
15             VIDEO TECHNICIAN:  Doctor, you've got your cane up
16        against the mic.
17             THE WITNESS:  Oh, I'm sorry.  I'll get rid of my
18        cane.
19   Q.   (By Mr. Altman)  Now, by the way, if the medical records
20        that you had access to show some of these facts that are
21        alleged in this complaint, then it would have been
22        unreasonable for you to say that you can't confirm or deny
23        it if the records show it, right?
24             MS. VAN THOMME:  Object to form and foundation.
25             THE WITNESS:  I have to go through this again?
```

124

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  You do.
 2   A.   I don't look at medical records that I have not produced
 3        when I evaluate a malpractice case.  Well, this isn't
 4        really a malpractice case.  This is a deliberate
 5        indifference case.
 6             MR. ALTMAN:  All right.  Let's take a break.
 7             VIDEO TECHNICIAN:  The time is 4:55.  We are now off
 8        the record.
 9             (Brief recess.)
10             VIDEO TECHNICIAN: The time is 7:59.  We are now back
11        on the record.
12             MR. ALTMAN:  Did you say 7:59?
13             MS. VAN THOMME:  Yeah, what?
14             VIDEO TECHNICIAN: 4:59.
15             MR. ALTMAN:  I have no more questions.
16             THE WITNESS:  Excuse me?
17             MR. ALTMAN:  I have no more questions.  Do you want
18        me to ask you more questions?  I'd be happy to.
19             THE WITNESS:  I can't believe you're not -- is this
20        yours?
21             MR. ALTMAN:  Yes.
22             MS. VAN THOMME:  Do you want to go next?
23             MS. ROBBINS:  You can go first.  That's fine.
24             MS. VAN THOMME:  All right.
25   ///
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1                   REDIRECT EXAMINATION
 2   BY MS. VAN THOMME:
 3   Q.   I just have a few clarifying questions.
 4          Do you direct patient care?  Do you tell providers
 5        what care to provide a patient?
 6   A.   No.  I will suggest, I will -- and if look through a large
 7        number of my 407s, you might see consider ATP medical
 8        necessity not demonstrated at this time, consider.
 9   Q.   Do you know what choices the provider has when they
10        receive an alternative treatment plan?
11   A.   Yes, there are three choices.  One is okay, two is I am
12        going to get him and resubmit with more information and
13        three is appeal.
14   Q.   And at one time did you engage in phone discussions
15        regarding patients with providers?
16   A.   Yes, that is going away.
17   Q.   When you did that, did the provider have a choice whether
18        or not to follow your suggestions?
19   A.   Yeah.
20   Q.   Are all 407s and 407 responses in the electronic medical
21        record?
22   A.   Yes.  Just give me a second.  Yes.
23   Q.   Earlier, you were asked about whether a provider's note in
24        the electronic medical record should reflect orthopedic
25        specialist's recommendations and if there are more than
```

126

```
 1      one opinion, whether or not those opinions are in
 2      agreement or not.  Would you expect that the provider
 3      would document what a specialist recommended close in time
 4      to receiving that recommendation or --
 5  A.  That would be optimal.
 6  Q.  Would you necessarily think that that provider would
 7      continue to fully document all the details of the
 8      different consults, say, one year or more later?
 9  A.  In every note?
10  Q.  Right.
11  A.  Oh, Lord, no.
12  Q.  If a provider cancels a 407 request, is that the same
13      thing as an alternative treatment plan?
14  A.  No.
15          MS. VAN THOMME:  That's all I have.  Thank you.
16          THE WITNESS:  Cancellation is I've decided I don't
17      want this.
18                   CROSS-EXAMINATION
19  BY MS. ROBBINS:
20  Q.  Dr. Papendick, I just have a few questions for you.
21          The medical providers at the facilities are the
22      people who create 407s, correct?
23  A.  Yes.
24  Q.  And then you review and approve the 407s; is that correct?
25  A.  Or defer.
```

127

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   Okay.  If a 407 is canceled by a medical provider prior to
 2        your review, would you ever see that 407?
 3   A.   No.
 4   Q.   Do you have any knowledge about 407 cancellations in
 5        regards to Mr. Spiller?
 6   A.   Only that one from 1-28 -- no, 2-18 of '15.
 7   Q.   And that's the one that was discussed earlier?
 8   A.   That's right.
 9   Q.   Dr. Papendick, have you ever canceled a 407?
10   A.   That would be inappropriate.
11   Q.   So is that a no?
12   A.   That's a no.  That's not my job.
13   Q.   Dr. Papendick, do you have any incentive to limit the
14        number of surgeries for MDOC prisoners?
15   A.   Excuse me a moment.  Can we go back to the last question?
16   Q.   Yes.
17   A.   When my nurse tells a patient -- or a provider to cancel
18        the 407 because it's inappropriate, it's not filled out
19        correctly, logistical stuff, and they don't do it, it
20        comes to me and I ATP that, but I don't -- it's not listed
21        as a cancellation.  It's listed as an ATP.
22   Q.   And that ATP is the alternative treatment plan?
23   A.   That would be correct.  That would be the deferral instead
24        of the approval.
25   Q.   And so if you are recommending an alternative treatment
```

128

```
 1        plan, that's included in your reviewer notes; is that
 2        correct?
 3   A.   That's correct.  I'm sorry.
 4   Q.   Sure.  Dr. Papendick, do you have any incentive to limit
 5        the number of surgeries for MDOC prisoners?
 6   A.   I wish.  No.
 7   Q.   Do you have any incentive to limit the number of MDOC
 8        prisoners that see medical specialists?
 9   A.   Oh, no.
10   Q.   Dr. Papendick, would you be in the position to know if
11        there are any issues with Corizon finding adequate number
12        of specialists to see and treat prisoners?
13   A.   There have been times that there have been questions from
14        providers like urology and that was driven by a provider
15        that decided not to see MDOC people.
16   Q.   Specifically in regard to Mr. Spiller, do you know of any
17        issues with Corizon's ability to find an orthopedic
18        specialist that would see him?
19   A.   You're not going like this.  If there was nobody in
20        Lansing, which there wouldn't be, because the orthopedists
21        in Lansing won't see our patients, there are people in
22        Jackson who do, though, at the Henry Ford Allegiance
23        Hospital and will see our patients.  There is an occasion
24        that they will not, and if those -- those things have all
25        been done and been checked, found out, there have been
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        times that those patients have gone to local hospitals and
 2        had their surgeries done and had overnight stays,
 3        especially when they are sent to University of Michigan,
 4        which is what typically happens if we don't have a
 5        provider in Jackson.  It's not a contractual issue with
 6        those providers, it is a I don't want to do a shoulder or
 7        find somebody who's a shoulder specialist.  In this case,
 8        that's what they would've done.
 9   Q.   Dr. Papendick, do you have the ability to put a prisoner's
10        medication on restricted access?
11   A.   No.  I have the ability to recommend and have, but no, I
12        do not have that ability.
13   Q.   Thank you, sir.  I have nothing further for you.
14                        RECROSS-EXAMINATION
15   BY MR. ALTMAN:
16   Q.   I just want to clear up, because I'm confused now.  You
17        said that the nurse canceled the 407 because you told her
18        there was nobody to do the surgery up there, right?
19   A.   She said that.
20   Q.   She said there is nobody to do the surgery?
21   A.   That's what you showed me in the note.
22   Q.   I thought you said that there was nobody?
23   A.   I told her it had to go to McLaren Lansing.
24   Q.   Right.
25   A.   Or to Allegiance, Henry Ford Allegiance.  She sent it to
```

130

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        McLaren Traverse City because McLaren is McLaren.  Well,
 2        the physicians who are McLaren physicians in Traverse City
 3        can't go to Lansing, either.  They are different
 4        hospitals.
 5   Q.   That's not what we are talking about.  We are talking
 6        about the 407 that was canceled by the nurse, the one from
 7        February 18th.
 8   A.   Right.
 9   Q.   She did that after having a conversation with you about
10        the 407, correct?
11   A.   That could very well be, but she said it, I didn't.
12   Q.   But you told her there was nobody to do it where he was,
13        right?
14   A.   No.  Okay.  I told her she couldn't do it where she was
15        because the surgeon couldn't go to McLaren, so you can't
16        use Ganzhorn, because he doesn't go to McLaren Lansing.
17        She can't use Sault Ste. Marie, where this is the only
18        place he did surgery because they don't have a secure
19        unit.
20   Q.   So she canceled it after you had a discussion with her
21        that couldn't be approved as it stood, right?  She didn't
22        cancel it because she didn't think he needed the surgery,
23        she canceled it --
24   A.   No, she canceled it because I told her she couldn't have
25        it up there.
```

131

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   Right, so you had a discussion with her before it was
 2        canceled, right?
 3   A.   Oh, I would assume.  I mean, that is assumption.
 4   Q.   So she didn't spontaneously cancel this 407 on her own?
 5   A.   No, but I don't know called her, because if I see it, I do
 6        it.
 7   Q.   What do you mean if you see it, you do it?
 8   A.   Okay.  If I see it, right, I review it and put my
 9        response.  So if she canceled it, she canceled it before I
10        saw that report or that request.
11   Q.   You just said you spoke to her before she canceled it.
12             MS. VAN THOMME:  Form.
13             THE WITNESS:  That doesn't mean I've seen it.  That
14        means she's seen it and called me and asked.
15   Q.   (By Mr. Altman)  So you discussed it before you got the
16        407?
17   A.   If she says.  I'm assuming so, but she had an option.
18   Q.   What was the option?
19   A.   Let it go and it would be an ATP.
20   Q.   What do you mean let it go and it would be ATP?
21   A.   Let it come through to me and I would ATP it and say okay
22        for an orthopedic consult, but you can't have surgery
23        overnight.
24   Q.   But he then would not have gotten his treatment, right?
25   A.   He would not have gotten the surgery.  He may have gotten
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1      treatment, but not the surgery.
 2   Q.  But the surgery was necessary at that point, wasn't it?
 3          MS. VAN THOMME:  Object to form.
 4          THE WITNESS:  We already went through that.  I'm not
 5      convinced.
 6   Q.  (By Mr. Altman)  You've got two orthopedists who said he
 7      needed to surgery.  You are questioning two orthopedists
 8      now?
 9   A.  Did you look at the report that I asked you to look at and
10      said look at his neck?  His neck has nothing to do with
11      the shoulder.
12   Q.  So you're challenging, just so we are clear now, the
13      records here say two orthopedists saw him, said he needed
14      the surgery and you're saying they must be wrong?
15   A.  No, I didn't say they were wrong.
16          MS. VAN THOMME:  Object to form.
17          THE WITNESS:  I said there had to be other workup.  I
18      said that earlier to you.
19   Q.  (By Mr. Altman)  I see.
20   A   I said we need to look and find out why he's got problems
21      with his neck and his shoulder because his shoulder may be
22      from his neck.
23   Q.  Don't you think an orthopedist would have looked at that?
24          MS. VAN THOMME:  Object to foundation.
25          THE WITNESS:  If they had it.
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   Q.   (By Mr. Altman)  Sorry?
 2   A.   If they had that information.
 3   Q.   If it was bothering him, you don't think he would have
 4        told the orthopedist that his neck was bothering him, too?
 5   A.   That happens all the time.
 6   Q.   Does it make sense that he would've been complaining about
 7        his shoulder and not said anything about his neck when he
 8        went to see the orthopedist?
 9             MS. VAN THOMME:  Object to form.
10             THE WITNESS:  What makes sense to you and I does not
11        make sense to her.  Everybody has their own sense.  You
12        know that and I know that.
13   Q.   (By Mr. Altman)  I see.  You said that things have changed
14        now, but the healthcare provider had a choice of whether
15        to comply with your suggestions?  That is what you said a
16        few minutes ago?
17   A.   That's the way it's always been.
18   Q.   Well, if you said he can't have the surgery, how does the
19        physician get him to surgery if you said -- she doesn't
20        have a choice to comply.
21             MS. VAN THOMME:  Object to form.
22             THE WITNESS:  She sends him downstate.  She can
23        appeal it.
24   Q.   (By Mr. Altman)  What do you mean by send him downstate?
25   A.   To Lansing McLaren or Jackson Allegiance Hospital.  If she
```

134

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        had sent him down there and had a physician and went to
 2        one of the two secure units, see the patient and he could
 3        have the surgery and they decided he needed the surgery
 4        and he -- they got him into the secure unit to have the
 5        surgery done, it would've been done.
 6   Q.   By the way, what would happen if one specialist said he
 7        needed the surgery and the other one said he didn't?
 8             MS. VAN THOMME:  Object to foundation and form.
 9             THE WITNESS:  Okay.  That is clearly medical,
10        correct?
11   Q.   (By Mr. Altman)  Yeah, from a medical perspective.
12   A.   Okay.
13   Q.   How would that issue be resolved?
14   A.   If Ganzhorn said he needed surgery and Ganzhorn can't do
15        the surgery --
16   Q.   Forget about whether they can or they can't.
17   A.   Oh, no, that's the whole part of it.
18   Q.   So Ganzhorn says --
19   A.   And he goes to a physician who can do the surgery and they
20        don't need the surgery according to the second physician,
21        it wouldn't have gotten done.  It wouldn't even have been
22        asked for, right?
23   Q.   That's not what -- let's say two physicians -- if Ganzhorn
24        said he could do -- he wanted to do the surgery and could
25        do it in a secure facility, there never would've been a
```

135

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1      second opinion?
 2   A.  It would have been done.
 3   Q.  So there never would've been a second opinion?
 4   A.  No, there was no second opinion.  It ended up being a
 5       second opinion because she sent him to McLaren in Traverse
 6       City instead of McLaren in Lansing where there is a secure
 7       unit.
 8   Q.  I understand that.  So the second, in this case, if the
 9       second orthopedist had said he doesn't need the surgery,
10       that one would have overridden the first one?
11          MS. VAN THOMME:  Object to foundation and form.
12          THE WITNESS:  You mean the one in Traverse City?
13   Q.  (By Mr. Altman)  Yes.
14   A.  No, that would've been between him and Ganzhorn.  They
15       would have had to discuss that.
16   Q.  What if they couldn't resolve it?  Who resolves it then?
17   A.  The provider at the site.  I don't do it.
18   Q.  So if the provider at the site, if they had disagreed and
19       the provider at the site said I believe Ganzhorn who says
20       he needs it, he would have had it?
21          MS. VAN THOMME:  Object to form and foundation.
22          THE WITNESS:  After we evaluated his neck.
23   Q.  (By Mr. Altman)  Did you ever make sure that his neck got
24       evaluated?
25   A.  Pardon me?
```

136

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1    Q.   Did you ever make sure that his neck got evaluated?
 2              MS. VAN THOMME:  Object to form.
 3    Q.   (By Mr. Altman)  Strike that.
 4    A.   That's not where I am.  That's not my job.
 5    Q.   So in other words, you take a look at the 407, you make a
 6         decision and then you have nothing further to do with that
 7         patient unless another 407 comes across your desk, right?
 8    A.   Correct.  That's absolutely correct.  That's why.
 9    Q.   And if the medical provider is too busy to appeal your
10         denial -- deferral, excuse me, then too bad for the
11         patient, right?
12    A.   Nothing I can do about that.  If I've done my medicine and
13         said -- sorry -- and said that the patient needs to go a
14         different direction and they disagree with that, they have
15         to take and do whatever it is that they disagree to.
16    Q.   How many times per year are you appealed, your decisions
17         appealed?
18              MS. VAN THOMME:  Object to foundation.
19              THE WITNESS:  I have no clue.  I'm the lowest in the
20         company.
21    Q.   (By Mr. Altman)  Is it more than once --
22    A.   Oh, sure.
23    Q.   -- a year?  More than 10 times a year?
24    A.   I don't have a clue.
25    Q.   Is it more than a thousand times a year?
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   Is it what?
 2   Q.   More than a thousand times a year?
 3   A.   I don't believe so.
 4   Q.   Is it more than 100 times a year?
 5   A.   I just told you, I don't know the number.
 6   Q.   Is it more than 500 times a year?
 7   A.   I don't believe so.
 8   Q.   Is it more than 400 times a year?
 9   A.   I don't know.
10   Q.   So somewhere between one and 500; is that a fair
11        statement?
12   A.   I don't know.
13   Q.   You said you didn't think it was more than 500, right?
14   A.   Well, that would be one a day, and I don't get one a day.
15   Q.   More like two a day, but -- do you get one a day?
16   A.   One and a half a day.  No.
17   Q.   How many times are you -- tell me how an appeal takes
18        place.  You actually talk to somebody or does somebody
19        just completely independently review the information?
20   A.   Before, it was they called me.  I listen to what they had
21        to say and if they didn't like my decision after that,
22        then they went to the regional medical director.
23   Q.   Okay.
24   A.   After they went to the -- if the regional medical director
25        came up with the same thing I did, then they would go to
```

138

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1         the State medical director.  If the State medical director
 2         said, no, you better do what Papendick says, then it goes
 3         to MSAC, Michigan --
 4    Q.   I know the panel you are talking about.  That's MDOC and
 5         Corizon?
 6    A.   Correct, and then they sit and talk about it, Borgerding
 7         or whoever is the CMO decides final word on --
 8    Q.   How often was your decisions reversed on an appeal?  Use
 9         whatever metric was convenient.  I mean, I'm --
10    A.   Probably a third.  That was the old way.  The new way goes
11         to two physicians who are the utilization management
12         medical directors in the same position I'm in and they
13         evaluate.  It goes to a regional medical director who adds
14         a note to the billing system that says that this is why I
15         think you should or shouldn't -- or you should do this,
16         and then two physicians who are UMMD, same position I'm
17         in, and other states review it.  I don't even know it's
18         happening.
19    Q.   So it's kind of like a peer review process?
20    A.   Yeah, but I don't know it's happening.
21    Q.   Sure, so you are involved in that process for reviewing
22         other people's stuff?
23    A.   Correct.
24    Q.   So it's just two other --
25    A.   Correct.  Two out of four or two out of five, five now,
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

```
 1        and so --
 2   Q.   Two out of the five?
 3   A.   There are five UMMDs.
 4   Q.   For the whole country?
 5   A.   Yeah.
 6   Q.   How many states does -- I mean, you handle just Michigan,
 7        right, unless you are covering for somebody?
 8   A.   Yeah.  Kansas, Missouri, Idaho, Wyoming, Arizona.  I'm
 9        sure there six, oh, Michigan.  Six states.
10   Q.   Now, are there other states were Corizon has contracts
11        with prisons that don't have utilization managers?
12   A.   One.
13   Q.   Which one is that?
14   A.   Kansas, and that's, I think is going to change.  They
15        started requesting to see how the system works.
16             MR. ALTMAN:  Nothing further.
17             MS. VAN THOMME:  Nothing from me.
18             MS. ROBBINS:  Nothing for me.
19             VIDEO TECHNICIAN:  The time is 5:20.  That will
20        conclude the deposition.
21             (Whereupon the deposition was concluded at about
22             5:20 p.m.)
23
24
25
```

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

CERTIFICATE OF NOTARY – COURT RECORDER

STATE OF MICHIGAN)
                 )
COUNTY OF OAKLAND)

I, James A. Hengstebeck, a Notary Public in and for the above county and state, do hereby certify that the deposition of KEITH PAPENDICK, M.D. was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me; that it was later reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

I further certify that I am neither of counsel to either party nor interested in the event of this case.

_____

James A. Hengstebeck, CER 4623,
Notary Public, Oakland County,
Michigan
My Commission Expires:  10-30-2022

141

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

Page 1

| A | | | | |
|---|---|---|---|---|
| **A** | **administrative** | **alleviating** 101:22 | 95:8,10,16,18 | 91:21 |
| **a/k/a** 1:11 | 52:23 53:3,12,17 | **allow** 75:9 111:9 | 97:7,14 102:9,10 | **answering** 6:1 |
| **A1C** 63:22,25 64:4 | **admissions** 106:25 | **allowed** 18:23 | 103:14,19,23 | 90:25 98:24 |
| 64:19 65:3 | **admit** 99:9,18,23 | **allows** 102:1 | 104:7,22 105:11 | **answers** 40:12 90:9 |
| **ability** 68:14 71:12 | 100:20 115:4 | **alongside** 30:1 | 108:8 109:7 | 90:20 91:6,17,19 |
| 129:17 130:9,11 | 117:3 120:9 | **altered** 23:19,20,23 | 110:13,19,24 | 91:24 93:3,6,17 |
| 130:12 | 121:25 122:2,4,10 | 23:25 | 111:5 112:12 | 107:12,14 141:11 |
| **able** 21:21 23:6,7,9 | **admitted** 69:16 | **alternative** 7:20 | 113:13,17 114:6 | **anti-inflammatory** |
| 43:15 74:24 79:14 | **advance** 91:25 | 10:13 12:5 16:22 | 114:10,18 115:11 | 47:13 |
| 86:24 103:2 | **advised** 123:16 | 16:25 17:1 18:4 | 115:20 116:7,12 | **anybody** 35:7 |
| 104:17 | **afraid** 113:8 | 32:18 43:5 45:7 | 116:19,25 117:8 | 90:17,19 106:13 |
| **above-entitled** 1:22 | **afternoon** 5:6 | 45:17,24 62:1 | 117:15,24 118:7 | 106:14,18 108:8 |
| **absence** 35:10 | **ago** 5:17 29:25 30:5 | 65:17 99:24 | 118:24 119:1,5,8 | 109:7 110:10 |
| **absent** 52:11 | 30:9 32:14 36:10 | 101:25 104:25 | 119:16,20,25 | **anymore** 104:21 |
| **absolutely** 35:8 | 36:18,20 114:19 | 105:5,12 126:10 | 120:4,7,20,25 | **anyway** 100:4 |
| 40:14 62:9 64:2 | 134:16 | 127:13 128:22,25 | 121:4,8,13,19,25 | 103:23 |
| 69:21 77:18 | **agree** 14:7 30:7 | **Altman** 2:1 3:4,7 | 122:3,8,17,22 | **apart** 123:22 |
| 100:13 101:23 | 31:2,19 35:4,9 | 4:12,12,20 5:5 | 123:3,12,22 | **apiece** 112:4 |
| 137:8 | 39:8 41:19 43:4 | 6:17 7:1 8:1,17 | 124:19 125:1,6,12 | **appeal** 37:23 39:7 |
| **absurd** 44:12 | 56:20 65:16 68:2 | 9:5,22 10:7,21,25 | 125:15,17,21 | 126:13 134:23 |
| **acceptable** 16:13 | 70:6 73:10 75:25 | 11:4,12,16 12:12 | 130:15 132:15 | 137:9 138:17 |
| **access** 84:17 99:10 | 79:3,17 83:17,17 | 12:24 13:6,11 | 133:6,19 134:1,13 | 139:8 |
| 115:15,16,20,21 | 100:11 108:4 | 14:17 15:14 16:23 | 134:24 135:11 | **appealed** 36:1 |
| 115:25 116:2,14 | 113:2 116:19 | 17:17,22 18:10,15 | 136:13,23 137:3 | 137:16,17 |
| 116:15 123:18 | 122:13 | 18:21 19:7,10,22 | 137:21 140:16 | **appeals** 37:15,23 |
| 124:20 130:10 | **Agreed** 62:16 | 20:12,15 21:9,14 | **amend** 25:16,22 | 37:25 |
| **accomplishes** | **agreement** 80:5,7 | 21:22 22:3,23 | 26:2,3,4 | **appear** 23:3,11,15 |
| 111:24 | 127:2 | 23:9,11 24:4,11 | **amended** 26:5 | 76:9 96:3 |
| **accurate** 92:18 | **ahead** 33:16 51:7 | 24:16,21,23 25:5 | **amount** 42:20 | **APPEARANCES** |
| 93:3 | 87:23 110:24 | 25:15 26:12,19,23 | **and/or** 42:9 115:6 | 2:1 |
| **achieve** 41:1 | **aids** 31:22 | 27:1,10,16 37:18 | 120:11 | **Appearing** 2:6,13 |
| **achieved** 41:6 | **algorithm** 40:25 | 43:10 46:10,15 | **answer** 8:19 9:4 | 2:21 |
| **achieves** 40:10 | 57:23 | 48:16,24 49:14 | 14:4,16,22 15:13 | **appears** 25:25 67:3 |
| **ACMO** 47:22,23 | **all-inclusive** 79:12 | 52:15 54:17 55:21 | 15:19,20 18:22,25 | 78:4 79:17 |
| **act** 58:5 | **allegation** 117:21 | 58:17 61:5 65:21 | 20:15 21:12 25:22 | **appendectomy** |
| **acting** 31:11 | **allegations** 115:5,7 | 67:20 68:2,8,12 | 26:3,5,17,18,19 | 83:20,21,23 |
| **action** 59:8 84:3 | 120:10,12 122:4 | 69:1 72:24 73:18 | 40:8 60:11 63:1 | **appendicitis** 83:20 |
| **actions** 93:24 | 123:8 | 74:14 76:10,13 | 85:1 90:3 101:10 | **appointment** 35:1 |
| **actual** 8:7 122:13 | **alleged** 124:21 | 77:1,6 78:6,22 | 101:14 114:6 | **appropriate** 16:17 |
| 122:18 | **Allegiance** 9:11,11 | 80:4,20 81:1 | 115:3 116:2,5,7,9 | 17:3,5,9 24:5 |
| **additional** 111:22 | 10:1,1 11:8,9,9 | 82:13,22 83:1 | 116:10,12,20,21 | 32:18 33:8,9 |
| **adds** 139:13 | 50:8,8 52:19,19 | 84:14 85:3 86:1 | 117:2,9,12,17 | 34:20 47:9 48:17 |
| **adequate** 7:9 | 112:18,19 124:12 | 86:19 88:25 92:9 | 119:12 120:1,1 | 54:13,19,22,22 |
| 129:11 | 124:13 129:22 | 92:13,15 94:6,9 | 122:13,18,23,24 | 55:16,19 57:4 |
| **adjustments** 31:1 | 130:25,25 134:25 | 94:14,18,22 95:2 | **answered** 60:10 | 58:10 59:6,18,22 |

Keith Papendick, M.D.      Eddie Spiller v. Jeffrey Stieve

Page 2

60:13,16 71:5
74:8 84:3 85:14
122:9
**approval** 17:16
39:7 47:19 72:17
72:20,21 73:4
104:2 128:24
**approve** 9:1 17:14
17:15 19:1,25
20:4,22 33:11
35:19 48:2 69:2
77:9 108:9 127:24
**approved** 6:23 7:7
7:19 8:13 10:12
11:24 12:1,4
15:22,25 16:5,14
16:16 22:16 25:8
25:9,10 26:8
33:23,24 51:21
68:22 69:14 71:8
71:10 76:15 77:3
93:19 103:1,3
108:5 131:21
**approving** 6:20
47:21 57:19 76:18
**area** 123:15 124:6
**Arizona** 140:8
**arm** 68:3,9,14,17
70:1,2,4 71:20,22
73:14,19,21,23,25
74:3,10 76:15,23
87:24,25 88:13,16
89:6,8,9
**arthroscopy** 79:20
80:14,19 81:11
85:2,8,15,25
**articles** 30:16,20
**articulately** 88:21
**aside** 47:7 71:9
111:22
**aska** 17:15
**asked** 24:12 25:12
25:18,20,22,23,23
26:2 27:2 29:16
39:15,17 42:1

48:16 49:8 50:2
54:15 58:23 72:1
87:20 89:18 90:9
92:11,17 99:8
101:9 126:23
132:14 133:9
135:22 141:11
**asking** 5:25 8:1
9:22 15:12,14,14
15:18 24:2 26:9
54:18 57:8 60:2,9
62:18 63:15 67:8
71:11 81:12 83:12
83:14 92:7,9,10
99:14 100:23
106:18,18 114:15
117:18 118:1,4,7
**assessed** 42:14,16
**assessment** 35:22
**Assistant** 2:17 4:13
**assume** 6:8 17:24
71:4 105:15 132:3
**assuming** 56:25
69:11 75:13,15
108:9,13,17
132:17
**assumption** 132:3
**assumptions** 88:24
**ATP** 16:24 36:1,15
39:14,16 100:5
101:5,5,25 102:4
102:24 126:7
128:20,21,22
132:19,20,21
**attorney** 2:17,18
4:13 90:14
**attorney-client**
92:5
**attributed** 106:25
107:1
**attributes** 124:1
**available** 16:10
**average** 34:16 45:1
63:10,14,15 64:9
64:11 65:2,5 66:4

66:5,7,10,10,11
66:12,14 67:3,4
112:3
**aware** 7:2 8:9

---

**B**

**B** 84:6
**babies** 28:20,20
29:1
**back** 7:1 12:18 24:7
27:14 35:16 39:18
40:16 41:9,11,13
67:24 83:1 89:16
93:8 94:12,13
95:9,12,13 103:13
103:23 108:1
110:17 114:22
118:13 125:10
128:15
**backup** 111:22
**bad** 39:1 42:4
61:16,18 114:2
137:10
**bank** 43:23
**barely** 70:21
**based** 14:1 30:9
35:22 78:13 93:25
100:23
**bases** 14:20 15:15
15:16 16:16
**basically** 38:21
60:22 91:21
**basis** 69:18 79:6
92:4
**Beach** 109:1
**beg** 16:3 73:9 78:8
96:10
**behalf** 2:6,13,21
4:12,14,16,22
**belief** 115:6 120:12
141:14
**beliefs** 31:3
**believe** 7:25 8:16
9:12 13:15 99:22
125:19 136:19

138:3,7
**believes** 30:25
**bend** 71:14
**benefit** 43:13,14,14
63:12
**best** 8:24 40:7 41:3
43:1 72:2,6 112:6
141:14
**better** 5:11 33:10
39:18 40:3 42:2,5
43:4,18,23 61:21
62:22 63:12 64:18
66:4,14 139:2
**big** 113:11
**billing** 106:4
139:14
**bit** 91:17
**blank** 103:20
**bleed** 77:20
**board** 28:6,8,10,12
29:11,22 30:7
**boat** 59:7
**BOMBER** 1:13
**bones** 70:17
**bonuses** 106:7
**book** 88:12
**Borgerding** 1:10
2:22 4:14 48:1
139:6
**bother** 61:8 112:9
112:12 113:5,21
**bothering** 134:3,4
**bottom** 40:25 45:17
**Box** 2:19
**break** 5:21,21 27:9
43:23 67:20
110:12,20 123:22
125:6
**Brentwood** 109:22
110:9
**Brief** 27:13 67:23
110:16 125:9
**bring** 63:19,20
**bringing** 37:20
**broken** 61:11

**brought** 57:16
**bus** 47:25
**business** 118:8
**busy** 137:9

---

**C**

**C** 45:5,8 46:1,4,7
47:4,4
**call** 38:18 56:17
**called** 7:13 38:16
38:17 85:18 90:10
112:18,19 132:5
132:14 138:20
**cancel** 128:17
131:22 132:4
**canceled** 104:5,9,13
104:17 105:3,8
128:1,9 130:17
131:6,20,23,24
132:2,9,9,11
**cancellation** 104:15
127:16 128:21
**cancellations** 128:4
**cancels** 127:12
**cancer** 46:25 47:2,2
**candidate** 41:14
**cane** 124:15,18
**cardiac** 43:17
**care** 6:19 10:6
28:20,21 38:15,20
40:17 47:17 57:16
63:17 99:13,13
100:14 111:6,8
113:14 121:17
124:10 126:4,5
**cared** 87:21
**Carly** 2:9 4:16 24:4
27:5
**Carmody** 1:9
**case** 1:4 4:6,8 15:7
15:17 19:24 45:2
48:8 49:25 50:2
60:4,5 62:13
81:12 90:10 98:22
107:12,15 125:3,4

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

125:5 130:7 136:8 141:18
**cases** 37:9 106:23 106:24 107:23 114:19 123:4
**CAT** 41:23 42:1
**cause** 1:22 65:18
**caused** 59:8,9 66:1 66:13,17 67:6
**causes** 77:20
**causing** 77:12,14
**Center** 38:17,18 104:21
**CER** 1:23 141:20
**certain** 31:3,3 40:8 44:7,21 51:16 69:17 75:11 108:21
**certainly** 25:17 44:15,21 50:21,22
**CERTIFICATE** 141:1
**certified** 1:23 28:6 28:8,10,12 29:11 29:23 30:8
**certify** 141:6,16
**cetera** 49:17
**challenging** 133:12
**change** 36:22,25 37:6,7,8 100:15 101:10,14 140:14
**changed** 134:13
**changes** 64:18,24 65:1
**Chapman** 2:10
**charged** 111:15
**chart** 59:2 60:25 84:17 87:16,16 114:20
**check** 93:2,20 94:13 100:12
**checked** 93:22 105:24 106:1 129:25
**chest** 43:17,17

**children** 28:22
**choice** 126:17 134:14,20
**choices** 126:9,11
**chondroplasty** 85:19
**chronological** 96:3
**chronologically** 94:17
**circumstance** 36:13
**circumstances** 17:10
**City** 55:7 56:10 85:13,14 131:1,2 136:6,12
**CK** 64:7
**clarify** 11:15
**clarifying** 126:3
**class** 45:13 46:20 46:20,21,21
**clavicle** 86:7
**clean** 6:2
**clear** 20:17 37:23 45:7 49:20 89:10 120:7 130:16 133:12
**clearly** 21:6 135:9
**client** 92:8
**clinic** 39:23
**close** 54:8 127:3
**clue** 10:5 22:12 34:4 47:17 59:13 75:18 86:4 99:16 105:23 118:22,22 119:1,3 124:10 137:19,24
**CMO** 110:3 139:7
**Coleman** 48:9
**colleagues** 32:11
**come** 9:9,24 12:18 18:4 39:1 76:16 112:17 121:14 132:21
**comes** 35:1 128:20 137:7

**coming** 106:12
**comment** 51:18 94:1,25
**comments** 24:24 25:6 95:19 103:11
**Commission** 141:22
**common** 32:4
**communication** 92:12
**communications** 92:8,9
**community** 43:19 43:21 44:10
**company** 38:3 137:20
**comparable** 46:5 46:11
**comparator** 66:24
**compete** 84:2
**complaining** 134:6
**complaint** 107:15 107:15 114:23 116:16 117:10 124:21
**complete** 26:18 76:9 98:24,25 111:21
**completed** 21:8 33:24
**completely** 25:25 138:19
**comply** 134:15,20
**computer** 65:9,10 84:18 92:19,25 114:11
**computers** 62:15
**conclude** 140:20
**concluded** 140:21
**condition** 14:9 22:4 31:4 36:25 39:10 54:2 72:3 83:2
**conditions** 18:3
**confirm** 118:19 119:6,22 123:18

124:22
**confirmed** 59:17
**confused** 130:16
**confusion** 104:3
**conjunction** 90:10
**conservative** 65:25
**consider** 28:14 126:7,8
**considered** 69:15
**consult** 12:10,12 62:3,8 73:3 80:13 85:7 103:3 132:22
**consulted** 51:1
**consults** 79:18 80:15 81:9,13 82:3,6,17 127:8
**contained** 120:10 122:4
**context** 70:1
**continue** 127:7
**continued** 38:4
**contract** 32:10 109:2 111:16,19 111:21
**contracted** 38:8 111:8
**contracts** 140:10
**contractual** 130:5
**contradict** 25:25
**contradicting** 18:17
**contradictory** 25:11
**contradicts** 25:15
**convenient** 139:9
**conversation** 131:9
**converse** 41:5
**convinced** 133:5
**copy** 24:9 92:24 98:18,25 107:8
**Corizon** 1:11,12 2:13 4:17 27:19 32:6 38:8 42:9 46:3 48:5 90:20 109:4,5 111:4,8

111:15 129:11 139:5 140:10
**Corizon's** 129:17
**corporate** 109:19 109:22 111:11
**corporation** 111:10 111:12
**correct** 6:20,21 8:11 9:14 13:8,11 13:17 14:5,6,9 25:1,9 30:4,5,6 31:16 32:24 35:24 36:7,23 37:8 41:2 41:3,4,20 44:20 45:20 48:4,25 53:14 56:14 57:11 57:21 58:9 63:24 64:13 65:7 66:18 68:23 69:18 70:19 71:6,12,15,17,18 71:20 72:10,18 73:20 76:16 78:25 79:1,7,21,23 83:3 83:4,6,7,11 90:7 91:19 95:20,21 97:17,20 98:19 99:20 101:15 102:12 103:1 108:5,14,18 110:20 111:17,18 111:20 112:1 113:1 115:17 116:16 119:14,17 122:16 127:22,24 128:23 129:2,3 131:10 135:10 137:8,8 139:6,23 139:25 141:15
**Correctional** 111:6
**Corrections** 8:6 10:20 21:2 32:10 46:8 52:5 87:17 98:7
**correctly** 8:14 128:19

**cost** 42:9,12,17,24
  43:1,6,13,15,18
  44:7,9,11,16,17
  44:17,18,22,23
  61:22 106:14,15
  106:21
**costs** 42:14,15,16
  43:5,14
**could've** 24:12
  119:16
**counsel** 4:11 91:22
  92:17 93:18
  117:16 141:17
**countermanding**
  19:12
**country** 140:4
**county** 1:24 141:4
  141:6,21
**couple** 5:18
**course** 16:17 88:7
  93:14 110:13
  118:8
**Court** 1:1 4:7 141:1
**cover** 32:10 46:23
**covered** 32:15 90:2
**covering** 140:7
**covers** 32:12 46:22
**cramps** 77:11
**create** 91:14 127:22
**created** 100:9
**criteria** 15:21 16:7
**Cross-Examinati...**
  3:4,6 5:4 127:18
**cruise** 32:14
**cuff** 71:23 75:8
**cure** 45:14
**cures** 45:8
**current** 27:16
**currently** 28:8
  29:23 30:7
**custody** 50:14,18
**cut** 62:14 65:9
**cvanthomme@c...**
  2:14

**D**
**D** 3:1
**D.O** 30:22,24 31:2
**daily** 33:15 59:12
  99:13,13 124:10
**damage** 66:1 71:23
**data** 7:17 86:17
**date** 1:20 4:10 6:14
  11:25 12:2,3,4
  13:13,14 96:25
  105:2
**dates** 12:1
**day** 8:22 14:24 15:1
  15:3 34:14,16
  38:19,20 58:3,8
  96:18 108:20,22
  111:25 138:14,14
  138:15,15,16
**deal** 23:9
**debilitating** 41:13
**decide** 16:4 32:17
  102:22 108:9
  118:15
**decided** 62:6
  127:16 129:15
  135:3
**decides** 33:7 54:23
  108:18 139:7
**decision** 34:1 79:12
  108:14 137:6
  138:21
**decisions** 108:4
  111:16 137:16
  139:8
**defeat** 84:1
**Defendant** 123:17
**defendants** 1:15
  2:13 4:14,17
  115:4 120:9 122:4
**defer** 18:4 36:1
  41:24 42:3,5
  51:25 90:1,3
  101:9 104:23
  127:25
**deferral** 17:16 39:6

39:14 41:22
  101:21,25 128:23
  137:10
**deferred** 7:19 10:12
  12:4 90:5 100:16
  103:4,5,8
**deferring** 18:8
  57:19 100:21
**deficit** 31:20
**definitely** 23:7
  29:24
**definition** 32:8 74:7
**degree** 28:1,3 63:22
  71:20
**degrees** 88:20,20
**delayed** 113:16
  123:16 124:7
**deliberate** 118:12
  125:4
**deliver** 28:20
**delivering** 29:1
**demonstrated** 17:1
  17:2 126:8
**denial** 37:15 39:6,9
  39:14 41:21
  100:13 101:21
  123:8,9,21 137:10
**denied** 14:17,23
  15:5 99:10,19,20
  99:20 100:8,8,10
  100:10 118:20
  122:22 123:8
**denies** 100:7
**deny** 15:16 16:19
  16:21 41:22 51:25
  74:8 99:24 100:6
  100:6,16,23 115:4
  117:3 118:16,19
  118:24 119:1,6,22
  120:9 122:8,9
  123:5 124:22
**denying** 15:8 99:18
  101:6 119:22
  122:20
**department** 2:18

8:6 10:20 21:2
  32:10 46:8 52:4
  87:16 98:7 109:12
**depend** 50:25
**dependent** 17:18
**Depending** 52:14
**depends** 31:5 32:8
  39:11 43:9 48:22
  58:15 59:10 61:10
  63:21 74:7
**deposition** 1:18
  3:10 4:4 5:8,16,19
  8:21,23 22:21
  68:1 140:20,21
  141:7
**describe** 32:16 80:3
**described** 89:2
**describing** 79:24
**description** 28:17
  79:2
**desk** 137:7
**details** 127:7
**diabetes** 40:19
**diagnosis** 48:11
**die** 16:2,4
**difference** 18:8
  30:24 35:3 37:6,7
  66:21 71:7 84:25
  86:5 101:21,24
  119:21,23,25
**different** 19:5
  20:18 32:1 39:16
  51:13,16 53:22
  81:10 88:9 95:14
  98:16 100:7 122:5
  127:8 131:3
  137:14
**differently** 49:2
  64:11
**difficult** 37:25
  111:3
**difficulties** 49:23
**direct** 27:3 109:8
  110:11 112:23
  126:4

**direction** 137:14
  141:13
**directions** 20:18
**directly** 39:4,20
  112:25
**director** 27:18 32:9
  138:22,24 139:1,1
  139:13
**directors** 139:12
**directorship** 38:5
**disagree** 80:23
  81:14 137:14,15
**disagreed** 81:16
  136:18
**disagreement**
  31:11 56:19 79:24
  80:11 81:2,22
  82:4,7,18,22 83:8
**disc** 67:25
**discretion** 57:25
**discuss** 136:15
**discussed** 128:7
  132:15
**discussing** 7:4
**discussion** 92:20
  93:17 131:20
  132:1
**discussions** 106:15
  106:19 126:14
**dispute** 96:13 99:14
  105:21,22
**disputed** 105:20
**disqualified** 74:25
**disqualifying** 74:11
  74:13
**distal** 86:7
**District** 1:1,1 4:6,7
**divergence** 84:9
**divergent** 31:2,6
**divided** 42:24
**doctor** 4:18,24 7:1
  14:6 28:23 35:5
  40:11 48:17 53:5
  54:18,18 55:16,19
  57:3,9,9 58:3,10

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

59:16 60:2,12
98:1 112:12,22
113:2,3,20 124:15
**doctors** 31:10,18
32:1 37:14 50:20
**document** 13:13
23:3,5,6 24:13,18
25:1 78:4 87:4
90:5 91:7,9,10,10
91:12,14 93:12,13
97:2,19 98:12
101:11,12 103:14
104:8 107:4,6,11
107:13,17,19,21
114:10,14 121:7
127:3,7
**documented** 82:24
93:25
**documents** 17:19
**doing** 10:17 19:5
32:5 35:14,15
37:21,21 38:23
46:3 51:13,15
53:22 59:15 62:15
62:17 88:12 89:3
89:7 108:22 112:5
117:24
**dollars** 43:19 44:6
44:15,16,17,18,18
44:22
**Dorsey** 108:24
**doubtful** 97:21,23
**downstate** 9:24
11:7 12:6 53:23
55:2 59:14 134:22
134:24
**Dr** 4:4,14,15,17 5:6
6:13 10:16 15:19
23:5 27:16 48:1
51:17,19,22,22
53:21,23 55:20
67:25 90:8 97:15
98:12,20 107:11
110:19 121:14
127:20 128:9,13

129:4,10 130:9
**dried** 62:14 65:9
**drinking** 64:20
**driven** 129:14
**Drs** 2:21
**drug** 48:3 66:18,19
66:20,21 72:21
**drugs** 45:22 47:13
**Duane** 38:18,18,20
104:21
**due** 64:19,20,21,23
**duly** 5:2 141:9,12
**dummy** 57:23
**duties** 42:8
**duty** 108:9

___
**E**

**E** 3:1
**earlier** 47:4 104:6
126:23 128:7
133:18
**early** 38:6
**eating** 64:20
**eats** 64:18
**Eddie** 1:3 4:5
**effect** 36:9
**efficacious** 43:7
63:19 67:3
**either** 8:16 9:10
11:8 39:22 86:15
96:15 131:3
141:17
**elbow** 74:3,6
**electromyelogram**
33:20,22
**electronic** 1:23
86:22,25 87:1,7
87:10,12,14 91:3
126:20,24
**Ellen** 1:9
**emergency** 69:11
**emergently** 69:10
**EMG** 33:19 39:22
102:14
**employee** 109:4

**employees** 90:20
**ended** 136:4
**endurance** 5:20
**engage** 126:14
**ENT** 34:25
**entire** 24:18 28:19
59:2
**entirely** 64:23
**entitled** 92:15
113:14
**entries** 78:24 79:1
**epidural** 39:23
40:17
**ER** 43:17 69:10
107:1
**Erie** 28:5
**Ernst** 109:18
**error** 88:11
**especially** 79:13
130:3
**ESQUIRE** 2:1,2,9
2:16
**Essentially** 70:13
**et** 49:17
**evaluate** 15:22
32:17 44:2 125:3
139:13
**evaluated** 17:25
136:22,24 137:1
**evaluation** 65:11
**event** 141:17
**eventually** 46:21
**everybody** 39:20
40:2 46:19 87:15
134:11
**everybody's** 84:25
**exactly** 24:2 37:2,4
37:12 56:19
**Examination** 3:5
126:1
**examined** 15:9
**examining** 73:11
**example** 33:17
34:24 39:18 44:5
45:3 61:14 93:21

**exception** 63:1
**excises** 86:7
**Excolo** 2:3
**excuse** 11:8 28:2
47:10,15 124:13
125:16 128:15
137:10
**exercise** 63:7,13
72:2,7 88:1
**exercises** 65:12
72:5 88:12,13,19
88:25 89:1,3,7
105:13
**exercising** 114:25
**exhibit** 3:10 22:21
22:24 24:9 25:25
76:3 91:5 94:5
95:19 99:2,3
**EXHIBITS** 3:9
**exist** 97:19
**expect** 81:1 82:2,5
107:22 127:2
**expectation** 81:24
82:14 87:13
**expected** 14:2 79:3
81:17,21 82:10
**expecting** 123:12
124:4
**expensive** 42:3,4
45:11,21 46:25
47:3
**experts** 89:11
**Expires** 141:22
**explain** 18:21,25
20:6,19 25:18,20
25:21 46:17 96:11
**explained** 39:11
**explanation** 96:9
**extent** 92:7 116:9
**extremely** 45:21

___
**F**

**facilities** 10:19
54:22 127:21
**facility** 9:25 11:5

19:21 20:2 21:3,4
21:7,8,17,20,21
22:10,13 54:6
59:5 60:22 61:2
105:10 113:6
115:1 135:25
**fact** 12:24 32:4
41:14 51:22 107:2
**facts** 124:20
**failed** 41:17
**fair** 37:12 40:10
42:19 101:16
116:21,25 117:2
138:10
**fall** 106:12
**false** 122:14,19
**familiar** 91:7
**families** 28:21
**family** 14:6 28:4,13
28:14,17,19,23
29:1,7,12,12 30:1
**far** 50:19
**fast** 114:12,13
**fault** 10:7
**February** 10:14
13:15,17 90:4,4
94:2 101:19
102:11 103:3,10
104:7,9,10 131:7
**feel** 34:11 35:2 51:4
51:4 114:2
**feeling** 47:6
**fight** 61:11
**figure** 59:2 100:20
**filed** 106:24
**fill** 8:13 91:22
**filled** 91:24 92:10
128:18
**final** 139:7
**find** 9:4 40:9,25
73:6 77:9 98:15
105:9,18 112:4
121:7 129:17
130:7 133:20
**finding** 129:11

Keith Papendick, M.D.                                    Eddie Spiller v. Jeffrey Stieve

Page 6

fine 76:10 89:19,21
   101:1 125:23
fingers 77:10
finish 5:25 6:1
   26:17 58:18,20
finished 28:4 30:3
first 5:2 16:21
   17:13 23:4 24:4,7
   40:20 51:15 52:18
   54:24 55:22,24
   56:9 69:22 75:4
   85:16 95:19 96:20
   96:24 99:24
   100:12 125:23
   136:10 141:9
fits 57:24,24
five 36:20 48:10
   61:19 112:3
   113:24 139:25,25
   140:2,3
flabbergasted 72:4
flip 96:22
focused 30:17
follow 17:15 20:20
   57:12 126:18
follow-up 34:25,25
following 4:4 20:8
   21:1 26:6 57:23
   73:10 120:8
follows 5:3
Ford 9:11,25 11:9
   50:7 52:19 112:19
   124:13 129:22
   130:25
foregoing 141:11
   141:11
forever 15:4
Forget 51:2 100:6
   135:16
form 6:25 7:24 8:14
   8:15,18 9:2,20
   10:9,14,23 11:2,6
   11:14 12:9,21
   13:3,9 14:14
   15:11 16:20 17:12

17:20 18:7,13,19
   19:3,9,19 20:9,14
   20:24 21:11,19,24
   22:18 25:4,14
   26:11 37:16 43:8
   46:14 48:14,21
   49:12 52:13 54:14
   55:18 58:14 60:4
   60:5 65:19 68:5
   68:11,24 72:19
   73:15 74:12 77:4
   82:11,19,25 84:11
   84:23 86:16 92:2
   93:1 102:25 108:6
   109:6 112:11
   113:7,15,23
   114:16 115:6,10
   115:18 116:4,18
   116:23 117:5,14
   118:3 120:11
   121:10 123:20
   124:24 132:12
   133:3,16 134:9,21
   135:8 136:11,21
   137:2 141:13
format 93:8
formatted 93:7,13
forms 7:11 8:20,22
formulary 47:11,12
   47:14,16,19
forth 141:8
forward 41:7
found 80:16 123:14
   124:6 129:25
foundation 6:15
   10:4,9 12:21 13:3
   19:19 46:6,14
   54:14 55:18 58:14
   60:24 72:19 76:19
   77:4 78:19 80:2
   80:17,25 82:19
   84:11,23 85:24
   86:16 88:23 102:8
   105:6 113:7,23
   114:8,16 115:10

115:18 116:4,23
   117:5,19 118:3,21
   118:25 119:2,7,15
   119:19,24 120:2,5
   120:18,22 121:2,5
   121:10,16,23
   122:1,7,11,15,21
   123:1,10 124:9,24
   133:24 135:8
   136:11,21 137:18
four 5:17 48:10
   65:14 77:22 78:1
   139:25
fours 46:20
friend 61:17
front 8:18 24:16
   40:8,13 103:25
full 38:17
fully 127:7
fundamental
   101:21
further 123:16
   130:13 137:6
   140:16 141:16
future 36:3

### G

games 19:7 24:19
   24:20,21
Ganzhorn 10:16
   51:17,19,22 53:21
   53:23 55:20 85:11
   90:8 131:16
   135:14,14,18,23
   136:14,19
general 2:17,18
   4:13 14:8 29:10
   29:16 49:8 50:3
   58:24,25 69:5
   71:1 73:11 78:23
   83:14,15,16
generally 19:23
   29:7 63:19 69:2
   72:18 74:22 79:3
   87:7 91:7

getting 19:17 39:10
   102:15,16,21
   103:4,23 105:11
   118:11
give 18:17 33:17
   34:24 39:17 61:14
   114:21 126:22
given 17:7,16 53:24
   54:13 64:17 65:18
   66:2 91:16,25
   93:8 100:5 105:4
   113:12 114:15
   118:14
gives 10:11 16:11
giving 45:3
glasses 47:6 73:7
glenoid 85:20
glipizide 40:22
go 5:18 8:19 9:3
   14:12 33:12,14,16
   34:2,16,17 39:20
   43:23 44:15 47:2
   47:19 51:7 52:18
   52:24 53:22 59:6
   61:2 63:16 77:22
   83:9 85:12 87:23
   90:19 96:22
   110:24 112:18
   113:19 116:6
   117:22 118:13
   124:25 125:22,23
   128:15 130:23
   131:3,15,16
   132:19,20 137:13
   138:25
goal 113:2
goals 42:19
goes 63:25 65:14
   135:19 139:2,10
   139:13
going 5:24 13:21
   14:8 16:4 18:5,9
   18:11,16 19:2,4
   19:11 20:4,22,25
   21:3 22:23 23:4

24:6,8 29:14,21
   37:12 39:16 40:14
   41:7 44:12 46:15
   47:6 48:22 58:24
   61:18 62:18,19
   65:5 69:18,20,24
   76:3 77:9 78:7,10
   83:19 86:24 89:16
   91:5 97:10 98:9
   99:2 102:19
   104:17 107:11
   123:7 126:12,16
   129:19 140:14
good 5:6 33:10
   40:11 47:25 55:20
   61:17 64:5 93:2
   101:3
gotten 54:25
   122:19 132:24,25
   132:25 135:21
grabbed 94:15
Group 2:10
groups 44:21
guess 9:6 12:22
   65:14 68:6 85:4
   88:2
guidelines 34:20
guy 85:13 88:5
guys 38:18

### H

half 124:12 138:16
hand 4:19,25 22:23
   24:5 68:21 73:24
   74:1,4 76:3 77:10
   107:11
handed 24:13
   25:24
handle 140:6
hands 18:1 35:6
   88:5
hanging 61:23
hangs 71:22
happen 10:3 36:3
   50:5,5,10 55:1

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

65:5,21,23 67:8
98:22 103:9 135:6
**happened** 55:10
61:8 82:9 99:6
100:8
**happening** 59:10
59:13 139:18,20
**happens** 31:14
62:11 65:20 84:8
130:4 134:5
**happy** 63:2 125:18
**hard** 5:7 35:9
**harm** 65:18 66:17
67:6
**Harvoni** 45:5,10,18
45:18 46:4,11,13
46:15
**head** 6:10,11
**headquarters**
109:19 110:8
**heal** 37:1
**Health** 1:12 38:8
38:16,18 104:21
109:5 111:4,9
**healthcare** 17:19
78:18 82:5 134:14
**hear** 38:1 54:9 60:8
76:23
**hearing** 31:20,22
31:23 41:10
**held** 4:6 113:11
**help** 21:15,18,22
47:10,25 90:19
108:15 122:19
**helped** 90:13
**helpful** 42:7 96:20
**helps** 21:25
**Hengstebeck** 1:22
141:5,20
**Henry** 9:10,25 11:9
50:7 52:19 112:19
124:13 129:22
130:25
**hep** 45:5,8 46:1,4,7
**hepatitis** 47:4,4

**hereinbefore** 141:8
**hide** 97:16
**high** 106:16,20
**highest** 106:17
**Hold** 24:11 49:20
112:25 119:10
123:25 124:3
**holes** 107:7
**Honorable** 1:8 4:8
**hope** 82:15
**hoped** 81:23
**horrible** 75:14
**hospital** 9:11,11
10:1,2 11:9,10
12:16 38:15,16,17
38:19,23 39:2
50:8,8 51:23
52:19,24 53:21,23
53:25 59:6 112:18
112:19 124:14
129:23 134:25
**hospital's** 55:4
**hospitalist** 38:8,13
38:14
**hospitals** 130:1
131:4
**hour** 112:3 124:13
**hours** 108:22 112:2
**Huh** 38:11 107:5
**hundred** 8:22
14:24,24 15:1
34:14 42:13
108:22 111:24
**hurt** 117:21
**hypothesis** 66:23
**hypothetical** 14:15
14:21,23 15:12
18:23 20:10,15

**I**

**Idaho** 140:8
**idea** 37:14
**identification**
22:22
**immediately**

118:17
**imminent** 123:12
124:4
**implied** 17:23
**importance** 61:12
**important** 46:23
47:5 82:16,18,20
84:8 87:14
**impressions** 81:10
**improvement** 66:1
**inappropriate**
24:13,14 128:10
128:18
**incentive** 128:13
129:4,7
**incident** 36:4
**included** 129:1
**includes** 12:10
28:19
**including** 4:17
**inclusive** 7:17
**incorrect** 75:24
**incretin** 40:20
**independently**
138:19
**indicated** 110:19
**indifference** 118:12
125:5
**individual** 43:20,25
44:2,11 64:17
65:6,18
**individual's** 67:10
**individuals** 64:10
**inferred** 70:5
**information** 8:3,5
10:12,13,14 16:11
17:7 35:20,22
36:6,8,13,15 42:6
42:15 78:14 79:11
79:16 83:5,9
91:22 93:7 98:16
98:19 115:6
120:11 126:12
134:2 138:19
**informed** 123:13

124:5
**initial** 85:12
**injected** 62:4
**injection** 61:19,19
**injections** 61:21
62:7 102:2 105:13
**injured** 114:25
**injuries** 29:7
**injury** 118:18
**inpatient** 13:21,22
13:24 22:20 69:13
69:20 107:3
**input** 60:4 91:1,20
114:14,17,18,21
**inside** 60:19
**instance** 36:2
**instructions** 21:1
**insurance** 33:7
**intentionally** 97:5
97:11,16 98:9
**interaction** 96:14
98:14
**interactions** 98:13
**interested** 141:17
**interpret** 69:25
117:18
**interpretation** 80:4
80:15,20 85:21
86:10,14,15
119:11,13
**Interqual** 33:3,5,6
33:10,12,14,23
34:3,3,10,12,16
34:17,19,20,22
35:1 58:1 105:22
105:23 106:3,3
**Interquals** 34:23
**interrogatories**
90:11,25 91:6,9
91:11 98:17,24
**interrogatory**
90:13 92:16 96:3
**interrupt** 51:7
**introduce** 4:11
**involve** 88:13

**involved** 6:19,20
37:19 59:12 72:18
139:21
**involvement** 96:4
**Irregardless** 13:22
**issue** 10:18 21:10
47:5 52:15,16,17
53:3,4 54:7 74:1,3
74:4 99:13 130:5
135:13
**issues** 28:25 48:13
49:4,11,15 53:12
59:12 129:11,17
**items** 42:16,17
**iterative** 40:4,7

**J**

**Jackson** 10:2,19
50:9 52:19 55:13
104:20 112:17
129:22 130:5
134:25
**James** 1:22 141:5
141:20
**Janet** 1:8 4:8
**January** 22:25
62:20 67:14 95:15
96:6,13,16
**Jeffrey** 1:10,13 4:5
**job** 22:14 32:23
33:1 36:5 112:4,5
118:14 128:12
137:4
**joint** 70:10,16
77:19 85:20
**journal** 30:15,17
**journals** 30:13
**judgment** 32:21
57:18 58:2,8 59:3
107:24
**July** 99:19,21 100:5
100:19,21 101:5
123:13 124:3,5
**June** 27:20
**jury** 20:6,11,12,19

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

25:3
**justified** 43:15,20
  43:21

**K**
**Kalamazoo** 115:14
kaltman@excolol...
  2:7
**Kansas** 140:8,14
**keep** 41:6 89:16
  94:20 95:5 104:8
**keeping** 59:14
**Keith** 1:12,18 2:1
  3:3 4:4,12 5:1
  61:16 141:7
**kept** 102:15,20
**keyword** 71:13
**kids** 28:20
**kind** 40:9 42:25
  47:7,7 56:22
  57:11 58:12 66:22
  70:11 74:10 85:4
  86:3 139:19
**knee** 61:16,20
  67:16 70:11,18,20
  70:24 71:2,4,11
  71:14
**knew** 37:22 50:21
  50:21,22,22 69:23
**know** 6:5 11:16
  14:8,16,21 15:15
  19:24 23:24 27:4
  27:5 28:22 29:6
  29:11,21 30:19
  35:14 36:11 37:25
  39:4 40:7,11,21
  42:1,2,3 45:2
  46:22 50:13,19,20
  56:5,23 59:24,25
  62:3,3,4 63:1,4,10
  65:24 67:10,11,15
  69:17,20 72:4,5
  72:25 77:1 78:20
  78:21 79:15 80:24
  81:12 88:2,10,17

91:7,10 92:16,23
93:5 94:12 95:10
96:17,18 97:9,9
97:14,14,20,22
98:13,20 100:17
101:13,14,17
102:5 104:3,5
107:8 108:16
111:3 112:22,25
113:9,19 116:8,10
116:11,12 117:20
119:4,12 120:23
121:4,9,14,21,22
121:22 122:6,8,9
122:23 124:11
126:9 129:10,16
132:5 134:12,12
138:5,9,12 139:4
139:17,20
**knowing** 34:4 35:4
**knowledge** 7:22
  115:5 117:21
  120:11 121:12,20
  128:4 141:14
**known** 121:3
**knows** 30:8 35:6
  87:15

**L**
**lack** 115:5 120:10
  121:12,20
**LACY** 1:13
**Lahser** 2:4
**laid** 17:25 88:5
**Lake** 2:11
**language** 120:20
**Lansing** 1:19 2:20
  4:1,9 9:12 10:2,18
  11:8 12:16 51:1
  52:18 55:13 85:13
  104:18,19 112:17
  123:15 124:6
  129:20,21 130:23
  131:3,16 134:25
  136:6

**lapse** 28:7
**large** 64:10 126:6
**Law** 2:3,10
**lays** 35:5
**learned** 72:4
**leave** 97:6 98:10
**leaves** 120:13
**left** 50:13,15,16,17
**legal** 91:9 100:7
  107:15 121:6
**legitimate** 60:9
**let's** 16:17 17:24
  21:14 27:9,10
  34:12 45:4 47:12
  49:1,20 64:7
  66:20 67:20 75:15
  83:1 88:22 103:17
  105:3 118:7 123:5
  123:6,6,7,22
  125:6 135:23
**letter** 104:15
**lifestyle** 64:18,24
  65:1
**limit** 34:12 128:13
  129:4,7
**limited** 68:3,9,14
  71:12,13,13
**line** 40:25 45:17
**lines** 64:8
**list** 15:8
**listed** 111:21
  128:20,21
**listen** 63:19 66:3
  101:7 138:20
**listening** 51:20
**little** 5:10 91:16
**live** 109:1,2
**liver** 46:25 47:2,2
**lives** 109:1
**local** 130:1
**located** 4:9
**LOCATION** 1:19
**locking** 77:18 89:18
**logical** 83:22
**logistic** 48:13

**logistical** 10:22
  11:1,13,17 12:7
  21:9 49:4,11,15
  52:15 53:17 54:5
  128:19
**long** 2:11 5:7 27:19
  27:23 37:4 57:9
  92:6 114:19
**longer** 28:7 61:5
**look** 13:18 24:8
  33:19 34:10,12,14
  43:11,22 66:24
  75:19 76:2 79:9
  86:23 96:2 99:22
  100:25 101:11
  108:1 115:24
  117:6,7 118:13,14
  125:2 126:6 133:9
  133:9,10,20 137:5
**looked** 30:17 86:5
  89:22 94:3 102:10
  102:13 103:15
  104:5 114:6
  133:23
**looking** 11:23 12:2
  23:19 42:18 67:10
  87:5 94:16 95:5
  103:18
**looks** 42:4 43:12
  91:7,9 95:7
**Lord** 114:12
  127:11
**lot** 37:9 43:14,14
  77:8,18 104:23
**love** 48:1 77:19
**lower** 77:25
**lowest** 137:19

**M**
**M.D** 1:18 3:3 5:1
  30:22,23,24 31:2
  141:7
**Madeleine** 4:22
**MADELINE** 2:2
**Magistrate** 1:9

**making** 79:1
  111:15
**malpractice** 106:23
  106:24 118:12
  125:3,4
**managed** 57:16
**management** 27:18
  32:9 38:5 57:14
  57:17 109:16
  139:11
**manager** 32:6
  42:20
**managers** 140:11
**manner** 68:15
**March** 1:20 4:2,10
  117:22 118:14
**Marie** 10:16,17
  12:15 51:23 53:21
  54:3 55:3 90:8
  105:19 131:17
**mark** 91:5
**marked** 22:21,24
  94:5,7
**Maryland** 109:22
**matter** 4:5 13:23
  39:9 44:11 72:3
  120:24
**mattered** 106:1
**matters** 120:25
**maximum** 42:21
**McLaren** 9:12 10:2
  11:8 12:16 52:18
  55:7 130:23 131:1
  131:1,1,2,15,16
  134:25 136:5,6
**MDOC** 14:11
  17:14 20:21 23:12
  38:9,16,24 48:2
  49:9 50:18,22
  59:7 60:17,19
  61:9 70:25 71:1
  72:17,22,23 87:15
  111:16 114:25
  115:13 128:14
  129:5,7,15 139:4

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

Page 9

**MDOC's** 50:14
**mean** 6:17 7:10
  9:23 11:17,17
  16:9 17:3 31:8
  35:21 36:25 38:10
  39:13 40:19 45:4
  45:8,11,17 46:10
  48:24 51:6 57:12
  57:22 59:10 61:17
  63:9,11,25 64:3
  66:9 67:1 68:3
  69:20 70:3 71:5
  71:14,17 75:24
  79:15 80:9 84:12
  87:20 88:19 89:9
  95:10 99:17
  103:11,24 108:20
  109:13 115:15
  120:4,8,16 121:24
  122:5,23 132:3,7
  132:13,20 134:24
  136:12 139:9
  140:6
**means** 9:18 16:24
  18:5 39:16 66:4,7
  66:9 68:9 80:7
  116:20 120:13,15
  132:14
**meant** 72:18
  117:11
**med** 27:24
**Medicaid** 46:22
**medical** 9:13 16:25
  17:2 21:10 22:24
  23:10,12,15 27:18
  28:1,3,15 30:25
  31:10,18 32:9,20
  32:23 35:5 38:5
  48:17,24 49:1
  52:16,17,20,22,24
  53:2,4,9,9,10,14
  53:19,20,24 54:2
  54:7,17,18 55:9
  55:15 57:3,8,9,12
  57:18 58:2,6,8,10

  59:16 60:2,12
  61:25 70:1,1
  72:16,16,24 77:20
  78:17 79:6,9
  80:10 82:16,23,24
  83:2,8,10 86:22
  86:25 87:1,3,5,8
  87:11,14 88:11
  90:24 93:20,22
  109:14 112:7
  113:14 115:16,21
  115:24 117:6,23
  118:9,10 124:19
  125:2 126:7,20,24
  127:21 128:1
  129:8 135:9,11
  137:9 138:22,24
  139:1,1,12,13
**medically** 11:12
  75:10
**medication** 47:8
  99:9 123:17
  130:10
**medications** 123:19
**medicine** 40:4
  43:12,12 53:4,18
  57:16 62:13,14
  65:10,10 111:11
  137:12
**meet** 5:21 33:9
**member** 111:12
**Memorial** 51:23
  53:21
**meniscal** 62:21,23
**mess** 70:8
**met** 53:20 55:9,15
  78:15
**metformin** 40:20
  63:19 64:1,5,18
  64:19,21,23,25
  65:2
**metric** 139:9
**MI** 2:5,12,20
**Miami** 109:1
**mic** 124:16

**Michigan** 1:1,11,19
  4:1,7,10 8:6 10:19
  16:11 21:2 22:6,7
  23:13 27:22 32:7
  32:9,10,13 46:8
  49:24 52:4 55:13
  57:6 87:16 98:7
  108:25 109:2,3
  110:10 111:6,9,9
  111:16 115:14
  130:3 139:3 140:6
  140:9 141:3,21
**Mignon** 109:18
**million** 43:19 44:6
  44:15,16,17,17,18
  44:22
**mine** 61:17 108:2
**minimal** 40:9 41:1
  43:13 72:11,13
**minute** 54:21 69:22
  85:11
**minutes** 67:20
  112:3 113:25
  134:16
**missing** 23:5 71:9
  97:22 98:17,21
  117:8
**Missouri** 140:8
**mistake** 25:17
**mobility** 68:9
**modalities** 39:24
**moment** 128:15
**money** 42:20 63:7
**monthly** 42:12
**months** 5:17 61:20
**mothers** 28:21
**move** 40:21,23
  71:20 75:10 89:6
  89:8
**Mr.Altman** 122:12
**MRI** 36:11,13,15
  36:16,18 39:22
  41:24 42:3,5
  65:13 75:8,18,20
  75:20 76:2

**MRIs** 75:19,22
**MSAC** 139:3
**MSJ** 78:2
**multiple** 78:4
  123:23
**Mumford** 79:22
  85:3,8,9,19 86:1,3
  86:11
**muscles** 74:4
**musculoskeletal**
  76:5 78:9

---

**N**

N 3:1
**name** 48:1 68:25
  88:7 107:24
  111:21 114:20
  116:3 117:12,17
**nasty** 70:8
**near** 79:22 85:3,8,9
  85:18 86:1,3,10
**necessarily** 16:15
  28:24 29:15 37:6
  66:16 68:20 84:12
  127:6
**necessary** 9:18
  73:13 75:10 79:11
  81:6 133:2
**necessity** 16:25
  17:2 126:8
**neck** 77:10,11,12
  77:18 89:17,17,17
  133:10,10,21,22
  134:4,7 136:22,23
  137:1
**need** 5:21 12:12
  17:19 21:16 23:6
  23:7 32:18 36:7
  36:12,12,15 47:6
  48:11,19 51:9
  52:12 68:4,6,10
  68:18 70:18,20
  71:7,11,19 72:7
  73:7 74:16,17,19
  74:23 75:9 86:20

  101:10 105:18
  112:5 133:20
  135:20 136:9
**needed** 9:9 11:12
  12:14,19 14:12,18
  21:6 34:1 35:20
  50:23 54:24 56:11
  56:18,21 57:4
  103:6 114:2
  123:15 124:7
  131:22 133:7,13
  135:3,7,14
**needs** 5:21 15:10
  17:8 18:1,10,16
  19:1,10,18 20:7
  20:21 21:15 34:11
  35:18,23 36:10
  52:10 53:9,9,10
  53:11,14,19,20
  54:3,11,19,21,23
  55:9,15 59:4,17
  61:15 61:13 71:4
  77:15 80:8,9
  83:21,23 84:5,6
  84:24 89:11,15,22
  89:23 105:17
  136:20 137:13
**Neff** 1:8 4:8
**neither** 115:4 117:3
  119:6 120:9
  141:17
**neurosurgeon**
  39:20,21
**never** 7:9 22:19
  25:12 35:19 50:14
  50:18 61:20 62:11
  65:23 75:7,7,8,8
  76:2,12,25 102:4
  102:4 121:6
  135:25 136:3
**Nevertheless** 86:9
  89:11,21
**new** 12:10,12 36:15
  36:16 39:22,22
  50:25 61:1 66:11

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

Page 10

67:4 70:15,15
99:6 139:10
**nice** 93:1,7,13
**NMI** 35:20 36:7
**Nods** 6:10
**non-paper** 87:16
**nonformulary** 48:3
**nonmedical** 11:19
**nonresponsive** 27:2
**Nonsteroidal** 47:13
**normal** 31:16,18
66:11
**nose** 61:11
**Notary** 1:23 141:1
141:5,21
**note** 76:24 81:3
85:6 99:16 102:10
126:23 127:9
130:21 139:14
**noted** 100:4
**notes** 78:24 84:20
104:4 129:1
**notice** 118:19
**NSAID** 47:18
**NSAIDs** 47:14,16
**numb** 77:10,10
**number** 3:10 4:8
22:21 76:4 77:25
78:9 99:18,23
106:24,25 107:1
108:19,21 114:24
126:7 128:14
129:5,7,11 138:5
**numbered** 77:24
**nurse** 34:19,19
109:14 123:13,16
124:5 128:17
130:17 131:6

**O**

**Oakland** 1:24
141:4,21
**oats** 39:21
**OB/GYN** 28:25
29:4

**object** 6:15,25 7:24
8:15 9:2,20 10:4,9
10:23 11:2,6,14
12:9,21 13:3,9
14:14 15:11 16:20
17:12,20 18:7,13
18:19 19:3,9,19
20:9,14,24 21:11
21:19,24 22:18
23:4 25:4,14
26:11 37:16 43:8
46:6,14 48:14,21
49:12 52:13 54:14
55:18 58:14 60:24
61:23 65:19 68:5
68:11,24 72:19
73:15 74:12 76:19
77:4 78:19 80:2
80:17,25 82:11,19
82:25 84:11,23
85:24 86:16 88:23
92:2,4 102:8,25
105:6 108:6 109:6
112:11 113:7,15
113:23 114:8,16
115:10,18 116:4,5
116:18,23 117:5
117:14,19 118:3,6
118:21,25 119:2,7
119:15,19,24
120:2,5,18,22
121:2,5,10,16,23
122:1,7,11,15,21
123:1,10,20 124:9
124:24 133:3,16
133:24 134:9,21
135:8 136:11,21
137:2,18
**obligation** 98:23
**obstructing** 62:22
**obviously** 7:4 10:11
**occasion** 129:23
**offer** 16:21
**offered** 56:23,24
**offhand** 15:7 62:4

**office** 56:3 71:25
76:21,24 108:17
115:13
**oh** 28:11,13 32:14
50:17 63:18 64:2
67:17 69:19 71:2
76:22 78:2 85:25
86:8 87:22 94:7
94:19 96:23 99:3
99:5,7 107:10
114:12 124:17
127:11 129:9
132:3 135:17
137:22 140:9
**okay** 5:18,22 6:2,8
7:5,14,16 8:17
11:20 13:10 14:7
14:25 15:2 16:23
18:2 20:4 21:12
22:23 23:15 24:23
25:3,11 26:6,14
27:7 29:5 30:24
33:25 38:25 40:13
41:25 42:23 43:11
43:23 44:25 45:13
50:20 51:3 53:16
57:1,22 58:10,17
60:3 61:8 66:6,9
67:1 69:9,17
70:14 71:19 73:6
73:25 74:2,2 75:3
75:6,13,16 76:7
78:2,6 79:17
83:11 84:8 86:19
88:15 89:5 90:17
90:24 91:21,24
95:16 96:17 97:1
97:24 98:6 99:5,8
99:12 101:16
102:10 103:16,19
104:22 107:7,10
107:16 108:25
111:5,7,13,14
113:17 115:2,19
115:23 117:6

118:4,16 119:16
120:15 121:19
122:17 123:5,8
126:11 128:1
131:14 132:8,21
135:9,12 138:23
**old** 36:14 38:18
66:11 139:10
**onboarded** 37:22
**onboarding** 37:19
37:19
**once** 55:9,14 56:11
56:14 57:1 137:21
**one-tenth** 61:22
**ones** 37:22 46:21
47:14 78:23 97:12
111:18
**OP** 26:7
**open** 114:19
**opened** 55:3
**opinion** 48:10 52:2
52:8,9 83:16
84:16,24,25 127:1
136:1,3,4,5
**opinions** 52:4 83:11
83:16,23 84:10
127:1
**Opp** 78:2
**opportunity** 78:11
**optimal** 43:6 127:5
**option** 41:20
132:17,18
**order** 13:5 74:25
79:15 86:17,24
95:6 117:20 119:9
**ordered** 123:17
**originally** 106:23
**ortho** 80:13
**orthopedic** 8:8
12:11,13,15 13:4
14:9 22:1 29:7,9
29:20 30:1,13,15
30:16 36:22,24,25
51:8 54:24 55:20
59:4,5,5 61:1,2,15

62:8,10 65:13
72:1 79:13,18
80:15 81:9,13
82:3,6,17 84:16
85:7,12 123:14
124:6 126:24
129:17 132:22
**orthopedics** 29:22
29:23,25 30:8,18
36:22 104:2
**orthopedist** 8:3
12:18 14:2,5,7,11
14:13,18 15:6,9
17:8,11,13,25
20:21 21:16 29:5
29:6,11 30:7
48:11,19 49:21
52:10,12 54:10
55:5,7 56:9 62:25
65:17 75:25 88:3
88:4 133:23 134:4
134:8 136:9
**orthopedist's** 71:25
**orthopedists** 71:2
78:15 79:25 80:5
80:11,18 81:2,10
81:14,16 82:4
89:23,25 102:14
129:20 133:6,7,13
**osteopath** 30:25
**Ottawa** 1:19 4:9
**ought** 52:11
**outcome** 42:24
43:18,23 61:21
62:22
**outpatient** 13:21
13:22,25 22:16
25:7 26:7 56:1
69:12,15,18 73:3
95:23 107:3
**outside** 60:16,16
61:14
**over-the-counter**
47:8
**overall** 29:2 42:17

Keith Papendick, M.D.  Eddie Spiller v. Jeffrey Stieve

Page 11

63:9

**overnight** 10:15,17
11:11,22 13:23,24
13:25 14:3 21:5,6
25:7 26:7 54:3
69:24 95:24 130:2
132:23
**overridden** 136:10
**override** 17:11
**oversight** 97:4
**owned** 111:18

— **P** —

**p.m** 1:21 4:2
140:22
**packet** 24:7
**page** 3:2 23:5,14,19
24:7 73:6 76:3
77:22,22 78:1,4,4
78:5 95:1,13,19
96:16,20,21,22,22
96:24,24
**pages** 24:5 77:22
78:5 87:10
**paid** 106:5
**pain** 35:18 36:10
39:18,23 40:16
41:11,13 43:17,17
47:9,10 77:14
101:20,22
**panel** 139:4
**Papendick** 1:12,18
3:3 4:4,17 5:1,6
6:13 15:19 23:5
27:16 97:15 98:12
98:20 107:11
110:19 121:14
123:17 127:20
128:9,13 129:4,10
130:9 139:2 141:7
**Papendick's** 67:25
**paper** 10:11 35:17
84:15 85:17 86:20
86:23 87:2,15
**papers** 15:3

**paperwork** 56:6
**paragraph** 77:7
78:6,9 114:24
115:4 116:20
117:1,4,18 118:16
118:20 119:5,11
119:17 120:1,1,9
121:8,19 122:3,13
122:18 123:6,7
**paragraphs** 120:8
**paraphrase** 116:25
117:2
**paraphrasing**
91:16 116:21
**pardon** 16:3 33:21
73:9 78:8 96:10
136:25
**paroled** 7:2,5
**part** 31:16,18 32:16
41:10 42:14 49:14
56:21 85:9 87:6,9
89:18 114:7,9
135:17
**particular** 17:4,6,6
36:2,4 40:14,15
44:8,13 51:6 60:1
73:12
**particularly** 78:22
121:17
**parts** 60:14
**party** 141:17
**patellofemoral**
65:12,15
**pathophysiology**
77:21
**patient** 6:19 9:8
12:5 14:11,18
15:9,10 17:4,6,8
17:25 18:1,1 21:6
21:15,18,22,25
31:3 32:2 35:4,6,6
35:7,9,10,12,18
35:23 36:9 43:16
43:19,25 44:1,2,3
44:6,13,13,18,19

44:22,24 47:17
49:7,9,9,20 51:24
52:1,8 53:5,10,11
53:19,20 54:2,11
54:19 59:17 60:2
61:5,15,19 62:5
65:6,18 70:2,4
73:12,13 75:5
79:1,2 83:3,23
86:24 100:13
101:20 112:22,24
113:25 114:3
126:4,5 128:17
135:2 137:7,11,13
**patient's** 22:4 39:8
53:14
**patients** 21:2 37:14
39:4,5 41:22,23
42:13,18 44:7,8
44:11,21,23 45:16
46:13 51:8 58:5
59:13 106:14,16
106:21 113:3
115:13 126:15
129:21,23 130:1
**paying** 45:15
**PC** 111:6
**pediatrician** 28:22
**peer** 139:19
**Peninsula** 9:8,17
**Pennsylvania** 28:5
**people** 21:20 22:5
38:15 40:1 50:7
59:1 62:17,21,23
63:10,12 64:4
65:12 66:4,7,14
66:24 67:1 70:18
70:20,24 71:11,19
72:7 87:7 113:13
114:4 127:22
129:15,21
**people's** 139:22
**percent** 34:5,7,9
40:3,16 52:24
**percentage** 34:2

47:1
**perfect** 44:14
**performance**
106:11
**performing** 32:20
33:1
**period** 7:4 37:4
**person** 13:6,7 14:12
40:15 47:3 48:2,5
48:10,18 49:2
51:3 52:10 53:12
55:21,22,23,24
63:25 68:22 69:2
72:21 85:16,17
88:6 109:19
111:20,23
**perspective** 39:8
48:24 72:24 100:7
101:20 135:11
**Pete** 110:7
**phone** 126:14
**phrase** 42:23 69:25
**phrased** 43:2
**physical** 39:22
40:16 62:3,6
66:22 75:7
**physically** 38:21
**physician** 21:4,7
22:13 48:4 49:16
53:25 54:22,23
55:12 57:10 61:6
65:7 75:22 76:24
83:19 85:5,18
102:21 103:6
108:19,21,23
111:8,10 134:19
135:1,19,20
**physician's** 59:8
**physician-patient**
113:25 114:1
**physicians** 37:20
50:22 75:23 76:20
131:2,2 135:23
139:11,16
**picture** 113:11

**piece** 10:10 35:17
84:15 85:17 86:23
**pile** 94:15
**place** 22:7,9 38:3
54:12,19 55:10,14
55:16 56:15 70:15
82:4 102:16 103:6
103:7 105:4
131:18 138:18
141:8
**placed** 11:24 99:15
123:18
**placing** 99:9
**plaintiff** 2:6 4:12
4:23 114:24 115:1
115:7 118:17
123:13,16,19
124:4
**plaintiff's** 99:9,19
100:21 123:15,17
124:7
**plaintiffs** 1:5
114:23 120:13
**plan** 7:20 10:13
12:5,7,7,11 16:12
16:25 18:5 32:19
52:3 65:17,25
99:25 101:25
105:5,9,12 126:10
127:13 128:22
129:1
**plans** 16:22 31:6
**plant** 17:1
**Plavix** 43:18 44:5
**play** 24:19,19
**played** 20:12
**playing** 19:7 24:21
**please** 4:11,25 6:4
15:19 18:25,25
20:19 25:3 32:16
33:18 77:23
**PLLC** 2:3
**PO** 2:19
**point** 41:15 54:10
64:9,16 76:4,13

86:22 88:8 98:1
98:11,20 102:5,5
102:16,24 104:23
105:3,11,14,17,20
133:2
**pointed** 51:3
**policy** 72:22
**portion** 23:12,15
**position** 129:10
139:12,16
**possibility** 68:17
97:18
**possible** 15:8 31:10
68:12 85:19 86:14
**possibly** 29:17
30:10,11 97:20
**Powell** 110:7
**practice** 5:24 27:22
27:23 28:4,13,14
28:17,23 29:12
30:1 31:16,18
58:2 111:11
**practicing** 29:11
**practitioner** 29:1,7
29:12
**precise** 5:10 75:15
118:7
**preparation** 8:20
8:23 117:9
**prepare** 90:13
**prepared** 92:16
116:3,13,15
**preparing** 115:16
**prescription** 47:8
**presented** 8:2
**president** 109:15
**pretty** 27:23 32:4
33:10 70:8 71:23
89:10
**preventative** 43:12
43:12
**previous** 41:5
93:17
**previously** 11:9
**primarily** 111:23

**principles** 57:12
**print** 93:1
**prior** 62:7 128:1
**prison** 7:8 10:20
38:22,22 39:1
58:25 59:1
**prisoner** 9:18 17:18
20:21 46:4 58:22
**prisoner's** 130:9
**prisoners** 38:22
128:14 129:5,8,12
**prisons** 140:11
**private** 27:22,23
**privilege** 53:24
92:5
**privileges** 52:21,25
53:2,24
**probably** 5:11,15
13:18 28:9 29:6
29:11,18,21 30:8
30:11,12 34:8
35:6,18 54:12
62:12 73:5 74:23
120:6 139:10
**problem** 21:9 31:23
36:11 40:17 50:4
54:5 59:8 75:23
76:1 77:12 101:6
101:8
**problematic** 68:16
**problems** 30:25
64:8 133:20
**procedure** 13:5
21:4,21 22:2,14
33:8 39:6 51:9
69:12,13 73:1,2
79:22 83:17,18,18
83:19 85:4,8,9,19
85:22 86:1,3,11
86:13 102:22
112:21 114:3
**procedures** 32:17
**process** 37:15,20,23
37:23,25 38:3
40:4,7 108:8

139:19,21
**produced** 125:2
**product** 33:7
**profession** 28:15
**professional** 17:19
35:5 78:18 82:5
82:16 88:11
111:12
**professionals** 82:23
83:9
**program** 16:10
63:7 92:19 106:4
106:4
**progress** 40:23
**progression** 40:9
**promptly** 54:11
**proofs** 115:8
120:13
**properly** 32:24
36:5
**proposition** 14:8
29:10,16 49:8
50:3 69:5 71:1
73:11 78:23 83:14
83:15
**provide** 42:21 43:1
90:9 98:24,25
104:24 114:14,18
126:5
**provided** 91:6,21
93:6 104:25
107:12,14 117:17
**provider** 8:5 10:5
17:7,14 35:5
81:20,21 104:13
112:17 126:9,17
127:2,6,12 128:1
128:17 129:14
130:5 134:14
136:17,18,19
137:9
**provider's** 10:7
126:23
**providers** 16:10
126:4,15 127:21

129:14 130:6
**provides** 43:4,6
**providing** 41:19
42:15
**PT** 102:2
**public** 1:23 22:2
141:6,21
**published** 30:20
62:20
**pulled** 103:17
**purports** 66:3
**purpose** 83:2
**put** 21:14 24:16
25:17 40:19 62:10
70:15 71:9 78:23
81:20,21 82:17
83:5 84:8,13,14
92:19,20,25 95:3
101:9 113:10
114:17,23 119:16
130:9 132:8

**Q**

**Quality** 111:6
**question** 6:4,8 8:1
12:23 14:4 15:19
15:20 18:24,25
20:16,17 25:16
26:1 27:3 34:10
49:13 54:16 56:20
59:16 60:7,9
61:23 62:18 68:7
68:16 71:4,10
75:1,2 82:3 85:1
95:18 97:8 112:6
115:25 116:6,21
117:2 122:12
123:11 128:15
**questioning** 133:7
**questions** 5:25 6:1
15:18 54:8 61:13
76:5 78:7,10
90:10,19 91:18
93:6 125:15,17,18
126:3 127:20

129:13 141:11
**quick** 27:9 110:12
**quit** 89:10
**quite** 40:24 75:2

**R**

**R** 2:16
**radiologist** 75:24
**raise** 4:18,24 87:25
88:16,18 89:9
106:8
**raising** 87:24 88:13
88:20,20
**random** 15:25
**rare** 67:9,11
**rarely** 34:10 37:1,4
65:20,22 72:8
79:11
**RC** 85:19 86:14
**Rd** 2:4,11
**re-evaluation** 65:11
**react** 64:11
**read** 25:3 30:15,16
67:12 75:22,24
76:2,4 77:7 78:6,9
78:11,12 87:19
89:18 93:16,19
102:14 117:1
123:7
**reading** 76:2 93:14
**reads** 75:25
**real** 45:22 70:16
101:6
**realistic** 35:21
**realistically** 36:5
40:13 45:21
**reality** 50:13
**realize** 67:17,19
**really** 19:17 24:23
35:9 39:9,13
52:22 92:13 95:9
105:16 120:3
121:11 122:23
123:8 125:4
**reason** 7:18 9:13,15

Keith Papendick, M.D.                    Eddie Spiller v. Jeffrey Stieve

Page 13

9:16 12:24 13:2
21:13 33:10 49:1
52:20,22,23 76:22
106:3
**reasonable** 36:17
41:3,20 80:4,15
80:20 83:22 85:21
86:9,13,14,15
119:10,13
**reasonably** 31:12
**reasons** 10:22 11:1
11:13,18 15:8
16:18
**recall** 8:7 90:9 92:3
**receive** 7:11 48:12
48:19 49:21,24
59:18 62:1 118:18
126:10
**received** 7:9 8:5
**receives** 17:18
**receiving** 127:4
**recess** 27:13 67:23
110:16 125:9
**recollect** 8:25
**recommend** 44:12
71:2 130:11
**recommendation**
19:12 20:23 21:1
87:3 127:4
**recommendations**
18:6 20:8,20
126:25
**recommended** 7:22
8:10 13:20 14:2
15:6 20:1 51:15
58:12 76:14 79:20
80:13 85:7 127:3
**recommending** 8:3
42:11 128:25
**recommends** 52:2
86:21
**record** 4:3 6:2
22:25 23:12,16,23
24:7 27:12,15
67:22,25 70:1

72:16,16 76:8,9
78:3,17 80:10
81:17,19 82:10,24
83:10 86:25 87:1
87:3,14 88:6 94:2
100:25 110:15,18
117:23 118:10
125:8,11 126:21
126:24
**recorded** 141:12
**Recorder** 1:23
141:1
**records** 23:10,13
23:24 35:11 79:3
79:6,9 83:2 86:22
87:5,8,11 90:24
91:3 93:20,22
112:7 115:17,21
115:24 117:6
118:9 124:19,23
125:2 133:13
**Recross-Examin...**
3:7 130:14
**Redirect** 3:5 126:1
**reduce** 63:22 65:3
**reduced** 141:13
**reduces** 64:4
**reduction** 64:19
**refer** 112:7
**referencing** 72:17
**referral** 7:15,17
39:9
**referred** 13:13 21:3
22:1
**reflect** 83:2 126:24
**reflected** 81:3,17
81:19 82:6 84:19
96:6 97:1,10,19
**reflects** 98:13
**refused** 46:13
**regard** 129:16
**regarding** 126:15
**regardless** 48:12
**regards** 128:5
**regimen** 62:6 63:13

**regional** 138:22,24
139:13
**regular** 42:8 79:6
**regularly** 123:19
**relate** 49:6
**related** 30:25 45:2
45:10 51:21
**relates** 60:3
**relating** 49:25
**relationship** 114:1
114:1,3
**relevant** 54:17 83:5
83:9
**reliable** 79:4
**relief** 39:12
**relieve** 47:10,10
**rely** 36:17 87:7
93:17
**remember** 13:14
15:3,6 90:3 91:11
107:20
**repair** 85:19 86:15
**repairable** 75:12
**repeat** 29:14
**replace** 70:10
**replaced** 61:16,18
77:15
**replacement** 61:20
70:7,11,18,20
71:5,11,19 73:12
73:16 74:9,11,17
74:20,24,25 75:17
76:14 86:4
**replacements** 70:24
**report** 8:7 42:12
75:20 109:21,24
110:2,10 132:10
133:9
**reports** 66:3
**request** 7:9 8:25
9:8 11:23 83:19
90:1 94:24 96:25
97:1 99:19,21,23
100:21 101:17
103:21 127:12

132:10
**requested** 56:5
118:17
**requesting** 69:23
140:15
**requests** 7:15,17
19:6 32:17 41:23
**require** 26:21 69:7
**required** 109:1,2
**requirements** 54:13
**residency** 28:4 29:9
30:2,3
**resident** 72:1
**resolve** 136:16
**resolved** 135:13
**resolves** 136:16
**resort** 41:9
**resource** 34:18
**resources** 33:1
**responded** 105:8
**response** 94:24
95:20 96:16 97:5
98:17,25 103:22
104:4,6,13 105:8
114:23 115:3,3,16
117:1,18 119:11
120:8 122:3 132:9
**responses** 6:10
90:13 92:16 96:3
126:20
**responsibility** 52:1
**responsible** 42:10
42:14
**rest** 87:9
**restate** 68:6
**restricted** 99:10,15
123:18 130:10
**resubmit** 126:12
**result** 41:3 66:4
**results** 39:18 40:10
41:3,6 42:21 43:1
43:5,6 67:11
**reversed** 139:8
**review** 8:20 15:1
42:9 59:2 60:25

79:6,9 90:24
91:18 92:18 93:12
95:4,19 107:19
114:15 118:9,10
118:10 127:24
128:2 132:8
138:19 139:17,19
**reviewed** 91:1
117:17
**reviewer** 25:1,5
129:1
**reviewer's** 24:23
94:1
**reviewing** 87:7
139:21
**reviews** 106:11
**Ricky** 48:9
**rid** 124:17
**right** 4:18,24 7:2,12
7:21 8:2,9 11:23
12:20 15:16 16:7
18:6 19:8,18
21:10 22:17 24:24
25:19 29:8,13,25
30:3 31:6,8 33:20
34:14 35:7,12,19
35:23 36:6,18,20
36:21 37:5 39:10
39:13 40:8,23
41:7,15,17 43:7
44:14 45:25 46:2
49:18 50:14,24
52:12,15 53:14
55:17 56:2,4,12
56:22,24 57:10,12
57:20,25 58:3,8
61:24 63:13,23
64:1,5,11,20,21
64:21,24 65:1,3,6
65:8,18 66:5,8,12
66:24 67:3,6 68:3
68:4,9,14 69:3,7
69:14,25 70:1,2,4
70:22 71:16 73:14
73:17,18,19 74:2

Keith Papendick, M.D.          Eddie Spiller v. Jeffrey Stieve

74:10,15,17,18
75:21 76:11,15,23
77:3 78:15,18,24
79:18,20,25 80:14
80:23 81:3,15,25
83:10 85:8 87:8
88:14,16 89:9,12
89:24 90:6,16
95:16 96:4,14
97:19 98:6,8,23
99:10 101:13
102:2,7,17,24
103:7,9 105:14,20
105:22,24 107:8
107:23 109:4,22
111:22 112:2
113:3,6 114:19,25
116:21 118:2
122:14 124:23
125:6,24 127:10
128:8 130:18,24
131:8,13,21 132:1
132:2,8,24 135:22
137:7,11 138:13
140:7
**right-hand** 77:25
**risk** 64:6,7
**RML** 124:2
**road** 124:13
**Robbins** 2:16 3:6
4:13,14 125:23
127:19 140:18
**ROBERT** 1:13
**Rogers** 123:13,16
124:5
**roll** 16:2,4
**rooms** 38:20
**rotate** 60:15
**rotating** 60:18
**rotator** 75:8
**rounded** 38:19
**routine** 118:8
**rub** 70:15,16
**rubbing** 70:17
**rule** 26:24

**runs** 107:1

---

**S**

**S** 1:9
**safety** 22:2
**Salary** 106:6
**Sarah** 2:16 4:14
**sat** 106:13,14
**satisfy** 9:1
**Sault** 10:16,17
12:15 51:22 53:20
54:3 55:3 90:8
105:19 131:17
**save** 44:6,19,22,23
**saw** 55:7,21,22 70:2
76:12,25 95:19
99:16 107:19
132:10 133:13
**saying** 7:21 10:21
10:24 15:24 17:17
18:2 19:25 29:2,2
35:14 36:2,3 39:3
40:12 42:17,25
43:2,22 46:17
52:6,6,12 54:10
55:1 58:22 59:21
59:24 60:21 68:16
78:22,23 84:4
85:9,21 86:9
93:23 97:11 98:2
99:16,22 101:7,10
113:14,21 119:21
120:7 133:14
**says** 16:13,17 17:3
17:8,9 18:10,16
19:1,10,18 20:7
20:21 21:16 25:5
26:24 35:17 36:11
42:12 48:19 52:9
52:10 53:10,11,12
54:10 61:17,18
63:9 64:10,11
80:8,13 83:21
84:5,5 85:7,14,18
86:7,20 89:1,11

89:15,23 91:11
100:19,20 102:13
114:24 115:3
118:16 119:5
121:11 122:22
123:12 132:17
135:18 136:19
139:2,14
**scan** 42:1
**scans** 41:24
**school** 27:24
**scope** 62:23 63:4,5
67:16
**second** 13:19 23:14
24:11 52:2,4,8,9
55:5,7,21,23 56:7
56:8,10,23 57:4
59:1,1 80:8 83:11
83:16,16,19,21,23
85:5,17,18 86:20
87:2,25 94:25
98:19 108:1
126:22 135:20
136:1,3,4,5,8,9
**secretaries** 101:2
**secretary** 95:3
109:11
**secure** 9:10,17,25
10:18,20 11:5,10
12:17 13:5,7 21:5
22:2 51:10,12
55:8,12 61:3
102:16,21 112:20
131:18 135:2,4,25
136:6
**security** 9:15,16,19
10:18 21:13 22:5
49:5,17 50:9
51:11 54:13 95:24
**see** 10:21 11:15,23
15:24 16:13,23,24
17:8 19:7 22:7
23:1,18,22 24:23
40:12,21,22 51:18
52:1 55:5 59:4,4

60:20 62:11 65:13
66:24 75:20,20
77:1,17,20,25
78:13 81:17 85:5
86:24 87:18 93:2
94:2,22,24 95:5
96:6 97:1 100:9
101:12 102:6
104:16 106:2
113:3 115:1
118:20 119:22,25
123:6 126:7 128:2
129:8,12,15,18,21
129:23 132:5,7,8
133:19 134:8,13
135:2 140:15
**seeing** 8:7,22 35:11
91:11 115:13
**seen** 37:9 50:20
55:12,25 56:9
58:11 65:23 75:18
77:16 100:17,19
100:22 102:13
107:13,17 114:7
132:13,14
**seg** 113:10,13,18
**select** 43:7
**send** 49:4,23 62:10
65:13 114:22
134:24
**sends** 39:21 134:22
**sense** 44:14 66:2
134:6,10,11,11
**sent** 54:12,19,21
59:14,23 108:19
108:21 130:3,25
135:1 136:5
**sentence** 73:10
76:13 87:20 88:16
100:18
**separate** 53:8 94:15
**September** 116:13
**set** 24:15 59:1
141:8
**seven** 64:4

**severe** 41:13
**shakes** 6:11
**shape** 60:4,5
**short** 75:22
**should've** 57:5
**shoulder** 6:13 7:8
8:4,11 21:15
35:18 36:10 47:9
48:12 49:3,10,22
50:14,23 52:10,11
53:11 62:11 68:4
68:10,13,18,20
70:7,12 71:19
72:2,7,7,15 73:12
73:12,16,17,18
74:3,4,6,6,8,11,16
74:17,20,23,25
75:10,17 76:14
77:11,12,13,14,19
79:20 80:8,14
85:8 86:4 89:7,16
89:22,23,25 90:1
90:6 112:10
114:25 118:17
130:6,7 133:11,21
133:21 134:7
**show** 24:8 93:21
124:20,23
**showed** 43:16
62:21 110:25
130:21
**shown** 65:25 78:14
93:5
**shut** 114:5
**side** 71:22 77:25
**sign** 93:9,10,14,19
114:15,22
**signed** 92:24 93:13
99:5 117:13,15,16
118:5
**signing** 93:3
**similar** 45:18
**similarly** 39:4
**simply** 12:19 55:9
55:15

Keith Papendick, M.D.                     Eddie Spiller v. Jeffrey Stieve

**single** 15:5 43:16
58:3,8 62:25
86:23
**Sinkovich** 2:2 4:22
4:22
**sir** 14:24 130:13
**sit** 7:21 8:2,9 27:1
42:8 101:13 139:6
**site** 8:5 11:22 17:14
114:4 136:17,18
136:19
**sitting** 113:2
**situation** 14:15,21
20:10 58:16 59:11
59:24 61:3,10
84:4
**six** 77:22 140:9,9
**slight** 56:19
**slipped** 84:17
**small** 47:1
**somebody** 29:3,20
29:22 32:12,15
35:11 38:21 39:5
40:19 41:13 46:3
47:9,18 68:2,9,13
74:14,19 75:4
77:15 92:20,25
93:6 97:15 108:11
109:12,13 130:7
138:18,18 140:7
**sorry** 4:21 26:19
31:21 40:6 51:6
58:21 83:13 89:10
94:21 99:5 116:24
124:17 129:3
134:1 137:13
**sounds** 17:22
**source** 98:19
**sources** 98:16
**Southfield** 2:5
**spasms** 89:17
**specialist** 7:22 8:10
8:10 18:2,6,10,12
18:16,18 19:1,2,4
19:5,10,12,18

20:1,7,23,25
23:24 50:23,25
52:2 53:10 84:5,5
127:3 129:18
130:7 135:6
**specialist's** 20:8
126:25
**specialist-recom...**
49:10,22
**specialists** 59:17
84:9 89:11 129:8
129:12
**specialty** 28:14,18
28:19
**specific** 7:18 37:24
42:16,17 62:6
69:4 91:10 95:21
95:22 106:2
107:21
**specifically** 29:2
129:16
**specifics** 15:7
**spend** 42:20
**Spiller** 1:3 4:5 6:13
6:22 7:2,23 8:4,11
10:21 13:1 19:22
22:17,20 50:10,13
56:14 57:1 58:12
58:22 62:1,12
88:8 96:4 102:4
104:25 112:9,16
113:20 114:2
128:5 129:16
**Spiller's** 6:23 7:7
22:8 33:24 88:10
90:1
**spine** 31:1
**spoke** 132:11
**spontaneously**
132:4
**stack** 94:9,10
**stand** 71:17
**standard** 23:11,12
**standpoint** 43:20
43:22 77:21

**staple** 24:6
**start** 40:20 47:12
60:22 106:12
**started** 46:20 57:17
61:10 66:15 67:2
67:5 140:15
**starting** 62:7
**state** 9:9 16:11 22:5
22:7 23:13 32:7,9
49:23 57:6 111:9
111:16 139:1,1
141:3,6
**statement** 26:15
29:4 60:7 103:2
124:4,8 138:11
**states** 1:1 4:6 10:15
32:11 88:16 89:9
139:17 140:6,9,10
**static** 37:9,10,10
**status** 99:15
**stay** 11:11,22 13:23
13:24,25 14:3
21:5,6 25:8 26:7
37:1,4 54:3 95:24
**stays** 130:2
**Ste** 2:4,11 10:16,17
12:15 51:22 53:21
54:3 55:3 90:8
105:19 131:17
**step** 7:1 35:16 83:1
**steps** 37:24
**steroid** 62:11
105:12,13
**steroids** 39:23
40:17 62:4
**Stieve** 1:10 2:21 4:5
4:15 47:25
**Stiller** 10:25
**stood** 131:21
**stories** 88:9
**story** 88:10 113:9
**Street** 4:9
**strengthened** 75:8
**strike** 6:22 20:5
34:13 42:18 51:25

57:1 69:6 70:6
74:9 78:15 81:22
83:1 102:9 104:24
122:12 137:3
**structure** 77:14
**studies** 63:16,17
65:2 67:19
**study** 43:16 62:20
63:9 66:2,3,14,22
67:2,3,11,12,13
67:15
**stuff** 31:19 49:17
72:6 128:19
139:22
**subscribe** 30:13
**substance** 116:20
**suddenly** 61:12
**sued** 107:25 114:20
118:11
**sufficient** 78:14
115:5,6 117:21
120:10,11 121:12
121:20
**suggest** 23:18,23
97:7,7 126:6
**suggested** 36:12
56:5 85:22 86:10
**suggesting** 54:9
97:15 102:24
**suggestions** 126:18
134:15
**sum** 116:19
**summary** 78:13
84:19 107:23
**supervision** 109:8
109:11 141:13
**supervisor** 109:25
**supplement** 97:5
**supplied** 112:8
**supply** 79:11 111:8
**support** 111:22
**supposed** 83:5
84:22 85:12 112:8
**supposedly** 96:21
98:13 109:20

**sure** 9:5 17:22,23
63:3 64:17 69:19
71:24 72:15 87:23
91:18 92:18
105:25 110:21
129:4 136:23
137:1,22 139:21
140:9
**surgeon** 8:8 12:11
12:13,15 13:4,8
20:20 22:1 51:4,8
51:11,12,17 52:9
52:18 54:24 55:20
56:11,23 57:4
59:4,5,6 61:1,2,15
61:24 65:14 72:1
84:16 85:12 86:20
87:2 105:9 123:14
124:6 131:15
**surgeon's** 56:3
**surgeons** 51:10
56:15,18,21 58:11
102:6 105:19
**surgeries** 6:20
10:17 22:15 68:23
69:3,6,7,17 71:2
89:25 128:14
129:5 130:2
**surgery** 6:14,22,23
7:7,9,23 8:4,11,17
8:25 9:9,14,18
10:8,15,22,25
11:4,13,21,24
12:14,17,19,19,20
12:25 13:1,20
14:12,18 15:6,10
17:9,14,15 18:2,4
18:10,11,16,17
19:1,10,17,20,21
20:1,22 21:3,8,15
22:8,11,16,20
25:7,7 26:6,7
35:18,23 36:10,12
39:24,25 40:3,18
41:9,14 47:7

| | | | |
|---|---|---|---|
| 48:12,12,19,20 | **take** 5:21,24 7:1 | 77:7 96:15 113:8 | 97:4 99:1 101:18 |
| 49:3,11,22,24 | 10:6 16:4 27:9 | 114:5 126:4 | 103:13,14 104:3 |
| 50:7,14,23 51:13 | 35:16 38:20 40:17 | 138:17 | 104:14 107:22 |
| 51:14,15,17,21,24 | 45:4 63:10 66:20 | **telling** 10:10 84:16 | 117:15,16 119:21 |
| 52:10,11,25 53:11 | 66:22,23,23 67:20 | 88:8 | 120:25 127:6 |
| 53:13,22 54:4,11 | 83:1 93:24 99:22 | **tells** 79:2 128:17 | 131:22 133:23 |
| 54:13,19,20,24 | 108:1 110:12 | **ten** 44:22 | 134:3 138:13 |
| 55:4 56:5,7,11,13 | 123:5 125:6 137:5 | **tend** 36:22 37:7 | 139:15 140:14 |
| 56:18,20 57:5 | 137:15 | **tends** 36:25 | **thinks** 77:15 |
| 58:12,13 59:9,17 | **taken** 1:22 4:5 5:8 | **Tennessee** 109:23 | **third** 139:10 |
| 59:19 61:22,22 | 5:16,19 82:3 | **terms** 35:4 37:10 | **Thomme** 2:9 3:5 |
| 62:2 63:12 68:4 | 122:23 141:7 | 37:10 49:4 96:4 | 4:16 6:15,25 7:24 |
| 68:10,13,18 69:23 | **takes** 38:15 64:1,17 | 101:22 | 8:15 9:2,20 10:4,9 |
| 70:7,11,18,20 | 108:22 112:2 | **test** 5:20 | 10:23 11:2,6,14 |
| 71:5,11,19 72:7 | 138:17 | **testified** 5:2 | 12:9,21 13:3,9 |
| 73:12,13,16 74:9 | **talk** 58:24 63:21 | **testify** 141:9 | 14:14 15:11 16:20 |
| 74:11,17,20,24 | 138:18 139:6 | **Thank** 26:14 | 17:12,20 18:7,13 |
| 75:1,12,14,17 | **talked** 49:16 51:2 | 107:10 127:15 | 18:19 19:3,9,19 |
| 76:14,18 77:2,9 | 73:22 76:18 89:1 | 130:13 | 20:9,14,24 21:11 |
| 79:13 80:8 89:12 | 94:2 106:13 124:3 | **therapy** 39:22 | 21:19,24 22:18 |
| 89:15,16,17,24 | **talking** 19:22,23 | 40:17 62:3,6 | 23:4 24:6,15,19 |
| 90:1,6 95:23 | 41:21 44:10 45:13 | 66:22 75:7 | 25:4,4 26:11,17 |
| 99:19 100:21 | 45:14 46:10 58:24 | **thing** 25:13,24 29:5 | 26:21,24 27:4,7,9 |
| 102:15,20 103:3 | 66:19 67:15,18 | 38:1 42:12,25 | 37:16 43:8 46:6 |
| 104:16 105:17 | 69:4 72:25 77:2 | 43:2 53:17 61:25 | 46:14 48:14,21 |
| 112:10 123:12,15 | 83:15 87:4 90:20 | 70:15 80:16 85:14 | 49:12 52:13 54:14 |
| 124:4,7 130:18,20 | 112:21 113:18,20 | 102:15,20 114:21 | 55:18 58:14 60:24 |
| 131:18,22 132:22 | 117:9,10 131:5,5 | 120:4,8,13,16 | 65:19 68:5,11,24 |
| 132:25 133:1,2,7 | 139:4 | 121:13 124:1 | 72:19 73:15 74:12 |
| 133:14 134:18,19 | **talks** 88:25 | 127:13 138:25 | 76:8,19 77:4 78:3 |
| 135:3,3,5,7,14,15 | **tanalog** 38:21 | **things** 5:18,24 | 78:19 80:2,17,25 |
| 135:19,20,24 | **task** 111:24 | 34:22 40:8 41:6 | 82:11,19,25 84:11 |
| 136:9 | **tasks** 32:20 | 41:12 46:3 75:9 | 84:23 85:24 86:16 |
| **surgical** 56:22 73:1 | **teach** 38:2 | 75:11,16 87:12 | 88:23 92:2,4,7,14 |
| **surprise** 37:13,17 | **tear** 62:23 | 93:14 107:2 | 94:5,12,16,19,21 |
| **sworn** 5:2 141:9 | **tears** 62:21 | 113:19 123:23 | 94:23 95:5,9,12 |
| **symptoms** 37:10 | **TECHNICIAN** 4:3 | 129:24 134:13 | 95:14 97:4 102:8 |
| 51:24 | 4:18,21,24 27:11 | **think** 5:20 29:20 | 102:25 103:13,17 |
| **syndrome** 65:12,15 | 27:14 67:21,24 | 33:23 34:2 42:25 | 103:21 104:3,11 |
| **system** 139:14 | 110:14,17 124:15 | 43:1 48:8,17 49:2 | 104:14 105:6 |
| 140:15 | 125:7,10,14 | 54:9 55:2 57:3 | 108:6 109:6 |
| | 140:19 | 58:10 59:3 62:12 | 110:12,23 111:1 |
| **T** | **tell** 6:7 15:21 23:20 | 78:1,13 80:7,14 | 112:11 113:7,15 |
| **T** 1:8 | 40:13 51:16 61:15 | 90:2,5 91:17 94:5 | 113:23 114:8,16 |
| **table** 24:15 | 63:2,3 65:5,11 | 94:11 95:9,12 | 115:10,18 116:4,9 |
| | | | 116:18,23 117:5 |
| | | | 117:14,19 118:3,6 |
| | | | 118:21,25 119:2,7 |
| | | | 119:15,19,24 |
| | | | 120:2,5,18,22 |
| | | | 121:2,5,10,16,23 |
| | | | 122:1,7,11,15,21 |
| | | | 123:1,10,20 124:9 |
| | | | 124:24 125:13,22 |
| | | | 125:24 126:2 |
| | | | 127:15 132:12 |
| | | | 133:3,16,24 134:9 |
| | | | 134:21 135:8 |
| | | | 136:11,21 137:2 |
| | | | 137:18 140:17 |
| | | | **Thomne** 4:16 |
| | | | **thought** 57:24 |
| | | | 101:18 104:2 |
| | | | 130:22 |
| | | | **thousand** 42:13,18 |
| | | | 43:13 106:14,15 |
| | | | 106:21 137:25 |
| | | | 138:2 |
| | | | **thousands** 87:10 |
| | | | **three** 78:6,9 99:18 |
| | | | 99:23 113:17,22 |
| | | | 126:11,13 |
| | | | **threes** 46:20 |
| | | | **threshold** 74:23 |
| | | | **throw** 47:24 |
| | | | **thusly** 115:7 |
| | | | **time** 1:21 4:10 5:16 |
| | | | 5:20 7:4,8,22 9:12 |
| | | | 10:16 15:5 17:6 |
| | | | 19:25 24:12 27:5 |
| | | | 27:11,14 28:8 |
| | | | 30:15,17 31:14,23 |
| | | | 33:13 34:2,5,7,9 |
| | | | 34:21 36:3,4,23 |
| | | | 36:25 37:5,8 40:3 |
| | | | 40:16,20 46:18,19 |
| | | | 47:24 48:6 50:13 |
| | | | 50:15,16,17 55:11 |
| | | | 55:15 56:15 57:16 |
| | | | 59:2,7 62:25 |

Keith Papendick, M.D.

Eddie Spiller v. Jeffrey Stieve

Page 17

67:21,24 71:3
75:4,17 84:7 92:6
105:1,3 110:14,17
112:4 115:9,12,13
116:2,12,15
122:22 123:5
125:7,10 126:8,14
127:3 134:5
140:19 141:8
**times** 5:9,14,19
18:3 34:12,16
80:13 85:7 104:23
108:16 129:13
130:1 137:16,23
137:25 138:2,4,6
138:8,17
**title** 27:17
**today** 5:6 62:9 99:5
108:15,20
**today's** 4:10 8:20
**told** 11:21 65:9
104:17 112:15,16
113:9 121:21
130:17,23 131:12
131:14,24 134:4
138:5
**top** 23:1
**totally** 24:14 72:3
**touched** 35:7,11
**touching** 35:10
**trained** 29:9,25
30:1 51:10
**training** 29:21 30:9
32:23 58:6
**trains** 29:20
**transcript** 141:15
**transcription** 88:11
**transferred** 12:6
21:7 22:10,13
55:2,24,25 58:23
58:25 60:21
**transported** 11:7
**travel** 12:16
**Traverse** 55:7
56:10 85:13,14

131:1,2 136:5,12
**treat** 31:3 32:2 35:9
35:13 37:14 38:2
43:16 46:1,18,19
112:25 129:12
**treated** 22:4 39:10
41:23 46:9,10,10
113:3,21
**treating** 14:8 28:22
29:6 38:22 39:4,5
50:22 58:5
**treatment** 7:20
10:13 12:5,7,11
14:1 16:12,14,18
16:22,25 17:1,4,5
17:10,17 18:5
31:6 32:18 40:10
40:14 41:1,19
43:4,5,7 45:7
46:25 47:2,3 52:2
56:22 62:1 65:17
65:25 66:20,23
72:25 99:25
101:25 102:1
105:5,9,12 113:5
118:17,18 126:10
127:13 128:22,25
132:24 133:1
**treatments** 42:10
**trick** 53:8
**tried** 41:11,17
**trouble** 58:23 59:22
**Troy** 2:12
**true** 18:15,21
122:14,18 123:9
124:4,8 141:14
**truth** 115:7 120:12
141:9,10,10
**try** 40:8,9 41:5
103:5 105:13
**trying** 45:4 46:17
49:6 53:8,8,16
84:1,2,2 97:8
98:14 100:11,15
100:20 104:22

105:16 117:11
**tune** 111:24
**two** 20:17 56:15,18
56:21 58:11 61:21
62:22 67:25 70:16
76:4 77:22 78:15
79:17,24 80:11,13
81:2,5,9,13 82:3,6
82:17 85:7 88:9
88:13,19,25 89:1
89:3,11,11,23
98:16 100:6 102:6
102:14 120:8
123:4 126:11
133:6,7,13 135:2
135:23 138:15
139:11,16,24,25
139:25 140:2
**twos** 46:21
**Tylenol** 47:13
77:20 99:9,15
123:17 124:2
**type** 114:10,12,12
120:24
**typically** 28:25
40:24 67:7,8
73:21 74:2 84:15
107:20 130:4

— U —

**Uh-huh** 45:6
**ultimate** 105:9
**ultimately** 105:16
**UM** 101:8
**UMMD** 139:16
**UMMDs** 140:3
**unable** 88:13,16
89:9
**understand** 6:4,7
6:17 11:12,17
14:1 17:23 23:6
29:10 37:21 39:3
41:8,11 45:4
46:16,17 52:6
53:1 54:1,15 55:5

56:8 60:3,6,8,20
75:1,2 76:12
83:25 92:22 93:5
93:16,23,23 95:8
96:2 98:11 99:18
100:11,15 101:4,7
101:7 107:8 112:6
113:24 115:15
117:11 118:8
136:8
**understanding**
12:22 68:7 120:19
**Understood** 75:15
**unequivocally** 68:8
**unintentionally**
98:9
**unit** 9:10,17,25
10:18 11:10 12:17
13:5,7 21:5 22:2
50:9 51:10,11,12
55:8,12 61:3
102:21 112:20
113:10,18 131:19
135:4 136:7
**United** 1:1 4:6
**units** 113:13 135:2
**University** 130:3
**unreasonable**
124:22
**unusual** 32:1
**Upper** 9:8,17
**UpToDate** 16:8,9
16:10,13,17 17:3
17:9 33:2 35:2,2
105:24,24
**urology** 129:14
**use** 6:10 16:7 32:20
33:1,2 34:18 48:2
50:9 51:11 55:12
57:18 59:3 68:3
68:14,17 69:25
70:2,4 73:13,19
73:21,23,23,25
74:2,7,10 76:15
76:22 103:17

105:10 120:20
131:16,17 139:8
**uses** 21:7 54:22
**usually** 70:20 71:21
71:21,23
**utilization** 9:10
27:18 32:6,8 38:5
42:20 57:10,13,17
109:16 111:15
139:11 140:11
**utilized** 11:10

— V —

**V** 4:5
**vacation** 108:10
**vaccinations** 43:11
**vague** 49:13,14
76:21
**Value** 42:24,24
43:3
**Van** 2:9 3:5 4:16,16
6:15,25 7:24 8:15
9:2,20 10:4,9,23
11:2,6,14 12:9,21
13:3,9 14:14
15:11 16:20 17:12
17:20 18:7,13,19
19:3,9,19 20:9,14
20:24 21:11,19,24
22:18 23:4 24:6
24:15,19 25:4,14
26:11,17,21,24
27:4,7,9 37:16
43:8 46:6,14
48:14,21 49:12
52:13 54:14 55:18
58:14 60:24 65:19
68:5,11,24 72:19
73:15 74:12 76:8
76:19 77:4 78:3
78:19 80:2,17,25
82:11,19,25 84:11
84:23 85:24 86:16
88:23 92:2,4,7,14
94:5,12,16,19,21

94:23 95:5,9,12
95:14 97:4 102:8
102:25 103:13,17
103:21 104:3,11
104:14 105:6
108:6 109:6
110:12,23 111:1
112:11 113:7,15
113:23 114:8,16
115:10,18 116:4,9
116:18,23 117:5
117:14,19 118:3,6
118:21,25 119:2,7
119:15,19,24
120:2,5,18,22
121:2,5,10,16,23
122:1,7,11,15,21
123:1,10,20 124:9
124:24 125:13,22
125:24 126:2
127:15 132:12
133:3,16,24 134:9
134:21 135:8
136:11,21 137:2
137:18 140:17
**variability** 64:10
**verbal** 6:10
**verify** 92:11 93:16
**vice** 109:15
**video** 4:3,4,18,21
4:24 27:11,14
67:21,24 110:14
110:17 124:15
125:7,10,14
140:19
**views** 32:1
**visit** 78:25
**Vivian** 108:24
**vs** 1:7

**W**

**W** 2:11
**wait** 4:20 5:25 6:1
48:10,18 49:2,7,9
49:21 54:21 59:18

61:5 85:11 94:19
94:23 98:16
119:10 123:24,25
**waited** 58:12
**walk** 5:7 70:19,21
70:22 71:6,12
107:20
**want** 8:18 9:6 24:9
24:19 27:6 41:22
43:21 47:24 56:17
60:20 62:25 63:4
63:4 76:5 81:11
82:1 91:7 92:23
95:18,23 100:1,3
104:7 108:3
125:17,22 127:17
130:6,16
**wanted** 10:15 25:22
26:2 51:18 61:24
80:18 85:11 87:19
103:5 110:20,21
135:24
**wants** 27:2 39:20
47:18 52:8
**War** 51:23 53:21
**wasn't** 8:13 11:5
19:21 20:17 22:10
26:18 42:4 59:16
76:21 88:21 92:9
93:1 99:8 103:8
104:17 113:18
115:12 133:2
**watching** 20:19
**Waters** 38:18,19,20
104:21
**way** 20:5 21:13,14
23:19,20 30:22
32:5 34:4 35:21
36:4 37:13 46:3
46:25 47:2 51:4
51:12 60:4,5
68:12 77:25 82:10
82:14 86:5 105:21
111:14 117:2
119:12 121:3,18

124:19 134:17
135:6 139:10,10
**we'll** 5:21 8:24
**we're** 117:8
**we've** 50:20 102:1
**week** 32:14
**weeks** 65:14
**went** 20:17 32:14
46:20 51:11,16
106:23,23,24
107:1 133:4 134:8
135:1 138:22,24
**West** 1:19 4:9
**Western** 1:1 4:7
27:22
**whatsoever** 66:20
**wheelchair** 70:23
**wheelchairs** 70:24
**When's** 30:15
**WILLIAM** 1:10
**wish** 45:15 129:6
**withheld** 97:16
**witness** 3:2 5:2
6:16 7:25 8:16
9:3,21 10:5,10,24
11:3,7,15 12:10
12:22 13:4,10
14:15 15:12 16:21
17:13,21 18:8,14
18:20 19:4,20
20:10,25 21:12,20
21:25 22:19 23:7
24:5,8,17,22
26:25 27:8 37:17
43:9 46:7 48:15
48:22 49:13 52:14
54:15 55:19 58:15
60:25 65:20 68:6
68:25 72:20 73:16
74:13 76:11,20
77:5 78:20 80:3
80:18 82:12,20
84:12,24 85:25
86:17 88:24 92:3
92:6,12 94:7,20

95:3,7,13 97:12
103:1,16,20
104:12,16 105:7
108:7 109:5
110:25 111:3
113:8,16,24 114:9
114:17 115:19
116:5,11,24 117:6
117:20 118:4,22
119:3 120:3,6,19
120:23 121:3,6,11
121:17,24 122:2
122:16 123:2,11
123:21 124:10,17
124:25 125:16,19
127:16 132:13
133:4,17,25
134:10,22 135:9
136:12,22 137:19
141:9,12
**women's** 28:25
**wonderfully** 64:3
**word** 19:7 100:6,6
100:9,15 101:9
139:7
**words** 31:10 39:12
40:4 100:2 121:1
137:5
**work** 6:11 40:14
64:3 75:7 77:8
83:24 102:1 111:4
111:5,6,10 114:5
115:9,12 117:23
**worked** 41:12
102:21
**working** 109:7
110:5,7
**works** 40:21,22
140:15
**workup** 133:17
**world** 51:13 60:14
60:18
**worry** 95:16
**worse** 37:1 66:7,9
66:10,16 67:2,4,5

77:13
**worst** 106:17
**worth** 39:21
**would've** 51:17
69:2 77:2,3,16
96:20 100:4
105:24 130:8
134:6 135:5,25
136:3,14
**wouldn't** 12:19
16:16 29:18 40:11
62:17 66:2 79:15
84:4,17,19 88:3
106:1,2 129:20
135:21,21
**wrapped** 112:21
**wrist** 68:21 74:6
**write** 26:10,12,20
72:12,14 73:22,25
105:7 114:7,9
**writes** 34:19
**writing** 72:15 74:5
76:24 111:1
**written** 88:21 92:17
116:22 141:13
**wrong** 31:8 55:10
55:10,14,14 56:14
56:15 133:14,15
**wrote** 25:5,18
85:15 88:6 100:8
115:1,8
**Wyoming** 140:8

**X**

**X** 3:1
**x-ray** 55:2

**Y**

**yeah** 7:3 8:12 11:19
13:12 14:10,19
26:13 27:7 28:11
31:25 32:14,14
33:18,23 34:15,22
37:18 41:18 43:21
45:12 57:13 64:22

65:4 66:25 69:5,8
71:2 73:3,4,23
74:6,6,16 78:12
79:5,19 80:22
83:21 85:14,25
87:6 89:13 93:11
94:12,13,16 95:12
96:5 99:6 104:11
104:14,16 107:18
108:2 109:9
110:23 111:1
113:24 125:13
126:19 135:11
139:20 140:5,8
**year** 127:8 137:16
137:23,23,25
138:2,4,6,8
**years** 29:21,25 30:5
30:9 36:10,14,18
36:20 48:11,18
49:3,10,21 58:13
59:18 62:22
113:17,22
**yes/no** 26:20 90:22

### Z

### 0

**04** 78:2

### 1

**1** 3:10 22:21,24
76:3 95:19
**1-23** 96:25 97:1
**1-28** 128:6
**1.4** 64:8
**1:45** 4:2
**1:47** 4:11
**10** 5:11,14 34:9
36:10,13,18
107:23 108:22
112:2,3 114:19
137:23
**10-30-2022** 141:22
**100** 15:3 52:24

138:4
**1000** 44:23
**10th** 118:14
**126** 3:5
**127** 3:6
**130** 3:7
**13th** 90:4
**1441** 2:11
**15** 13:17 128:6
**157** 38:20
**18** 13:15,17 94:2
103:3 116:13
**18-cv-00692** 1:5 4:8
**180** 87:24 88:14,14
88:18,20
**18th** 10:14 90:4
103:10 104:7,9,10
131:7
**19** 90:4 114:24
115:4 116:20
117:1,18 119:5,11
120:1,9 121:8
122:13
**1993** 27:25 30:3

### 2

**2-18** 128:6
**2:00** 1:21
**2:14** 27:11
**2:22** 27:14
**20** 5:12,14 29:21
45:14 118:16
119:17 120:1
121:20 122:4,18
**2010** 28:9 114:24
117:22
**2011** 118:18
**2012** 27:20 38:4,7
**2014** 38:5,7 106:8
**2015** 10:14 13:1,17
22:25 50:20,21,24
90:4 94:3 96:6,13
99:19,21 100:21
123:13 124:3,5
**2016** 68:22 69:2

102:11
**2017** 38:6 106:10
**2018** 62:20 67:14
116:13
**2019** 1:20 4:2,10
**21** 122:18
**22** 3:10
**25** 29:25 30:5,9
34:7
**26** 96:6,13,16
**26700** 2:4
**26th** 22:25
**27** 1:20 4:2,10
123:13
**27th** 124:3,5

### 3

**3:15** 67:21
**3:28** 67:24
**30754** 2:19
**310** 2:11
**32** 123:6,7
**3rd** 102:11

### 4

**4:26** 110:14
**4:37** 110:17
**4:55** 125:7
**4:59** 125:14
**400** 2:4 138:8
**407** 14:17 15:5,9,16
15:22,25 16:19
37:15 57:20 69:4
69:7 75:19 76:11
76:25 79:10,12,13
93:24,25 95:14,20
95:21,22 96:6
98:18 100:19
101:2 108:9
117:23 126:20
127:12 128:1,2,4
128:9,18 130:17
131:6,10 132:4,16
137:5,7
**407s** 7:13 39:6 91:1

91:3 93:22 97:10
108:4,11,18 117:7
118:11 126:7,20
127:22,24
**409** 85:18
**4623** 1:23 141:20
**48033-2618** 2:5
**48098-4476** 2:12
**48909-8254** 2:20

### 5

**5** 3:4
**5:20** 140:19,22
**50** 34:5 40:2,16
**500** 138:6,10,13
**525** 1:19
**535** 4:9

### 6

**6** 76:3
**60,000** 45:12,15
47:1

### 7

**7:59** 125:10,12

### 8

### 9

**90** 87:24 88:14,14
88:14,17,20
**93** 28:3
**98** 89:3,6