UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW LYLES,

      Plaintiff,

v.

KEITH PAPENDICK, M.D., and
SHARON A. OLIVER, M.D.,

      Defendants.

_____/

Case No. 2:19-cv-10673

District Judge Laurie J. Michelson
Magistrate Judge Kimberly G. Altman

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 66)

### I.     Introduction

This is a prisoner civil rights case under 42 U.S.C. § 1983. Plaintiff Andrew Lyles (Lyles), a prisoner currently in the custody of the Michigan Department of Corrections ("MDOC") filed a *pro se* civil complaint under alleging Eighth Amendment violations naming several medical personnel and employees of the Michigan Department of Corrections as defendants. (ECF No. 1).[1] Pretrial

_____

[1] An Order for Appointment of Counsel was entered on October 1, 2020 (ECF No. 39, PageID.230), and attorney Ian T. Cross entered an appearance on Lyles' behalf on March 25, 2021 (ECF No. 46, PageID.279). Thus, Lyles is now represented by counsel.

matters have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B). (ECF No. 40).  As will be explained, only Sharon A. Oliver, M.D. (Dr. Oliver) and Keith Papendick, M.D. (Dr. Papendick) remain as defendants.  Before the Court is defendants' motion for summary judgment.  (ECF No. 66).

For the reasons that follow, the undersigned RECOMMENDS that the motion for summary judgment be GRANTED IN PART AND DENIED IN PART.  Specifically, summary judgment should be GRANTED as to Lyles' claims against Dr. Oliver and DENIED as to Lyles' claims against Dr. Papendick.

## II.    Procedural History

In addition to Dr. Oliver and Dr. Papendick, Lyles named Heidi Washington, Corizon Medical Services, Joshua Buskirk, Donna Rohrs, Susan Smith, Kathleen Leffingwell, Curtina Jones, Carla Gross, and Cynthia Pawlaczyk as defendants.  Upon initial screening, Washington and Corizon Medical Services were dismissed under 28 U.S.C. §§ 1915(e)(2)(B).  (ECF No. 6).  The case was then stayed for 90 days to allow Lyles to participate in the *pro* Se Prisoner Early Mediation Program.  (ECF No.  7).  Mediation did not result in a settlement.  Following motion practice, Lyles' claims against Buskirk and Rohrs were dismissed for Lyles' failure to exhaust his administrative remedies.  (ECF No. 37).  Following the appointment of counsel, the parties stipulated to the dismissal of the MDOC defendants (Smith, Leffingwell, Jones, Gross, and Pawlaczyk).  (ECF No. 65).

### III.   Facts

The relevant facts as gleaned from the record follow.

According to the complaint, Lyles was incarcerated in the Saginaw Correctional Facility.  (ECF No. 1, PageID.2).  Lyles suffers from ulcerative colitis.  He was first seen on November 7, 2016, with complaints of low abdominal pain with bloody stools starting three weeks earlier.

Lyles states that Dr. Papendick denied numerous requests for an off-site colonoscopy that could have diagnosed the condition earlier, and that the treatment he was given both before and after the diagnosis was ineffective.  He alleges that both Dr. Papendick and Dr. Oliver were deliberately indifferent to his serious medical needs and failed to properly diagnose and treat his ulcerative colitis, in violation of the Eighth Amendment.  (ECF No. 1, PageID.4-5).  He alleges that by the time he was belatedly given a colonoscopy, and then given mild and ineffective medications, his "disease had progressed to the need for immediate and lengthy hospitalizations, nearly losing his colon and his life."  (*Id.*, PageID.5).  He eventually spent seven weeks in the hospital and dropped to 124 pounds.  (*Id.*).

As set forth below, the depositions, affidavits, and medical records submitted with the defendants' motion and Lyles' response further detail the substance of Lyles' Eight Amendment claim.

3

Dr. Oliver testified at her deposition that during the relevant time period, she was the only physician on duty at the Saginaw Correctional Facility. (ECF No. 66-2, PageID.571-572). Lyles presented with pain in his lower left quadrant which Dr. Oliver said could indicate a number of problems, including constipation, ulcers, gas, cancer, and diverticulitis. (*Id.*, PageID.573). She ordered a fecal occult blood test ("FOBT"), in which a small stool sample is examined for blood. Lyles' FOBT showed "bright red blood per rectum" ("BRBPR") which indicated that the bleeding likely came from the large intestine. (*Id.*, PageID.572). Based on the test results and a physical examination, she ruled out problems with the esophagus and stomach. She did not find fissures or hemorrhoids. She prescribed Protonix, which decreases acid in the stomach and small intestine. (*Id.*, PageID.573). Dr. Oliver then scheduled an anoscopy, which looks for masses or ulcers in the lower part of the colon. She testified that if the test was negative she would order further procedures. The test showed normal results.[2] (*Id.*, PageID.573-574).

---

[2] Dr. Oliver's testimony as to the course of Lyles' treatment and evaluation, as well as the testimony of Dr. Papendick and the affidavits of the parties' expert witnesses, reflect documentation in Lyles' medical records, contained in Defendants' Exhibits A and E, and Lyles' Exhibit B. Specific relevant portions of those records will be discussed in the Analysis section of this Report and Recommendation.

Then, on November 22, 2016, Dr. Oliver requested a colonoscopy in order to find the cause of Lyles' pain and bleeding.  She submitted her request to Utilization Management for approval of an outside provider.  In her request she noted that Lyles "failed outpatient therapies," meaning that the Protonix did not relieve his symptoms.  (*Id.*, PageID.574).  Dr. Papendick, who was the reviewer for Utilization Management, denied the request for a colonoscopy, stating "medical necessity not demonstrated."  He also ordered an Alternative Treatment Plan ("ATP") to evaluate or treat other possible causes.  (*Id.*).  The ATP that he ordered directed treatment for constipation with medications and re-evaluation with x-rays. (*Id.*, PageID.574).

Dr. Oliver testified that the November 29, 2016 ATP from Dr. Papendick meant that she should rule out constipation as the cause of Lyles' symptoms.  On December 13, 2016, Lyles' abdominal x-rays were normal, which, she said, ruled out constipation.  (*Id.*, PageID.575).  On December 22, 2016, Lyles again had a positive FOBT and BRBPR.  He had lost weight, which indicated his symptoms were worsening, and had three to five liquid stools per day.  (*Id.*).  On December 22, 2016, Dr. Oliver again requested an outside gastroenterology consult, because after following the ATP, Lyles continued to have symptoms.  She said that this could indicate polyps, diverticulosis, or ulcerative colitis.  (*Id.*, PageID.575-576).

Dr. Papendick again denied the outside consult, stating "no medical necessity."  His second ATP directed treatment of constipation with medications and to prove clearance with abdominal films.  (*Id.*, PageID.576).  When asked if that was what she had already done, Dr. Oliver stated, "I thought so."  (*Id.*).  She did not agree with the ATP because she felt the constipation had already been successfully treated.  (*Id.*).  Because she did not have the authority to send a patient for an off-site colonoscopy without Dr. Papendick's approval, she re-submitted her request on January 6, 2017.  In this new request, she changed the order of presentation of Lyles' lab results and x-rays, and added information about weight loss and increased number of stools.  She again indicated "failed outpatient therapy," including the normal anoscopy which showed that the bleeding had nothing to do with the anus or rectum.  (*Id.*, PageID.576-577).  Dr. Papendick again denied the request, stating "medical necessity not demonstrated."  He added, "when symptoms demonstrate medical necessity, resubmit."  (*Id.*, PageID.577).

Dr. Oliver opined that "medical necessity" for a colonoscopy would be shown "if he continued to have symptoms or the symptoms were worsening."  She said that at that point, she believed Lyles' symptoms had worsened.  She had requested a colonoscopy three times and "did feel that it was something that was important to get the diagnosis," so that "we would know exactly what we were

trying to treat." (*Id*.).  At that time, however, there was no process for appealing ATPs, and Dr. Papendick's decisions were final.[3]

Dr. Oliver examined Lyles on January 11, 2017.  He again had BRBPR with bowel movements, and by now he had been bleeding for three months.  The bright red blood in the stool indicated that the bleeding was in the lower gastrointestinal tract, that is, the large intestine.  Lyles' pain was worsening, and he had lost 11 pounds.  (*Id.*, PageID.579).  She testified that in late 2016 she thought it important to determine the cause of Lyles' rectal bleeding but could not do so without a colonoscopy.  (*Id.*, PageID.579-580).  She was not able to have a colonoscopy done because it was not approved by Dr. Papendick.  (*Id.*, PageID.580).

Dr. Oliver testified that before she made her fourth and ultimately successful request for a colonoscopy in April of 2017, Lyles' symptoms "waxed and waned," at times improving and then deteriorating again.  (*Id.*, PageID.580).  The colonoscopy revealed ulcerative colitis.  (*Id.*, PageID.581).  She testified that it was impossible to say whether or not Lyles would have decompensated even if he had been treated for ulcerative colitis earlier.  (*Id.*).  She said that the purpose of treatment for ulcerative colitis is to relieve symptoms, improve quality of life, and to prevent any progression of the disease.  She said that "to relieve a patient's

---

[3] Dr. Oliver testified that currently, an ATP can be appealed to the MDOC Regional Medical Director.  (*Id*.).

symptoms, if at all possible, the sooner that you can treat them so that they experience relief, the better it is for the patient." (*Id.*).  She added that a patient can have early treatment and still progress, but although it can't be guaranteed, early treatment can relieve pain and stop progression. (*Id.*, PageID.581-582).

Dr. Papendick testified that he was the medical director for Utilization Management, and reviewed requests for off-site medical visits for MDOC prisoners, which he referred to as "407s." (ECF No. 66-3, PageID.597).  He testified that an on-site treating physician would probably know more about a patient than a non-examining physician. (*Id.*, PageID.598).  When asked why he would not "defer to the medical judgment of Dr. Oliver regarding whether a patient needs a given off-site procedure," he replied "that sometimes those procedures that are requested are not the best for the patient." (*Id.*, PageID.600).  He stated that in this case, he did not have any information about what was best for the patient that Dr. Oliver did not have. (*Id.*, PageID.600-601).

Dr. Papendick testified that in response to Dr. Oliver's November 22, 2016 request he ordered an ATP to clear any constipation and to obtain an x-ray to confirm that it was cleared. (*Id.*, PageID.602).  He said that he did not approve a colonoscopy because that procedure could not be done on a constipated individual, and that constipation was a "horrible problem" in the prison population.  He added that constipation was a common reason for bright red bleeding. (*Id.*).

Dr. Papendick testified that in 2016, a radiologist read the x-ray as showing no constipation. (*Id.*, PageID.604). He said that he denied Dr. Oliver's second request for a colonoscopy because the ATP "wasn't completed the first time." (*Id.*, PageID.605). He stated that he himself would "have to see the x-ray" and that the lab and x-ray report indicating "no constipation was seen" was insufficient. (*Id.*, PageID.602). He opined that the radiologist who read the x-ray would not have been able to discern whether there was constipation. (*Id.*, PageID.607).

Dr. Oliver's third request dated January 6, 2017, noted positive FOBT results on November 8, 9, 17, 18, and 22, along with epigastric pain, six to seven stools daily with bright red blood, and a seven-pound weight loss since December. (*Id.*, PageID.600-601). Dr. Papendick characterized the bright red blood in Lyles' stool "as a subjective observation," that is, that Lyles "thinks" he has had bright red blood. (*Id.*, PageID.603). He also testified that the five positive FOBT results between November 8 and November 22 were "subjective from a physician's standpoint." (*Id.*). He stated that he did not know if the FOBT cards were read by a doctor or a nurse and speculated that they may have been misread. (*Id.*). Dr. Papendick acknowledged that Dr. Oliver's January 17 request noted that constipation was cleared, but he added "depending on who read the x-ray." (*Id.*, PageID.604). He testified that he denied this third request because he did not have the information to prove the colonoscopy could be performed without a problem

from the constipation.  (*Id.*, PageID.609).  He also said that "[t]he x-ray needed to be redone."  (*Id.*, PageID.612).  Dr. Papendick also testified that in his view, Lyles' normal hemoglobin levels were a significant factor in his decision to deny a consult, "[b]ecause significant, significant bleeding in the bowel, or anywhere, would cause anemia.  And in this case there wasn't anemia, so he hadn't lost a great deal of blood, if he had lost any.  Like I said, they could've misinterpreted what the red was."  (*Id.*).

Earlier in his deposition, Dr. Papendick testified that to determine the source of the bleeding, he would first determine whether the patient was constipation, then clear the constipation, and then "probably do a colonoscopy."  (*Id.*, PageID.602).

Defendants also submit the affidavit of Dr. Randall R. Stoltz in which he states that he is board certified in family medicine and certified as a "correctional health care professional" by the National Commission on Correctional Health Care.  (ECF No. 66-4, PageID.630).  He reviewed Lyles' medical records, including two positive FOBT results in November of 2016 and two negative results in February of 2017.  He stated that Lyles was diagnosed with ulcerative colitis, hospitalized in August of 2017, and underwent an abdominal colectomy in 2019.[4]

---

[4] "A colectomy is a type of surgery used to treat colon diseases." https://www.hopkinsmedicine.org. (Last visited February 25, 2022).  "The surgery is done by removing a portion of the colon." *Id.*

(*Id.*, PageID.630-631).  He opines that Dr. Oliver ordered appropriate lab testing,

x-rays, and medications in a timely manner, with no unreasonable delay.  (*Id.*,

PageID.631).  He also opines that the length of time until the final diagnosis was

reasonable and had no influence on Lyles' outcome.  (*Id.*).  He states that Dr.

Papendick's initial denial of a referral for a colonoscopy was reasonable, as the

"initial x-rays showed constipation."  (*Id.*, PageID.632).  He stated that he does not

agree that an earlier diagnosis of ulcerative colitis should have been made, and

does not believe that Lyles suffered any damages as the result of Dr. Oliver's and

Dr. Papendick's care and decisions.  (*Id.*, PageID.633).

Finally, defendants submit the affidavit of Dr. Michael Duffy in which he

states that he is board certified in internal medicine with a subspecialty

certification in gastroenterology.  (ECF 66-7, PageID.652).  He reviewed Lyles'

medical records and opines that Lyles' assessment, diagnosis, and treatment

involved the exercise of medical judgment.  (*Id.*, PageID.652-653).  Dr. Duffy

states that Lyles' symptoms did not suggest ulcerative colitis and were common in

other medical conditions.  (*Id.*, PageID.653).  He states that he "do[es] not agree

with the argument that an earlier diagnosis should have been made," adding that

"more likely than not" an earlier diagnosis would not have prevented the need for

surgery.  (*Id.*, PageID.654).  He opines that Lyles did not suffer any medical

damage from defendants' alleged actions or inactions.  (*Id.*).

In response, Lyles submitted the declaration of Dr. Myung Choi, M.D.  Dr. Choi is a board-certified gastroenterologist.  (ECF No. 67-2, PageID.764).  Over his 20 years of practice, he has frequently treated patients with ulcerative colitis as well as patients presenting with abdominal pain or who report passing bright red blood.  He performs colonoscopies several times a week.  (*Id.*, PageID.765).  He states that he has reviewed Lyles' medical records, the complaint, and the deposition testimony of Dr. Papendick.  (*Id.*).

In his Declaration, Dr. Choi summarizes Lyles' medical records, noting that "[b]y 12/22/16, Lyles constipation had resolved; in fact he complained of diarrhea along with persistent rectal bleeding and abdominal pain."  (*Id.*, PageID.766).  He states that Dr. Oliver "appropriately requested a colonoscopy" on November 22, 2016 and December 22, 2016.  (*Id.*, PageID.765-766).  He notes that Dr. Oliver saw Lyles on January 6, 2017 and again "appropriately requested a GI consult," due to an increased number of stools and weight loss. (*Id.*, PageID.766).  He opines as follows:

> There was no legitimate justification for Dr. Papendick's three separate denials of a colonoscopy and gastroenterology referral for a patient with persistent rectal bleeding, change in bowel habits, and a negative anoscopy (no internal hemorrhoids or anal fissure).  Any patient presenting with even minimal rectal bleeding and change in bowel habits such as constipation or diarrhea should undergo a colonoscopy.  Any patient with acute lower GI bleeding consisting of large amounts of blood mixed with stool should also undergo a colonoscopy.

(*Id.*, PageID.766-767).  Dr. Choi states that bleeding from the GI tract does not always cause anemia, and that the fact that a patient is not anemic cannot be used to rule out most serious pathologies like cancer or colitis.  He further states, "Waiting for a patient with persistent rectal bleeding to become anemic before determining the etiology of the bleeding is irresponsible and needlessly exposes the patient to elevated medical risks."  (*Id.*, Page ID.767).  He states that bright red blood passing from the rectum usually indicates bleeding from the lower GI tract. (*Id.*).

Dr. Choi described the FOBT as a procedure where the patient places a stool sample onto a card and submits it to a medical provider, who tests the card by placing a few drops of a liquid reagent onto the sample.  If the reagent turns blue, the sample contains blood.  (*Id.*, PageID.767-768).  Eating beets will not cause a false positive.  While food containing large amounts of animal blood can cause a positive FOBT, it will not cause visible, bright red blood passing from the rectum. (*Id.*, PageID.768).

Dr. Choi further states that neither Protonix nor TUMS is an appropriate treatment for lower GI bleeding, and that neither medication has any effect on a patient's lower GI symptoms.  (*Id.*).  He describes an anoscopy as a procedure which allows the provider to visualize the anal canal and lower rectum, and if the bleeding is caused by hemorrhoids or an anal fissure resulting from constipation,

anoscopy can be helpful to detect those sources of rectal bleeding.  (*Id.*, PageID.769-770).  A colonoscopy, however, "allows a physician to visualize both the entire rectum and the entire length of the colon," and permits the physician to take biopsies of various parts of the colon.  (*Id.*, PageID.770).

Dr. Choi states that "Dr. Papendick's testimony that a colonoscopy cannot be performed when a patient has constipation is false.  In fact, persistent or severe constipation are indications **for** a colonoscopy."  (*Id.*) (boldface and emphasis in original).  He states that patients are prepped for colonoscopies by consuming a laxative solution the day before the procedure.  This "will result in evacuation of any stool from the colon, even if the patient is severely constipated."  (*Id.*).

Dr. Choi opines that because the blood in Lyles' stool was bright red, and the anoscopy did not show internal hemorrhoids or an anal fissure, "the most likely source of the bleeding was pathology in Mr. Lyles' colon or rectum."  (*Id.*).  Such bleeding, he states, can be caused by a number of serious conditions, including cancer, Crohns' disease, and ulcerative colitis.  However, "[b]leeding in the colon is normally not caused by constipation."  (*Id.*, PageID.771).  He states that the primary means of determining the cause of bright red blood or microscopic blood in the stool is colonoscopy.  (*Id.*).

Dr. Choi states that ulcerative colitis cannot be cured, but "timely diagnosis and treatment can arrest progression of the disease and result in long-term

remission." He adds that "when ulcerative colitis goes untreated, the disease

progresses in severity, and the risk of adverse outcomes, including toxic

megacolon, death, or need for a colectomy, increases." (*Id*.). Regarding the failure

to refer Lyles for an earlier colonoscopy, Dr. Choi states:

> The failure to perform a colonoscopy, diagnose ulcerative colitis, and
> commence treatment between early November of 2016 and late
> June/early July of 2017 allowed the patient's ulcerative colitis to
> progress from mild to severe, resulting in progressive anemia,
> pyoderma gangrenosum, aphthous ulcers, and extreme weight loss,
> eventually necessitating a series of hospitalizations in late 2017.

(*Id.*, PageID.772).

Dr. Choi explained that a goal of treatment of ulcerative colitis is to establish

and maintain corticosteroid-free remission, "avoiding both the need to remove the

patient's colon and long-term dependence on corticosteroids." (*Id*.). Long-term

use of corticosteroids has many negative health consequences, including

development of cataracts, glaucoma, loss of bone density, and increased rates of

myocardial infarction, stroke, and heart failure. (*Id.*, PageID.773). He states that

Lyles developed a corticosteroid dependency which lasted until mid-2020. (*Id*)

In conclusion, Dr. Choi opines:

> Within a reasonable degree of medical certainty, had Mr. Lyles
> received appropriate treatment for his ulcerative colitis in late 2016, his
> disease could have been placed into remission and kept in remission
> without long-term use of corticosteroids. The cascade of complications
> that Mr. Lyles experienced from mid-2017 to late 2019, including
> pyoderma gangrenosum, extreme weight loss, multiple emergent
> hospitalizations and dependence on steroids, are a consequence of the

failure to timely and appropriately diagnose and treat Mr. Lyles'
ulcerative colitis.

(*Id.*, PageID.773-774).

### III.    Summary Judgment

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is material if it might affect the outcome of the case under governing

law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court "views

the evidence, all facts, and any inferences that may be drawn from the facts in the

light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley

Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of

material fact exists. . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486

(6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing

that if a party "fails to properly address another party's assertion of fact," the court

may "consider the fact undisputed for purposes of the motion").  "Once the moving

party satisfies its burden, 'the burden shifts to the nonmoving party to set forth

specific facts showing a triable issue.' "  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d

446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))

## IV.    Discussion

Under the Eighth Amendment, prisoners have a constitutional right to medical care. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976).  Prison officials may not act with deliberate indifference to the medical needs of their prisoners.  *Id.* at 104.  An Eighth Amendment claim has two components, one objective and the other subjective.  *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2002).  Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.' "  *Id.*  Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Id.*  Deliberate indifference may be established by showing an interruption of a prescribed plan of treatment, or a delay in medical treatment.  *Id.*; *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992).

Here, Lyles has shown that there are triable issues of fact as to both prongs of his deliberate indifference claim.

### A.    The Objective Component

Defendants argue that Lyles has not met the objective component of a deliberate indifference claim because prior to the time he received a definitive diagnosis of ulcerative colitis, "it was not known and still remains unconfirmed that Plaintiff had ulcerative colitis, as his conditions were consistent with other less serious conditions, including constipation and hemorrhoids, and his condition did appear to improve with treatment that was provided."  (ECF No. 66, PageID.466). Citing *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004) and *Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001), they also argue that in order for Lyles to establish "a serious medical need requiring treatment and that the treatment he received was inadequate and/or delayed, he must demonstrate harm." (*Id*.).

First, the objective test does not require that a medical provider know definitively what an ultimate diagnosis might be.  In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that the objective test requires that "the inmate show that he is incarcerated under conditions posing *a substantial risk* of serious harm."  (Emphasis added).  That risk can be shown by an individual's symptoms. *See, e.g., Burwell v. City of Lansing*, 7 F.4th 456, 453 (6th Cir. 2021) (objective test met where plaintiff exhibited symptoms of abdominal pain and vomiting); *Blackmore v. Kalamazoo County.*, 390 F.3d 890, 899 (6th Cir. 2004) (objective test

met where plaintiff vomited and complained of sharp stomach pains for an extended period of time).

Here, the crux of the deliberate indifference claim is the delay in ordering the colonoscopy as a critical diagnostic procedure, without which the diagnosis and treatment of ulcerative colitis would not be possible.[5] From November of 2016 to January of 2017, Lyles had complaints and symptoms of rectal bleeding, lower left quadrant pain, and weight loss. He had positive FOBT tests showing bright red blood. Dr. Oliver ruled out stomach and esophagus issues, as well as hemorrhoids or tears in the rectum. After an anoscopy was performed, she ruled out ulcers. Because, as Dr. Oliver testified, these symptoms could be consistent with serious conditions such as cancer or diverticulitis, they presented a *substantial risk* of serious harm.

In *Blackmore*, the Sixth Circuit noted two ways to determine whether a medical need is objectively serious: if it is "one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person

---

[5] Defendants' argument that the objective prong fails because "the medical evidence does not suggest [] that he required treatment for ulcerative colitis prior to his ultimate diagnosis in June 2017" (ECF No. 66, PageID.468) misses the point. Obviously the *treatment* for ulcerative colitis was dependent on a *diagnosis* of ulcerative colitis, which in turn required a colonoscopy. This case turns on the delay in ordering a critical diagnostic test, which resulted in a delay in diagnosing and treating Lyles' condition. Under defendants' analysis, the objective test would not have been met if a colonoscopy had *never* been ordered, and thus a diagnosis of ulcerative colitis had never been made.

would easily recognize the necessity for a doctor's attention." *Id.,* 390 F.3d at 897

(quoting *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990))

(emphasis added by *Blackmore*).  Lyles satisfies both methods.  An individual who

has continued rectal bleeding, abdominal pain, and weight loss has symptoms

sufficiently obvious that even a lay person would recognize the need for a medical

professional to determine the cause.  *See Blackmore*, 390 F.3d at 899.

These symptoms were also viewed by physicians as requiring treatment, i.e.

a colonoscopy to determine the cause of Lyles' symptoms.  Dr. Oliver in fact

requested authorization for a colonoscopy multiple times, and testified that she

"did feel that it was something that was important to get the diagnosis," so that "we

would know exactly what we were trying to treat."  (ECF No. 66-2, PageID.577).

Lyles has also submitted the Declaration of Dr. Choi as to the necessity of a

colonoscopy.

Defendants are also incorrect in asserting that to satisfy the objective

component, a plaintiff must demonstrate harm.  This argument is based on a

misreading of *Blackmore*.  In *Blackmore*, the Sixth Circuit stated that a plaintiff

need *not* show actual harm:

> As the Supreme Court has held, the test for deliberate indifference is
> whether there exists a "*substantial risk* of serious harm," *Farmer,* 511
> U.S. at 837, 114 S.Ct. 1970 (emphasis added), and does not require
> actual harm to be suffered.  *See also Smith v. Carpenter*, 316 F.3d 178,
> 189 n. 15 (2d Cir.2003) (observing that "actual physical injury is not
> necessary in order to demonstrate an Eighth Amendment violation" and

declining to adopt a *per se* rule that such injury is required) (citing in part *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the "detrimental effect" of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm.

390 F.3d at 899.

*Blackmore* also held that where there is an obvious need for medical attention,[6] the plaintiff does not have to show "verifying medical evidence" that the condition worsened:

To the extent our previous opinions would benefit from clarification, we hold today that where a plaintiff's claims arise from an injury or illness "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," *Gaudreault*, 923 F.2d at 208, the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated. Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.

*Id*., at 899-900.

Viewing the evidence in the light most favorable to Lyles, as required in a summary judgment motion, he has established the objective prong of his deliberate indifference claim.

## B.    The Subjective Component

---

[6] Lyles does not contend that he received *no* medical attention. The nature and quality of that medical attention is addressed in the discussion of the subjective component.

In contending that Lyles has not satisfied the subjective component of his deliberate indifference claim, defendants argue that he did in fact receive medical attention, testing, and treatment for his symptoms, and that their actions involved the exercise of medical judgment.[7]  Citing *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976), they argue that "[d]ifferences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim."  (ECF No. 66, PageID.468-469).

In *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), the Sixth Circuit did hold that "[t]he requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an

---

[7] Based on a portion of Dr. Papendick's deposition, defendants argue that "Plaintiff has acknowledged that [Dr. Papendick and Dr. Oliver] were exercising medical judgment."  (ECF No. 66, PageID.471).  This contention fails for two reasons.  Regarding the denials of Dr. Oliver's requests for authorization for a colonoscopy, Lyles' counsel asked, "So why wouldn't you defer to the medical judgment of Dr. Oliver regarding whether a patient needs a given off-site procedure," and "So why would you second guess her medical judgment?"  (ECF No. 66-3, PageID.600-601).  These questions were directed at the three requests that Dr. Oliver made between November of 2016 and January of 2017.  But the claim against Dr. Oliver is based on her alleged delay in making her fourth request in April of 2017 *after* the January denial.  Lyles is not questioning her medical judgment before January.  Moreover, as jurors are routinely instructed, questions by counsel are not evidence.

ailment."  However, neither *Comstock* nor *Westlake* held that the quality of the

medical treatment provided to a prisoner is beyond scrutiny under the Eighth

Amendment.  In *Comstock*, the Sixth Circuit said:

> Although defendants strenuously argue that "if medical treatment is
> given it is not a courts [sic] job to second guess the treatment given," .
> . . the issue is not whether McCrary provided *some* medical attention to
> Montgomery, but rather whether McCrary's conduct evinced deliberate
> indifference to Montgomery's serious medical needs.  Defendants'
> position is, apparently, that if a prison doctor offers some treatment, no
> matter how insignificant, he cannot be found deliberately indifferent.
> This is not the law: as the Supreme Court noted in *Estelle,* 429 U.S. at
> 104–05 & n. 10, 97 S.Ct. 285, a prison doctor's medical response to an
> inmate's serious need may constitute deliberate indifference just as
> readily as the intentional denial or delay of treatment.

*Id*., 273 F.3d at 707, n.5.

In *Westlake*, the Sixth Circuit stated that "[w]e believe that a prisoner states

a proper cause of action when he alleges that prison authorities have denied

reasonable requests for medical treatment in the face of an obvious need for such

attention where the inmate is thereby exposed to undue suffering or the threat of

tangible residual injury."  Reasonable requests for treatment would include

reasonable requests for critical diagnostic tests.[8]

---

[8] *Westlake* also suggests that the question of whether a denial of treatment or
diagnostic tests crosses the line into deliberate indifference is a question for the
jury:

> Whether a prisoner has suffered unduly by the failure to provide
> medical treatment is to be determined in view of the totality of the
> circumstances.  In making this determination *the trier of fact* should

In *Atchison v. Cruz*, No. 10-10545, 2011 WL 893096, at *5–6 (E.D. Mich. Jan. 24, 2011)(Whalen, M.J.), *report and recommendation adopted sub nom. Atchison v. Sta. Cruz*, No. 10-10545, 2011 WL 900305 (E.D. Mich. Mar. 14, 2011)(Rosen, J.), a case involving the failure to diagnose a prisoner's risk of suicide, the court discussed in detail why the question of whether the failure to diagnose was negligence or deliberate indifference is generally addressed to the trier of fact, and necessitates the testimony of expert witnesses:

> However, deliberate indifference is not restricted to cases where there is a complete absence of care, and the fact that an inmate receives *some* level of medical attention does not preclude constitutional scrutiny of the quality of that care. That assessment necessitates a factual inquiry.

> In *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir. 1989), the issue was whether "decisions to remove [the prisoner] from medication and to restore the medication without Lithium constituted deliberate indifference to [his] psychiatric condition." Affirming a denial of summary judgment, the Eleventh Circuit stated, "We cannot determine ... whether [the doctor's] treatment constituted deliberate indifference to Waldrop's serious psychiatric needs because that treatment must be evaluated according to professional standards," and thus "there is a disputed issue of material fact regarding the quality of care ... provided to [the prisoner]." *Id. Waldrop* relied in part on *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986), where the Court held that "[w]hether an instance of medical misdiagnosis resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses."

---

consider the practicalities of the situation including the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention. *Id*., at 860, n.4. (Emphasis added).

In *Terrance v. Northville Regional Psychiatric Hosp.,* 286 F.3d 834, 844 (6th Cir.2002), a case also involving a claim of deliberate indifference to a prisoner's psychiatric needs, the Sixth Circuit relied on *Waldrop* in reversing a grant of summary judgment:

> "The [*Waldrop* ] court stated that the relevant inquiry as to whether the defendants provided grossly inadequate care was 'whether a reasonable doctor ... could have concluded his actions were lawful.' *Id.* at 1034. In *Waldrop,* the court affirmed the denial of defendants' motion for summary judgment in a § 1983 action finding that a particularized, fact-specific inquiry was a necessity to the proper analysis of plaintiff's claim. Here, as in that case, the proper analysis of Terrance's claim requires a similar inquiry."

Having rejected defendants' argument that Lyles cannot satisfy the subjective component because his claim is based on a difference in medical judgment, the undersigned will further consider whether Lyles has satisfied the subjective component as to each individually sufficient to survive summary judgment. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

### 1.____–Dr. Papendick

The testimony of Dr. Oliver and of Dr. Papendick, viewed in the light most favorable to Lyles, supports a finding that Dr. Papendick "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 702. When Dr. Oliver submitted her first request for a colonoscopy on November 22,

2016, Dr. Papendick was informed that Lyles had five positive results on FOBT tests between November 8 and November 22.  (ECF No. 66-1, PageID.497).  He therefore knew that Lyles was bleeding, and that the bleeding occurred in the lower part of the colon.  He knew that an x-ray had revealed constipation "without evidence of obstructive process." (*Id.,* PageID.497, 501-502).  In denying Dr. Oliver's request on November 29, 2016 for a "colonoscopy to evaluate rectal bleeding, " he ordered an ATP to "clear constipation using Senna 8.6 mg" and to "re-evaluate at the time abdominal films demonstrate resolution of constipation." (*Id.*, PageID.498).

Dr. Oliver did just that.  (*Id.*, PageID.504-508).  X-rays taken on December 8, 2016 showed a normal abdomen, i.e., no constipation.  (*Id.*, PageID.509).  The radiologist's report was read by Dr. Mindlen and electronically signed by Dr. Henderson.  (*Id.*).  In her second request for an outside consult, dated December 22, 2016, Dr. Oliver informed Dr. Papendick of the radiology results.  (*Id.*, PageID.512).  An anoscopy showed normal results, and was negative for masses or ulcers in the lower part of the colon.  (*Id.*).  Lyles continued to experience rectal bleeding and lower left quadrant pain.  (*Id.*).  Although Lyles had an x-ray report showing that any constipation had cleared, Dr. Papendick denied the second request with the exact same ATP as his first denial: "Treat constipation, prove clearance with abdominal film." (*Id.*, PageID.513).  He testified that he denied the

second request because the first ATP (which directed clearing the constipation and confirming with x-rays) "wasn't completed the first time." (ECF No. 66-1, PageID.605). Dr. Papendick's testimony stands at odds not only with the medical records, but with Dr. Oliver's testimony that she completed the ATP and obtained an x-ray. (ECF No. 66-2, PageID.576).

In Dr. Oliver's third request for an outside consultation on January 11, 2017, Dr. Papendick was again advised of the x-ray showing that the constipation had cleared, as well as the positive FOBT results and the significant weight loss. (ECF No. 66-1, PageID.518). Yet he testified that he did not order a colonoscopy in January because he did not have the information to prove that the procedure could be done without a problem from the constipation. (ECF No. 66-3, PageID.601-604). His rationale for disregarding the December 8, 2016 x-ray was his speculation that the board certified radiologist who read it would not have been able to discern constipation from an x-ray. (*Id.*, PageID.604-605). Dr. Papendick testified that he himself had no board certifications. (*Id.*, PageID.598). Even assuming that the Court accepts Dr. Papendick's specious claim that he is free to disregard objective testing performed by other physicians and trained medical personnel, he provides no explanation for failing to request that the films be read by a radiologist in whom he had more confidence, given that he was already aware of Lyles' bleeding and other symptoms.

Dr. Papendick claims to have questioned the significance of Lyles having bright red blood in his stools on the basis that it was "a subjective observation." (*Id*., PageID.603).  He also testified that the five FOBT tests in November-that verified the presence of blood-were "subjective from a physician's standpoint." (*Id*.).  While laboratory test results would seem to be the epitome of objective findings, Dr. Papendick based his skepticism on not knowing whether the FOBT cards "were read by a M.D. or a nurse," and speculated that they may have been misread.  (*Id.*, PageID.603).  Yet his distrust of other medical professionals and skepticism of laboratory results was implausibly selective.  He had no difficulty accepting an earlier x-ray that showed constipation, or blood tests showing normal hemoglobin.

Viewed in the context of Dr. Papendick's testimony that after the constipation was cleared he would "probably do a colonoscopy," Dr. Oliver's testimony that she could not determine the cause of the rectal bleeding without a colonoscopy, and the medical evidence showing that Lyle's constipation had in fact cleared and his symptoms continued, a jury could find that instead of exercising sound medical judgment, Dr. Papendick was offering an after-the-fact rationalization for his pre-determined decision to simply deny appropriate diagnostic testing.  In other words, a jury could find deliberate indifference on these facts.

28

In addition, the Declaration of Dr. Choi creates disputed issues of material fact. Dr. Choi declared that after reviewing Lyles' medical file, he concluded that there was "no legitimate justification" for Dr. Papendick to deny three requests for a colonoscopy. (ECF No. 67-2, PageID.766-767). With regard to Dr. Papendick's testimony that Lyles' normal hemoglobin count and absence of anemia weighed into his decision to deny a colonoscopy, Dr. Choi stated that the fact that a patient is not anemic cannot be used to rule out most serious pathologies like cancer or colitis, and further stated, "Waiting for a patient with persistent rectal bleeding to become anemic before determining the etiology of the bleeding is irresponsible and needlessly exposes the patient to elevated medical risks." (*Id*., Page ID.767). To be "irresponsible" is not consistent with exercising informed medical judgment.

Dr. Choi states that "Dr. Papendick's testimony that a colonoscopy cannot be performed when a patient has constipation is false. In fact, persistent or severe constipation are indications **for** a colonoscopy." (*Id.*, PageID.770) (boldface and emphasis in original). In any event, Dr. Choi states that constipation can be cleared with laxatives before a colonoscopy. (*Id*.). Dr. Choi states that bleeding in the colon or rectum can indicate serious medical conditions, such as ulcerative colitis, and that "[b]leeding in the colon is normally not caused by constipation." (*Id.*, PageID.771). He states that the primary means of determining the cause of bright red blood or microscopic blood in the stool is colonoscopy. (*Id*.).

Dr. Choi also disputes the opinions of Dr. Papendick, Dr. Stoltz, and Dr. Duffy that the delay in diagnosing and treating Lyles' ulcerative colitis could not and did not result in any damages.  To the contrary, Dr. Choi states that the "failure to perform a colonoscopy, diagnose ulcerative colitis, and commence treatment between early November of 2016 and late June/early July of 2017 allowed the patient's ulcerative colitis to progress from mild to severe, resulting in progressive anemia, pyoderma gangrenosum, aphthous ulcers, and extreme weight loss, eventually necessitating a series of hospitalizations in late 2017." (*Id.*, PageID.772).

Summary judgment is inappropriate where there is conflicting expert testimony. "Indeed, competing expert opinions present the 'classic battle of experts' and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (citation omitted).[9]

---

[9] Defendants suggest that Dr. Choi's choice of words such as "should **[not must]** undergo a colonoscopy," or the "source of bleeding is *most likely* in the lower GI tract" shows that he is merely disagreeing with Dr. Papendick as opposed to affirmatively stating that Dr. Papendick did not exercise proper medical judgment.  (ECF No. 69, PageID.1148-1149).  However, this argument ignores Dr. Choi's statement that "there was no legitimate justification" for Dr. Papendick to deny three requests for a colonoscopy, or his statement that Dr. Papendick's testimony that a colonoscopy cannot be performed where constipation is present is "false."  Dr. Choi refers to Dr. Papendick's reliance on a normal hemoglobin count as "irresponsible," and states that the medications provided-Protonix and TUMS-

Because Lyles has put forth sufficient evidence from which a reasonable juror could conclude that Dr. Papendick violated his Eighth Amendment rights under both the objective and subjective prongs of a deliberate indifference claim, summary judgment should be DENIED.

2.____–Dr. Oliver

Dr. Oliver presents a closer question.  The claim against Dr. Oliver is based on her alleged delay in making a fourth request for a colonoscopy between mid-January and April of 2017.  Dr. Oliver argues that during that time she provided appropriate medical care and that Lyles' condition showed periodic improvement.

Again, under the subjective component of a deliberate indifference claim, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 702.

---

an appropriate treatment for lower GI bleeding, and that neither medication has any effect on a patient's lower GI symptoms.  Further, Dr. Choi clearly states that the delays in diagnosis and treatment allowed the ulcerative colitis to progress from mild to severe, resulting in identified medical harms.  Dr. Choi's Declaration, read in its entirety, contradicts Dr. Papendick and his experts, and supports Lyles' claim of deliberate indifference.  If defendants draw a different inference, their argument is more properly made to a jury.

As early as November of 2016, Dr. Oliver perceived that Lyles had unexplained rectal bleeding, and based on positive FOBT results and a normal anoscopy, she requested a referral for a colonoscopy on November 22.  Her actions were actually consistent with what Dr. Choi said should be done where there is rectal bleeding.  When the request was denied, she followed Dr. Papendick's ATP, cleared the constipation, and obtained x-ray confirmation that there was no constipation.  When that request was denied, she made a third request in January of 2017, which was also denied.  She had ruled out conditions relating to the stomach or esophagus, as well as hemorrhoids or tears in the rectum, and knew that Lyles' symptoms could indicate serious problems such as diverticulitis and cancer.  (ECF No. 66-2, PageID.572-573).  Her repeated but unsuccessful requests for an outside referral show that Dr. Oliver drew the inference that Lyles faced a substantial risk if his condition was not properly diagnosed with a colonoscopy, and that she did not disregard that risk.  The question is whether she disregarded the risk between January and April of 2017.

Dr. Papendick's denial of the second and third requests did not make a lot of sense.  In denying Dr. Oliver's first request on November 23, 2016, Dr. Papendick ordered that constipation be cleared, with verification by an abdominal x-ray.  Yet even though Dr. Oliver complied with this ATP and included objective clinical evidence that Lyles' constipation was cleared, Dr. Papendick denied her second

request for the same reasons, directing that she treat the constipation and prove

clearance with an x-ray.  Dr. Oliver testified that she did not agree with this second

ATP because she felt the constipation had already been successfully treated.  (*Id*.,

PageID.566).  Dr. Papendick denied Dr. Oliver's third request in January of 2017,

even though he was again informed that the constipation had cleared and that Lyles

had an additional three positive FOBT results after that.  (*Id*., PageID.516).  He

directed that the request could be resubmitted "when symptoms demonstrate

medical necessity."  (*Id*., PageID.577).

Unfortunately, Dr. Oliver could not appeal Dr. Papendick's decisions under

the protocols in effect at the time.  Although she believed at that point that medical

necessity *had* been shown, to simply resubmit the request would have been an

exercise in futility.  She concluded that she would have to show Dr. Papendick that

Lyles' "continued to have symptoms or the symptoms were worsening."  (*Id*.).

Dr. Oliver testified that after January, Lyles' symptoms "waxed and waned,"

with times he improved and times he deteriorated.  (*Id*., PageID.580).  There were

negative FOBT results between January 19 and February 17, 2017, and a positive

FOBT and BRBPR on March 10, 2017.  (*Id.*, PageID.523-525, 528).  He also had

positive FOBT results on March 30, 31, and April 1.  (*Id.*, PageID.531).  Dr. Oliver

testified that she submitted her fourth request for a colonoscopy after seeing that

Lyles' symptoms had improved and then deteriorated again.  (*Id*., PageID.580).

Dr. Oliver was in an untenable position in that although she understood the necessity of diagnosing the cause of Lyles' bleeding in November of 2016, as well as in January through April of 2017, she was powerless to order a colonoscopy without Dr. Papendick's approval.  And although she repeatedly submitted sufficient clinical information to support her requests, Dr. Papendick continued to find "no medical necessity" for the procedure.  It would have been reasonable for her to assume that the few negative FOBTs in January and February - while not negating or diminishing the need to determine the still unknown cause of months of symptomology - would be insufficient to sway Dr. Papendick.  Given her continuous and aggressive determination to obtain a diagnosis through a colonoscopy, it cannot be said that she deliberately disregarded the risk to Lyles. Dr. Choi in fact agreed with her initial treatment recommendations and her recommendation for a colonoscopy.  During the time period in question for Dr. Oliver, she provided all of the treatment available under the circumstances created by Dr. Papendick's directive.  More to the point - Dr. Oliver cannot be held vicariously liable for Dr. Papendick's deficiencies. *See Yowell v. Booker*, No. 13-10029, 2014 WL 1096398, at *9 (E.D. Mich. Mar. 19, 2014)(Cox, C.J.) (Defendant entitled to summary judgment where she had arranged appropriate "screening and biopsy" and "any follow-up treatment for plaintiff's cancer was outside of [her] control"); *see also Burton v. Michigan Dep't of Corr.*, No.

34

1:20-CV-858, 2020 WL 7041071, at *9 (W.D. Mich. Dec. 1, 2020) (No deliberate indifference where the defendant "lacked [the] authority" to "change [plaintiff's] medical detail").

Overall, the record fails to show a genuine issue of material fact as to whether Dr. Oliver's actions amounted to deliberate indifference to Lyles' Eighth Amendment rights.  For these reasons, the motion for summary judgment should be GRANTED as to Dr. Oliver.

## V.    Conclusion

For these reasons, the undersigned RECOMMENDS that defendants' motion for summary judgment be GRANTED IN PART AND DENIED IN PART. Summary judgment should be GRANTED as to Dr. Oliver.  Summary judgment should be DENIED as to Dr. Papendick.


Dated: March 4, 2022                           s/Kimberly G. Altman
Detroit, Michigan                              KIMBERLY G. ALTMAN
                                               United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and
Recommendation.  Any objections must be filed within 14 days of service, as
provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).
Failure to file specific objections constitutes a waiver of any further right of
appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &
Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some
issues but fail to raise others with specificity will not preserve all the objections a
party might have to this Report and Recommendation. *Willis v. Sec'y of Health &
Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of
Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule
72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.
2," etc.  Any objection must recite precisely the provision of this Report and
Recommendation to which it pertains.  Not later than 14 days after service of an
objection, the opposing party may file a concise response proportionate to the
objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR
72.1(d).  The response must specifically address each issue raised in the objections,
in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 4, 2022.

<u>s/L. Hosking</u>
Case Manager on behalf of C. Ciesla
